ORIGINAL

Name and Address of Pro Se Plaintiffs:

Michael J. Flynn
PO Box 690
Rancho Santa Fe CA, 92067
Tel: 858 775 7624
Email: mike@mjfesq.com

William Sheridan
15 Broad Street, Suite 800
Boston, MA  02109
Tel: 617 720 2700
Email: was@wsheridanlaw.com

Michael Tabb
1 Liberty Square, Suite 1200
Boston, MA  02109
Tel:  617 261 0040
Email: matabb@greenellp.com

Philip Stillman
3015 North Bay Road, Suite B
Miami Beach, FL  33140
Tel: 786 529 2123
Email: pstillman@stillmanassociates.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

MICHAEL J. FLYNN, WILLIAM
SHERIDAN, MICHAEL TABB and PHILIP
STILLMAN

            Plaintiffs,

    vs.

JACQUELINE LOVE

            Defendants

Case No.:        **3:19-cv-00239**

**COMPLAINT**

{00046690 }
                              - 1 -
                          Complaint

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS**

1.      This is an action premised on the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332.  The Plaintiffs are citizens and domiciliaries of the States of California, Massachusetts and Florida.  The Defendant is a citizen and domiciliary of the State of Nevada.  Plaintiffs seek amounts lawfully owing to them in excess of $1 million, which exceeds the jurisdictional amount.

2.      Plaintiff Michael J. Flynn ("Flynn") is an individual who resides in Rancho Santa Fe, San Diego County, CA.   Flynn is an attorney licensed to practice in the Commonwealth of Massachusetts.  Flynn was a partner in the law firms, Flynn Sheridan & Tabb and Flynn Sheridan Tabb & Stillman.

3.      Plaintiff William Sheridan ("Sheridan") is an individual who resides in Marblehead, Essex County, MA.  Sheridan is an attorney licensed to practice in the Commonwealth of Massachusetts.  Sheridan was a partner in the law firms, Flynn Sheridan & Tabb and Flynn Sheridan Tabb & Stillman.

4.      Plaintiff Michael Tabb ("Tabb") is an individual who resides in Newton, Middlesex County, MA.  Tabb is an attorney licensed to practice in the Commonwealth of Massachusetts.  Tabb was a partner in the law firms, Flynn Sheridan & Tabb and Flynn Sheridan Tabb & Stillman.

5.      Plaintiff Philip Stillman ("Stillman") is an individual who resides in Miami Beach, FL.  Stillman is an attorney licensed to practice law in the Commonwealth of Massachusetts and the State of California.   Stillman was a partner in the law firm Flynn Sheridan Tabb & Stillman.

6.      Defendant Jacqueline Love ("Jackie Love") is an individual who is domiciled in Incline Village, Nevada.  Jackie Love is married to Michael E. Love, lead singer of the rock band, The Beach Boys. Claims involving the facts recited herein have been submitted to non-binding arbitration.  In the event the arbitration fails under

1  California Business and Professions Code 6200 – 6206, Michael E. Love and likely
2  others will be joined in this law suit.

3        7.     DOES 1 through 100 are participants in the torts and claims recited herein.
4  Their identity and specific acts are unknown at this time. They will be added as
5  defendants as the case progresses

6        8.     During the 1960s, Love, in addition to being the lead singer for the Beach
7  Boys, also co-wrote songs with Brian Wilson, his cousin and fellow Beach Boy band
8  member. On some of the songs, Love was credited as a co-writer. On 35 songs which
9  he co-wrote with Wilson, Love was not credited as a song author (the "35 Songs").
10  Love only received songwriting royalties on those songs for which he was a credited co-
11  author. Some of the Beach Boys' most popular songs, however, were songs where Love
12  had never been credited, including "California Girls," "I Get Around," "Wouldn't It Be
13  Nice" and "Help Me, Ronda." As of 1992, the failure to credit Love as a song writer on
14  the 35 Songs had cost him millions of dollars and would have cost him many times that
15  amount in the future, but for the work of plaintiffs.

