# EXHIBIT  2

Law Offices
**FLYNN, SHERIDAN & TABB**
P.O. Box 1668
6125 El Tordo
Rancho Santa Fe, California 92067
(619) 756-3823

PHILIP H. STILLMAN, Bar # 152861

Attorneys for Plaintiff MICHAEL E. LOVE

(SPACE BELOW PROVIDED FOR FILING STAMP ONLY)

FILED
DEC 29 1994
CLERK

I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY
... MAIL, POSTAGE PREPAID, TO ALL COUNSEL
... PARTIES AT THEIR RESPECTIVE, MOST RECENT, ADDRESS OF
... IN THIS ACTION, ON THIS DATE.

12-29-94

DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

DEC 29 1994

| | |
|---|---|
| MICHAEL E. LOVE, | CASE NO. 92-4594 WJR (SHx) |
| Plaintiff, | |
| vs. | JUDGMENT PURSUANT TO TERMS OF SETTLEMENT |
| BRIAN D. WILSON, an individual, by and through Jerome S. Billet in his representative capacity as Conservator of the Person and Estate of Brian Wilson, | |
| Defendants. | Courtroom 10 The Honorable William J. Rea |

IT IS HEREBY STIPULATED by and between plaintiff Michael E. Love and defendant Brian D. Wilson, by and through Jerome S. Billet, Conservator of the Person and Estate of Brian Wilson through their respective counsel, that a Judgment, in the amount of $5,000,000 (Five Million Dollars and No Cents), based upon the Special Verdict returned by the jury and filed on December 12, 1994, shall be entered on December 29, 1994 upon the terms and conditions set forth in the Settlement Agreement and Mutual Releases executed by the parties, and enforcement of Judgment shall be upon the terms and conditions set forth in the Settlement Agreement and Mutual Releases.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that pursuant to the Special Verdict, Michael E. Love is a co-author of the songs listed below and shall receive royalties from the songs listed below pursuant to the following schedule:

DOCKETED
MLD (COPY) PTYS
MLD NOTICE PTYS
JS-6

**EXHIBIT** 12   DEC 29 1994

1 of 3

Judgement Pursuant to Terms of Si     ant. CV 92 4394 WJR (SHx)

| SONG | MIKE LOVE'S SHARE | BRIAN WILSON'S SHARE | OTHER AUTHOR'S SHARE |
|------|-------------------|----------------------|----------------------|
| 409 | 25% | 25% | 50% |
| All Summer Long | 50% | 50% | |
| Amusement Parks USA | 50% | 50% | |
| Be True To Your School | 50% | 50% | |
| California Girls | 50% | 50% | |
| Catch A Wave | 50% | 50% | |
| Chug A-Lug | 25% | 25% | 50% |
| Custom Machine | 50% | 50% | |
| Dance, Dance, Dance | 25% | 25% | 50% |
| Do You Remember | 50% | 50% | |
| Don't Back Down | 50% | 50% | |
| Don't Hurt My Little Sister | 50% | 50% | |
| Drive In | 50% | 50% | |
| Farmer's Daughter | 50% | 50% | |
| Finder's Keepers | 50% | 50% | |
| Good To My Baby | 50% | 50% | |
| Hawaii | 50% | 50% | |
| Help Me Rhonda | 50% | 50% | |
| I Get Around | 50% | 50% | |
| I Know There's An Answer | 37.5% | 37.5% | 25% |
| In The Back Of My Mind | 50% | 50% | |
| Kiss Me Baby | 50% | 50% | |
| Let Him Run Wild | 50% | 30% | |
| Little Saint Nick | 50% | 50% | |
| Merry Christmas, Baby | 50% | 50% | |
| Salt Lake City | 50% | 50% | |
| Santa's Beard | 50% | 50% | |
| She Knows Me Too Well | 50% | 50% | |
| Girl From New York City | 50% | 50% | |
| Man With All The Toys | 50% | 50% | |
| Noble Surfer | 50% | 50% | |
| Wendy | 50% | 50% | |
| When I Grow Up | 50% | 50% | |
| Wouldn't It Be Nice | 37.5% | 37.5% | 25% |
| You're So Good To Me | 50% | 50% | |

FMML,080

2 of 3

Judgment Pursuant to Terms of Settlement, CV 92 4594 WJR (SHx)

Accordingly, Judgment shall be entered on December 29, 1994 against Brian Wilson and in favor of Michael E. Love pursuant to the terms of settlement in the amount of $5,000,000 as set forth above, and Michael E. Love's rights as a co-author of the above listed songs are hereby declared.

Dated:        December 20, 1994              J. MICHAEL CROWE
                                             DOUGLAS L. DAY
                                             CROWE & DAY

                                             By: _____
                                             Douglas L. Day
                                             Attorneys for defendant Brian Wilson
                                             by and through Jerome S. Billet,
                                             Conservator of the Person and Estate
                                             of Brian Wilson

Dated:        December 20, 1994              MICHAEL J. FLYNN
                                             PHILIP H. STILLMAN
                                             FLYNN, SHERIDAN & TABB

                                             By: _____
                                             Michael J. Flynn
                                             Attorneys for Michael E. Love

        IT IS SO ORDERED.

Dated:        December 29, 1994              _____
                                             UNITED STATES DISTRICT COURT JUDGE

FINAL.ORD

3 of 3

TOTAL PAGE.04

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and Release ("Agreement") is made by and between Michael E. Love ("Love") and Brian D. Wilson, by and through his specially appointed guardian ad litem Judge Peter Smith ("Wilson") and subject to and upon approval by the Superior Court of California, Los Angeles County, Judge David Rothman presiding, Santa Monica Branch ("Court Approval") with reference to the following facts:

### 1.0 RECITALS

1.1   Certain civil litigation has been filed in the United States District Court, Central District of California Michael E. Love v. Brian D. Wilson, et al., Case No. 92- 4594 WJR (SHx) and companion case filed in the Los Angeles Superior Court entitled Michael E. Love v. Brian D. Wilson, et al., Case No. BC 065322 which has been stayed pending resolution of the Federal Action (collectively "the Action").

1.2   Between October 4, 1994 and December 1, 1994, the jury trial of this Action went forward before the Honorable William J. Rea United States District Court Judge.  On December 12, 1994, the jury returned a Special Verdict in favor of Michael E. Love against Brian D. Wilson on all claims only on the issue of liability ("Verdict"), a copy of which is attached hereto as Exhibit "1."

1.3   Subject to the terms and conditions of this Agreement, the parties wish to enter into a complete settlement with each other with respect to any and all claims, demands, and or causes of

1



action between them, including the facts, circumstances and events referred to in the pleadings in the Action, raised during the course of the Action and/or trial of the Action.

