1
2
3        UNITED STATES DISTRICT COURT
4               DISTRICT OF NEVADA
5                      * * *

6   MICHAEL J. FLYNN, *et al.*,                    Case No. 3:19-cv-00239-MMD-CLB

7                                Plaintiffs,        ORDER
          v.
8
    MICHAEL LOVE, *et al.*,
9
                                Defendants.
10

11   **I.    SUMMARY**

12          This action arises from contractual disputes pertaining to a settlement involving

13   the copyrights of 35 songs and events surrounding these songs dating back to the

14   1960s. Plaintiffs Michael Flynn and Philip Stillman[1] filed a third amended complaint

15   against Defendants Michael Love, his wife Jacquelyne Love, Meleco, Inc., and the

16   Michael Love Family Trust (collectively, "Defendants"[2]). (ECF No. 50 ("TAC").) Before

17   the Court are Plaintiffs' motion to strike and motion for partial summary judgment, and

18   Defendants' motion to dismiss. (ECF Nos. 51, 67, 70.)[3]

19

20          [1]Plaintiffs are both attorneys licensed in Massachusetts. (ECF No. 50 at 2.)
     Plaintiffs are representing themselves *pro se*. Additionally, Plaintiffs' TAC name William
21   Sheridan and Michael Tabb as plaintiffs in this action. (*Id.*) Plaintiffs, however, state that
     Sheridan and Tabb have assigned their rights, title, and interests to Plaintiffs. (*Id.*) The
22   Court notes that Sheridan's and Tabb's claims against Defendants were previously
     dismissed without prejudice. (ECF No. 22.) The Court construes the TAC as being
23   brought by Michael Flynn and Philip Stillman only.

24          [2]The Michael Love Family Trust ("Trust") is named a Defendant in the TAC. The
     Trust is not a proper defendant. To the extent that Plaintiffs' claims are against the
25   Trust, the Court interprets those claims against Love, in his capacity as trustee of the
     Trust (henceforth, "Trustee Love"). Moreover, Plaintiffs appear to allege alter ego
26   liability against Meleco, Inc. ("Meleco") in the TAC. In Plaintiffs' reply (ECF No. 84 at 20-
     21), Plaintiffs state that they are not alleging alter ego principles. The Court will construe
27   the TAC accordingly.

28          [3]The parties additionally filed corresponding responses and replies to these
     motions. (ECF Nos. 64, 71, 74, 79, 84, 90.)

1        As further discussed below, the Court denies Plaintiffs' motion to strike as

2    Plaintiffs are not prejudiced by Defendants' motion to dismiss, nor would it be in the

3    interest of judicial economy to delay the resolution of the issues in Defendants' motion.

4    The Court additionally denies Plaintiffs' partial summary judgment motion as Plaintiffs

5    have not shown they are entitled summary judgment. Moreover, the Court grants in part

6    and denies in part Defendants' motion to dismiss as discussed in this order.

7    **II.    BACKGROUND**

8        The following facts are taken from Plaintiffs' TAC[4] (ECF No. 50), unless noted

9    otherwise. In November 1961, the Beach Boys music group was formed and included

10   Michael Love ("Love") and Brian Wilson ("Wilson") as members. (*Id.* at 11.) Wilson's

11   father, Murry Wilson, was the Beach Boys' manager and took control of the copyrights

12   and publishing of the group's songs. (*Id.*) Between 1961 and 1964, Love and Wilson co-

13   wrote many of the Beach Boys' songs and albums. (*Id.*) However, Love was not given

14   songwriting credits on the copyright applications of these songs. (*Id.*)

15       In 1967, Abraham Somer became attorney for both the Beach Boys and Murry

16   Wilson. (*Id.*) Somer incorporated the Beach Boys as Brother Records, Inc., and made

17   Murry Wilson sole proprietor of Sea of Tunes, Inc., which held the copyrights and

18   publishing rights to the Beach Boys' songs. (*Id.* at 11-12.) In 1969, Sea of Tunes, Inc.

19   was sold to Almo Irving Music (the "1969 Sale") with Somer representing the parties,

20   along with Brother Records, Inc., and Beach Boys members. (*Id.* at 12.) At the time,

21   Somer's conflict of interest was allegedly concealed, Wilson was mentally incompetent,

22   and Love received nothing from the 1969 Sale. (*Id.*)

23       Around 1985, Somer's conflict of interest was discussed at Brother Records'

24   board meetings. (*Id.*) An investigation into the matter was conducted from 1985 to 1986

25   by attorneys John Branca and James Tierney, and by Eugene Landy. (*Id.* at 12-13.)

26   Additionally, members of the Beach Boys and others were involved in the investigation

27   _____

28   [4]The allegations in Plaintiffs' 55-page TAC relate to numerous events and
     individuals spanning six decades. Plaintiffs' claims require the Court to construe facts as
     stated above.

1    and corresponded with Branca. (*Id.* at 13.) Plaintiffs allege that there are documents
2    and correspondences during this period regarding the investigation and its purpose. (*Id.*
3    at 13.)