16        9.     The copyrights to most of the Beach Boys songs Wilson and Love had
17  written in 1960s, including the 35 Songs, were originally held by an entity known as Sea
18  of Tunes. Wilson and Love both thought they had ownership interests in Sea of Tunes,
19  and/or in the copyrights held by Sea of Tunes. They did not. Sea of Tunes was wholly
20  owned by Wilson's father (and Love's uncle) Murray Wilson, who had surreptitiously
21  transferred the copyrights to his own private entity without compensating Wilson, Love
22  or any of the Beach Boys for the transfers. He did so with the knowledge and assistance
23  of the Beach Boys' lawyer, Abraham Somer, although Somer never informed his clients
24  of the transfers or their significance.

25        10.    In August, 1969, Murray Wilson sold the Sea of Tunes catalog to
26  Almo/Irving Music, a music publisher affiliated with the owners of A&M records. The
27  purchaser was also a client of Abraham Somer, who was also on its Board of Directors,
28  although this information was not disclosed to Wilson, Love or any of the other Beach

Boys. Somer's undisclosed conflicts of interest was allegedly not learned by Love and Jackie Love until the plaintiffs undertook an investigation in early 1992 on their behalf.

11. Love and Wilson, once they learned of the proposed transfer of the copyrights in the summer of 1969, opposed it. They sought advice from Somer on how to stop the sale. Somer not only failed to inform his clients of his involvement in the transaction on behalf of Almo /Irving Music and Murry Wilson, , he falsely informed Love and Wilson that there was nothing that could be done. He, in fact, advised Love and Wilson to sign a letter required by the purchaser that confirmed that the individual Beach Boys had no interests in copyrights that were being transferred. Relying on the advice they received from Somer, Wilson and Love signed the letter. The transfer of the Sea of Tunes catalog went forward. Murray Wilson received all of the consideration, believed to be $700,000 – a fraction of their real value - and no money was paid to the authors of the songs that had been sold. Murry died a few years later.

12. Even after the sale of the Sea of Tunes catalog, Wilson and Love continued to receive songwriter royalties on those songs on which they were credited authors. This meant that on the 35 Songs, Wilson continued to receive all of the royalties that should have been split between Love and Wilson.

13. In the summer of 1989, counsel retained by Wilson informed Love and the other Beach Boys that Wilson was going to try to void the Sea of Tunes transfer on the ground that Wilson was not mentally competent to assent to the transaction in 1969. Wilson's counsel sought each of the Beach Boys' assistance. When Love informed them that Wilson had been receiving royalties for years for songs that should have been credited to Love as well as Wilson, Wilson and his representatives told Love that they intended to retrieve the copyrights for all of the songwriters' benefits, and once the copyrights had been recovered, they would account to Love for all of the royalties for which he was owed, as well as give him full credit on all of the co-written songs. Love agreed to assist Wilson's efforts to recover the copyrights.

14.     Wilson's lawyers did not inform Love that there was a second ground for voiding the Sea of Tunes transfer: the transaction was tainted by Somer's breach of fiduciary duty and his conflicts of interest. Had Love known of this basis, which provided Love with standing to void the transaction as well as Wilson, Love could have joined Wilson's suit or filed his own action to recover his copyrights. Wilson's lawyers in 1989, Tierney and Little, actively concealed the Somer conflict of interest from Love during Wilson's suit against Somer and Almo / Irving. Issues exist as to disclosure by Wilson's prior lawyers during the 1980 s.

15.     After several years of litigation, Wilson settled his claims for $10 million, but did not recover the copyrights. Wilson refused to attribute any of the recovery to Love, in violation of his earlier commitment, and also refused to honor his commitment to give Love credit on any of the 35 Songs. At that point, Love sought litigation counsel to determine if he had any rights to recover any of his copyrights transferred in the Sea of Tunes sale and to determine what rights he had in order to obtain credit and to obtain unpaid royalties for the 35 Songs.

16.     In November, 1991, Love and Jackie Love met with Flynn, who then agreed to investigate the matter. Flynn soon discovered from the pleadings and docket entries in Wilson's case that Wilson's and his lawyers' primary basis for defeating the obvious statutes of limitations defenses in his case was not the alleged incompetency but actually Somer's undisclosed conflicts of interest.