## 2.0 COVENANTS

2.1  Wilson agrees to pay $2,250,000 (Two Million Two Hundred Fifty Thousand Dollars and No Cents) to Love as follows: the payment of $1,500,000 (One Million Five Hundred Thousand Dollars and No Cents), within one business day of entry of the Superior Court's Order approving this Agreement.  The remaining balance of $750,000 (Seven Hundred Fifty Thousand Dollars and No Cents) will be paid in three equal installments of $250,000 to be paid on March 1, 1995, June 1, 1995 and on September 1, 1995.  In the event of any default in the payment of any monetary obligation under this paragraph, Love shall be entitled to immediately execute against any assets of Wilson upon the balance of the $2,250,000 then due (less any amounts already paid).  In the event of default, Love shall be entitled to recover his reasonable attorneys' fees and costs in pursuing collection efforts on the Judgment.

2.2  Concurrently with the receipt of said funds, the parties agree that Judgment on the Special Verdict shall be entered against Wilson and in favor of Love in the above-referenced litigation in the amount of $5,000,000 (Five Million Dollars and No Cents), a copy of said Stipulated Judgment is attached hereto as Exhibit "2." No more than $2,250,000 may be collected from Wilson (excluding any royalties referred to in Paragraphs 2.4 and 2.5) and under no



circumstances may Love execute against any assets of Wilson to collect any more than $2,250,000 of the $5,000,000 Judgment. The balance of the Judgment may be collected only from third parties, if at all. In no event, shall Wilson be obligated to pay more than the sum of $2,250,000 of the Judgment, excluding those royalties referred to in Paragraphs 2.4 and 2.5.

2.3  Love has agreed to limit the sums that Wilson shall pay hereunder to $2,250,000 of the $5,000,000 Judgment only because Wilson has agreed to attempt to pay the balance of his stipulated judgment from these third party claims. Nothing herein warrants that these third party claims will result in a recovery from anyone.

2.4  Concurrently with the receipt of said funds, the parties agree that a declaration of Love's rights in the list of songs attached hereto as Exhibit "3" ("Songs") will be entered in the Civil Actions, and the parties agree to execute such documents as necessary to notify payors of royalties on the Songs that Love has an equal interest with Wilson in the Songs as set forth in Paragraph 2.5.

2.5  Love will receive fifty percent of Wilson's songwriter royalties on the Songs, set forth in the Special Verdict returned on December 12, 1994 pursuant to a declaration of rights. The Declaration shall be recorded and sent to BMI, Rondor and any other payor of royalties on the Songs. To the extent that there are co-authors, Love will receive 50% of Wilson's share. For example, on "409," Love would be entitled to 25% of the royalties and Wilson

3



would be entitled to 25% of the royalties, and Gary Usher's share would remain unaffected.  To the extent that any songs are community property, Love will receive 50% of the total income from the song which formerly was paid to Wilson and Marilyn Wilson.  For example, on California Girls, every dollar of songwriter royalties would be split Love, 50 cents, Wilson and Marilyn Wilson, 50 cents. On a song such as "Wouldn't It Be Nice," Love would receive 37.5 cents, Wilson and Marilyn Wilson would receive 37.5 cents, and the accredited co-author, Tony Asher, would receive 25 cents.

2.6  In consideration of this Agreement and other good and valuable consideration, receipt of which is hereby acknowledged, Love agrees to release and discharge Wilson, and each of his past, present and future officers, directors, partners, employees, agents, insurers, reinsurers, servants, attorneys, affiliates and subsidiaries, except as to those individuals set forth in Paragraph 3.1, of and from any and all claims, demands, sums of money, actions, rights, causes of action, obligations and liabilities of any kind or nature whatsoever, which Love may have had or claims to have had, or now has or claims to have, or hereinafter may have or assert to have against Wilson, which arises out of or are in any way connected with or related to the Action or any matter involved in the Action ("Released Matters").

2.7  For valuable consideration, receipt of which is hereby acknowledged, Wilson and each of his past, present and future officers, directors, partners, employees, agents, insurers, reinsurers, servants, attorneys, affiliates and subsidiaries,

4



except as to those individuals set forth in Paragraph 3.1, hereby waives any and all claims, demands, sums of money, actions, rights, causes of action, obligations and liabilities of any kind or nature whatsoever, which Wilson may have had or claims to have had, or now has or claims to have, or hereinafter may have or assert to have against Love, which arise out of or are in any way connected with or related to any of the Released Matters as defined in Paragraph 2.6, _supra_.

2.8  Love hereto agrees to promptly file a Request for Dismissal with prejudice of the action filed in Los Angeles Superior Court referenced in Paragraph 1.1, _supra_.  Love also agrees to execute and file with the Clerk of the appropriate Court Partial Satisfactions of Judgment as payments are made.

### 3.0  THIRD PARTIES

3.1  This Agreement and Mutual General Releases attached hereto are not deemed to benefit any third party other than as expressly set forth herein, and specifically exclude the following individuals:  James P. Tierney, James J. Little, The Law Offices of James P. Tierney, John Mason, John Branca, Ziffren, Brittenham & Branca and its predecessors and successors, Jerome S. Billet, and Billet & Kaplan.

3.2  Wilson will, through a duly appointed guardian _ad litem_, prosecute legal actions against the following individuals arising from the Action or _Wilson v. Irving Music_ litigation:  James P. Tierney, James J. Little, The Law Offices of James P. Tierney, John



Mason, John Branca, Ziffren, Brittenham & Branca and its predecessors and successors, and Jerome S. Billet, except to extent that the guardian <u>ad litem</u> in good faith determines that the claim against one or more individuals is unmeritorious. "Unmeritorious" as used herein, shall mean "totally without merit" as set forth in Code Civ. P. § 128.5 and/or to the extent the commencement of such actions do not violate the Rules of Professional Conduct, are not illegal and/or unconscionable. In the event that the guardian <u>ad litem</u> determines in good faith that a proposed action is "unmeritorious," or that there may be a violation of the Rules of Professional Conduct, is illegal and/or unconscionable, the parties shall present the issue to the Superior Court supervising the Conservatorship of Brian Wilson for a final order finding either that the proposed action is actionable or not actionable. Wilson, through a duly appointed guardian <u>ad litem</u>, will prosecute the actions with counsel of his choice and in conjunction with Love. Flynn, Sheridan & Tabb or any successor entity shall serve as Love's counsel and as lead co-counsel. Except to the extent that Wilson's counsel is instructed by the guardian <u>ad litem</u> or Wilson to take affirmative steps or take action in the litigation, all responsibility for taking all steps necessary in the prosecution of the actions shall be done by counsel selected by Love and paid for by Love.