4    Attorney Tierney met with Love on December 5, 1986 and they entered into a
5    written agreement on December 22, 1986 securing Love's cooperation in a lawsuit
6    Wilson was pursuing to regain copyrights of the Beach Boys' songs. (*Id.* at 13-14.) For
7    his cooperation, Love would receive "30% of the [Wilson] case recovery, restoration of
8    [Love's] songwriting credit and copyrights and a minimum of $2 million for past unpaid
9    songwriting payments that had been paid to [Wilson]." (*Id.* at 14.) Nearly three years
10   later in August 1989, Wilson filed a lawsuit against defendants Almo Irving Music,
11   Somer, and Somer's law firm, to regain copyrights to the Beach Boys' songs ("Wilson
12   Case").[5] (*Id.* at 15.) In the Wilson Case, Wilson argued the defendants concealed
13   Somer's conflict of interest from the date of the 1969 Sale until fall of 1988, and
14   additionally argued that Wilson was legally incompetent. (*Id.*)

15   **A. The 1992 Agreement**

16   Love and Jacquelyne Love ("together, the "Loves") met Plaintiff Michael Flynn
17   ("Flynn") in December 1991. (*Id.* at 17.) Jacquelyne Love ("Jacquelyne") disclosed to
18   Flynn the legal claims she believed Love had in numerous Beach Boys songs he co-
19   authored with Wilson, and the ongoing Wilson Case at the time. (*Id.* at 17-18.) She
20   further disclosed that there was no written agreement evidencing a promise of what
21   Love was to receive from the Wilson Case. (*Id.*)

22   From January to July 1992, Plaintiffs investigated the Wilson Case. (*Id.* at 19.)
23   Plaintiffs informed the Loves that Somer's conflict of interest in the 1969 Sale was the
24   basis to defeat the statute of limitations issues in the Wilson Case. (*Id.*) At the time,
25   California had a one-year statute of limitations to sue Somer and his law firm. (*Id.*)
26   ///

27

28   [5]The Wilson Case was eventually settled in favor of Wilson for $10 million and he
     forfeited recovery of the copyrights. (*Id.* at 22.)

1    Plaintiffs allege that, at the time, the Loves knew about the statute of limitations and
2    about the conflict of interest. (*Id.*)

3         Plaintiffs thereafter entered into an agreement with Love to pursue Love's claims
4    to the copyright of the Beach Boys' songs on July 27, 1992 ("1992 Agreement"). (*Id.* at
5    21.) Under the 1992 Agreement, Plaintiffs agreed to pursue Love's case on a sliding
6    scale contingent fee agreement with an expense retainer to be replenished when it fell
7    below $7,000. (*Id.*) The Agreement provided that for any disputes over the fees charged
8    for services, the parties "agree to submit the controversy to binding arbitration in
9    accordance with the Rules of the State Bar Fee Arbitration program set out in Section
10   6200-6206 of the California Business and Professions Code." (ECF Nos. 51-2 at 11, 64-
11   3 at 5.) It concluded with the sentence, "By executing this Agreement, you acknowledge
12   receipt of an executed copy hereof." (ECF Nos. 51-2 at 12, 64-3 at 6).[6] When the
13   Agreement was made, Jacquelyne stated that all financial matters, documents
14   production, and related questions should go to her. (ECF No. 50 at 21.)

15        From July 1992 until February 1995, Plaintiffs represented Love in a lawsuit
16   against Almo Irving Music and Wilson ("Love Case"). (*Id.*) During this time, Plaintiffs met
17   with Tierney and Little, who refused to acknowledge any agreement with Love or that
18   Love co-authored 35 Beach Boys songs. (*Id.* at 22.) Tierney and Little claimed then that
19   they spoke to the Loves about the statute of limitations issue in the Love Case prior to
20   Love's deposition in the Wilson Case in March of 1991. (*Id.*)

21   **B. The 1993 Agreement**

22        Beginning around January 1993, the expense retainer pursuant to the 1992
23   Agreement was not being replenished and defaulted. (*Id.* at 22-23.) Flynn borrowed
24   $200,000 to maintain the Love Case. (*Id.* at 23.) In September 1993, Almo Irving Music
25   offered to settle Love's claims. (*Id.*) However, conflict and disagreement arose between

26        [6]The parties included their copies of the 1992 Agreement. (*See* ECF Nos. 51-2 at
27   8-12; 64-3). The quoted text from the Agreement appears the same on both copies. As
     discussed below, the parties dispute whether Love received a duplicate copy of a
28   properly executed 1992 Agreement under California law. They do not dispute Love's
     signature on the Agreement.

1    the Loves. (*Id.*) Jacquelyne had intentions to obtain the settlement money to remodel

2    the Love's property and to get married. (*Id.*) Flynn thus prepared an agreement ("1993

3    Agreement") between him and Love. (*Id.*) The Agreement provided that Plaintiffs would

4    "'own' 30% of [Love's] rights and income in the songs recovered" and Plaintiffs would

5    pay the expenses from the Love Case. (*Id.* at 24.) Jacquelyne gave Flynn a fully

6    executed 1993 Agreement. (*Id.* at 43.) The Loves married in April 1994. (*Id.* at 25.)

7        **C. The 1994 Agreement**

8        On December 12, 1994, a jury return a special verdict in favor of Love. (*Id.* at 26.)

9    Plaintiffs and the Loves engaged in discussions after the verdict. (*Id.*) Jacquelyne took a

10   lead in the discussions and control of the decision making. (*Id.* at 26-27.) She and

11   Plaintiffs agreed that Plaintiffs were to be paid 30% of all fees on songwriting royalties

12   going forward plus 30% of the cash portion of the settlement. (*Id.* at 27.) She produced

13   to Plaintiffs the signed 1994 Agreement ("1994 Agreement") in the presence of Love.

14   (*Id.*) Between 1995 to 1999, Plaintiffs' law firm represent Love on a number of matters

15   and Flynn routinely consulted Love on non-litigation matters. (*Id.*) From 1995 to 2017,

16   the Loves provided accounting on a regular basis on the royalties and other income

17   received from the 35 Songs. (*Id.* at 46.) Jacquelyne controlled and paid Plaintiffs

18   quarterly their 30% contingent fee but this amount is alleged to be inaccurate. (*Id.* at 6.)