17.     Love and Jackie Love repeatedly represented to Flynn and Stillman between January and July, 1992 while plaintiff's were investigating the matter that they had no knowledge whatsoever of the Somer conflicts until Flynn disclosed it to them in early 1992. They claimed that their own transactional lawyer, Robert Kory, apparently did not know about the Somer conflicts throughout the 3 year Wilson case, nor discuss or disclose it to them. They represented that none of the other Beach Boys or their lawyers ever disclosed it to them at any time between 1969 and their meetings with Flynn and Stillman.

1    18.    In July 1992, after consulting with several lawyers, Love retained Flynn

2  Sheridan & Tabb, a law firm with offices in Boston, Massachusetts and Rancho Santa Fe,

3  California to represent him with regard to his claims against Wilson, Almo/Irving (and

4  affiliated entities) Abraham Somer (and his law firm Mitchell, Silberberg & Knupp) and

5  others with regard to Love's "co-authorship of Beach Boys songs and the sale of the 'Sea

6  of Tunes' catalog to Irving Music Co; and also arising out of the conduct,

7  representations, writings and statements of Brian Wilson."

8    19.    Flynn Sheridan & Tabb was a law partnership with Flynn, Sheridan and

9  Tabb as the partners. Stillman, at the time of Love's retention, was an associate with the

10  firm. However, by the conclusion of the matter Stillman had become a partner and the

11  name of the firm had changed to Flynn Sheridan Tabb & Stillman. Both Flynn Sheridan

12  & Tabb and Flynn Sheridan Tabb & Stillman shall be referred to as the "Partnership."

13    20.    Love retained the Partnership on a contingency fee basis. Pursuant to a

14  written contract dated July 27, 1992 (the "Fee Agreement"), a copy of which is attached

15  as Exhibit 1, the Partnership's contingency fee would be decided on a sliding scale basis

16  depending when in the course of the litigation the case settled and the amount of the

17  recovery. If there were recoveries after the filing of a lawsuit, the percentage for

18  calculating the contingency fee could be as low as 20%, but could be as high as 25%.

19    21.    The Partnership and Love recognized that Love was seeking rights to

20  future income and that it was possible that Love would recover royalty rights that

21  would be paid him well into the future. Accordingly, the Fee Agreement provided that

22  in addition to any cash recovery Love received in the litigation, the Partnership's

23  contingency fee percentage would be paid on

24        the present value of the amount of payments expected to be received from each
          responsible party in the future in excess of the present value of amounts
25        currently expected to be paid. (It being the intention of the foregoing clause to
          include within the definition of "recovery" the present value of any increased
26        future royalties or license fees to be paid to Client as a result of the Attorneys'
27        representation of Client and pursuance of the Client's claim).

28

{00046690 }                                    - 6 -
                                            Complaint

22.     Love agreed to be responsible for all expenses incurred in the litigation and to pay them on a current basis. Love was required to provide a $25,000 retainer from which the Partnership could pay costs and out-of-pocket disbursements the Partnership made on Love's behalf. Love agreed to "deposit additional funds into the account to maintain the retainer balance at $25,000 when the account value decreases to below $7,000 at the end of any billing cycle."

23.     At all times the Partnership represented Love, Love retained other attorneys, unrelated to the Partnership, to advise him on business and music industry matters. Independent counsel for Love reviewed and approved the Fee Agreement before Love executed it.

24.     Love and Flynn, on behalf of the Partnership, executed the Fee Agreement and the requisite copies were provided to the client. The Fee Agreement was a valid binding agreement between Love and the Partnership.

25.     Shortly after the Fee Agreement was executed, the Partnership in August 1992 filed complaints on Love's behalf in California Superior Court and the United States District Court for the Central District of California. The defendants in these actions were Almo/Irving and related entities, Mitchell Silberberg & Knupp and Wilson.

26.     The ensuing litigation was heated, complex, involved extensive and vigorous discovery, and was extremely contentious. The subject matter was complex because the central transactions had occurred decades ago, making the compiling of the requisite evidence extremely difficult. The legal issues were complicated, particularly given that very serious issues existed regarding the statute of limitations and whether the limitations period had been tolled by fraudulent concealment. Extensive motion practice ensued, and the Partnership repeatedly had to fend off dispositive motions filed by the defendants. Dozens of depositions were taken and the deposition of Wilson alone took 17 days because his claimed mental disability only allowed him to be

1 | deposed for several hours per day while counsel lived in hotel rooms for months at a
2 | time.