3.3 Any recovery from the litigation referred to in this Section 3.0 will be shared as follows: 75% to Love up to a maximum of $2,750,000 (i.e. the balance of the $5,000,000 Judgment) and 25%



to Wilson.  Any recovery in excess of $2,750,000 shall be retained exclusively by Wilson.  In addition, the amount of $2,750,000 may also be paid by way of a producer royalty allocated to Wilson from Brother Records, Inc. at Love's option.

3.4  Flynn, Sheridan & Tabb shall be entitled to a 15% contingency fee on the total amount recovered by Wilson up to the amount of $2,750,000.  On any amount recovered beyond the $2,750,000, Flynn, Sheridan & Tabb shall be entitled to a 25% contingency fee.  Love agrees to fund the costs of the litigation; except, however, that Love shall not be responsible for any legal fees payable to Wilson's co-counsel (if any), or any fees attributable to any guardian ad litem or conservator.

3.5  Love shall be entitled to bring any claims which he might have against any of these third parties in the same action to the extent permitted by law.

3.6  Love and his counsel shall, in consultation with Wilson's guardian ad litem, be permitted to make all decisions regarding the litigation referenced in this Section 3.0, except to extent that the decisions are unmeritorious, violate the Rules of Professional Conduct, are illegal and/or unconscionable.  In the event that Wilson's guardian ad litem in good faith believes that there is or may be such a violation, and cannot reach agreement with Love and his counsel of the issue, the dispute shall be brought to the Superior Court supervising the Conservatorship of Wilson for a final resolution of the issue.

7



3.7  Wilson agrees to fully cooperate with Love and his counsel to the extent necessary for the orderly prosecution and resolution of any action against third parties as referred to in this Section 3.0.

3.8  Wilson will execute a waiver of any conflict of interest Michael Flynn, Philip Stillman or the law firm of Flynn, Sheridan & Tabb might have in connection with the above referenced third party litigation, including conflicts arising out of their representation of Brother Records, Inc. in defamation litigation against Wilson, and their representation of Love in any of the actions referred to in this Section 3.0.  Love will agree to vote and sign a written agreement that BRI shall not collect on any judgment obtained in any defamation litigation against Wilson.

3.9  The parties expressly agree and acknowledge that Wilson's agreement to pay Love 75% of the proceeds of the litigation referred to in this Section 3.0 is not an assignment of Wilson's claims against the enumerated third parties, nor shall this agreement be construed as an assignment by any court.  The parties specifically and unequivocally state that this Section 3.0 is not an assignment of claims by Wilson.

3.10  The guardian <u>ad litem</u> owes no duty to Love.  Love has no independent recourse against the guardian <u>ad litem</u>.  Any dispute Love or his counsel may have with a decision made by the guardian <u>ad litem</u> must be brought before the superior court supervising the Conservatorship of Wilson for a final resolution of the dispute.

8



3.11    Wilson acknowledges that Love will continue to participate in the Order to Show Cause ("OSC").   Any monetary sanctions awarded to Love pursuant to the OSC shall be paid to Love.  Any monetary sanctions awarded to Wilson pursuant to the OSC shall be paid to Wilson.

3.12  Wilson agrees not to oppose Love's Motion to Vacate the April 18, 1994 Order of the federal court in Love v. Wilson, 92-4594 WJR (SHx).  Love agrees to defend and indemnify Wilson for any liability arising out of vacating the April 18, 1994 Order.  Any costs of defense or indemnity obligation owed to Wilson by Love may at Wilson's election:   (1)   be used to reduce the outstanding balance of the $2,250,000; (2) be paid directly to Wilson for his benefit; or (3) be applied to reduce the $2,750,000 balance of the $5,000,000 Judgment.

3.13 The parties agree that this Agreement will not affect any action in the conservatorship proceeding against James Tierney or the Law Offices of James P. Tierney for disgorgement of legal fees.


## 4.0 WAIVER OF CIVIL CODE SECTION 1542

4.1  Except for the obligations created by this Agreement, it is understood by the parties that this Agreement is intended to be a general release and is executed notwithstanding Section 1542 of the California Civil Code; and the parties acknowledge that this Agreement extends to all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected, regarding



or arising out of the Released Matters and all rights under Section 1542 of the California Civil Code are hereby expressly waived.  Said Section reads as follows:

Section 1542.  General Release

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known to him, must have materially affected his settlement with the debtor."

4.2   It is further understood by the parties hereto that the facts with respect to this Agreement may hereafter turn out to be other than, or different from the facts now known to them or believed by them to be true, and the parties expressly assume the risk of the facts turning out to be different than they believed them to be; and the parties agree that this Agreement and the foregoing releases shall be in all respects effective and not subject to termination or rescission by any such difference in facts.

4.3   The parties hereto and each of them understand and acknowledge the significance and the consequences of this specific waiver of California Civil Code Section 1542, and thereby assume full responsibility for any injuries, damages or losses that they have incurred or hereafter incur in connection with the facts and claims which are the subject of the Action, this Agreement or the Released Matters.

10



## 5.0 <u>COMPROMISE OF CLAIMS</u>

5.1   In executing this Agreement, it is the intention of each party to fully and finally dispose of any and all claims which exist or may hereafter exist between the parties arising out of or in any manner connected with the Action or related to the Released Matters.

## 6.0 <u>WARRANTIES: AUTHORITY</u>

6.1   Each of the parties to this Agreement represents, warrants, and agrees as follows:

(a)   Each party has received independent legal advice from their attorney with respect to the advisability of making the settlement provided for herein and with the respect to the advisability of executing this Agreement;

(b)   Each party to this Agreement has made such investigation of the facts pertaining to this settlement and this Agreement and of all the matters pertaining thereto as it deems necessary;

(c)   Each party or responsible officer thereof has read this Agreement and understands the contents hereof.   Each person executing this Agreement on behalf of the respective parties warrants that he is empowered to do so and thereby binds his respective party.

11



(d)    Except as contained herein, each party has not heretofore assigned, transferred, or granted, or purported to assign, transfer, or grant, any of the claims, demands, and cause or causes of action disposed of by this Agreement.

(e)    No party relies upon any statement of any other party in executing this Agreement, except as expressly stated in this Agreement.

## 7.0 <u>CONFIDENTIALITY</u>

7.1  This Agreement and the terms embodied therein are intended to be confidential.  The parties may disclose that the parties have amicably settled the case, but no details of the terms shall be disclosed, without prior written permission of all parties to this Agreement, or an order of court, except the parties may divulge the terms of this Agreement to: (1) their attorneys, accountants, and immediate family members; (2) government taxing agencies; (3) their creditors or credit providers, as necessary; and (4) any other person who is required by law to know the contents of this Agreement (collectively referred to as "Authorized Person").  Any party or its counsel of record in this Action who discloses to any Authorized Person the contents or terms of this Agreement will instruct such Authorized Person that the contents and terms of this Agreement must be maintained in the strictest possible confidence as described above and will take all reasonable and necessary steps to compel compliance with such instructions. Each party agrees independently to enforce this provision.