19   Over the past 25 years, the Loves diverted money owed to Plaintiffs over to Meleco and

20   the Trust. (*Id.* at 44.) Jacquelyne received and spent millions on Love's property and her

21   fashion business. (*Id.* at 47.)

22       In early 2017, Love called Flynn and stated, "[Jacquelyne] cheated you and your

23   partners on royalties." (*Id.* at 30.) Between March and April 2017, Love told Flynn the

24   following: Jacquelyne demanded 50% (community interest) of money from the songs,

25   she cheated Flynn with regard to BMI income, switched BMI to ASCAP and took a

26   million dollars on a three-year contract without paying Flynn and his partners, she failed

27   to pay them on time by holding checks, she was seeking to get $2.5M from music

28   publishing company BMG on upcoming copyright reversions by selling the songwriter

royalties. (*Id.* at 30, 34.) In April 2017, Plaintiffs were denied approximately $200,000 when the Loves "switched from BMI to ASCAP with three advance annual payments of $333,000, of which two had been paid in the amount of $666,000" to Defendants. (*Id.* at 8.) In May 2017, Jacquelyne stated to Flynn that she "would never have allowed Mike Love to agree to the 30% of the gross recovery required by the fee agreements" and the "fee agreements should have stopped after 7 years." (*Id.* at 34.) She further stated that "Love never signed the 30% agreement." (*Id.*)

Plaintiffs' TAC sets forth the following claims: (1) fraud against Defendants; (2) breach of contract against Love; (3) accounting against Defendants; (4) *quantum meruit* against Defendants; (5) intentional interference with contractual relations against Jacquelyne; (6) unjust enrichment against Defendants; (7) declaratory judgment against Defendants; (8) fraudulent transfer against Meleco and Trust; (9) constructive trust against Defendants; and (10) embezzlement against the Loves. (*Id.* at 39-54.) As a result of Defendants' actions, Plaintiffs allege they have been damaged in the amount of at least $17.5 million. (*Id.* at 45.)

Relevant to this order, Defendants filed a motion to strike portions of the TAC. (ECF No. 62.)[7] Shortly thereafter, Defendants filed a motion to dismiss several of Plaintiffs' claims. (ECF No. 67.) Plaintiffs responded with a motion to strike Defendants' motion to dismiss, arguing that Defendants violated Fed. R. Civ. P. 12(g)(2). (ECF No. 70.)

**III.   DISCUSSION**

Plaintiffs raise several state-law claims, but the parties cite to both California and Nevada law in their motions. Accordingly, the Court will first address which state law is appropriate to apply. The Court will then address Plaintiffs' motion to strike and motion for partial summary judgment. The Court will conclude by addressing Defendants' motion to dismiss, applying the appropriate choice of law to each claim.

///

---

[7]The Court denied this motion. (ECF No. 95.)

### A. Choice of Law

Because this is a diversity action filed in the District of Nevada, Nevada's law governs the Court's analysis of the choice-of-law issue. *See Cleary v. News Corp.*, 30 F.3d 1255, 1265 (9th Cir. 1994) ("A district court in diversity jurisdiction must apply the law of the forum state to determine the choice of law."); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Nevada uses the most significant relationship test from the Restatement (Second) of Conflict of Laws to govern choice of law issues. *See GMC v. Eighth Judicial Dist. Court of Nev.*, 134 P.3d 111, 116-17 (Nev. 2006); Restatement (Second) of Conflict of Laws § 145 (Am. Law Inst. 1971).

Here, either California or Nevada has the "most significant relationship" to this action, depending on the particular claim. Plaintiffs and Love entered into a contract for legal services performed in California. The 1992 Agreement provides Cal. Bus. & Prof. Code §§ 6200-6206 govern any disputes over fees charged for the services performed. (ECF Nos. 51 at 11, 64-3 at 5.) Flynn also resides in California. The Loves, however, reside in Nevada. Meleco is a Nevada corporation doing business in Nevada. The alleged actions committed by Defendants following 1994 appear to have taken place in Nevada. Because both California and Nevada have a significant interest, the Court looks to § 6 of the Restatement to weigh factors relevant to the choice of the applicable rule of law. *See* Restatement (Second) of Conflict of Laws § 6(2) (Am. Law Inst. 1971).

Sections 6(2)(c), (d), (f), and (g), weigh in favor of applying California law to Plaintiffs' claims pertaining to the three Agreements and royalties. This includes the following claims: fraud, breach of contract, accounting, *quantum meruit*, intentional interference with contractual relations, unjust enrichment, declaratory relief, and constructive trust. In consideration of § 6(2)(c), California has an interest in applying its laws to contracts in its jurisdiction along with the monetary results expressed in the terms of those contracts. *See* § 6(2)(c). Although the 1992, 1993, and 1994 Agreements (collectively, "Agreements") do not include a choice-of-law clause, Plaintiffs and Love had a "justified expectation" California rather than Nevada law would apply to disputes

1     arising from the Agreements. *See id.* § 6(2)(d). While the ownership and possession of

2     the royalties are in dispute, the royalties are not merely incidental to the Agreements.

3     Plaintiffs allege the 1994 Agreement sets forth their ownership to the royalties. For

4     predictability and uniformity of results and the ease of determining the application of law

5     to be applied, as set forth in § 6(2)(f) and (g), the Court applies California law to these

6     claims pertaining to the Agreements and royalties.