3 |    27. Not long after the Fee Agreement was executed, Love breached it.  Love
4 | lived a life style consistent with rock star status, but without the matching income.  He
5 | had numerous homes, ex-wives, employees and hangers-on and substantial financial
6 | obligations and outside interests.   Consequently he did not honor his obligation to fund
7 | the expense retainer, causing the Partnership to pay the costs of the litigation on its
8 | own.  This was a hardship for the Partnership because Flynn and Stillman devoted
9 | almost all of their professional time to the Love's litigation for about 3 years, and were
10 | not bringing any income into the Partnership.

11 |    28. In September 1993, all defendants in the litigation other than Wilson
12 | agreed to settle with Love for $1.5 million.  Love informed the Partnership that he
13 | required as much of the settlement proceeds as he could get and that he no longer
14 | wanted to fund the expenses for the remaining claims against Wilson.  (In fact, he had
15 | not funded the expenses for the litigation for much of the prior year.)  As an
16 | accommodation to Love, the Partnership and Love novated the Fee Agreement, and
17 | agreed that the contingency percentage for any future recoveries (regardless of when
18 | the recovery occurred or its amount) would be 30%.  No new contingency interests in
19 | claims held by Love were granted to the Partnership and the parties expressly affirmed
20 | the Partnership's right to a 30% fee on the present value of any royalty or other
21 | payment rights Love might subsequently receive.  A memorandum prepared at the time
22 | the parties agreed to the novation stated that "In sum, [the Partnership] now own[s]
23 | 30% of whatever you own in the songs, the rightsd (sic), the royalties, etc."

24 |    29. Prior to agreeing to the novation, the terms of the novation were reviewed
25 | by Love's financial advisor and approved by independent transactional counsel  Love
26 | and the Partnership signed all documentation necessary to effectuate and make binding
27 | the 1993 Novation, although in the 25 years since the 1993 Novation was agreed to,
28 | some of the documentation has not been able to be located.

30.     Subsequent to the September 1993 settlement, litigation against Wilson continued, which was particularly combative. A special Master was appointed to conduct discovery. Flynn and Stillman continued to devote almost all of their professional time to the case, which after the settlement, did not generate any income but incurred sizable expenditures. Flynn, the Partnership's principal trial attorney, was supposed to try cases in the Partnership's Boston office, but was unable to devote any time to Boston matters. Instead, income from the Boston office was used to fund the operations of the firm's California office. When those funds ran out, the partners were required to put additional capital into the Partnership. Tens of thousands of dollars for out of pocket expenses and litigation costs were advanced by the Partnership for the Love litigation. By the time the trial concluded, the Partnership was close to insolvency, having difficulty paying its bills in the ordinary course as they became due.

31.     Trial against Wilson was supposed to commence in September 1994, but before a jury was impaneled, the United State District Court required an evidentiary hearing relating to the statute of limitations defenses. Both Love and his lawyer, Kory, affirmed their testimony that they had no knowledge of the Somer conflict until the plaintiffs began their investigation in early 1992. The Court heard almost a month of testimony before it decided that Love could present his claims to a jury. The Court however, bi-furcated the trial, only permitting evidence relating to liability in the first phase. The liability phase of the jury trial took another two months. At the end of the liability phase, the Court required the jury to complete a 25 page special verdict form, which among other things, required the jury to explicitly determine whether Love was a co-author of each of the 35 Songs and whether Wilson and his father had defrauded Love in connection with his rights in the compositions. The Verdict is attached hereto as Exhibit 2.

32.     After more than two weeks of deliberations, the jury returned its special verdict, answering just about every question in Love's favor, including that he was the co-author of each of the 35 Songs and had been deprived by Wilson of his royalties in

all of those songs by fraud.  The verdict was returned in the middle of December, 1994 and the Court intended to try the damages phase of the trial in January 1995.  At the damages phase of the trial, expert evidence would establish that the present value of Love's share of expected future royalties on the 35 Songs was in excess of $50,000,000.

33.     After the liability verdict, Wilson made a settlement proposal to Love which was comprised of cash, assignments of valuable causes of action held by Wilson and providing full co-authorship credit (and corresponding future royalties) to each of the 35 Songs.  After conferring with his financial advisor and independent transactional counsel, as well as the Partnership, Love accepted Wilson's settlement offer.