### 8.0 COURT APPROVAL

8.1   This Settlement Agreement by and between Love and Wilson is subject to approval of the Superior Court of California Los Angeles County, Judge David Rothman presiding, Santa Monica Branch.

8.2   Crowe & Day, on Wilson's behalf, recommends this settlement to the Los Angeles Superior Court.

### 9.0 ATTORNEY'S FEES

9.1   Each party shall bear its own costs and attorneys' fees to the date of this Agreement.

9.2   If an action is instituted by any party to this Agreement for breach of this Agreement, or its terms, or for breach of any warranty or representation, or to interpret or enforce this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs, including all attorneys' fees and costs of suit incurred in connection with the executing and collecting upon final judgment in said litigation in addition to any other relief.

9.3   If, for any reason, Wilson is in default of Section 3.0, Love may seek relief only for breach of contract of this Agreement with a maximum total recovery on damages of $2,750,000 (Two Million Seven Hundred Fifty Thousand Dollars and No Cents) for breach of Section 3.0.



## 10.0 <u>COUNTERPARTS</u>

10.1  This Agreement may be executed in counterparts, and when each party has executed and delivered at least one such counterpart, each counterpart shall be deemed an original, and, when taken together with other signed counterparts, shall constitute one Agreement, which shall be binding upon and effective as to all parties.

## 11.0 <u>MISCELLANEOUS</u>

11.1  The parties hereto agree and covenant not to institute any lawsuit which is based on any claims released, resolved or waived by this Agreement.

11.2 This Agreement constitutes a single, integrated, written contract and expresses the entire agreement of the parties hereto with respect to the subject matter of this Agreement.  No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all of the parties, or their authorized representative as required by Court Order.

11.3 This Agreement is binding upon and shall inure to the benefit of the parties hereto, their respective agents, employees, representatives, officers, directors, divisions, subsidiaries, affiliates, assigns, heirs, successors in interest, and shareholders, except those persons not released by the terms and conditions of this agreement.

14



11.4 Any provision of this Agreement which is deemed to be unenforceable or violative of California law, shall not affect the balance of the agreement between the parties as set forth herein and the Agreement shall remain enforceable in all other respects. Wilson expressly agrees not to contest this Agreement or Section 3.0 on the grounds that Section 3.0 constitutes an assignment of rights.  Nothing herein shall be deemed to prevent the guardian _ad litem_ from providing full disclosure to the superior court on any issue.

11.5 Each of the parties agrees to execute any additional documents and take any further action which reasonably may be required by its respective counsel in order to consummate this Agreement or otherwise to fulfill the intent of the parties hereunder, including, but not limited to, the filing of a Request for Dismissal with prejudice of the action filed in the Los Angeles Superior Court referenced in paragraph 1.1, _supra_, and Partial Satisfactions of Judgment.

11.6  This Agreement shall be deemed to have been executed and delivered within the State of California, and the rights and obligation of the parties hereto shall be construed and enforced in accordance with, and governed by, the laws of the State of California.

11.7  This Agreement has been jointly drafted and negotiated by and between all parties through their attorneys of record.  No individual party or entity or counsel to any party or entity shall



be deemed to have drafted, prepared or otherwise written this Agreement and the Agreement shall not be construed in favor of or against any party hereto.

11.8 The parties agree to work together to provide both Wilson and Love with the maximum tax benefits possible under this Agreement.  Counsel for Love and Wilson make no representation as to the potential tax benefits or potential tax liability for their respective clients by virtue of this Agreement.

WHEREOF, the parties hereto have executed this Agreement the day and year indicated below.


DATED:  December _22_, 1994            MICHAEL E. LOVE:

                                      By: _____
                                            MICHAEL E. LOVE


DATED:  December _20_, 1994            FLYNN, SHERIDAN & TABB:

                                      By: _____
                                            MICHAEL J. FLYNN
                                            Counsel for Michael Love


DATED:  December _20_, 1994            BRIAN D. WILSON

                                      By: _____
                                            HON. PETER SMITH (Ret.)
                                            Guardian Ad Litem


DATED: December 20, 1994              Douglas L. Day for Brian Wilson

APPROVED BY:
DATED:  December _20_, 1994           By: _____
                                      Judge Los Angeles Superior Court

16





FILED

DEC 12 1994

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL E. LOVE,<br><br>   Plaintiff,<br><br>  v.<br><br>BRIAN D. WILSON, an<br>individual, by and through<br>JEROME S. BILLET in his<br>representative capacity as<br>Conservator of the Person and<br>Estate of BRIAN WILSON,<br><br>   Defendant. | CASE NO.   CV 92 4594 WJR (SHx)<br><br>SPECIAL VERDICT |

We, the jury in the above entitled action, find the following Special Verdict on the questions submitted to us:

### SECTION I.   FRAUDULENT CONCEALMENT

Question No. 1:  Were Brian Wilson and Mike Love partners?

Answer "yes" or "no".

Answer: YES

Proceed to answer Question No. 2.

EXHIBIT 1

Question No. 2:  Were Mike Love and Brian Wilson in a fiduciary or confidential relationship?

Answer "yes" or "no".

Answer: YES

Proceed to answer Question No. 3.

Question No. 3:  Did Brian Wilson or his authorized agent(s) know of material facts and know that such facts were neither known nor readily accessible to Mike Love or his agent(s)?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 1, 2 or 3 "yes," then answer Question No. 4.  Otherwise go to section II.

Question No. 4:  Did Brian Wilson or his authorized agent(s) conceal or suppress a material fact which they had an obligation to disclose?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 4 "yes," then answer Question No. 5. If you answer Question No. 4 "no," then go to section II.

Question No. 5:  Did Brian Wilson or his authorized agent(s) intentionally conceal or suppress a material fact(s) with the intent to defraud Mike Love?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 5 "yes," then answer Question No. 6.  If you answer Question No. 5 "no," then go to section II.

Question No. 6:  Would Mike Love have acted in the way he acted if he had known of the concealed or suppressed fact(s)?

2

Answer "yes" or "no".

Answer: NO

If you answer Question No. 6 "no," then answer Question No. 7. If you answer Question No. 6 "yes," then go to section II.

Question No. 7:  Did Brian Wilson's or his authorized agent(s)' concealment or suppression of the fact(s) cause Mike Love damage?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 7 "yes," then answer Question No. 8. If you answer Question No. 7 "no," then go to section II.