7           This leaves Plaintiffs' fraudulent transfer and embezzlement claims. Sections

8     6(2)(c), (d), and (e), weigh in favor of applying Nevada law to these claims. Under the

9     circumstances of this case, Nevada rather than California would have a greater interest

10    in having its law applied to acts within its jurisdiction. *See id.* § 6(2)(c). It would be unfair

11    and a derogation of § 6(2)(d) if Defendants were to be held liable under California law

12    for alleged actions that occurred in Nevada. Moreover, as a general principle and in

13    consideration of § 6(2)(e), unless circumstances dictate otherwise, the law of the state

14    where the tortious action occurred should apply to the tort claim.[8] *See Orr v. Bank of*

15    *Am.*, 285 F.3d 764 (9th Cir. 2002) (emphasis added) ("Nevada law . . . governs

16    [plaintiff's] tort claims because they alleged torts *occurred in* the state of Nevada.").

17    Accordingly, the Court applies Nevada law to these tort claims.

18        **B.  Plaintiffs' Motions**

19          The Court will first address Plaintiffs' motion to strike (ECF No. 70) Defendants'

20    motion to dismiss and then proceed to address Plaintiffs' motion for partial summary

21    judgment (ECF No. 51) on their seventh cause of action for declaratory judgment. The

22    Court will deny both motions.

23             **1.     Motion to Strike**

24          Plaintiffs argue that Defendants' motion to dismiss is improper as it violates

25    Federal Rule of Civil Procedure 12(g)(2) and should be stricken. (ECF No. 70.)

26    _____

27          [8]The Court notes that Plaintiffs' claim for intentional interference with contractual
      relations is a tort claim. The Court, however, as discussed in the preceding paragraph,
      finds that the cause of action is intimately related to a contract governed by California
28    law. In consideration of § 6(2)(f) and (g), Plaintiffs' intentional interference with
      contractual relations claim warrants applying California rather than Nevada law.

Specifically, Plaintiffs argue the plain language of Rule 12(g)(2) prohibits Defendants from filing a motion to dismiss after they filed a motion to strike the same complaint, and Defendants therefore waived their right to file a Rule 12(b)(6) motion. Defendants counter that Plaintiffs have not cited to any controlling authority, and proffer *Pepper v. Apple Inc.*, 846 F.3d 313 (9th Cir. 2017) for the proposition that policy consideration cautioned against unnecessary and costly delays. (ECF No. 71 at 6-11.) In furtherance of judicial economy and drawing upon "practical wisdom," the Court agrees with Defendants and therefore denies Plaintiffs' motion to strike.

Rule 12(g)(2) states, "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). In *Pepper*, the Ninth Circuit Court of Appeals held that district courts have some discretion to consider a successive Rule 12(b)(6) motion under Rule(g)(2) if doing so does not prejudice the plaintiff and furthers resolution of the case. *See Pepper*, 846 F.3d at 319-20; *see also Interior Elec. v. T.W.C. Constr.*, Case No. 2:18-cv-01118-JAD-VCF, 2020 WL 5983882, at *10-11 (D. Nev. Oct. 8, 2020) (citing *Pepper* and reasoning that "district courts have some discretion to consider such a motion if doing so does not prejudice the plaintiff and expedites resolution of the case."). The Ninth Circuit additionally observed, while "Rule 12(g)(2) provides that a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6)" that "defense may be asserted in other ways" under Rule 12(h)(2). *Id.* at 318. "Denying late-filed Rule 12(b)(6) motions and relegating defendants to the three procedural avenues specified in Rule 12(h)(2) can produce unnecessary and costly delays, contrary to the direction to Rule 1." *Id.*

Here, Defendants filed a motion to strike portions of the TAC under Rule 12(f) on July 21, 2020. (ECF No. 62.) Defendants thereafter filed on August 3, 2020 a motion to dismiss several claims in the TAC under Rule 12(b)(6). (ECF No. 67.) Despite Plaintiffs'

1  assertion that Defendants waived the failure-to-state-a-claim defense under Rule

2  12(b)(6) by not asserting the defense in their earlier motion to strike, Defendants are

3  correct that Rule 12(h)(2) explicitly permits them to raise this defense in any pleadings

4  allowed under Rule 7(a), by motion under Rule 12(c), or at trial. Defendants therefore

5  argue, and as the Ninth Circuit observed with Rule 12(h)(2), "[a] defendant who omits a

6  defense under Rule 12(b)(6)—failure to state a claim upon which relief can be

7  granted—does not waive that defense." *See Pepper*, 846 F.3d at 317.

8       The Ninth Circuit, however, also observed that Rule 12(g) was designed to "avoid

9  repetitive motion practice, delay, and ambush tactics" and consideration should be

10  given as to whether a late filed Rule 12(b)(6) motion was "filed for any strategically

11  abusive purpose." *Id.* at 318-19, 320. Plaintiffs briefly allege in their motion that it is

12  reasonable to infer Defendants filed their motions for the purposes of delaying Love's

13  deposition. The Court declines to make this inference and, as Plaintiffs note in their

14  motion, this allegation is moot in light of the Court's denial of Defendants' motion for

15  protective order. (*See* ECF Nos. 47, 72.) Plaintiffs have not shown prejudiced by the

16  successive Rule 12(b)(6) motion and a strict application of Rule 12(g)(2), as discussed

17  above, would not promote judicial efficiency and resolution of the issues in this action. A

18  strict application of Rule 12(g)(2) would merely delay the issues raised in Defendants'

19  motion to dismiss to be reargued at a later date under Rule 12(h)(2). The Court will

20  therefore reach the merits of Defendants' motion to dismiss rather than unnecessarily

21  delay resolution for a later date. Accordingly, Plaintiffs' motion to strike is denied.