34.     Upon Love's acceptance of Wilson's offer, the Partnership's duties under the Fee Agreement and the 1993 Novation were completed and the Partnership had fully performed its obligations under those contracts.  Further, the Partnership's right to payment was no longer contingent.  Love had an unconditional obligation to pay the Partnership its share of the recovery.

35.     Love, however, was unable to meet his performance obligations under the Fee Agreement and the 1993 Novation.  The fee Love owed to the Partnership in connection with the rights to the 35 Songs he obtained in the settlement was in excess of $15,000,000.  There was insufficient cash in the settlement to pay this amount and Love did not have sufficient funds to pay the balance.

36.     Love's accountant and financial advisor, George Ashley, suggested that in lieu of Love paying the Partnership a fee based on the present value of the royalties Love would be receiving, the Partnership could be paid 30% of the royalty stream as it was paid to Love.  Love asked the Partnership to agree to this modification of the payment terms.

37.     As an accommodation to Love, the Partnership and Love agreed to a second novation.  On December 19, 1994, Love signed a memorandum agreeing that with regard to the fee he owed the Partnership in connection with the rights he was receiving to the 35 Songs, Love would "pay us (the Partnership) from the royalty stream

1   for these songs and whatever rights you own in the songs, past, present and future, 30%
2   of those bundle of rights and monies belong to us." Love signed the memorandum
3   after receiving advice from independent transactional counsel and from his accountant
4   and financial advisor.

5       38.    The December 1994 Novation agreement is a binding and valid agreement
6   between Love and the Partnership. A copy of the December 1994 Novation is attached
7   as Exhibit 3.

8       39.    Love has admitted that the value of the services he received from the
9   Partnership in connection with the Wilson litigation far exceeded the fees he paid to the
10  Partnership, including all fees he has paid pursuant to the 1994 Novation. In his
11  autobiography, published in 2016 (only a few months before the dispute between Love
12  and Plaintiffs arose) Love observed that had he not settled and allowed damages
13  portion of the trial to go forward, he would have recovered far more money from
14  Wilson — between $58 million and $342 million. Love, however, decided that he did not
15  want to financially crush his cousin, and agreed to a settlement where he only received
16  "a fraction of what I could have collected." Love conceded that by doing so **"I cost
17  Mike Flynn millions of dollars in contingency fees, every penny of which he
18  earned."**

19      40.    Pursuant to the 1994 Novation, for 22 years the Partnership (and after the
20  dissolution of the Partnership, the Plaintiffs) received regular payments from Love's
21  accountants based on Love's receipt of royalties on the 35 Songs. Love's accountants,
22  under Love and Jackie Love's direction and control, periodically sent the Partnership or
23  Flynn statements that identified the royalties Love received on the 35 Songs, tabulated
24  the total received on those songs and then calculated the Partnership's share, which was
25  30% of the total received on the 35 Songs. Each statement would include a check from
26  Love for the amount owed pursuant to the 1994 Novation. Between 1995 and May 2017,
27  the Partnership or Flynn generally received five to eight such statements and payments

28

per year. During these 22 years, the Plaintiffs received approximately $2.7 million in royalties, far less than the $15 million present value they were entitled to receive at the time of the settlement.

41.     From at least the time of the first meeting with Flynn in November, 1991 Love delegated to his wife, Jackie Love, the full responsibility for producing all documents requested by the plaintiffs, all documents requested by the defendants – the same responsibility she had in the Wilson case - and overseeing the receipt of royalties and coordinating with Love's accounting firm, Ashley Quinn (formerly Ashley Quinn Nelson). Love also gave Jackie Love the responsibility to negotiate licensing deals and other agreements relating to Love's receipt of royalties on the 35 Songs.