Question No. 8:  Did Mike Love have knowledge of the essential facts giving rise to his claim for concealment or suppression of facts before July 31, 1989?

Answer "yes" or "no".

Answer: NO

Proceed to section II.

SECTION II.   PROMISSORY FRAUD

Question No. 9:  Did Brian Wilson or his authorized agent(s) make any of the following promises to Mike Love: (1) Wilson would pay Love 30% of the proceeds from Wilson's lawsuit; and/or (2) Wilson would pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs; and/or (3) Wilson would give Love credit and future royalties on the 35 songs; and/or (4) Wilson would pursue recovery of the copyrights to the songs; and/or (5) Wilson would keep Robert Kory informed of the status of the Wilson v. Irving litigation?

///

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ____ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ____ |
| 4. | Would pursue recovery of the copyrights for the songs. | YES | ____ |
| 5. | Would keep Robert Kory informed of the status of the Wilson v. Irving litigation. | YES | ____ |

If you answer Question No. 9 "yes," as to any of the promises, then answer Question No. 10.  Otherwise go to section III.

Question No. 10:  At the time Brian Wilson or his authorized agent(s) made the promise(s), did Brian Wilson or his agent(s) intend for Brian Wilson to perform them?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | ____ | NO |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | ____ | NO |

4

|  |  | Yes | No |
|---|---|---|---|
| 3. | Give Love credit for future royalties on the 35 songs. | ___ | NO |
| 4. | Would pursue recovery of the copyrights for the songs. | YES | ___ |
| 5. | Would keep Robert Kory informed of the status of the Wilson v. Irving litigation. | ___ | NO |

If you answer Question No. 10 "no," as to any of the promises, then answer Question No. 11.   Otherwise go to section III.

Question No. 11:  Did Brian Wilson or his authorized agent(s) make the promise(s) for the purpose of inducing Mike Love to rely upon them and to act or refrain from acting in reliance upon them?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ___ |
| 4. | Would pursue recovery of the copyrights for the songs. | YES | ___ |

///

///

|   |   | Yes | No |
|---|---|---|---|
| 5. | Would keep Robert Kory informed of the status of the _Wilson v. Irving_ litigation. | YES | ___ |

If you answer Question No. 11 "yes," as to any of the promises, then answer Question No. 12.  Otherwise go to section III.

Question No. 12:  Did Mike Love, at the time Mike Love acted, know of the intention of Brian Wilson or his authorized agent(s) not to perform the promise(s)?

Answer "yes" or "no".

|   |   | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | ___ | NO |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | ___ | NO |
| 3. | Give Love credit for future royalties on the 35 songs. | ___ | NO |
| 4. | Would pursue recovery of the copyrights for the songs. | ___ | NO |
| 5. | Would keep Robert Kory informed of the status of the _Wilson v. Irving_ litigation. | ___ | NO |

If you answer Question No. 12 "no," as to any of the promises, then answer Question No. 13.  Otherwise go to section III.

Question No. 13:  Did Mike Love act in reliance upon the
se(s)?

Answer "yes" or "no".

| | Yes | No |
|---|---|---|
| 1. Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | _____ |
| 2. Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | _____ |
| 3. Give Love credit for future royalties on the 35 songs. | YES | _____ |
| 4. Would pursue recovery of the copyrights for the songs. | YES | _____ |
| 5. Would keep Robert Kory informed of the status of the Wilson v. Irving litigation. | YES | _____ |

If you answer Question No. 13 "yes," as to any of the
promises, then answer Question No. 14.   Otherwise go to section
III.

Question No. 14:  Was Mike Love justified in relying upon
the promise(s)?

Answer "yes" or "no".

| | Yes | No |
|---|---|---|
| 1. Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | _____ |
| 2. Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | _____ |

|  | | Yes | No |
|---|---|---|---|
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ___ |
| 4. | Would pursue recovery of the copyrights for the songs. | YES | ___ |
| 5. | Would keep Robert Kory informed of the status of the <u>Wilson v. Irving</u> litigation. | YES | ___ |

If you answer Question No. 14 "yes," as to any of the promises, then answer Question No. 15. Otherwise go to section III.

Question No. 15: Was Mike Love damaged as a result of his reliance upon the promise(s)?

Answer "yes" or "no".

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ___ |
| 4. | Would pursue recovery of the copyrights for the songs. | YES | ___ |

///
///

|  | Yes | No |
|---|---|---|
| 5.   Would keep Robert Kory informed of the status of the Wilson v. Irving litigation. | YES | ___ |

If you answer Question No. 15 "yes," as to any of the promises, then answer Question No. 16.  Otherwise go to section III.

Question No. 16:  Did Mike Love have knowledge of the essential facts giving rise to his claim for promissory fraud before July 31, 1989?

Answer "yes" or "no".

|  | Yes | No |
|---|---|---|
| 1.   Pay Love 30% of the proceeds from Wilson's lawsuit. | ___ | NO |
| 2.   Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | ___ | NO |
| 3.   Give Love credit for future royalties on the 35 songs. | ___ | NO |
| 4.   Would pursue recovery of the copyrights for the songs. | ___ | No |
| 5.   Would keep Robert Kory informed of the status of the Wilson v. Irving litigation. | ___ | NO |

Proceed to section III.

/// 

/// 

/// 

9

SECTION III.   FRAUD/INTENTIONAL MISREPRESENTATION

Question No. 17:  Did Brian Wilson or his authorized agent(s) make a representation as to a past or existing material fact?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 17 "yes," then answer Question No. 18.  If you answer Question No. 17 "no," and you answered Questions Nos. 8 and 16 "yes" then go to section V.   If you answer Question No. 17 "no," and you answered Question Nos. 8 or 16 "no," then go to section IV.

Question No. 18:  Was the representation false?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 18 "yes," then answer Question No. 19.  If you answer Question No. 18 "no," and you answered Questions No. 8 and 16 "yes," then go to section V.  If you answer Question No. 18 "no," and you answered Questions Nos. 8 or 16 "no," then go to section IV.

Question No. 19:  Did Brian Wilson or his authorized agent(s) know that the representation was false at the time it was made?

Answer "yes" or "no".

Answer: YES

Proceed to Question No. 20.

Question No. 20:  Did Brian Wilson or his authorized agent(s) make the representation(s) recklessly without knowing whether they were true or false?

Answer "yes" or "no".

Answer:  NO

If you answer Question Nos. 19 or 20 "yes," then answer Question No. 21.  If you answer Question Nos. 19 and 20 "no," and you answered Questions Nos. 8 and 16 "yes," then go to section V. If you answer Question Nos. 19 and 20 "no," and you answered Questions Nos. 8 or 16 "no," then go to section IV.

Question No. 21:  Did Brian Wilson or his authorized agent(s) make the representation(s) with an intent to defraud Mike Love?