22       **2.    Motion for Partial Summary Judgment**

23       Plaintiffs move for summary judgment on their seventh cause of action—

24  declaratory judgment. (ECF No. 51.)[9] Plaintiffs assert that no genuine issue of material

25  fact regarding the validity of the 1992 Agreement exist and the damages owed to

26   

27       [9]Plaintiffs have additionally requested judicial notice of the San Diego Fee
Arbitration Panel's non-binding findings and award. (ECF No. 117.) The Court only
admits evidence in compliance with Rule 201 of the Federal Rules of Evidence and

28  finds nothing in the Arbitration's findings and award impact the outcome of Plaintiff's
motion for partial summary judgment.

1   Plaintiffs under the Agreement. Specifically, Plaintiffs assert that Love's written
2   acknowledgement of receiving an executed copy of the 1992 Agreement is conclusively
3   presumed true under California Evidence Code § 622, and that the Agreement was
4   signed in the presence of Flynn, who handed Love a duplicate copy. Defendants
5   counter that Plaintiffs' argument relies on a misapplication of § 622, and that summary
6   judgment is premature as there remains outstanding disputes of material fact. The Court
7   agrees with Defendants that Plaintiffs are not entitled to summary judgment, and thus
8   declines to address the issue of damages.

9                              **a.    Legal Standard**

10          "The purpose of summary judgment is to avoid unnecessary trials when there is
11   no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
12   18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate
13   when the pleadings, the discovery and disclosure materials on file, and any affidavits
14   "show there is no genuine issue as to any material fact and that the movant is entitled to
15   judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An
16   issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-
17   finder could find for the nonmoving party and a dispute is "material" if it could affect the
18   outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
19   242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue,
20   however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of
21   evidence necessary to raise a genuine issue of material fact is enough 'to require a jury
22   or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v.
23   Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv.
24   Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court
25   views all facts and draws all inferences in the light most favorable to the nonmoving
26   party. *See Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th
27   Cir. 1986) (citation omitted).
28   ///

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]" *Anderson*, 477 U.S. at 252.

### b.    Analysis

Section 6147(a) of California Business and Professions Code provides in part that "[a]n attorney who contracts to represent a client on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the client." "Failure to comply with any provision of this section renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee." *Id.* at § 1647(b). Relevant to Plaintiffs' assertion, California Evidence Code § 622 states in part that "[t]he facts recited in a written instrument are conclusively presumed to be true as between the parties thereto[.]"

Here, Plaintiffs argue that § 622 is dispositive and requires the Court to conclusively presume the 1992 Agreement is valid as set forth by § 1647(a). Plaintiffs offer an executed copy of the Agreement signed by Flynn and Love on July 27, 1992. (ECF No. 51 at 8-12.) Above their signatures, the Agreement states, "By executing this Agreement, you acknowledge receipt of an executed copy hereof." (*Id.*) The presumption therefore is that Flynn and Love signed the Agreement and Love received

1   a duplicate copy. Under § 622, the Court must conclusively presume the Agreement is a

2   valid contingency contract as set forth by § 1647(a). Plaintiffs' argument, however, fails

3   in light of California case law.

4        In the decision of *In re Marriage of Clarke & Akel*, a California appeals court

5   rejected the application of § 622 to a disputed agreement with a written expression that

6   parties were adhering to California Family Code § 1615(c)(2), despite the contrary. *See*

7   19 Cal. App. 5th 914 (Cal. Ct. App. 2018). The court held that § 622 "does not apply to

8   situations not involving arm's length negotiations; moreover, it does not apply when the

9   contract itself was *invalid.*" *Id.* at 921 (emphasis added) (citing *City of Santa Cruz v.*

10  *Pac. Gas & Elec. Co.*, 82 Cal. App. 4th 1167, 1176-77 (Cal. Ct. App. 2000) ("contractual

11  estoppel based on factual recitations in an instrument is inapplicable to the extent that

12  the agreement is void.")). *See also McKellar v. Mithril Capital Mgmt. LLC*, Case No. 19-

13  cv-073144-CRB, 2020 WL 1233855, at *8 (N.D. Cal. Mar. 13, 2020) ("If a contract is

14  otherwise unenforceable, it would be unjust to bind the parties to its factual

15  representations."). As further discussed immediately following, this Court finds that a

16  dispute remains as to whether a valid contingency fee agreement was executed by

17  Flynn and Love and therefore declines to apply § 622 in this instance.

18       In the alternative to applying § 622, Plaintiffs argue the 1992 Agreement meets

19  the requirements of § 1647(a) as it was signed in the presence of Flynn, who "handed to

20  Love at that time" a duplicate copy. (ECF No. 51 at 10.) Defendants deny this and raise

21  "considerable doubt as to the authenticity" of the Agreement copy offered by Plaintiffs.

22  (ECF No. 64 at 4.) Defendants alternatively presented a different copy of the 1992

23  Agreement, which Flynn faxed to Love on February 9, 1993. (ECF No. 64-3.)

24  Defendants' copy, however, does not include Flynn's signature. Had a fully executed

25  agreement in compliance with § 1647(a) been executed on July 27, 1992, a copy of that

26  Agreement with both signatures would have been later faxed on February 9, 1993. A

27  rational trier of fact could reasonably find there was no agreement in full compliance

28  with § 1647(a). In viewing the facts and drawing all inferences in the light most favorable

to the nonmoving party, the Court finds a genuine issue of material fact exists as to the fully executed Agreement. *See Celotex Corp.*, 477 U.S. at 322. Accordingly, the Court denies Plaintiff's motion for partial summary judgment.

### C.   Defendants' Motion to Dismiss

Defendants have moved to dismiss seven of Plaintiffs' 10 claims in their entirety as alleged in the TAC. (ECF No. 67.) Defendants additionally move to dismiss Jacquelyne, Meleco, and the Trust from five of the 10 claims. The Court will first set forth the legal standard, address each claim in turn, applying the appropriate state's law. As further discussed below, the Court grants in part and denies in part Defendants' motion to dismiss.