42.     At all times, Jackie Love was aware of the Partnership's right to receive 30% of all income Love received in connection with the 35 Songs.  Between January, 1992 and August, 1992, during the plaintiffs' investigation into this matter, particularly the statute of limitations issues, Jackie Love was responsible for producing all documents from the Love archives, responding to questions and the primary agent of Love as the plaintiffs investigated and prepared the case. At times she actively interfered with Plaintiffs' rights after they won the case. At times, Jackie Love instructed Ashley Quinn to not make timely payments of the Partnership's share of royalty income because she diverted the money owed to the Plaintiffs to pay for Love's and her personal expenses.   She did not inform the Plaintiffs that she had delayed payments until after the fact.  When such diversions occurred, Love told Flynn that the money owed to the Plaintiffs would be paid in full in the future, and the Plaintiffs were given the impression by Love, Jackie Love and their accountants that all money owed to the Plaintiffs was ultimately paid to them.

43.     In 1999, Flynn, Sheridan, Tabb and Stillman elected to voluntarily dissolve the Partnership.   Any remaining assets of the Partnership were distributed to the individual partners.  Flynn, Sheridan, Tabb and Stillman agreed that the Partnership's

1 rights to receive royalties and other fees from Love pursuant to the 1994 Novation
2 would be divided with Flynn to receive 40%, Sheridan to receive 20%, Tabb to receive
3 20% and Stillman to receive 20%. The dissolution of the Partnership did not affect
4 Love's obligations under the 1994 Novation, and in fact regular statements and
5 payments were received after the dissolution in the same way they had been received
6 while the Partnership still existed.

7     44.     Under the Copyright Act, authors of works that were published prior to
8 1978 have the right to terminate any transfers of copyrights in works they created 56
9 years after the original transfer. On works such as the 35 Songs, which remain popular
10 more than half a century after they were created, these reversion rights are extremely
11 valuable, as they allow the author to once again transfer the publishing rights for the
12 compositions at current market rates. Love only acquired the reversion rights as a
13 result of his being recognized as the author of the 35 Songs, a right he acquired through
14 the Wilson settlement and the litigation prosecuted by the Partnership. Consequently,
15 any income Love received in connection with his exploitation of the reversion rights on
16 the 35 Songs is income that was required to be accounted for under the 1994 Novation,
17 the 1993 Novation and the original Fee Agreement, and the Plaintiffs were entitled to
18 receive their share of such funds.

19     45.     In early 2017, several months went by without the Plaintiffs receiving a
20 royalty statement and check from Ashley Quinn. When payments resumed, the
21 royalties received from one of the usual payees, Broadcast Music, Inc. ("BMI"), was
22 substantially lower than usual. Between March and May, 2017, Love called Flynn on
23 numerous occasions, stating he needed to conceal the calls from Jackie Love. Love told
24 Flynn in these calls that he intended to divorce Jackie Love, that she had secretly
25 switched from BMI to ASCAP and received a million dollar advance on a 3 million
26 dollar contract to administer Love's mechanical royalties, without informing or paying
27 the Plaintiffs. Love told Flynn that Jackie Love was now claiming "community
28 property" rights in the 35 Songs and for the first time in 23 years was intending to

Complaint

challenge the July 27, 1992 contract; and had instructed Ashley Quinn to not pay the Plaintiffs their share of royalties collected by ASCAP.  Indeed, when Love switched his account from BMI to ASCAP, the million dollar advance from ASCAP was to be recouped against future payments ASCAP owed to Love.  Love did not disclose the advance from ASCAP to the Plaintiffs until May, 2017, nor pay Plaintiffs their share of the proceeds. Moreover, because no income was being paid to Love on the royalties that were being recouped, Love and Jackie Love were not paying to Plaintiffs any amounts for the mechanical royalties that ASCAP had actually collected on Love's behalf but which it applied to the advance.

46.     Between March and June, 2017, Love made additional statements to Flynn regarding the conduct of Jackie Love over many years, statements that she had made to third parties; and  that she was attempting to secretly sell the songwriting royalty rights to the 35 songs wherein she would personally receive a $2.5 million dollar "administrative fee" for illegally and covertly arranging a sale of the songwriter royalties so that their copyright reversion rights would revert to the buyers of the songwriter royalties – an illegal transaction under the copyright laws. Flynn explained to Love at that time,  orally and in writing, that Plaintiffs owned 30% of all of the rights in the songs which Jackie Love was attempting to defraud them out of, including all copyright reversion rights.  Love agreed in May – June, 2017, as he had done over the past 23 years,  that without Plaintiffs he would never have recovered his songwriter or copyright rights, an admission he also made in his 2016 autobiography; and that Jackie Love's new found "community property" claims if he divorced her involved other credibility issues involving her past.