Answer "yes" or "no".

Answer:  YES

If you answer Question No. 21 "yes," then answer Question No. 22.  If you answer Question No. 21 "no," and you answered Questions Nos. 8 and 16 "yes," then go to section V.  If you answer Question No. 21 "no," and you answered Questions Nos. 8 or 16 "no," then go to section IV.

Question No. 22:  Did Mike Love know of the falsity of the representation(s)?

Answer "yes" or "no".

Answer:  NO

If you answer Question No. 22 "no," then answer Question No. 23.  If you answer Question No. 22 "yes," and you answered Questions Nos. 8 and 16 "yes," then go to section V.   If you answer Question No. 22 "yes," and you answered Questions Nos. 8 or 16 "no," then go to section IV.

Question No. 23:  Did Mike Love justifiably act or fail to act in reliance upon the truth of the representation(s)?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 23 "yes," then answer Question No. 24. If you answer Question No. 23 "no," and you answered Questions Nos. 8 and 16 "yes," then go to section V. If you answer Question No. 23 "no," and you answered Questions Nos. 8 or 16 "no," then go to section IV.

Question No. 24: Was Mike Love damaged as a result of his justifiable reliance on Brian Wilson's misrepresentation(s)?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 24 "yes," then answer Question No. 25. If you answer Question No. 24 "no" and you answered Questions Nos. 8 and 16 "yes," then go to section V. If you answer Question No. 24 "no" and you answered Questions Nos. 8 or 16 "no," then go to section IV.

Question No. 25: Did Mike Love have knowledge of the essential facts giving rise to the fraud before July 31, 1989?

Answer "yes" or "no".

Answer: NO

If you answer Question No. 25 "yes," and you answered Questions Nos. 8 and 16 "yes," then go to Section V. Otherwise go to section IV.

## SECTION IV.  <u>PUNITIVE DAMAGES</u>

Question No. 26: Do you find by clear and convincing evidence (as opposed to a preponderance of the evidence) that Brian Wilson was guilty of oppression, fraud or malice as defined in his dealings with Mike Love?

Answer "yes" or "no".

Answer: NO

If you answer Question No. 26 "no," then answer Question No. 27. If you answer Question No. 26 "yes," then go to section V.

Question No. 27:  Do you find by clear and convincing evidence (as opposed to a preponderance of the evidence) that Brian Wilson's authorized agent(s) were guilty of oppression, fraud or malice as defined in their dealings with Mike Love?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 27 "yes," then answer Question No. 28. If you answer Question No. 27 "no," then go to section V.

Question No. 28:  Do you find by clear and convincing evidence (as opposed to a preponderance of the evidence) that Brian Wilson ratified the conduct of his authorized agent(s) that constituted the claimed oppression, fraud or malice?

Answer "yes" or "no".

Answer: NO

Go to section V.

## V. LANHAM ACT

Question No. 29:  Did Mike Love co-author any of the following songs with Brian Wilson for which Mike Love did not get songwriting credit?

| | | Yes | No |
|---|---|---|---|
| 1. | 409 | YES | _____ |
| 2. | All Summer Long | YES | _____ |
| 3. | Amusement Parks USA | YES | _____ |

|  |  | Yes | No |
|---|---|---|---|
| 4. | Be True To Your School | YES | _____ |
| 5. | California Girls | YES | _____ |
| 6. | Catch A Wave | YES | _____ |
| 7. | Chug-A-Lug | YES | _____ |
| 8. | Custom Machine | YES | _____ |
| 9. | Dance, Dance, Dance | YES | _____ |
| 10. | Do You Remember | YES | _____ |
| 11. | Don't Back Down | YES | _____ |
| 12. | Don't Hurt My Little Sister | YES | _____ |
| 13. | Drive In | YES | _____ |
| 14. | Farmer's Daughter | YES | _____ |
| 15. | Finder's Keepers | YES | _____ |
| 16. | Good to My Baby | YES | _____ |
| 17. | Hawaii | YES | _____ |
| 18. | Help Me Rhonda | YES | _____ |
| 19. | I Get Around | YES | _____ |
| 20. | I Know There's An Answer | YES | _____ |
| 21. | In The Back Of My Mind | YES | _____ |
| 22. | Kiss Me Baby | YES | _____ |
| 23. | Let Him Run Wild | YES | _____ |
| 24. | Little Saint Nick | YES | _____ |
| 25. | Merry Christmas Baby | YES | _____ |
| 26. | Salt Lake City | YES | _____ |
| 27. | Santa's Beard | YES | _____ |
| 28. | She Knows Me Too Well | YES | _____ |
| 29. | The Girl From New York City | YES | _____ |
| 30. | The Man With All The Toys | YES | _____ |

|   |   | Yes | No |
|---|---|---|---|
| 31. | The Noble Surfer | YES | ___ |
| 32. | Wendy | YES | ___ |
| 33. | When I Grow Up | YES | ___ |
| 34. | Wouldn't It Be Nice | YES | ___ |
| 35. | You're So Good To Me | YES | ___ |

If you answer Question No. 29 "yes" to any of the songs, then answer Question No. 30 as to those songs only. Otherwise go to section VII.

Question No. 30:  Were the song(s) used in commerce during July 31, 1989 to the present?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 30 "yes," then answer Question No. 31.  If you answer Question No. 30 "no," then go to section VI.

Question No. 31:  Was commercial use made of the song(s) with a false designation of origin during July 31, 1989 to the present, with Brian Wilson's knowledge?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 31 "yes," then answer Question No. 32.  If you answer Question No. 31 "no," then go to section VI.

///

///

///

///

Question No. 32:  Was Mike Love damaged as a result of the false designation of origin?

Answer "yes" or "no".

Answer: YES

Proceed to section VI.

SECTION VI.   DECLARATORY RELIEF

Question No. 33:  As to any of the songs you answered "yes" to in Question No. 29, is Mike Love entitled to a judicial declaration that he is the co-author of those songs?

Answer "yes" or "no".

Answer: YES

Proceed to section VII.

SECTION VII.   ACCOUNTING

Question No. 34:  Does Brian Wilson owe Mike Love an accounting of the profits derived from any of the songs which you answered "yes" to in response to Question No. 29, based upon their songwriting partnership?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 34 "yes," then answer Question No. 35.  If you answer Question No. 34 "no" then go to section VIII.

Question No. 35:  Is Mike Love's claim for an accounting just and reasonable?

Answer "yes" or "no".

Answer: YES

Proceed to section VIII.