### 1.   Legal Standard

A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pleaded complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

In *Iqbal*, the Supreme Court of the United States clarified the two-step approach district courts are to apply when considering motions to dismiss. First, a district court must accept as true all well-pleaded factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *See id.* at 678. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *See id.* Second, a district court must consider whether the factual allegations in

14

the complaint allege a plausible claim for relief. *See id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *See id.* at 678. Where the complaint does not permit the Court to infer more than the mere possibility of misconduct, the complaint has "alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 679 (alteration in original) (internal quotation marks and citation omitted). That is insufficient. When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed. *See Twombly*, 550 U.S. at 570.

### 2.    Fraud

The elements of fraud are: "(1) misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) justifiable reliance, and (5) damages." *B. Braun Med., Inc. v. Rogers*, 163 F. App'x 500, 507 (9th Cir. 2006) (citing *Seeger v. Odell*, 18 Cal. 2d 409, 414 (Cal. 1941)). "A successful fraud claim also requires a showing of proximate causation—i.e., 'that damages were sustained as a proximate cause of the fraudulent conduct.'" *Ronpak, Inc. v Elecs. for Imaging, Inc.*, Case No. 14-cv-04058-JST, 2015 WL 179560, *2 (N.D. Cal. Jan. 14, 2015) (citing *B. Braun*, 163 Fed. App'x at 507). Claims based on fraud fall within Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. *See id.* (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003)).

Plaintiffs allege that the Loves' misrepresentation and concealment of Somer's conflict of interest induced Plaintiffs into entering the various terms of the Agreements. Moreover, they allege Jacquelyne produced Love's signatures on the 1993 and 1994 Agreements, which induced Plaintiffs into these Agreements. As a result, Plaintiffs have been harm in the amount of $2.5 million in what should have been paid, with other damages of at least $17.5 million.

Defendants assert that Plaintiffs have failed to allege any damages proximately caused by the alleged fraud. The Court agrees with Defendants. Based on Plaintiffs'

1   allegations, it remains unclear how Somer's conflict of interest or the produced

2   signatures were the proximate cause of Plaintiffs' damages. *See Ronpak, Inc.*, 2015 WL

3   179560 at *2. Based on these allegations, and in observance of the heightened

4   pleading standard of Rule 9(b), the Court finds that Plaintiffs have not sufficiently

5   alleged fraud. Accordingly, Plaintiffs' fraud claim against Defendants are dismissed.

6                          **3.    Accounting**

7        Under California law, "[a] cause of action for an accounting requires a showing

8   that a relationship exists between the plaintiff and defendant that requires an

9   accounting, and that some balance is due [to] the plaintiff that can only be ascertained

10  by an accounting." *Teselle v. McLoughlin*, 173 Cal. App. 4th 157, 179 (Cal. 2009)

11  (citation omitted). This cause of action is not available "where the plaintiff alleges the

12  right to recover a sum certain or a sum that can be made certain by calculation." *Id.*

13       Defendants first assert that accounting is a remedy and not an independent

14  cause of action. The Court, however, does not agree as an action for an accounting is

15  equitable in nature. *See Brea v. McGlashan*, 3 Cal. App. 2d 454, 460 (Cal. App. Ct.

16  1934) ("[A] cause of action for account need only state facts showing the existence of

17  the relationship which requires an accounting and some balance is due [to] the

18  plaintiff."); *see also Dahon N. Am., Inc. v. Hon*, Case No. 2:11-cv-05835-ODW (JCGx),

19  2012 WL 1413681, at *12 (C.D. Cal. Apr. 24, 2012) ("[A]ccounting is an independent

20  cause of action.").

21       Second, Defendants assert that damage calculation is straightforward and the

22  amount is ascertainable. Plaintiffs allege the Loves paid Plaintiffs quarterly and semi

23  quarterly Plaintiffs' 30% contingent fee on royalties over 20 years, but those payments

24  have been inaccurate. Defendants made special arrangements with third parties and

25  transferred money to Meleco and the Trust. Based on these allegations and royalty

26  payments spanning years, the Court finds Defendants possess information unknown to

27  Plaintiffs that is relevant for the computation of a sum certain that currently is not

28  ascertainable.

Finally, Defendants assert that an accounting claim should be dismissed as there is no fiduciary duty. The Court does not agree in part with Defendants' assertion. Under California law, an action for accounting need not allege a fiduciary relationship. *See Teselle*, 173 Cal. App. 4th 179 ("All that is required is that some relationship exists that requires an accounting."); *see also Baiul v. NBC Sports*, Case No. CV 15-05163 DDP (MRWx), 2016 WL 409938, *3 (C.D. Cal. Feb. 2, 2016) (collecting cases) ("[A]n accounting claim need not necessarily be a fiduciary one, courts typically require that [the relationship] reflect some degree of confidentiality or closeness.").

Here, Plaintiffs allege that a confidential personal and professional relationship existed between them and the Loves since 1992. Plaintiffs received payments and accounting from the Loves for over 20 years. Between 1995 to 1999, Plaintiffs' law firm represented Love on a number of matters, and Flynn routinely consulted with Love on non-litigation matters. The Court finds a close relationship may have existed between Plaintiffs and the Loves. Plaintiffs, however, do not allege sufficient facts to show a close relationship existed with Meleco and the Trust. Accordingly, Trustee Love and Meleco are dismissed. This claim will proceed against the Loves.

### 4. Intentional Interference with Contractual Relations

A plaintiff bringing a claim for intentional interference with contractual relations must plead the following: (1) a valid and existing contract; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *See Pac. Gas & Elec. Co. v. Bear Sterns & Co.*, 50 Cal. 3d 1118, 1126 (Cal. 1990).