47.     In at least June, 2017, Jackie Love retained Vince Chieffo, formerly the attorney for fellow Beach Boys' band member Alan Jardine, to represent both Love and herself in disavowing the July 27, 1994 contract.  Chieffo had represented Jardine during the Wilson v Irving case, and also during the Love v Wilson case.

Complaint

48.     Statements Love made in his 2016 autobiography also suggested that Plaintiffs were not receiving their full share of royalties.  In the book, Love states that before the settlement, Love only received approximately $75,000 a year for songwriter royalties.  These were royalties on the songs for which he was a credited co-author with Wilson or third parties.  After the settlement, as a result of the rights he obtained in the 35 Songs, Love wrote that he was receiving more than $1 million a year in songwriting royalties.  This was an increase of more than $900,000 due to the royalties on the 35 Songs.

49.     However, if Love was receiving $900,000 in royalties from the 35 Songs, he was supposed to pay the Plaintiffs at least $270,000.  Yet the most the Plaintiffs ever received from Love in a year was approximately $200,000 and the average amount they received annually was $125,000.

50.     Also in the  March - June, 2017, discussions, when Flynn learned from Love that Jackie Love was entering into negotiations to sell Love's songwriter royalties as part of a "deal" to finesse the copyright reversions on the 35 Songs to the buyer, Love stated to Flynn that in her negotiations, Jackie Love had  informed potential purchasers that no one other than Love had any interest in Love's rights to the 35 Songs or the royalties or payments generated by the 35 Songs, intentionally interfering with Plaintiffs' rights to receive 30% of all income Love received in connection with those Songs.

51.     Flynn informed Love that the reversion rights were subject to the 1994 Novation and that if Love made a deal in connection with those rights, Plaintiffs would be entitled to 30% of the consideration paid on account of the 35 Songs.  Love told Flynn that Jackie Love disagreed that the Plaintiffs had any rights to any funds paid on account of the reversion rights and that she would not agree to pay the Plaintiffs in connection with any agreement Love entered into, but was claiming community property rights in the 35 Songs.

52.     On May 9, 2017 Ashley Quinn sent the Plaintiffs a statement for royalties Love had received in recent months from BMI and ASCAP and paid the Plaintiffs 30% of the royalties Love had received on account of the 35 Songs.   The May 9, 2017 Statement was the last statement and last royalty payment the Plaintiffs have received.

53.     Thereafter, the Plaintiffs received a letter from Chieffo purporting to represent both Mike Love and Jackie Love retained by Love, informing the Plaintiffs that it was Love's position that he was not bound by the July 27, 1992 Fee Agreement, the 1993 Novation or the 1994 Novation, and that Love did not intend to make any additional payments in connection with services the Partnership had provided to Love in the Wilson litigation.

COUNT ONE

Breach of Contract (Against Jackie Love as agent of Michael Love)

54.     Plaintiffs repeat and reallege the allegations set forth in paragraph 1 – 53 above.

55.     The Fee Agreement, the 1993 Novation and the 1994 Novation were valid contracts which obligated Michael Love to pay the Partnership (or the Plaintiffs as the Partnership's successors) either a fee based on the present value of the rights relating to the 35 Songs that Love received in the Wilson settlement, or to pay to the Partnership (or the Plaintiffs as the Partnership's successors) 30% of all income Love received on account of the 35 Songs.   At all times over the past 22 years from July 27, 1992 until at least June, 2017, Jackie Love was obligated to fulfill her obligations as Love's agent under the contract.  She breached in the facts recited herein.

56.     Love is in breach of his obligations under these agreements.

57.     Plaintiffs, all of whom were partners in the Partnership, have the right to enforce Love's contractual obligations to the Partnership against Jackie Love.

COUNT TWO

Accounting (Against Jackie Love)

58.     Plaintiffs repeat and reallege the allegations set forth in paragraph 1 – 57 above.

59.     Love was required to account to the Partnership and the Plaintiffs for all royalties and other income he received on account of the 35 Songs.  Between 1995 and 2017 Love provided such accountings on a regular basis. Jackie Love was completely in control of all aspects of payment and accounting as alleged herein.