///

SECTION VIII.   <u>BREACH OF CONTRACT</u>

Question No. 36:  Did Brian Wilson or his authorized agent(s) make an offer to Mike Love to enter into a contract whereby (1) Wilson would pay Love 30% of the proceeds from Wilson's lawsuit; and/or (2) Wilson would pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs; and/or (3) Wilson would give Love credit and future royalties on the 35 songs.?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ____ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ____ |

If you answer Question No. 36 "yes," as to all of the terms, then answer Question No. 37.  Otherwise go to section IX.

Question No. 37:  Did Mike Love accept Brian Wilson's offer?  Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ____ |

|  |  | Yes | No |
|---|---|---|---|
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ___ |

If you answer Question No. 37 "yes," as to all of terms then answer Question No. 38.  Otherwise go to section IX.

Question No. 38:  Was there consideration?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs | YES | ___ |

If you answer Question No. 38 "yes," as to any of the terms, then answer Question No. 39.  Otherwise go to section IX.

Question No. 39:  Did Mike Love and Brian Wilson enter into a contract?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs | YES | ___ |

If you answer Question No. 39 "yes," as to any of the terms, then answer Question No. 40.  Otherwise go to section IX.

Question No. 40:  Did Mike Love perform his part of the contract?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ____ |
| 3. | Give Love credit for future royalties on the 35 songs | YES | ____ |

If you answer Question No. 40 "yes," as to any of the terms, then answer Question No. (42.)  Otherwise go to section IX.

TYPO ?

Question No. 41:  Which contract(s), if any, did Brian Wilson breach?

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ____ |
| 3. | Give Love credit for future royalties on the 35 songs | YES | ____ |

Proceed to Question No. 42.

///

///

19

Question No. 42:   Did the breach occur before July 31, 1990?

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | ____ | NO |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | ____ | NO |
| 3. | Give Love credit for future royalties on the 35 songs | ____ | NO |

Go to section IX

## SECTION IX.   PROMISSORY ESTOPPEL

Question No. 43:   Did Brian Wilson  promise Mike Love that (1) Wilson would pay Love 30% of the proceeds from Wilson's lawsuit; and/or (2) Wilson would pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs; and/or (3) Wilson would give Love credit and future royalties on the 35 songs?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ____ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ____ |

///

///

20

If you answer Question No. 43 "yes," as to any of the promises, then answer Question No. 44.  Otherwise go to section X.

Question No. 44:  Did Mike Love rely upon Brian Wilson's promise to his detriment?

Answer "yes" or "no".

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ___ |

If you answer Question No. 44 "yes," as to any of the promises, then answer Question No. 45.  Otherwise go to section X.

Question No. 45:  Should Brian Wilson have reasonably expected Mike Love to rely upon Brian Wilson's promise?

Answer "yes" or "no".

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs | YES | ___ |

If you answer Question No. 45 "yes," as to any of the promises, then answer Question No. 46.  Otherwise go to section X.

Question No. 46:  Which promise(s) should Brian Wilson have reasonably expected Mike Love to rely on?

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs | YES | ___ |

Go to section X.

## SECTION X. UNJUST ENRICHMENT

Question No. 47:  Was Brian Wilson unjustly enriched as a result of the promise(s) that: (1) Wilson would pay Love 30% of the proceeds form Wilson's lawsuit; and/or (2) Wilson would pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs; and/or (3) Wilson would give Love credit and future royalties on the 35 songs?

Answer "yes" or "no".

Answer: YES

Proceed to section XI.

## XI.  OTHER

Question No. 48:  Is Mike Love barred by the doctrine of unclean hands from asserting any of the following claims?

|  | Yes | No |
|---|---|---|
| Fraudulent Concealment | _____ | NO |
| Promissory Fraud | _____ | NO |
| Fraud | _____ | NO |
| Lanham Act | _____ | NO |
| Declaratory Relief | _____ | NO |
| Accounting | _____ | NO |
| Breach of Contract | _____ | NO |
| Promissory Estoppel | _____ | NO |
| Unjust Enrichment | _____ | NO |

Proceed to Question No. 49.

Question No. 49:  Is Mike Love barred by the doctrine of laches from asserting any the following claims?

|  | Yes | No |
|---|---|---|
| Lanham Act | _____ | NO |
| Declaratory Relief | _____ | NO |
| Accounting | _____ | NO |

Proceed to Question No. 50.

Question No. 50:  Is Mike Love barred by the statute of limitations from asserting any of the following claims?

|  | Yes | No |
|---|---|---|
| Fraudulent Concealment | _____ | NO |
| Promissory Fraud | _____ | NO |
| Fraud | _____ | NO |
| Accounting | _____ | NO |
| Breach of Contract | _____ | NO |

Proceed to Question No. 51.

///

Question No. 51:  Is Mike Love estopped from asserting any of the following claims?

|  | Yes | No |
|---|---|---|
| Lanham Act | ____ | NO |
| Breach of Contract | ____ | NO |
| Promissory Estoppel | ____ | NO |

Proceed to Question No. 52.

Question No. 52:  Is Brian Wilson estopped or barred by the doctrine of unclean hands from asserting a Statue of Limitation defense to any of the following claims?

|  | Yes | No |
|---|---|---|
| Suppression of Fact | YES | ____ |
| Promissory Fraud | YES | ____ |
| Fraud | YES | ____ |
| Breach of Contract | YES | ____ |

Proceed to Question No. 53.

Question No. 53:  Is Brian Wilson estopped or barred by the doctrine of unclean hands from asserting an Unclean Hands defense to any of the following claims?

|  | Yes | No |
|---|---|---|
| Suppression of Fact | YES | ____ |
| Promissory Fraud | YES | ____ |
| Fraud | YES | ____ |
| Lanham Act | Yes | ____ |
| Declaratory Relief | YES | ____ |
| Accounting | YES | ____ |
| Breach of Contract | YES | ____ |
| Promissory Estoppel | YES | ____ |

Proceed to Question No. 54.

Question No. 54:  Is Brian Wilson estopped or barred by the doctrine of unclean hands from asserting an Laches defense to any of the following claims?

|  | Yes | No |
|---|---|---|
| Lanham Act | YES | |
| Declaratory Relief | YES | |
| Accounting | YES | |

Proceed to Question No. 55.

Question No. 55:  Is Brian Wilson estopped or barred by the doctrine of unclean hands from asserting an Estoppel defense to any of the following claims?

|  | Yes | No |
|---|---|---|
| Lanham Act | YES | |
| Breach of Contract | YES | |
| Promissory Estoppel | YES | |

Please sign and return this Special Verdict form to the Clerk.