Defendants do not challenge that Plaintiffs have failed to state a claim against Jacquelyne but rather assert she is privileged as a person in a "confidential relationship"—i.e., spouse—with Love. This is a "Manager's Privilege" in the context of intentional interference with contractual relations, which can be a misnomer as in this instance. *See Huynh v. Vu*, 111 Cal. App. 4th 1183, 1194-95 (Cal. App. Ct. 2003). The

Court does not agree with Defendants' assertion because the privilege is a defense. Whether it exists raises questions of fact. *See Woods v. Fox Broad. Sub., Inc.,* 129 Cal. App. 4th 344, 351 n.7 (Cal. App. Ct. 2005) (citation omitted) (stating that a Manager's Privilege is a "qualified privilege that turns on the defendant's state of mind, the circumstances of the case, and the defendant's immediate purpose when inducing a breach of contract."). Accordingly, the Court finds that Plaintiffs state a colorable claim against Jacquelyne.

### 5. Quantum Meruit

To recover in *quantum meruit*, "a party need not prove the existence of a contract, but it must show the circumstances were such that the services were rendered under some understanding or expectation of both parties that compensation therefore was to be made." *Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458 (Cal. 2004) (citations and quotes omitted).

Defendants concede this claim against Love but assert Jacquelyne, Maleco, and the Trust are not third-party beneficiaries of Plaintiffs' legal services. Plaintiffs counter that Jacquelyne had an independent pecuniary interest and further argue their services benefited these Defendants. As a result of the services, Jacquelyne received and spent millions on Love's property and her business. Despite Plaintiffs' contention, the Court finds that Plaintiffs have failed to allege their services were performed with intention or written expression of benefiting Defendants. *See Ochs v. PacifiCare of Cal.*, 115 Cal. App. 4th 782, 795 (Cal. 2004) ("A third party may quality as a beneficiary when it appears from the terms of the contract itself that the contracting parties intended to benefit the third party." (citing *Jones v. Aetna Cas., & Sur. Co.*, 26 Cal. App. 4th 1717, 1724 (Cal. 1994)). Accordingly, this claim will proceed against Love. This claim is dismissed against Jacquelyne, Meleco, and Trustee Love.

### 6. Unjust Enrichment

The elements for an unjust enrichment claim are "receipt of a benefit and unjust retention of that benefit at the expense of another." *Prakashpalan v. Engstrom,*

*Lipscomb & Lack*, 223 Cal. App. 4th 1105, 1132 (Cal. App. Ct. 2014) (citation omitted). "The theory of unjust enrichment requires one who acquires a benefit which may not justly be retained, to return either the thing or its equivalent to the aggrieved party so as not to be unjustly enriched." *Id.* (citation omitted).

Similar to their *quantum meruit* position, Defendants assert that benefitting indirectly from the services provided by Plaintiffs do not make them liable. Plaintiffs allege that Defendants have benefitted from royalties obtained by Plaintiffs' legal services. As discussed above, Jacquelyne received and spent millions on Love's properties and on her business. In April 2017, Plaintiffs were denied approximately $200,000 when the Loves "switched from BMI to ASCAP with three advance annual payments of $333,000, of which two had been paid in the amount of $666,000" to Defendants. (ECF No. 50 at 8.) The Loves transferred funds owed to Plaintiffs to Meleco and the Trust. As a result of inaccurate accounting, actions changing the nature of the royalties, and the discontinuation of payment in 2017, Defendants have benefited and Plaintiffs have suffered millions in damages. The Court finds that Plaintiffs state a colorable claim against Defendants.

### 7.    Constructive Trust

"An action to impose a constructive trust is a suit in equity to compel a person holding property wrongfully to transfer the property to the person to whom it rightfully belongs." *Higgins v. Higgins*, 11 Cal. App. 5th 648, 658 (Cal. App. Ct. 2017) (citing *Community Party v. 522 Valencia, Inc.*, 35 Cal. App. 4th 980, 990 (Cal. App. Ct. 1995)). Three elements are needed to impose a constructive trust: "(1) a specific, identifiable property interest, (2) the plaintiff's right to the property interest, and (3) the defendant's acquisition or detention of the property interest by some wrongful act." *Id.* (citation omitted.) "A constructive trust cannot exist unless there is evidence that property has been wrongfully acquire or detailed by a person not entitled to its possession." *Communist Party*, 35 Cal. App. 4th at 991 (emphasis in original) (collecting cases).

///

Defendants assert that constructive trust is a remedy not a cause of action. The Court disagrees. First, California courts have recognized that a constructive trust maybe pled as a cause of action. *See Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 177 (Cal. App. Ct. 2009) ("[P]laintiff could establish a cause of action for constructive trust."); *see also Dabney v. Philleo,* 38 Cal. 2d 60, 67-68 (Cal. 1951) ("[T]he complaint does allege, sufficiently as against general demurrer, a cause of action for imposition of a constructive trust[.]"). Second, Plaintiffs allege that royalties due to them by an agreement are in the Loves' possession, and the Loves have altered or transferred royalties to Meleco and the Trust without Plaintiffs' consent. Plaintiffs were in receipt of these royalties from 1995 to 2017. The Court finds the issue of whether a constructive trust is appropriate may be premature. Accordingly, the Court will deny Defendants' motion as to this claim.