60.     Facts learned by the Plaintiffs in 2017, in addition to statements made by Love in his autobiography, suggest that the accountings made by Jackie Love were incomplete or inaccurate.  Since May 9, 2017 Jackie Love has failed to make any accounting at all to the Plaintiffs.

61.     Wherefore, Plaintiffs are entitled to a complete and accurate accounting of all payments Love has received on account of his interests in the 35 Songs, and to be paid in accordance with said accounting.

COUNT THREE

Quantum Meruit (Against Jackie Love)

62.     Plaintiffs repeat and reallege the allegations set forth in paragraph 1 – 61 above.

63.     Alternatively, in the event that neither the Fee Agreement, nor the 1993 Novation, nor the 1994 Novation are binding and valid contracts between the Partnership and Love, the Plaintiffs and the Partnership performed legal services for Love in connection with the Wilson litigation with the understanding and expectation that they would be paid for such services. Jackie Love is now claiming a 50% community property interest in the 35 songs in derogation of Plaintiffs' rights.  At all times material to these matters, Jackie Love approved, participated in, controlled all document discovery, and knew, and accepted the services of Plaintiff in order to obtain her claimed interests

64.    As a result of such services, Love successfully litigated against Wilson and recovered important rights in the 35 Songs which he would not have received but for the legal services provided by the Plaintiffs and the Partnership.  Plaintiffs delivered services of a high quality in extremely difficult litigation and produced results few, if any, lawyers and law firms would be able to match.  Further, Plaintiffs and the Partnership provided such services in a difficult environment, and were hampered in their efforts by a client who breached his promises to fund the expenses for the litigation because payment of such expenses might have curtailed the client's extravagant life style.

65.    Plaintiffs are entitled to be compensated for the fair value of the extraordinary services they provided.

66.    Love has already admitted that the fair value of the services Plaintiffs provided were millions of dollars more than what Love has paid them, which includes the royalty payments Love made throughout the past 24 years.  Plaintiffs should be paid what Love has publicly stated they were entitled to receive by Jackie Love, his agent, wife, and beneficiary of Plaintiffs' work.

COUNT FOUR

Intentional Interference with Contractual Relations (Against Jackie Love)

67.    Plaintiffs repeat and reallege the allegations set forth in paragraph 1 – 66 above.

68.    At all times, Jackie Love was aware of the Plaintiffs rights to receive 30% of all income paid to Love on account of his interest in the 35 Songs.

69.    Knowing of these rights, Jackie Love has entered licensing deals and other business contracts relating to Love's rights to the 35 Songs with the intention of not paying the Plaintiffs their share of income derived from the 35 Songs.  Jackie Love has deliberately instructed Ashley Quinn not to make payments of royalties to the Plaintiffs

1 which were otherwise due to them in order to divert funds that were owed to the
2 Plaintiffs to herself.

3   70.   Plaintiffs have been harmed by Jackie Love's intentional interference.  As
4 a result of action she has taken and instructions she has given to persons who would
5 have otherwise paid the Plaintiffs, Plaintiffs have not received their full share of income
6 related to the 35 Songs to which they are entitled.

7   WHEREFORE, for the reasons set forth above the Plaintiffs request this court, after
8 a trial to:

9   1.   Enter judgment in favor of the Plaintiffs and award them all damages to
10 which they are entitled;

11   2.   Order an accounting be provided to the Plaintiffs regarding all royalties
12 and other income Love and Jacki Love have received on account of the 35 Songs and
13 enter a declaration that the Plaintiffs shall receive the proper percentage of said
14 accounting;

15   3.   In the event the Court finds that there is no valid contract between the
16 Partnership and Love, enter judgment that the Plaintiffs shall be paid for the fair value
17 of their services which should be no less than millions of dollars more than Love has
18 already paid them to date;

19   4.   Enter such other relief as the Court finds to be fair and equitable.

20   Respectfully submitted

21

22   /s/ Michael J. Flynn
   Michael J. Flynn, Pro Se

23

24   /s/ William Sheridan
   William Sheridan, Pro Se

25

26   /s/ Michael Tabb
   Michael Tabb, Pro Se

27

28   /s/ Philip Stillman
   Philip Stillman, Pro Se

{00046690 }                              - 19 -

1

2

3   DATED: May 9, 2019

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28