DATED: __DECEMBER 12__, 1994

_____
Jury Foreperson
CHARLES S. DAVIS

1

**Law Offices**
**FLYNN, SHERIDAN & TABB**
P.O. Box 1668
6125 El Tordo
Rancho Santa Fe, California 92067
(619) 756-5823

2

3

4

PHILIP H. STILLMAN, Bar # 152861

5

Attorneys for Plaintiff MICHAEL E. LOVE

(SPACE BELOW PROVIDED FOR FILING STAMP ONLY)

6

7

8                          **UNITED STATES DISTRICT COURT**

9                      **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

| 11 | MICHAEL E. LOVE, | ) | CASE NO. 92-4594 WJR (SHx) |
|----|------------------|---|----------------------------|
| 12 | Plaintiff, | ) | |
| 13 | | ) | JUDGMENT PURSUANT TO TERMS OF SETTLEMENT |
| 14 | vs. | ) | |
| 15 | BRIAN D. WILSON, an individual, by and through Jerome S. Billet | ) | |
| 16 | in his representative capacity as Conservator of the Person and | ) | |
| 17 | Estate of Brian Wilson, | ) | Courtroom 10 |
| 18 | Defendants. | ) | The Honorable William J. Rea |

19          IT IS HEREBY STIPULATED by and between plaintiff Michael E. Love and defendant Brian D.

20   Wilson, by and through Jerome S. Billet, Conservator of the Person and Estate of Brian Wilson

21   through their respective counsel, that a Judgment, in the amount of $5,000,000 (Five Million Dollars

22   and No Cents), based upon the Special Verdict returned by the jury and filed on December 12,

23   1994, shall be entered on December 29, 1994 upon the terms and conditions set forth in the

24   Settlement Agreement and Mutual Releases executed by the parties, and enforcement of Judgment

25   shall be upon the terms and conditions set forth in the Settlement Agreement and Mutual Releases.

26          IT IS FURTHER ORDERED, ADJUDGED AND DECREED that pursuant to the Special Verdict,

27   Michael E. Love is a co-author of the songs listed below and shall receive royalties from the songs

28   listed below pursuant to the following schedule:

Judgment Pursuant to Terms of Settlement, CV 92 4594 WJR (SHx)

| SONG | MIKE LOVE'S SHARE | BRIAN WILSON'S SHARE | OTHER AUTHOR'S SHARE |
|---|---|---|---|
| 409 | 25% | 25% | 50% |
| All Summer Long | 50% | 50% | |
| Amusement Parks USA | 50% | 50% | |
| Be True To Your School | 50% | 50% | |
| California Girls | 50% | 50% | |
| Catch A Wave | 50% | 50% | |
| Chug A-Lug | 25% | 25% | 50% |
| Custom Machine | 50% | 50% | |
| Dance, Dance, Dance | 25% | 25% | 50% |
| Do You Remember | 50% | 50% | |
| Don't Back Down | 50% | 50% | |
| Don't Hurt My Little Sister | 50% | 50% | |
| Drive In | 50% | 50% | |
| Farmer's Daughter | 50% | 50% | |
| Finder's Keepers | 50% | 50% | |
| Good To My Baby | 50% | 50% | |
| Hawaii | 50% | 50% | |
| Help Me Rhonda | 50% | 50% | |
| I Get Around | 50% | 50% | |
| I know There's An Answer | 37.5% | 37.5% | 25% |
| In The Back Of My Mind | 50% | 50% | |
| Kiss Me Baby | 50% | 50% | |
| Let Him Run Wild | 50% | 50% | |
| Little Saint Nick | 50% | 50% | |
| Merry Christmas, Baby | 50% | 50% | |
| Salt Lake City | 50% | 50% | |
| Santa's Beard | 50% | 50% | |
| She Knows Me Too Well | 50% | 50% | |
| Girl From New York City | 50% | 50% | |
| Man With All The Toys | 50% | 50% | |
| Noble Surfer | 50% | 50% | |
| Wendy | 50% | 50% | |
| When I Grow Up | 50% | 50% | |
| Wouldn't It Be Nice | 37.5% | 37.5% | 25% |
| You're So Good To Me | 50% | 50% | |

FINAL.ORD

- 2 -

Accordingly, Judgment shall be entered on December 29, 1994 against Brian Wilson and in favor of Michael E. Love pursuant to the terms of settlement in the amount of $5,000,000 as set forth above, and Michael E. Love's rights as a co-author of the above listed songs are hereby declared.

Dated:        December 20, 1994                    J. MICHAEL CROWE
                                                   DOUGLAS L. DAY
                                                   CROWE & DAY


                                            By:_____
                                                   Douglas L. Day
                                                   Attorneys for defendant Brian Wilson
                                                   by and through Jerome S. Billet,
                                                   Conservator of the Person and Estate
                                                   of Brian Wilson

Dated:        December 20, 1994                    MICHAEL J. FLYNN
                                                   PHILIP H. STILLMAN
                                                   FLYNN, SHERIDAN & TABB


                                            By:_____
                                                   Michael J. Flynn
                                                   Attorneys for Michael E. Love


        IT IS SO ORDERED.


Dated:        December ___, 1994

                                            _____
                                            UNITED STATES DISTRICT COURT JUDGE

FINAL.ORD



## THE 35 SONGS

1. 409
2. ALL SUMMER LONG
3. AMUSEMENT PARKS USA
4. BE TRUE TO YOUR SCHOOL
5. CALIFORNIA GIRLS
6. CATCH A WAVE
7. CHUG-A-LUG
8. CUSTOM MACHINE
9. DANCE, DANCE, DANCE
10. DO YOU REMEMBER
11. DON'T BACK DOWN
12. DON'T HURT MY LITTLE SISTER
13. DRIVE IN
14. FARMER'S DAUGHTER
15. FINDER'S KEEPERS
16. GOOD TO MY BABY
17. HAWAII
18. HELP ME RHONDA
19. I GET AROUND
20. I KNOW THERE'S AN ANSWER
21. IN THE BACK OF MY MIND
22. KISS ME BABY
23. LET HIM RUN WILD
24. LITTLE SAINT NICK
25. MERRY CHRISTMAS BABY
26. SALT LAKE CITY
27. SANTA'S BEARD
28. SHE KNOWS ME TOO WELL
29. THE GIRL FROM NEW YORK CITY
30. THE MAN WITH ALL THE TOYS
31. THE NOBLE SURFER
32. WENDY
33. WHEN I GROW UP
34. WOULDN'T IT BE NICE
35. YOU'RE SO GOOD TO ME

EXHIBIT 3

## ACKNOWLEDGEMENT AND RECEIPT

I, ___Michael J. Flynn___, hereby acknowledge receipt of check no. 001433, in the amount of $1,500,000 (One Million Five Hundred Thousand Dollars and No Cents), payable to Michael E. Love and his attorneys, Flynn, Sheridan & Tabb, for partial satisfaction of the Judgment per Settlement Agreement in Michael E. Love v. Brian D. Wilson, et al., Case No. 92-4594 WJR (SHx).

Dated:  December  21 , 1994