### 8. Declaratory Judgment

"The purpose of a declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed jural relations." *Maguire v. Hibernia Sav. & Loan Soc'y*, 23 Cal. 2d 719, 729 (Cal. 1944) (quotes and citations omitted). "A complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the respective parties under the request that these rights and duties be adjudicated by the court." *Columbia Pictures Corp. v DeToth*, 26 Cal. 2d 753, 760 (Cal. 1945). Where there is an accrued cause of action of past breach of contract or other wrong, declaratory relief is inappropriate. *See Canova v. Trs. of Imperial Irrigation Dist. Emp. Pension Plan*, 150 Cal. App. 4th 1487, 1497 (Cal. App. Ct. 2007) (stating "declaratory relief operates prospectively to declare future rights, rather than to redress past wrongs").

Plaintiffs bring a cause of action for declaratory judgment of their legal rights under the Agreements against Defendants. Defendants do not challenge Plaintiffs' claim against Love but assert there is no justiciable controversy that exist between Plaintiffs ///

1    and the remaining Defendants as they were not parties to the Agreements. The Court

2    disagrees with Defendants in part.

3         In *Siciliano v. Fireman's Fund Ins. Co.*, 62 Cal. App. 3d 745 (Cal. App. Ct. 1976),

4    an attorney sought an action for declaratory relief against his former client and an

5    insurance company pertaining to a retainer agreement between attorney and client. *Id.*

6    Similar to this action, defendant company did not challenge the action against defendant

7    client, but argued declaratory relief was improper "against one who is not a party to the

8    contract." *Id.* at 753-54. The *Siciliano* court disagreed. It held that the company—though

9    not party to the agreement—"did not render it exempt from a declaratory relief action to

10   determine rights and duties under the circumstances." *Id.* at 753. The court reasoned in

11   part that the company was not exempt because it was a party to the settlement of

12   client's case and knew of attorney's interest at the time. *Id.*

13        Similarly here, Plaintiffs allege that Jacquelyne was not only involved, but "took

14   control of the decision making," when the Agreements came into existence between

15   Plaintiffs and Love. When the 1992 Agreement was formed, Jacquelyne stated that all

16   financial matters, documents production, and related questions should go to her. The

17   Loves married in April 1994 before the effective date of the 1994 Agreement. Plaintiffs

18   allege that Jacquelyne seeks community interest in the royalties. The Court finds that

19   Jacquelyne was involved with the Agreements and was aware of Plaintiffs' interest in

20   the royalties at that time. Plaintiffs, however, have failed to sufficiently allege facts to

21   show the same with respect to Meleco and Trustee Love. Accordingly, this claim will

22   proceed against the Loves. Maleco and Trustee Love are dismissed.

### 9. Fraudulent Transfer

24        The Nevada Uniform Fraud Transfer Act was "designed to prevent a debtor from

25   defrauding creditors by placing the subject property beyond the creditors' reach." *Herup*

26   *v. First Bos. Fin., Ltd. Liab. Co.*, 162 P.3d 870, 872 (Nev. 2007). The Act makes it fraud

27   for debtor to transfer or incur obligations on property with the intention of avoiding

28   paying a debt to creditor. *See* NRS §§ 112.180, 112.190. To succeed on a fraudulent

1   transfer claim, plaintiff must show: (1) a transfer of an asset occurred, (2) plaintiff's claim

2   preexisted the transfer, (3) the transfer was not for "reasonable equivalent value," and

3   (4) defendant was insolvent at time of the transfer. *See Wells Fargo Bank, N.A. v.*

4   *Radecki*, 426 P.3d 593 (Nev. 2018) (citing NRS § 112.190(1)).

5          Defendants assert that Plaintiffs' allegations are insufficiently plead under *Iqbal*.

6   Plaintiffs counter that not more specificity is required until discovery. The Court

7   disagrees. The Court finds that Plaintiffs have failed to allege fact sufficient to state a

8   claim against Meleco and Trustee Love, especially under the heightened pleading

9   standard of Fed. R. Civ. P. 9(b) for fraud claims. The Court therefore dismisses this

10  claim against Meleco and Trustee Love.

### 10.   Embezzlement

12         Plaintiffs title their tenth cause of action, "receipt of embezzled funds against

13  Love and Jaquelyne Love." (ECF No. 50 at 53.) Plaintiffs cite to *Batin v. State*, 38 P.3d

14  880 (Nev. 2002) in their reply to assert they have sufficiently alleged the elements for

15  embezzlement. *Batin*, however, is a criminal case where a defendant was convicted of

16  embezzlement. Moreover, Plaintiffs further state in their reply that their claim is "a claim

17  for conversion." (ECF No. 84 at 16.) The Court thus agrees with Defendants that

18  Plaintiffs fail to state a claim for embezzlement and dismisses this claim.

### 11.   Leave to Amend

20         The Court has discretion to grant leave to amend and should freely do so "when

21  justice so requires." *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990)

22  (*quoting* Fed. R. Civ. P. 15(a)).  Because the Court does not find that amendment is

23  futile, Plaintiffs are granted leave to amend the claims dismissed to the extent Plaintiffs

24  are able to cure the deficiencies addressed herein.

## IV.   CONCLUSION

26         The Court notes that the parties made several arguments and cited to several

27  cases not discussed above. The Court has reviewed these arguments and cases and

28  ///

determines that they do not warrant discussion as they do not affect the outcome of motions before the Court.

It is therefore ordered that Plaintiffs' motion to strike (EFC No. 70) is denied.

It is further ordered that Plaintiffs' motion for partial summary judgment (ECF No. 51) is denied.

It is further ordered that Defendants' motion to dismiss (ECF No. 67) is granted in part and denied in part, as explained herein. Plaintiffs are given leave to amend the dismissed claims within 15 days. Failure to file an amended complaint will result in dismissal of these dismissed claims with prejudice.

DATED THIS 30th Day of March 2021.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE