1

Michael J. Flynn, Esq., *pro se*
PO Box 690
Rancho Santa Fe CA, 92067
Tel: (858) 775-7624
Email: mike@mjfesq.com

2

3

4

Philip H. Stillman, Esq., *pro se*
3015 North Bay Road, Suite B
Miami Beach, FL  33140
Tel: (888) 235-4279
Email: pstillman@stillmanassociates.com

5

6

7

8

## UNITED STATES DISTRICT COURT

9

## DISTRICT OF NEVADA

10

11

MICHAEL J. FLYNN, and PHILIP STILLMAN

Plaintiffs,

vs.

MICHAEL E. LOVE, an individual; and JACQUELYNE LOVE, an individual; MICHAEL E. LOVE as TRUSTEE OF THE MICHAEL LOVE FAMILY TRUST; MELECO, INC., a Nevada corporation; and DOES 1-10,

12

13

14

15

16

17

18

19

Case No.: 3:19-cv-00239- MMD-CBC

**FOURTH AMENDED COMPLAINT FOR:**

1. **FRAUD**
2. **BREACH OF CONTRACT;**
3. **ACCOUNTING;**
4. **QUANTUM MERUIT;**
5. **INTENTIONAL INFERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONS;**
6. **UNJUST ENRICHMENT**
7. **DECLARATORY JUDGMENT**
8. **FRAUDULENT TRANSFERS;**
9. **IMPOSITION OF CONSTRUCTIVE TRUST; AND**

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS**

20

21

22

23

24

25

26

27

28

1      1.    This is an action premised on the Court's diversity jurisdiction pursuant to

2  28 U.S.C. § 1332.  The Plaintiffs are citizens and domiciliaries of the States of

3  Massachusetts and Florida.  The Defendants are citizens and domiciliaries of the State of

4  Nevada.  Plaintiffs seek amounts lawfully owing to them in excess of $1 million, which

5  exceeds the jurisdictional amount.

6      2.    Plaintiffs also seek declaratory relief under the federal Declaratory

7  Judgment Act, 28 U.S.C. § 2201, declaring their 30 % ownership of all "rights" in the 35

8  songs they recovered for the defendant, Michael E. Love, including rights as the

9  copyrights to the songs revert to the defendant.

10  **PARTIES**

11      3.    Plaintiff Michael J. Flynn ("MF") is a citizen of Massachusetts with a

12  residence in Rancho Santa Fe, San Diego County, CA.   MF is an attorney licensed to

13  practice in good standing in the Commonwealth of Massachusetts.   MF was a partner

14  in the law firm f/k/a Flynn Sheridan & Tabb and Flynn Sheridan Tabb & Stillman,

15  ("FST&S").

16      4.    Plaintiff Philip H. Stillman ("Stillman") is an individual who is a citizen of

17  Florida who resides in Miami-Dade County, Florida.   Stillman is an attorney in good

18  standing who is licensed to practice law in the Commonwealth of Massachusetts and

19  the State of California.   Stillman was a partner in the law firm Flynn Sheridan Tabb &

20  Stillman.

21      5.    Defendant Michael E. Love (alternatively "ML" or "Love") is an

22  individual who is a citizen of Nevada and who resides in Incline Village, Nevada.  Love

23  is the lead singer of the rock group "The Beach Boys," and the Trustee of the Michael

24  Love Family Trust.  Love is sued in both capacities.   At all relevant times between July

25  27, 1992 and July 28, 2017, a period of *25 years*, ML retained attorney Michael Flynn as

26  his litigation attorney in numerous matters, including the subject of this complaint, the

27  case of *Love v Irving Music, Abraham Somer, and Brian Wilson* U.S. Dist. Ct., Los Angeles,

28  Case No. 2:92-cv-04594 (WJR-SH), (hereinafter *Love v Wilson*.)  The plaintiff attorneys, as

partners in the firm of FST&S worked on, and/or represented Love in the *Love v Wilson* case and related matters between approximately January 1992 and at least December 1995. Plaintiffs estimate that FST&S spent over 18,000 hours of attorney time on said case and related matters, ultimately obtaining a "recovery" by Special Verdict dated December 12, 1994 for Love valued as of December 29, 1994 in excess of $50 million, in the form of past and future songwriter royalties on 35 of the  Beach Boys biggest "hits"; and the "rights" to 30% of the income and/or the actual copyright reversions on said 35 songs, (hereinafter the "Recovery").

6.     Defendant Jacquelyne Piesen Love ("JPL") is an individual who is a citizen of Nevada, who resides in Incline Village, Nevada.  JPL married ML in April 1994 – his 9th wife - during the underlying litigation relating to Plaintiffs' representation of ML as recited herein. The conflict giving rise to this complaint arose in this matter for the first time in July 2017 after 23 years and *full and complete performance* of the Plaintiffs' and ML's July 27, 1992 contingent fee contract, (the "'92 Agreement") as amended in September, 1993.

7.     These contracts and the 35 songs obtained by Plaintiffs pursuant to the contracts are pre-marital assets of Love. In the context of divorce issues in July 2017, JPL for the first time fabricated facts and claims designed to attempt to defeat the contracts which includes the fraudulent concealment of the original fully executed contracts. After requesting the turnover of Plaintiffs' voluminous files years ago, JPL has possession of Plaintiffs' original fee agreement files created over 28 years ago.

8.     Defendant MELECO, Inc. is a Nevada corporation with a usual place of business in Incline Village Nevada.  MELECO is the alter ego of Mike Love and Plaintiffs are informed and believe that MELECO has received funds to which Plaintiffs are entitled.

9.     Defendant Michael E. Love Family Trust, (the "Trust"), is a Trust Agreement between Michael E. Love and JPL almost exclusively operated, administered and controlled by JPL since at least 1998.  Over decades, Plaintiffs are informed and

believe thereon based on statements to MF by ML that JPL has used the Trust to divert funds owed to the Plaintiffs pursuant to the fee agreements recited herein; and also to gain administration and control over all of the assets of Love, both premarital assets of Love before he married JPL in April, 1994, and assets acquired after they were married.

10.     DOES 1 through 10 are believed to be participants in the torts and claims recited herein.  Their identity and specific acts are unknown at this time.  They will be added as defendants as the case progresses when their identities become known to the Plaintiffs.

<strong>JURISDICTION AND VENUE</strong>

11.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 in that Plaintiff and both defendants are domiciliaries of different states, and the amount in controversy is in excess of $150,000, exclusive of interest and attorney's fees.

12.     This Court also has supplemental jurisdiction over the state law claims by virtue of 28 U.S.C. § 1367.

13.     Venue is proper in this Court as both Defendants are domiciled and have a usual place of business in this District.

<strong>INTRODUCTION AND SUMMARY</strong>

14.     The premarital assets of Love include the "92 Agreement" and a 1993 Amendment to it; and all of the rights, royalties, copyright termination rights, and copyright reversion rights to the 35 Beach Boys songs won for ML by plaintiffs, all of which define their current value. According to the Special Verdict obtained for ML by Plaintiffs, the 35 Songs were created by Love and Brian Wilson between 1962 and 1968 when Love was married to several other women.  As referenced herein, the 35 Songs refers to the list of 35 songs listed in the Special Verdict, without which verdict, Love would have had no interest at all in those songs.

15.     As adjudicated in the 25 page "Special Verdict," Wilson and his father throughout the 1960's engaged in a pattern of fraud to deprive Love of both songwriting credit for the 35 Songs as well as loss of the copyrights to the songs.  The

Special Verdict specifically incorporates Love's "recovery" rights in multiple claims and answered "questions" determined by the Jury to "recover", (the term applied in the 92 Agreement) all of his current rights in the 35 songs including copyright rights of reversion and termination.  This dispute is now before this Court based on JPL's "schemes" to sell and control the songwriter royalties won for Love by the Plaintiffs; and to control the "termination" and "reversionary rights" to the copyrights to the 35 Songs in order to assert her purported "community property" interests in the 35 songs.

16.     The copyrights to the 35 Songs have been reverting to Love under applicable copyright laws since early 2017 when this dispute first arose in the context of Love intending to divorce JPL, as reported to MF by Love.  The copyright reversions in the songs are continuing through 2024.  Plaintiffs are informed and believe, based on the recent sales of other iconic song catalogs, that the value of the copyrights for the 35 Songs exceeds $300 million of which Love owns approximately ½, valued at approximately $150 million.  This money is a premarital asset of Love which, according to Love, JPL claims is her "community property."  Hence, this dispute.

17.     This dispute first arose after 23 years in July 2017 when JPL for the first time between December 29, 1994, the date of the Judgment in *Love v. Wilson*, Case No. 2:92-cv-04594-WJR-SH (C.D.Cal. Jul. 31, 1992) and "recovery" obtained by Plaintiffs under their fee agreements and July 2017, claimed a "community property" interest in the 35 Songs. But unknown to Plaintiffs until April 2017, JPL's "schemes" began at least in 2003 when Love filed for divorce and sought a Restraining Order against JPL because he was fearful of her "mob family" connections.  Love's disclosures to Michael Flynn in April 2017 of these and related facts caused a titanic eruption in this matter after 23 years of contractual payments, which then caused JPL and her lawyer, Vincent Chieffo, to purport to terminate the various contracts with Plaintiffs.

18.     At least by 2010 -2012, when JPL requested Mr. Flynn's files purportedly to "work on" the copyright reversion issues, she was implementing her "scheme" to interfere with and terminate the Plaintiffs' fee agreements by means of fraud, deceit and

concealment.  Trusting Love and JPL, and with no knowledge of her "community property scheme," between 2010 and 2012, at her request, Flynn gave JPL nearly all of his files involving the *Love v Wilson* case including all of his fee agreement files, correspondence files, work product files, general case files, and miscellaneous files. These were contained in approximately 50 "bankers boxes." JPL is currently concealing the fully executed fee agreements; and most importantly; she is fraudulently concealing the '92 Agreement signed by Michael Flynn on or about July 27, 1992 and mailed to Love along with the cover letter.  THAT signed copy is in her possession in her possession.  The mailed copy solely signed by Love on July 27, 1992 sent to the Ashley firm after it was retained in December, 1992 accounts for the agreement with solely Love's signature because that is what they requested.  The Ashley firm never requested from Love or JPL the fully executed copy or the copy signed and mailed by Mr. Flynn. This evidence was established in the Arbitration, hence the finding that the 92 Agreement was valid, along with Love's failure to dispute it in the Arbitration, unlike his obtuse affidavit filed in opposition to the Plaintiffs' Motion for Summary Judgment.

19.    At the time that Mr. Flynn turned over his files, the Plaintiffs were not only unaware of JPL's developing "community property scheme," they were unaware of her history of frauds, document concealments, misrepresentations and fraudulent inducements and subsequent fraudulent interference with their fee agreements. Plaintiffs now know that this "pattern of fraud" began in December 1991 and continues to the present.  If the Plaintiffs had known of such fraudulent intent, the fee agreements and all subsequent conduct between the parties would have been different. JPL's illegal conduct involves not only a pattern of fraud and misrepresentation to induce and interfere with Plaintiffs' fee agreements, it now involves a legally cognizable "conspiracy" to obtain over a hundred million dollars in the copyright reversions to the 35 Songs joined in by Love and others without paying the Plaintiffs' earned fees.

20.    Pursuant to her "community property scheme" as disclosed by Love to Flynn between April and July 2017, JPL fraudulently continues to conceal to date in

Fourth Amended Complaint

these proceedings critical evidence in Brian Wilson's earlier case, *Wilson v Irving* and *Love v Wilson* cases which she and Love concealed and suppressed between 1989 and December 29, 1994 both from the Court and from the Plaintiffs.  This evidence primarily involves the so-called "Branca Documents." Plaintiffs are informed and believe, based on statements made by Love to Flynn, that JPL is using the "Branca Documents" to "blackmail" Love into cooperation with her scheme.  If Plaintiffs had known in December, 1994, after the Special Verdict, of JPL's frauds they would have demanded full payment under their agreements at that time.  Plaintiffs' lack of knowledge of the fraudulent concealments, which continued until at least the fall of 2017, directly caused Plaintiffs to not pursue all of their legal rights for 23 years between December, 1994 and the filing of this action.

21.   Love and JPL first lied to the Plaintiffs in December 1991, which lies then continued throughout the first 7 months of 1992 during Plaintiffs' investigation into Love's claims to regain songwriting credit and the copyrights for what became known as the 35 Songs. The so-called "Branca Documents" involve the Beach Boys' attorney John Branca's 1985 investigation into the conflict of interest of attorney Abraham Somer in connection with the 1969 sale of Brian Wilson's and Love's song catalog, which included the 35 songs at issue here, as a means of setting aside the sale of the song catalog to A&M Records in 1969.  The Branca Documents would have been critical evidence for the defendants in both the *Wilson v. Irving Music* and *Love v. Wilson* cases because knowledge of the conflict of interest in 1985 would have undercut or eliminated any tolling of the applicable statute of limitations that enabled both Wilson and Love to proceed against Somer's law firm and Rondor Music to set aside the sale of the Beach Boys' song catalog in 1969.

22.   Between 1992 and continuing to the present, JPL and Love have continued to conceal documents from the Plaintiffs and now from this Court, mostly involving the fee contracts and the so-called "Branca Documents" discussed *infra*.

23.     The involvement of their present counsel, Vincent Chieffo, is at issue in this case, although the Court to date has rejected his disqualification.  Because the Branca Documents were circulated to the Beach Boys and their lawyers at the time, Plaintiffs are informed and believe that by virtue of his representation of founding Beach Boy Al Jardine, in representing Jardine during the *Wilson v. Irving Music* litigation, and now in connection with his representation of Defendants in this case, Mr. Chieffo is in and has been in possession of the Branca Documents and is engaged in a strategy to delay their production.

24.     A Court Order to produce the Branca Documents would establish a pattern over 28 years of JPL' fraud to induce and interfere with Plaintiffs' fee agreements.  It will potentially save enormous court time and resources. And it will expose Mr. Chieffo's involvement over 28 years ago in the suppression and concealment of the Branca Documents, when he represented a party copied on the Branca Documents during the underlying cases; and likely explains his presence in this case on behalf of Defendants.

25.     Most importantly, in connection with the causation elements of Plaintiffs' fraud claims in this case, JPL and Love have continued to conceal the fully executed '92 Agreement executed by both Love and Michael Flynn and subsequent agreements since this dispute arose. Their failure to produce it is part of JPL's pattern of fraud. Plaintiffs have verified this Fourth Amended Complaint to compel either production of the fully executed '92 Agreement and to compel the production of the "Branca Documents," or to compel Defendants and their counsel to deny their existence before more court time and resources are wasted.

26.     In 2017, *twenty-five* years after execution of the '92 Agreement, and approximately 10 years after requesting all of the Firm's files relating to the *Love v. Wilson* case, JPL first fraudulently concocted the legal strategy that Love never received a fully signed '92 Agreement in order to defeat it as a premarital asset of Love; and thereby fraudulently perfect her "community property" claim in the 35 songs.

27.     JPL's lawyer, Vincent Chieffo, also first incorrectly asserted in writing in related fee arbitration proceedings that the '92 Agreement did not comply with California law regarding insurance and negotiability of fees notices, but then dropped that position when they realized that those requirements involved a subsequent statutory amendment, so they then made up the claim that Love did not receive a fully executed copy of the '92 Agreement.  As recited herein, fraudulently asserting shifting positions since this matter began in July, 2017, is a classic tactic of JPL and her lawyers – they just make up facts and play fast and loose as this matter has proceeded in arbitration and in this court.

28.      As to the 1993 and 1994 agreements, JPL and her lawyers also first asserted that those agreements did not comply with California law regarding insurance notice and notice that "contingent fees are negotiable and not set by law" to be reviewed by independent counsel under California law. But even those fabricated positions changed too.

29.     In arbitration proceedings before the San Diego Fee Arbitration Board beginning in May, 2019 and continuing until February 1, 2021, JPL and her lawyer, Vincent Chieffo, never contested the signature of Love on the '92 Agreement, *which he admitted under oath to be authentic in those proceedings.*  But in their first filed written responses to Plaintiffs' claims filed under the California fee arbitration statute, JPL and her lawyer, Chieffo, claimed that Love's signatures on the 1993 amendment to the '92 Fee Agreement and the 1994 Agreement (the '92  agreement primarily governs this matter), were  an obvious  *"cut and paste job"* evidencing forgery.

30.     However, during 5 days of evidentiary hearings between October 19-22, 2020 and November 30, 2020, after Plaintiffs provided evidence that if Love's signatures were "cut and pasted" on the '93 and '94 agreements evidencing forgery, the real culprit was none other than JPL, who "signed" his name.  In their Response to Admissions in this case, they admit JPL signed Love's name to documents but qualified *how* she did it. Moreover, in April 2017, Love admitted to Mr. Flynn that JPL was "signing" and

Fourth Amended Complaint

"forging" his name to documents.  So JPL and Mr. Chieffo changed their story. In the arbitration, JPL and Chieffo never offered any evidence of their previously written concocted "*cut and paste*" theories after Love testified they were his signatures.

31.     Remarkably, after all the briefing was done in the arbitration proceedings, and while the matter was under submission, Mr. Chieffo then sent an email on January 13, 2021, saying the signatures on the 93 and 94 agreements were "*electronically affixed by someone else,*" (emphasis added), never mentioning his previous "*cut and paste*" position. JPL and Mr. Chieffo just keep changing their stories to evade the truth.

32.     The Panel rejected this late-filed concoction the same day; and issued its "Award" on Feb. 2, 2021. Among other things, it validated the '92 Agreement based on Love's testimony in the 5 days of evidentiary hearings essentially authenticating the 92 Agreement, and awarding approximately $2.6 million to the Plaintiffs with *no damages* for "future" losses, because Plaintiffs intentionally refrained from putting into evidence expert testimony on the current value of the reverting copyrights.  The Panel explicitly cited the provision in the '92 Agreement which specified that "recovery" for fee purposes included the difference between what Love had before July 27, 1992 and what he had as a result of Plaintiffs work under that Agreement:  *all of his rights in the 35 songs*.  Those issues are before this Court.

33.     Plaintiffs requested that this Court take Judicial Notice of the Fee Arbitration "Award" (ECF No. 117), which Defendants opposed (ECF No. 118) based upon their " Notice of Rejection " (ECF No. 108).  Thereafter, this Court denied Plaintiffs' Motion for Summary Judgment. (ECF No. 120).  The legal effect of Defendants' "Rejection" filed in this Court without the statutory mandated filing of a "complaint" accompanying it, and the legal effect of their Opposition to Plaintiffs' Request for Judicial Notice ("RJN") are now squarely at issue in this Court.

34.     Defendants did not disclose to this Court either in their Rejection of the Award or their opposition to the RJN that the California statutory framework mandates that a "complaint" be filed accompanying the notice of Rejection of the "Award."  See

Plaintiffs' Motion to Strike filed herewith. The filing of a "complaint" is a statutory requirement because it implicates the good faith requirements of Rule 11 following arbitration, and places at issue the facts and claims recited in the complaint following arbitration in connection with which a party seeks "*de novo*" review.  The issue for subsequent proceedings is *de novo* from what?  Hence the mandate of a "complaint. California courts routinely inquire in such cases precisely what a party disagrees with following arbitration and shapes the "complaint" and subsequent proceedings accordingly.  This likely explains "check marked" form the Defendants then filed in California, in contrast to what the Plaintiffs filed.

35.     Plaintiffs are informed and believe that Defendants did not file required "complaint" in this Court because of the Rule 11 mandates requiring that counsel have a "good faith" basis to support the facts alleged in a complaint.   Instead, they filed a "check the boxes" breach of contract Judicial Council form in the San Diego Superior Court suing the Plaintiffs contesting *only* the Panel's denial on statute of limitations grounds their absurd fabricated claim for over $800,000 dating back to 1995 of purported overpayments.  Their "form complaint" effectively admits the authenticity of the '92 Agreement.  See **Exhibit 8** attached hereto.  Defendants did *not* challenge the '92 Agreement in their San Diego complaint because their client Love, testified it was valid as found by the arbitration Panel.   Plaintiffs are informed and believe that Defendants' counsel know that the '92 Agreement is valid and that JPL is concealing the fully executed agreement.  Defendants' counsel's Rule 11 obligations prevented then from filing the required complaint.

36.     Defendants' clumsy procedural attempts to circumvent compliance with California law are defective as a matter of law, and implicate the subject matter jurisdiction of this Court over a California statutory fee arbitration award.

37.     Given Defendants conduct, in order to safeguard all of their rights under the California statutes governing the Fee Arbitration "Award", Plaintiffs complied with the California statute and case precedent and correctly filed a "Complaint" in the San

Diego Superior Court (Vista Division – the correct venue) within the 30 day statutory period *contesting only damages*.   The ultimate resolution of Defendants' procedural improprieties implicates the subject matter jurisdiction of this Court to adjudicate a California fee "Award" under a California statutory framework regulating the licensing and supervision of California lawyers, an exclusive state controlled jurisdictional matter.

38.   Because these issues involve the legal effect of Defendants' Rejection of the Fee Award based on the potential lack of subject matter jurisdiction of this Court over a California statutory framework governing attorney client fee arbitration and regulatory controls over attorney client matters, Plaintiffs are disclosing and incorporating said issues into this Fourth Amended Complaint, as well as a Motion to Strike the "Rejection" which would leave a judgment in effect on the validity of the 92 Agreement.

39.   JPL has retained as current counsel in this matter, Vincent Chieffo, who formerly represented JPL's litigation adversary in the Beach Boys band, Alan Jardine, between 1989 and December 29, 1994 during both the *Wilson v Irving* and *Love v Wilson* cases when JPL, Jardine, Love and the Beach Boys corporate entity, Brother Records, Inc ("BRI"),  were concealing and suppressing the "Branca Documents"; and allegedly suborning perjury among themselves to conceal Branca's 1985 investigation into the Somer conflict of interest in the 1969 sale as recited herein.

40.   Additionally, JPL induced Love and BRI to sue Jardine between 1998 and 2003 in order to remove him from the Beach Boys touring band controlled by Love in *Brother Records, Inc. v. Jardine*.  As a result of that litigation (handled, incidentally, by Plaintiffs), Plaintiffs are informed and believe that Love and JPL have profited in an amount in excess of *approximately $100 million*.  In early 2003, following the final resolution of the Jardine case, Love filed for divorce and sought a restraining order against JPL.  During that case, Jardine dismissed Mr. Chieffo as his lawyer.

41.   In connection with Defendants' "recovery" of money, songwriting credit and copyright rights in this case under the fee agreements with Plaintiffs, Defendants

have recovered money and *value* of approximately *$180 million*, but Plaintiffs have only been paid to date approximately *$4.6 million*.   Pursuant to the '92 Agreement, (assuming only for the sake of argument here that the '93 and '94 agreements do not meet the statutory technicalities imposed by a case decided over 14 years after the fee agreements had been signed, as Defendants allege), Plaintiffs are currently owed in 2021 dollars approximately **$37.5 million minus the $4.6 million or $32.9 million.** Without Plaintiffs' three years of intense attorney work against all odds, Defendants would not have credit for the 35 Songs and their reverting copyrights.

42.     Defendants' continuing fraudulent concealment of the original fee agreements, following fraudulent inducement of Plaintiffs into them provides the causative foundation of the fraud claims herein.

43.     The "present value" of the "recovery" as defined in the '92 Agreement for the 35 songs recovered by Plaintiffs for Defendants in the "Judgment" dated December 29, 1994 pursuant to the "Special Verdict" dated December 12, 1994, is based on current valuation of 1960's era top level iconic music catalogs which includes the Beach Boys, The Beatles, Barry Manilow, Bob Dylan, etc.   Manilow's catalog recently sold for $1 billion; Bob Dylan's sold for a reputed $300 million.   Thus, Plaintiffs' expert valuation of the 35 Songs making up the heart of the "Sea of Tunes" catalog of approximately 172 songs (the total song catalog sold in 1969, of which the 35 Songs are the core) is likely in that same range of approximately $700 million to $ 1 billion.

44.     JPL has manufactured this dispute and fraudulently interfered with the '92 fee agreement, which is a premarital asset of Love, in order to consummate her fabricated "community property" claims, and obtain said foregoing monies owed to the Plaintiffs.

45.     Having possession and control over all of the Plaintiffs' original files, JPL is concealing critical evidence in this case.

46.     Defendants collectively entered into an agreement to defraud the Plaintiffs pursuant to each and every allegation in the First Cause of Action for fraud, including

the concealment of the fully signed fee agreements, perjury and subornation facts. Defendants further agreed to interfere with and breach Plaintiffs' agreements as recited in the Second Cause of Action by, among other things, to not only conceal the fully signed contracts but also by means of JPL "blackmailing" Love relating to their collective concealment of the Branca Documents during the *Wilson v Irving* and *Love v Wilson* cases. Defendants have collectively agreed to use JPL's "community property" claims to defraud the Plaintiffs.  Defendants further agreed to not provide Plaintiffs with an accurate accounting, and to not pay royalties owed, pursuant to a fraudulent scheme to conceal the accurate amounts owed to the Plaintiffs.

47.     All of the false statements, misrepresentations, and fraudulent concealments recited herein constituted an unlawful agreement between JPL and ML to violate the law.  Defendants Michael Love Family Trust and Meleco knew of the agreement between Love and JPL to defraud Plaintiffs, and willingly took actions to further that scheme, by agreeing to hide assets from Plaintiffs, including proceeds of the 35 Songs to which Plaintiffs are entitled, and in doing so, unlawfully benefitted in and participated in the conspiracy between ML and JPL.

48.     Accordingly, all defendants as co-conspirators with one another are jointly and severally liable to Plaintiffs.

49.     In March - April, 2017, in numerous discussions culminating in a "D-Day" meeting on April 11-12, 2017 at ML's mansion in Incline Village, without JPL present, ML informed MF that he needed to divorce JPL.  Among many revelations and statements, ML informed MF that JPL was then engaged in more of her "schemes" – as ML referred to them and oft-repeated to MF for decades; and that she was seeking to "cheat" the Plaintiffs out of their fees in order to claim a 50% "community property" interest in the 35 songs and the reverting copyrights; and the $50 million "recovery" by the Plaintiffs; that JPL was "blackmailing" ML; and that JPL's family was connected to the Chicago "mob."

50.    Notwithstanding the nature of the facts and allegations recited herein, the Plaintiffs hold no animosity toward the Defendants, but rather sympathy.  Having represented Mike Love for over 28 years and observed the circumstances of his marriage to Jacquelyne, Plaintiffs offer the words of Longfellow:

**"If we could read the secret history of our enemies, we should find in each man's life sorrow and suffering enough to disarm all hostility."**

In this case, Plaintiffs neither perceive the Defendants as their "enemies," nor is their "sorrow and suffering" a "secret" to them**.**  As Mike Love knows, and as he said repeatedly, orally and in writing over many years, this dispute has been caused by JPL'a "schemes" based on issues between them.   In Love's words it was "Gita Time" – a reference to the Bhagavad Gita, where there is a day of reckoning between warring brothers.   Ironically, those machinations and manipulations have led to another "Gita Time" – this time between Love and Flynn. This case seeks a just resolution between them.

## STATEMENT OF FACTS

### A.    NATURE OF THE CLAIMS

51.     This lawsuit involves the outrageous fraudulent conduct of Jacquelyne Piesen Love in collusion with the recently discovered and equally outrageous and fraudulent conduct of her husband, Michael E. Love.  Over the course of approximately the last two years, because of marital problems with her husband, JPL devised a "scheme" – ML's "mantra" about his 9th wife's misconduct over the last several decades - to defraud the plaintiffs out of millions of dollars in earned attorneys' fees.

52.     ML has apparently gone along with this scheme based on years of JPL's domestic "blackmail" of her husband – his words.  Pursuant to this "scheme," JPL and the two defendant entities which she controls have intentionally interfered with Plaintiffs' 28 year old, fully performed fee contracts; and Plaintiffs are informed and believe that JPL has fraudulently conveyed monies belonging to the Plaintiffs to the Michael Love Family Trust and to MELECO, ML's entertainment corporation.

53.     JPL's scheme is not only a breach of the Plaintiffs' fee contracts, it is a fraud on the Plaintiffs, a fraud on the defendants in the underlying litigation, and a fraud on the federal courts involved in that litigation.  In the context of her efforts to "blackmail" her husband since at least the spring of 2017 while, according to Love, they were engaged in divorce discussions, many of the facts relating to her blackmail have only surfaced between September and December, 2017.

54.     JPL's motive to engage in her latest scheme of fraud is her quest for 50% "community property" control of the songwriting royalties, and copyright reversion rights to 35 of the Beach Boys' biggest "hits," which the Plaintiffs won for ML in massive litigation by "Special Verdict" on December 12, 1994.   The Special Verdict is attached here to as **Exhibit 1**.

55.     In order to assert her fraudulent "community property" claim in the 35 Songs, 30% of which are owned by the Plaintiffs, JPL is attempting to "void" their July 27, 1992 contingent fee contract – a pre-marital asset of ML.  A true and correct copy of the '92Agreement is attached hereto as **Exhibit 2.**

56.     The July 27, 1992 agreement was amended in September 1993 – also a premarital asset - increasing the contingent fee from 25% of the "recovery" to 30% as recited herein. A true and correct copy of the 1993 Amendment is attached hereto as **Exhibit 3**.

57.     The 35 Songs at issue were created by Brian Wilson and ML and obtained commercial value in the 1960's, during which time ML was married to at least 5 other women.  As of the date of the Special Verdict, ML and the Plaintiffs had an agreed upon, discounted valuation of between $50 million and $80 million for the "recovery" under the verdict. A true and correct copy of the 1994 agreement is attached hereto as **Exhibit 4.**

58.     In order to implement her scheme to acquire 50% of that valuation as "community property" in both the songwriting royalties and the copyright reversions

Fourth Amended Complaint

which are now occurring, JPL was advised by her lawyers that she had to void and defeat the Plaintiff's fee agreements which are premarital assets. So after 23 years of payments under the fee agreements, between at least April 1, 2016 and the present, JPL secretly implemented the "schemes" recited herein.

59.     The Loves were married in April 1994 in the middle of the underlying litigation. For 23 years between January 1995 and July 2017, JPL controlled and paid the Plaintiffs quarterly their 30% contingent fee for all songwriting royalties on the 35 Songs, *or so the Plaintiffs thought*.

60.     In ML's autobiography, *released in 2016*, he stated that he only made $75,000 per year on his royalties before the "recovery" under the fee contracts; but after obtaining the "recovery" for the royalties on the 35 Songs, the royalties increased to over a million dollars per year.  Excerpts of ML's book are attached hereto as **Exhibit 5**. However, Plaintiffs have never received their fees on the difference between the $900,000 increase reported in the Love autobiography and the approximately $300,000 to $500,000 reported to them over the past 25 years; and are seeking a full accounting.

61.     At all relevant times, JPL was in control of all payments, all accounting and, more specifically, all documents involved in the recently discovered frauds recited herein.

62.      In February 2018, the first of the 35 songs, "409," began reverting to ML under the pre 1976 copyright act.  The copyrights to other songs included in the 35 Songs recovered by Plaintiffs have also since reverted to Mike Love and his coauthor Brian Wilson.  The reversions on the 35 Songs will now continue to the year 2024.  For years prior to the reversions, JPL has been "scheming" to obtain control over the reverting copyrights valued in excess of $100 million dollars. Plaintiffs seek a declaratory judgment preserving their 30% interest in all income from said 35 Songs including their ownership interest in the copyrights themselves *when* they revert under applicable copyright law.

63.     Specifically, on April 11-12, 2017 at their meeting in the Love's 20,000 sq. ft. mansion in Incline Village, Nevada, ML admitted, *inter alia*, to longtime friend, Michael Flynn:

(a) that he needed to divorce JPL;

(b) that JPL was "blackmailing" him on "the Branca matter";

(c) that JPL had been "cheating" the attorneys out of royalty payments;

(d) that JPL was signing or forging his name:

(e) that JPL "lied about everything;"

(f) that JPL was carrying a gun and he considered her dangerous given her family's "mob connections;"

(g) that JPL's history of "scheming" and threats had become so volatile, he was desperate to separate from her, but concerned she would ruin his career with her blackmail threats, "or worse;" (In fact, Love had filed for divorce and sought a restraining order against JPL in 2003, which he later dropped based on his fears at that time of domestic blackmail but not fully revealed to Michael Flynn until April, 2017.)

(h) that JPL's current scheme involved an "illegal deal" that she was then making with the music publishing company, "BMG," and her lawyers to obtain a $2.5 million payment on the future reversion rights on Plaintiffs' 35 songs as part of a sale of all of ML's songwriter royalties;

(i) that JPL had already "cheated" the Plaintiffs out of approximately $200,000 on a million dollar advance contract, when Love and JPL switched from BMI to ASCAP with three "advance" annual payments of $333,000, of which two had already been paid in the amount of $666,000; and

(j) that JPL was forcing ML to remortgage their three mansions in order to obtain cash for JPL.

64.     In order to implement her scheme, JPL is attempting to void the Plaintiffs'

Fourth Amended Complaint

28 year old contingent fee "'92 Agreement" based on the absurd claim that Love did not receive an executed copy from Michael Flynn; and is claiming the September 1993 amendment is a "*cut and paste*" copy of Love's signature, or in a new version of their fraud, that Love's signature has been "*electronically affixed by someone*"  *as only JPL would know*.  On March 1, 2018, the defendants had their joint attorney, Vincent Chieffo send a notice that they were "voiding" the contract.  Upon information and belief, JPL retained Mr. Chieffo based on *her* perceived ability to control him based on *her* knowledge of his involvement as the attorney for Jardine in the concealment of the Branca Documents in the underlying two cases in which Mr. Chieffo represented Jardine.  Upon information and belief, ML has agreed to give JPL 50% of his rights in the 35 songs without first obtaining the agreement of the Plaintiffs while knowing that JPL is intending to defraud them.

65.    Incredibly, for the first time in 28 years, after 5 full days of evidence in fee arbitration proceedings in which Love admitted the authenticity of the 92 Agreement as well as his signature on the '93 and '94 Agreements, upon information and belief, JPL, on January 13, 2021 after the close of evidence, then knowing that the Loves were losing the arbitration, instructed Mr. Chieffo to write a letter claiming that Love's signature on the 93 and 94 agreements were "electronically affixed."  The Arbitration Panel rejected it the same day.  Mr. Chieffo and the other lawyers representing the defendants know this is a fraudulent act.  Fraud begets more fraud.

66.    JPL's schemes and blackmail threats are grounded in her suborned perjury of ML and her document suppression and concealment in the *Love v Wilson* case; and its predecessor, *Wilson v Irving Music, Somer et al.*  U.S. Dist Ct., Los Angeles, also litigated in the Los Angeles Superior Court, Case No. C 737 675, between August 1989 and August 1992.  JPL knows that the entire Beach Boys organization and their lawyers participated in a fraud in those cases involving the Branca Documents and is using that knowledge to leverage her control over both her husband and Chieffo.

Fourth Amended Complaint

67.     Revelations of ML's perjury, and JPL's subornation and fraud, came to light just before the death of JJ Little, attorney for Brian Wilson in the *Wilson v Irving* case.  Over the years, Mr. Little and plaintiff Stillman developed a close friendship.  They often spoke of the Beach Boys litigation, which had brought them together.  Mr. Little died unexpectedly on January 13, 2018.  For several months before his death, in the fall of 2017, he made disclosures to Plaintiff Philip Stillman about the fraudulent conduct of JPL and ML in the *Wilson v Irving* case.  This conduct occurred years before the Plaintiff began their representation of ML in July 1992; but it continued and was concealed by JPL and ML throughout Plaintiffs' representation of ML.

68.     On December 20, 1994, after the Special Verdict dated December 12, 1994, **Exhibit 1**, in the liability phase of the *Love v Wilson* case, with the damage phase ready to commence, ML entered into a settlement with Brian Wilson.  The Plaintiffs and ML, in consultation with his accountant and JPL, agreed prior to the Wilson settlement that the "recovery" under the '92 Agreement, as amended in September1993, had a valuation of between $50 million and $80 million.  A copy of the '94 Agreement including those representations and signed by Love is attached hereto as **Exhibit 4.**

69.     However, at the time, ML was unable to pay Plaintiffs their 30% contingent fee on the *total* valuation of the "recovery" under the fee contracts – a fee in the amount of at least $15 million based on a minimum valuation of $50 million for the future songwriter royalties and copyright reversions, as agreed.  At ML's request, ML and the Plaintiffs agreed that the Plaintiffs would receive 30% of the cash portion of the Wilson settlement, (subject to a separate agreement with Wilson involving his claims against his lawyers, JJ Little and James Tierney) plus 30% of all future rights and income ML possessed or received as a result of Plaintiffs establishing Love's co-authorship in the 35 Songs.

70.     For the next 23 years until the divorce and "community property" eruption during the summer of 2017, the Plaintiffs accepted and believed that ML and JPL had

paid the plaintiffs their 30% fees from the songwriter royalty quarterly payments. JPL was always in control of all payments, all accounting, and all original documentation from the inception of the Plaintiffs' involvement in early 1992; and as of 2011 -12, she requested and received most of the relevant Plaintiffs' files.

71.    In July – August, 2017, JPL, in apparent collusion with her husband, terminated the 25 year attorney-client relationship and friendship, and thereafter ceased making payments in breach of their fee contracts.

72.    In July, 2017, their new attorney, Vince Chieffo, then attempted to rewrite history in a series of letters alleging technical defects in the fee agreements; and then months later in February 2018, following the death of JJ Little, claimed for the first time in 25 years that ML's signature on the September 1993 agreement was a " forgery." But not until December 2020, after the arbitration was closed did JPL and Chieffo for the first time claim that Love's signature on the '92 Agreement was "forged." JPL has possession of all the original fee agreements.

73.    Vincent Chieffo was involved in both *Wilson v Irving* and *Love v Wilson*, dating back to at least 1989, involving his then-client Al Jardine's concealment of documents in Jardine's April 23, 1991 in the *Wilson v Irving* case. See Transcript of Jardine Deposition attached hereto as **Exhibit 9.**

74.    The allegedly "forged" September 1993 document – an amendment to the July 27, 1992 fee agreement, increasing the Plaintiffs' fee from 25% to 30% - together with all of the Plaintiff's relevant original files - are all in the possession of Jacquelyne Piesen Love.

75.    Upon information and belief those files were turned over to Mr. Chieffo in June, 2017 or before, and he is therefore in possession of not only the fully executed fee agreements from those files, but also is in possession of the Branca Documents. Plaintiffs have requested production of all those files for almost a year. Defendants and Mr. Chieffo have refused to produce them. Yet for the first time in *four* years in this

matter, notwithstanding Chieffo's possession of those documents throughout that time, and after 28 years in the Loves' possession, Chieffo claimed that Love's signatures on the 93 amendment was "cut and pasted".  If so, he need only look to his client.

76.    Plaintiffs allege herein that under all of the circumstances, and as part of her schemes and to the extent that it is determined that Mike Love's signature on the '93 Amendment is "cut and pasted", *JPL* is responsible for the "forgery" of her husband's name, unless he admits her "agency authority" to do it, as he indirectly did in the fee arbitration when he testified it appeared the signature was his.  The 23 years of 30% payments under the fee contracts is conclusive evidence that JPL and ML had agreed in September, 1993 to the agreement they now allege is "cut and pasted."

77.    JPL was also attempting to sell the songwriter royalties, for at least $5 million, 30% of which on the 35 songs was owned by the Plaintiffs.  She was also attempting to secure a $2.5 million "administrative fee" in an illegal copyright reversion scheme as recited herein, but allegedly not disclosing the full details to her husband, causing him to contact Flynn in March – April, 2017.

78.    In April, 2017, ML confirmed to MF that he had previously been told that the "administrative fee scheme" was "illegal" because prior to actual copyright reversion, no assignment or transfer of any rights was allowed under the law.  Mr. Chieffo admitted months later, after the conflict erupted, that JPL was no longer pursuing the "administrative fee."

79.    In April 2017, ML had already admitted to MF that JPL had already "cheated" the Plaintiffs out of approximately $200,000 on the two secret $666,000 "advances" on a million dollar contract switching from BMI to ASCAP.  But either his conscience, his liability under the fee agreements, or even perhaps his loyalty to his friend and attorney MF, who had won him back his entire musical legacy with the Special Verdict, caused him to make the disclosures that he did.

**B.    FACTUAL CHRONOLOGY**

80. **Nov. 1961 – 1964**: In November, 1961, the Beach Boys ("BB") were formed and produced a "hit" record "Surfin" with Brian Wilson, ("BW"), Carl Wilson, Dennis Wilson, Alan Jardine and Mike Love, ("ML"). The Wilsons' father, Murry, took control of the copyrights/publishing, of the BB songs, as a dba, "Sea of Tunes," and as Manager of the band.  "Surfin" was co-written by Brian Wilson and Love; and Murry gave ML songwriting credit on the copyright application.

81. However, between 1961 and June, 1964, the BB created many songs and albums, co-written by ML and Brian Wilson, but internal conflicts developed between Murry and ML; and Murry proceeded to defraud ML of songwriting credit on many copyright applications for many songs including the No. 1 hit "I Get Around" in spring, 1964.

82. **Spring, 1964**:  ML got in a fist fight with Murry and the BB fired him as Manager, but he remained in control of the copyrights and publishing; and continued to defraud ML without giving him credit on songs coauthored with BW.

83. **1964 – 1967:** The BB continued to create many "hits" including California Girls and Good Vibrations.  Murry defrauded ML by not giving him songwriting credit on the copyright applications on those songs and many others. BW had a nervous breakdown in 1964 and stopped touring.  BW began a history of severe drug addiction.

84. **1967:** Music business attorney Abraham Somer became the attorney for the Beach Boys and for Murry Wilson.  Somer incorporated Murry's sole proprietorship to "Sea of Tunes, Inc." for Murry; and incorporated the Beach Boys as "Brother Records, Inc. ("BRI").

85. **April and August, 1969**: April of 1969, Capitol Records deal ends and they do not renew. Somer manipulated a sale of all of the BB copyrights from Murry Wilson's, 100% ownership of Sea of Tunes, Inc., to Almo Irving Music for $700,000.   In the sale, Somer represented Almo/Irving, Sea of Tunes, Inc and BRI and the individual Beach Boys.   In the sale, ML lost all rights to over 35 songs for which he had never

1    received songwriting credit as well as his interest in all of the copyrights on songs he

2    coauthored.

3        86.    The Somer conflict of interest in the sale was *allegedly* concealed at the

4    time of the sale and for the next several decades.  Wilson was severely drug addicted

5    and mentally ill at the time of the sale. Murry took all of the $700,000 and died a few

6    years later.  ML received nothing from the sale. The entire Sea of Tunes catalog had a

7    value in 1969 of approximately $10 - $20 million.

8        87.    **1971:** Alan Jardine became the 5th shareholder and Director of BRI along

9    with Brian Wilson, ML, Carl Wilson and Dennis Wilson. As an equal shareholder and

10   Director, Alan Jardine had full access to all of the BRI corporate records, and

11   participated in the Board of Director meetings.  ML's and JPL's current attorney,

12   Vincent Chieffo, admitted *pro hac vice* in this case, was Mr. Jardine's attorney during the

13   *Wilson v Irving* case, 1989 – 1992; and Mr. Chieffo participated in the suppression and

14   concealment of documents during the *Wilson* case as later admitted by JJ Little.

15       88.    **1971 -1985:** The Beach Boys continued touring and producing songs and

16   records; signed to Warner Reprise in 1972 by Mo Ostin, but BW was in and out of drug

17   addiction under the intermittent care of the infamous Eugene Landy. On multiple

18   occasions beginning in at least 1985, the Somer conflict of interest during the 1969 sale

19   became a topic of discussion at the BRI Board meetings, recorded in the so called

20   "Branca Documents," among the Beach Boys' attending attorneys, managers and

21   accountants.

22       89.    **1985 -86:** Well-known music business attorney John Branca as attorney for

23   BW and BRI, along with Eugene Landy and attorney James Tierney conducted an

24   investigation into the Somer conflict of interest in connection with the 1969 sale for the

25   purpose of voiding the sale, tolling the applicable statutes of limitation, and regaining

26   the copyrights to the Beach Boys' songs.

27       90.    Landy and Tierney recommended filing a lawsuit to regain the copyrights.

28

All of the Beach Boys and their attorneys, the BRI officers, shareholders and Directors, the Beach Boys' manager, Tom Hulett, Landy and others were individually involved in the investigation, notified of its progress, and corresponded with by Branca.

91.     Those copied and notified of the Branca investigation in correspondence sent by Branca included Carl Wilson and his attorney; Alan Jardine and his attorney; Mike Love and his attorney; Tom Hulett; the BRI President and others.  (Hereinafter "the Branca documents.") BUT in order to protect his many contacts in the music business and relationships with Irving Music, Mr. Branca attempted to avoid a lawsuit and have the BB publishing company, "Brother Publishing" purchase the Sea of Tunes catalog from Irving Music. The matter was discussed among the BB and their attorneys and agents. Branca's proposal for a "deal" with Irving Music to avoid a law suit was rejected; Branca was "fired"; and Brian Wilson's ligation attorneys, Tierney and Little agreed to proceed.

92.     **January 1985 to present**:  ML and JPL, in collusion with the other BRI directors, shareholders, attorneys, and manager, concealed and suppressed the "Branca documents" regarding the Somer conflict of interest in order to defeat the statute of limitations defenses asserted by the defendants in the *Wilson* case.  ML and JPL thereafter concealed and suppressed the Branca documents from the plaintiffs.

93.     **March – December, 1986**: Landy and BW fired Branca.  Thereafter, Landy and BW hired Tierney to pursue the law suit for BW alone to regain the copyrights based on BW's alleged legal incompetency, and the Somer conflict of interest during the 1969 sale.

94.     **December 5, 1986**:  Tierney met with ML and his attorney, Robert Kory to secure his "cooperation" in the BW law suit.  The "cooperation" included access to all ML files and ML's testimony in the proposed case supporting BW's positions.  In exchange, ML agreed to receive 30% of the recovery on both the money recovered by BW with a "floor" of $2 million; and 50% of the copyrights; and restoration of his

Fourth Amended Complaint

songwriting credit on songs he had not been credited on.

95.   **December 22, 1986**: Tierney confirmed *in writing* the agreement with ML for him to receive 30% of the BW case recovery, restoration of his songwriting credit and copyrights and a minimum of $2 million for past unpaid songwriting payments that had been paid to BW.

96.   Throughout both cases, JPL suborned, and ML committed perjury denying this written agreement.  When Plaintiffs became involved in 1992, ML and JPL explicitly lied to the plaintiffs that an agreement in writing even existed.  JPL's and ML's motive to hide the written agreement from the Plaintiffs related to hers and ML's lies and misrepresentations to the Plaintiffs in the spring of 1992 that the defendants had no knowledge of the Somer conflict of interest until Flynn disclosed it to them at that time.

97.   **1987 - 1988:** ML purportedly met JPL while he was judging a "wet T shirt" contest in Hawaii; or "bikini contest" according to ML's book; and they began a relationship. ML's attorney at the time warned him about JPL's background and intentions to get ML's money and property.  JPL got pregnant with Brian Love.  ML and JPL separated for several months but subsequently got back together; and JPL moved in with ML. JPL turned against ML's attorney, Robert Kory who had warned him about her.

98.   **1988-August, 1989**: BW's attorneys, James Tierney, JJ Little, BW and Landy proceeded with the lawsuit to regain the copyrights.  Tierney and Little had additional meetings with  ML and his  attorney, Robert Kory,  to secure his "cooperation" in the BW law suit, which included the following:  confirmation of their prior agreement for ML to receive 30% of the recovery in the Wilson case, with the $2 million "floor",  and 50% of the copyright reversions;  access to the Loves' archives;  concealment of the Branca Documents;  ML's  testimony denying any agreement between BW and ML;  and support of BW's positions on BW's "legal incompetency" and related matters.

99.   **August, 1989:**  BW filed suit on a blended hourly and contingent fee

agreement with Tierney and Little against Irving Music, Somer and his law firm to regain the copyrights based on BW's legal incompetency allegedly beginning in the late 60's and continuing to the filing of the law suit; but primarily based on the Somer conflict of interest.

100.    Tierney and Little, BRI, its officers and directors, all of their attorneys, including Branca claimed that the defendants *concealed* the Somer conflict of interest between August, 1969 when the sale took place until the fall of 1988, when Tierney and others "discovered" it.   This was a fraud on the court and on the defendants. ML and JPL directly participated in this fraud during the *Wilson* case as part of their "cooperation" with BW, Tierney and Little.   They continued this fraud throughout the *Love v Wilson* case; and in all of their representations and dealings with the Plaintiffs. See **Exhibit 5,** Love's autobiography.  ML and Mr. Kory swore under oath in their depositions, evidentiary hearing testimony and trial testimony that they didn't learn of the Somer conflict of interest until they met Michael Flynn in early 1992. *This* book is apparently what years later in 2016 -17 triggered Mr. Little's outrage.

101.    **August, 1989 – August, 1992**:  The *Wilson* law suit proceeded with extensive discovery, document production, depositions and motions.

102.    The focus of the defense was the obvious statute of limitations facts and issues on *when* BW, his attorneys, the individual Beach Boys, and the shareholders and directors of BRI *discovered* the Somer conflict of interest. All of the Beach Boys, their attorneys, including Vince Chieffo and his client, Alan Jardine, Mike Love and his attorney, Robert Kory, Carl Wilson and his attorney, BRI and its officers and Directors covered up and concealed the Branca investigation and all related " Branca documents" originating in the 1985 period which would have barred BW's claims based on the Somer conflict of interest.

103.    Additionally, the "Branca Documents" and Mr. Branca's knowledge as BW's attorney of the Somer conflict in 1985, *four years before the Wilson law suit was filed*

1  by Tierney and Little, would have been attributable to Brian Wilson and defeated his
2  legal incompetency position.

3      104.   **January, 1990 – Present:**   By at least early 1990, JPL had taken control of
4  all the ML archives and documents; and during both the *Wilson v Irving / Somer* case,
5  and the *Love v Irving / Somer / Wilson* case extending to the present, she covered up,
6  concealed, and suppressed all documents relating to the 1985 Branca investigation as
7  part of ML's "cooperation" with JJ Little and Tierney.  To this day, JPL and ML have lied
8  to and hidden "the Branca Documents" from the Plaintiffs.

9      105.   The plaintiffs are requesting the Branca documents regarding the Somer
10 conflict of interest at the commencement of this case under Fed Rules Civ Pro. 26
11 (a)(1)(A)(ii) in order to save judicial resources and expedite this matter through the
12 pleading and discovery stages.

13     106.   **March, 1991:**   JPL, ML's attorney Robert Kory, ML and JJ Little met to
14 respond to the defense subpoena in BW's case and prepare ML for his deposition. As
15 part of his "cooperation" ML and JPL agreed with JJ Little to NOT produce any of the
16 Branca documents on the Somer conflict; nor give any testimony relating to it.

17     107.   **March 29, 1991**:   The Irving and Somer defendants took ML's deposition
18 in the *Wilson* case.  Among other facts and issues, it is now known that ML committed
19 perjury at his deposition on the instructions of JJ Little on the following:

20     (a) ML swore under oath that he did not have "any financial interest in the
21     outcome of this litigation Brian has brought."

22     (b) ML swore under oath that no one has "ever suggested to you that you might
23     benefit financially as a result of Brian winning this litigation";

24     (c) ML swore under oath that " NO "discussions... occurred concerning whether
25     or not Brian's success in this law suit might benefit you financially."

26     (d) ML swore under oath that "No. No one representing Brian has" .... "ever
27     indicated that you could benefit financially from Brian's success in this

28

litigation."

108.    These were all perjured statements.  During the deposition when the critical issues about ML's "cooperation" arose while being questioned by the Irving / Somer defendants, ML's attorney, Robert Kory, left the deposition and called Tierney to confirm their agreement for 30% of the Wilson recovery, with a floor of two million, and half ownership of the copyrights; and restoration of songwriting credit, *while ML was committing perjury*.

109.    **April 23, 1991**:  The Alan Jardine deposition proceeded represented by Vince Chieffo and JJ Little.  Mr. Chieffo made a point of the fact that the only documents being produced in response to the subpoena on his client, Alan Jardine, were being produced by JJ Little, thereby revealing his *mens rea* on the Branca documents.  He then left the deposition before Jardine was questioned about his knowledge of the Somer conflict.

110.    Mr. Little and Mr. Chieffo concealed and did not produce any of the 1985 Branca Documents reciting the Somer conflict of interest.  They were in the possession, custody and control of Mr. Jardine's lawyer, Bernstein, in 1985, and contained in the files turned over to Mr. Chieffo when he undertook the representation of Mr. Jardine. Mr. Chieffo knew that his and BW's attorneys' alleged "discovery" of the Somer conflict in 1988 as their defense to the statute of limitations was a massive fraud involving perjury.

111.    **December 1991**:  JPL and Mike Love met Plaintiff, Michael Flynn at the Deepak Chopra clinic in Lancaster, Massachusetts. ML and JPL, with JPL taking the lead, described legal claims she believed they had involving the loss of ML's rights in the 1960's of numerous Beach Boys songs which they claimed were jointly authored by ML and Brian Wilson.  JPL explained the ongoing litigation in the Los Angeles Federal Court and Superior Court in which BW was seeking to reclaim his copyrights to the songs in a lawsuit against Irving Music, the then publisher / copyright holder of the

Fourth Amended Complaint

songs.

112.     JPL claimed that BW's attorneys, JJ Little and James Tierney, had promised the Loves to recover the copyrights for both BW and ML, and pay and give credit to ML for the songs for which he had never received credit or royalties; and to pay ML a 30% share of the recovery in BW's case.  JPL explained that ML not only lost credit, and the songwriter royalties, but had lost the copyrights themselves, which *she* claimed were worth tens of millions.

113.     JPL said that their attorney, Robert Kory, was representing them on the matter *but that there was no written agreement* with BW or his attorneys, that BW's attorneys had *not* signed anything evidencing their promise, that ML was owed millions of dollars in songwriter royalties on many Beach Boys "hits," for which he was not the registered coauthor; but that the real value was in the tens of millions for the copyrights.

114.     When questioned about the statute of limitations for legal claims for ML's songs that were lost in the 1960's, she said that BW's attorneys told her, Kory and ML that BW was basing the claims to set aside the sale of the copyrights on his "legal incompetency;" and that only BW could bring the claims because he was "legally incompetent" from at least 1969 to when BW's suit was brought in August, 1989.

115.     During the meeting, JPL asked Flynn for his birth information, date, time and place. MF said he would have to call his mother for the time?  JPL requested him to do so. JPL then went and called her astrologer. She later came back and said that in your "12th house of justice" you have an "exalted Jupiter" or words to that effect. JPL then said that they wished to retain MF.  MF said he would first have to do a preliminary investigation before undertaking representation and on what terms, particularly given the obvious statute of limitations problems.

116.     **<u>January – July 27, 1992</u>**:  The plaintiffs, specifically  MF and Philip Stillman (a California licensed attorney and partner in the California office),

1   investigated, researched, reviewed the docket of *Wilson v Irving Music*,  read

2   voluminous pleadings, deposition segments attached to motions, requested documents

3   from Kory and JPL, repeatedly interviewed JPL and ML, interviewed others including

4   Vince Chieffo, (then atty for Al Jardine), Ross Schwartz, (atty for Carl Wilson), met with

5   BW's attorneys, JJ Little and Jim Tierney, met with ML's atty, Robert Kory,  and

6   interviewed others deposed in the *Wilson* case.  Hundreds of attorney hours were

7   expended.

8        117.     MF and PS almost immediately discovered and shared with ML and JPL

9   that BW's incompetency was at issue in his case,  but the foundational basis for

10   defeating the statute of limitations issues permeating the *Wilson* case was the concealed

11   conflict of interest of the Beach Boy's lawyer in 1969, Abraham Somer, who engineered

12   the sale of the copyrights in August, 1969 to his other client,  Irving Music, (then "Almo

13   Irving") from the Beach Boys, who all signed off, individually and as shareholders in

14   Brother Records, Inc ("BRI"), including ML.

15        118.     The *Wilson v Irving* pleadings, starting in August 1989, are permeated with

16   claims and facts involving the Somer conflicts, which during the three years between

17   August, 1989, and the plaintiffs' review of the *Wilson* docket in early 1992, *ML, JPL and*

18   *Kory all claimed they knew nothing about*.  At the time, the one year statute of limitations in

19   California to sue Somer and his law firm was known to ML, JPL Kory, Branca, Tierney,

20   Little, Chieffo, and BRI.  ML's attorney, Robert Kory, had denied reviewing the

21   pleadings or having any knowledge of the Somer conflict.

22        119.     During plaintiffs' investigation before July 27, 1992, JPL said to come to

23   her for any questions, or documents involving the *Wilson* case or related issues. JPL

24   became MF's primary contact for documents and information about the *Wilson v Irving*

25   case, including a transcript of ML's deposition, and any documents relating to the

26   Somer conflict.  JPL never produced any documents relating to the Somer conflict,

27   claiming that she had none and that she and ML knew nothing about it; and she

28

delayed producing ML's deposition for several months until May 28, 1992 when she requested their transaction attorney, Harry Hathaway to send it to MF.

120.   **February - March, 1992**:  MF met with and requested files from ML's attorney, Robert Kory.  JPL intervened, fired Kory and told MF to obtain all files from her. JPL later gave MF a selection of Kory's files; and said she had sent the rest to their transactional attorney, Harry Hathaway.  At one point in one discussion, Kory said he received instructions to send files to Hathaway and he sent them, and that he did not trust JPL; and had warned ML about JPL being a "gold digger."

121.   **April, 1992 – July 27, 1992**:  As the investigation by MF and PS intensified, questions arose about the apparent conflict between Robert Kory and JPL,  but ML and JPL  refused to discuss it and repeatedly confirmed that they had no knowledge of the Somer conflict of interest, had never discussed it with Mr. Kory, did not know it was the basis of BW's claims to defeat the SOL issues, did not know that nearly all of the pleadings and discovery in the *Wilson* case focused on the Somer conflict of interest; and on the individual and collective knowledge of the Beach Boys, including Mike Love, Alan Jardine, Carl Wilson, Brian Wilson, their attorneys, including Mr. Chieffo, managers, roadies, and hangers on, etc.

122.   When questioned, and when requesting correspondence and documents from JPL, including BRI board minutes, correspondence among then present and past Beach Boys lawyers, and ML's deposition in the Wilson case, ML and JPL repeatedly confirmed their lack of knowledge; and their lack of possession of any documents relating to the Somer conflict of interest or written promises by the Wilson lawyers to pay them any share of BW's case.

123.   In the Plaintiffs' investigation in the first 7 months of 1992, each and every individual within the corporate structure of BRI disclaimed any knowledge of the Somer conflict until JJ Little and Tierney "discovered" it in 1988 - 89 while investigating the case to bring based on Wilson's incompetency.

Fourth Amended Complaint

124.   **THE JULY 27, 1992 AGREEMENT**:  Based on their extensive research, pleading reviews, interviews, investigation, document search and review, etc. and in complete reliance on the representations made by both JPL and ML, the plaintiffs agreed to pursue the matter on a sliding scale contingent fee agreement with an expense retainer of $25,000 to be replenished when it dipped below $7000.  See the '92 contingent fee contract attached hereto as **Exhibit 2** dated July 27, 1992.  When the agreement was made, JPL stated that all financial matters, document production, and related questions should go through her. Plaintiffs' best memories, 28 years later, and following arbitration, are that the 92 Agreement was mutually swapped in the mail with cover letters signed each respectively by Mr. Flynn and Love.  Thus the California office had a copy of the mailed sole Love signature which it sent months later to the Ashley firm.  Love's sworn affidavit in opposition to the Plaintiff's Summary Judgment motion stating Flynn's executed copy "wasn't found" suggests that JPL is hiding it.  A second mutually signed copy at a Beach Boys rehearsal was signed and Mr. Flynn believes that pictures were taken

125.   Since the claims involved future songwriter royalties, future recovery of the copyrights and the projected income from them, the agreement provided for ML to pay the "*recovery....of the present value of the amount of payments expected to be received from each responsible party in the future in excess of the present value of amounts currently expected to be paid.*"  On these explicit contract terms, because ML and JPL have now breached the agreement and committed fraud, after 23 years of paying 30% of the royalties each year, ML now owes at a minimum under the '92 Agreement, 25% of the 1994 "present value" of the "recovery" which is 25% of $50 million or $12.5 million – the minimum benefit of the Plaintiffs' bargain.

126.   **July, 1992 – February, 1995**:  The *Love v Irving Music and BW* case was intensely, combatively, vigorously, contentiously and aggressively litigated by sometimes 6 lawyers in FST&S, and nearly full time by MF and PS.  There are

approximately 800 docket entries, involving massive summary judgments, extensive motion and discovery practice, appointment of a discovery referee, disqualification of BW's lawyers – Tierney and Little, forensic computer discovery, and massive discovery and motions concerning BW's purported incompetency.

127.    The case involved 25 – 30 year old claims in the context of the applicable Statute of Limitations ("SOL") defenses,  lost evidence, *ML and JPL claims of forged ML signatures on agreements assigning his rights in songs, (similar to claims JPL is now making)* deaths of witnesses,  lost documents, the knowledge and involvement of *all* of the Beach Boys attorneys on the SOL/Somer conflicts issues, including Chieffo, Schwartz, Kory, Tierney, Little, Branca, and others; and ML's apparent contradictions in his *Wilson v Irving* deposition on multiple issues.

128.    The case particularly involved issues concerning altered documents some from JPL in the Love archives – amidst the claims of ML *and JPL*, that ML's signature had been forged on various documents that *JPL found in the ML archives*, and defense positions involving the conflicting testimony of Mike Love suggesting perjury in his March 29, 1991 deposition testimony about not receiving any "financial benefit" from the *Wilson* case.

129.    **August - September, 1992:**  Tierney and JJ Little settled BW's case against Irving and Somer for $10 million and forfeited recovery of the copyrights.  The settlement included a Section 1542 "Waiver" for fraud.   MF and PS met with them. They refused to acknowledge any agreement with Kory or ML.  They claimed that they spoke to Kory, ML and JPL about the "SOL problems" in ML's case before his deposition in the *Wilson* case on both copyright and songwriter claims and refused to acknowledge ML co-authorship of the 35 songs then at issue, and rejected past and future royalty payments.

130.    They *never* mentioned the Branca Documents. At one point, Tierney told Kory "get rid of Flynn" and he would represent ML on a similar arrangement Tierney

had with Wilson – 25% of the recovery and $125.00 per hour.

131.   **Aproximately January, 1993 – September  1993**: JPL failed to replenish the expense retainer, claiming lack of resources and cash flow.  During that period, MF questioned JPL and ML about statements made by the Irving defense lawyers about an attempt by John Branca to make a "deal" in the mid 1980's with Irving Music to share in the copyrights and avert litigation.   ML and JPL disclaimed any knowledge of any attempt to avert any litigation by John Branca.  JPL claimed that she had reviewed the archives and found nothing.

132.   When JPL defaulted on the expense retainer, believing in JPL's representations about their cash flow problems, MF began to pay the expenses and ultimately borrowed $200,000 to maintain the case.  MF made this decision based on the clear and overriding evidence that ML had indeed been cheated out of his musical legacy; and that Tierney and Little were lying when disclaiming any promises that they had made to ML and Kory; and also on the then sworn testimony of ML in his own case that he did not have any knowledge of the Somer conflict until MF told him about it.

133.   **September, 1993**: The Irving defendants offered $1.6 million to settle ML's claims against Irving and Somer based on the then remaining balance of Somer's law firm's insurance coverage; BUT required ML's forfeiture of his copyright claims with an indemnity in the event others "come out of the Beach Boys woodwork" to sue on the copyrights.  In the midst of extremely heated and contentious negotiations between Flynn & Stillman on the one hand, and the Irving and Somer lawyers involving, *inter alia*, credibility and document production issues, and settlement agreement provisions, a *major* conflict ensued over several weeks between ML and JPL over *many* issues and facts.

134.   The conflict between ML and JPL involved *inter alia:*  ML's intention to recover the copyrights to his songs; JPL's intention to obtain the settlement money; JPL's claimed inability to fund the case against Wilson going forward even with the

settlement money based on *her* desire to remodel their Tahoe property, putting ML's properties in joint names, and getting married. As usual, JPL prevailed and ML seethed and sulked – this became a typical pattern over the ensuing decades.

135.    In the context of the aforesaid conflict, MF prepared an agreement in September, 1993 to memorialize the key issues in the settlement, mostly as a protection against their marital conflicts, and flew to their mansion in Lake Tahoe to deal with their rapidly escalating conflict. Over a period of two days while staying at their home, MF acted as a sort of mediator in attempting to resolve their conflicts while reviewing the provisions of the proposed settlement agreement, which included, *inter alia*: indemnity provisions by ML against future claims; a "Section 1542 Waiver," waiving future claims of undiscovered fraud; forfeiture of the copyright claims; the $1.6 million payment; and release of all claims.

136.    The agreement MF negotiated with Mike Love and prepared, (**Exhibit 3),** reviewed the key settlement issues; increased the contingency fee to 30% from '92 Agreement because JPL had defaulted on the expense retainer, and because she wanted all of the prospective settlement money without paying future expenses; and because the right to obtain the copyrights to the 35 Songs at that time would be forfeited under the proposed settlement, which adversely impacted the amount of the "recovery" going forward against Wilson. The '93 Amendment explicitly provided that the Plaintiffs' would "own" 30% of ML's rights and income in the songs recovered.

137.    As was the custom with regard to all documents, while sitting in their mansion in Lake Tahoe, JPL took possession of the proposed draft amended fee agreement stating that she would review it.  The following morning, she delivered it to MF in the presence of ML with the signature of ML.  JPL and Chieffo now claim that the ML signature is a forgery.  At the time of the delivery of the amended fee agreement in Lake Tahoe by JPL, ML said nothing about his signature.  But he did say that he was agreeing to the Irving settlement and the 30% fee agreement because he wanted to

1   maintain peace in his relationship with JPL. If it was "forged," it was forged by JPL.

2       138.    After the Irving/Somer settlement was entered into, JPL delivered the

3   September, 1993 agreement in ML's presence, and a 30% contingency going forward

4   against BW was agreed upon with the attorneys' paying the expenses of the case.

5       139.   **February, 1994**:  The plaintiffs were also representing ML in a case

6   against BW and the publisher of his autobiography, Harper Collins, for defamation. The

7   case settled for $1.5 M after 2 years of intense litigation.

8       140.   **April, 1994**:  ML married JPL.  MF was the "best man."  During this

9   period, ML told MF that JPL had him "by the balls," "got herself pregnant", was putting

10   his property in joint names, and "schemed about everything."  Over the ensuing

11   decades, this became an ML mantra.

12       141.   **September, 1993 – December 12, 1994**: The case against Wilson

13   proceeded.  A discovery referee was appointed.  Numerous depositions were taken.

14   Tierney and Little were disqualified for misconduct involving a forensic examination of

15   BW's computer.  A separate discovery referee was appointed under suspect

16   circumstances just for the Branca deposition, who essentially protected Branca from

17   responding to many questions about his investigation into the Somer conflict of interest

18   in 1985, particularly concerning a declaration prepared by JJ Little denying any

19   involvement or knowledge about the Somer conflict of interest.

20       142.   BW's deposition took 17 days, several hours per day based on his mental

21   disabilities. MF and PHS lived in hotels for months at a time.  BW's massive summary

22   judgment was first denied, then partially granted in part based on their being no

23   writing confirming the Tierney promises, then denied again.

24       143.   **September – October, 1994**:  On the credibility issues involving the

25   SOL's, on the oral promises made to ML to share in the Wilson recovery, on the forgery

26   issues in several documents, and on the perjury issues at ML's March 29, 1991

27   deposition in which he had denied receiving any "financial benefit," which conflicted

28

with his claims,  the federal court ordered 11 days of pretrial evidentiary hearings involving Mike Love, his lawyer,  Robert Kory, Brian Wilson's lawyers, James Tierney and JJ Little regarding, *inter alia*, *when* they learned about the Somer conflicts of interest; and when and what promises had been made to ML by Wilson's lawyers.

144.    Notwithstanding the overt conflicts in ML's testimony, it became evident that Tierney was himself committing perjury; and that ML had given "inaccurate" testimony in his 1991 deposition based upon the instructions of JJ Little.  The judge decided to allow the trial before the jury to proceed.

145.    **October -December, 1994**:  The Judge had previously granted Summary Judgment to BW on the contract and promissory fraud claims relating to the alleged promises to share in the Wilson recovery because there was no written contract; *and because ML had denied an agreement in his March 29, 1991 deposition testimony.*  After extensive briefing, argument, and motion practice, that portion of the Summary Judgment was later rescinded and the Judge allowed the jury to make the decision, after the evidentiary hearing, on the SOL issues and facts, on the promises, on the alleged agreement and on ML's alleged "perjury."

146.    **December 12, 1994**:  After 10 days of deliberation, the jury in its 24 page Special Verdict (**Exhibit 1**) decided in favor of ML on almost all claims including fraud and promissory claims notwithstanding that ML testified repeatedly that there was no *written confirmation* of the promises; and ML's denial under oath of an agreement when instructed by JJ Little. The judge continued the damage phase of the case to mid-January, 1995.  Settlement discussions immediately ensued between ML and BW's attorneys and conservator.

147.    **December 19, 1994:**  After the verdict, MF, PS, ML, and JPL, undertook hours and days of discussion, occasionally joined in by their CPA, George Ashley.   JPL, as usual took an aggressive lead in the discussions.   All aspects of the potential settlement were explored in depth.  Some of those issues are memorialized in the

Fourth Amended Complaint

December 19, 1994 agreement signed by ML, (**Exhibit 4**), in which ML agreed to a minimum "recovery" under the fee agreement of $50 million.   In December, 1994, Plaintiffs' expert economist, Robert Hall, rendered an opinion that the 35 Songs, songwriter royalties and copyrights had a valuation between $50 million and $80 million.

148.   BW's lawyers threatened to file bankruptcy *before* the damages phase began.  On the question of fees, ML, JPL and Ashley all stated that ML could not pay the 30% fee on the then present value of the future songwriter royalties, or the value of the lost copyrights, and other projected "recovery."  JPL also stated that they needed their cash portion of the settlements, for among other things, costs in connection with remodeling their Tahoe mansion.

149.    Once again, JPL essentially took control of the decision making and agreed, with possession of **Exhibit 4,** to pay the 30% on all fees going forward on future songwriter royalties plus the 30% FST&S cash portion of the settlement.  The plaintiffs' agreed.  JPL produced the signed **Exhibit 4** *in the presence of ML.*   A separate agreement was made with BW to pursue recovery from his lawyers, Tierney and JJ Little.

150.   **December 20, 1994**:  ML and BW entered into their settlement agreement with a "Section 1542 Waiver."

151.   **January, 1995 – November, 1995:**  FST&S litigated both ML's and BW's claims against Tierney and Little and settled for a multi-million dollar amount.

152.   **1995 – 1999**:  MF and ML became friends.  FST&S represented ML on numerous matters and MF routinely consulted with ML on non-litigation matters; and often on "issues" he was having with JPL over her "schemes."

153.   **1999 – 2003**: At the request of ML and JPL, and with the approval of BW and Carl Wilson's Estate, FST&S represented Brother Records, Inc against Mr. Chieffo's client, Alan Jardine, guitarist in the Beach Boys, who publicly accused JPL in so many words in different times and places of being a former prostitute stealing ML's money

and property.  JPL was relentless in pressuring MF to "go after" Jardine.  MF refrained from pursuing JPL's vendetta as he then explained to Mr. Chieffo. MF and PS won the case and ML took control of the Beach Boys touring group.  When the litigation ended in early 2003, ML filed for divorce and sought a restraining order against JPL.

154.    It is estimated that ML has made approximately $150 Million from touring by taking control of touring as a result of Plaintiff's efforts, culminating in an affirmance by the Ninth Circuit in *Brother Records, Inc. v. Jardine,* 318 F.3d 900 (9th Cir. 2003), won by FST&S.

155.    <u>**2003 – March, 2017**</u>: ML routinely called and met with MF on numerous issues, legal and domestic. During these years, ML repeatedly and routinely stated to MF that JPL was "scheming" to take everything he owned; that she "lied about everything"; that she was signing his name on documents; and that he needed to "secretly" consult with a therapist about JPL's scheming; and that JPL was "scheming" to control the Beach Boys' 50th Anniversary Tour in 2011 -12 with John Branca's and Melinda Wilson's choice as Manager of the tour, Joe Thomas, thereby "cutting out" Elliott Lott, ML's manager.

156.    <u>**2011 – 2012**</u>: ML, MF and Mr. Lott met for lunch to discuss the matter. MF advised ML to "fire" Joe Thomas "immediately," and to install Mr. Lott.  Thereafter, ML contacted MF and told him that JPL refused to replace Thomas with Lott; and that she had confirmed Thomas with Branca and Melinda Wilson, Brian's wife who controlled all aspects of Brian's life.

157.    At the same time in 2011-12, JPL was "investigating" the copyright reversions on the 35 songs, and a few other songs on which ML had received credit from Murry Wilson. During this period and before, JPL had been requesting boxes of Plaintiffs' old files in the *Love v Wilson* case, which Plaintiffs gave her. JPL deceived Mr. Flynn.  He turned over virtually all of his files unaware of JPL's ongoing "schemes" to void their fee agreements and claim a "community property" interest in the reverting

copyrights to the 35 Songs.

158.    One half of the songwriter credits and royalties, and rights to the termination and copyright reversions to the 35 Songs, with a few exceptions, are owned by ML.  The other half are owned by BW and his prior wife.

159.    During this period, when JPL was pursuing copyright issues, making deals with Melinda Wilson on the 50th Tour, she requested the FST&S files.   The original fee agreement files were among the numerous boxes MF had which he gave to JPL.   During this period, ML "secretly" visited the therapist arranged by MF, (although JPL was intercepting his texts and checking his phone calls – according to ML).   ML made many disclosures about his marriage crumbling, JPL's "schemes;" bad decisions; "routinely lying;" signing his name; lying about her "nursing" claims; "screwing Elliott Lott on the 50th tour"; and for the first time that he thought that JPL may have a lawyer who may have been reviewing alimony and divorce issues.

160.    **September 23, 2016, Book Signing:**  Over a period of years before the release of Mike Love's autobiography in 2016, Philip Stillman had begun working with JJ Little, Brian Wilson's former attorney.  Mr. Little passed on "tidbits" of relatively inconsequential information to Mr. Stillman who passed them on to MF about the *Wilson v Irving* and *Love v Wilson* cases.  When MF acquired the information, he passed it on to ML on multiple occasions.  Before a book signing in La Jolla on Mike Love's autobiography on or about September 23, 2016, there were several phone discussions between MF and ML about "tips" that Mr. Stillman had made to MF about disclosures made to Mr. Stillman by JJ Little.

161.    In a phone conversation before the book signing, MF informed ML that Mr. Little told Mr. Stillman that documents prepared by John Branca evidencing the Somer conflict of interest in 1985 were all covered up in the *Wilson v Irving case*; and that ML and JPL knew it; and JPL had a copy of the documents informing ML of the Somer conflict of interest; and that Mr. Little had discussions with both JPL and ML during the

1   *Wilson* case before his deposition over the Love's files and ML's testimony.

2   162.   MF passed on the foregoing information to ML asking if it was true and

3   expressing concern over ML's failure to disclose the Branca Documents to MF.

4   163.   ML said words to the effect: "I will check with Jackie. She handled it." ML

5   asked MF to speak to "Jackie" regarding her possession of any Branca documents and

6   what she had given to James Hirsch, the author of ML's book. MF refused stating that if

7   it was true, he wanted nothing to do with it; and asked in words to the effect "why

8   didn't you tell me all of this before I represented you?  As you always told me, as you

9   repeatedly testified, you didn't find out about the Somer conflict until you met me. And

10  you let me put in all of my money."

11  164.   ML blamed JPL on her "handling of the case while I was touring."  MF

12  stated that he was concerned; and that he had become "increasingly suspicious" of JPL

13  over the years, particularly when "she screwed Elliott Lott in the 50th Tour, and messed

14  up the tour by capitulating to Melinda Wilson and John Branca."  MF asked "what is she

15  scheming now?" ML stated "it is getting close to Gita time." ML stated that she has

16  "alimony claims" and may have a lawyer.

17  165.   As they had on numerous prior occasions, MF and ML discussed in this

18  discussion ML's "duties" under the Bhagavad Gita – ML was essentially Hindu in his

19  beliefs.  "Its Gita time" meant in the years of discussions between MF and ML on this

20  subject "to confront truth about JPL."  ML generally made the "Gita time" statement

21  when discussing "Jackie."  But when confronted with the "truth," ML generally stated:

22  "That would be the end of my marriage.  She has me by the balls.  Uta (MLs therapist)

23  always told me she was scheming" against me."

24  166.   In all of the years of their relationship, the foregoing discussion between

25  ML and MF was a decisive watershed moment.  There was then a long period, unlike all

26  of the prior years, where ML and MF did not routinely talk until early 2017 when he

27  called MF and told him in words to the effect:  "Jackie is scheming.  I have to get a

28

1  divorce.   She cheated you and your partners on royalties." MF immediately notified his

2  former partners in a running email chain.

3      167.   **March - April 2017: JPL'S Schemes Unravel**: ML called MF and told him

4  his marriage to JPL was over; he was getting a divorce; JPL had stolen his money in

5  many different "schemes"; she was demanding 50% of all money from the songs "you

6  recovered for me"; has "cheated you on your BMI income"; that she had secretly

7  switched "about a year ago" from BMI to ASCAP, taken a million dollar advance on a 3

8  year contract without informing or paying FST&S;  was scheming to get $2.5M from

9  BMG on what he was told was  an "illegal deal" on the upcoming copyright reversions

10  by selling the songwriter royalties and "figuring out a way with her lawyers" to cheat us

11  out of our percentage of the sale and somehow avoid copyright law; that she routinely

12  failed to pay us on time by holding checks; and  "routinely lied about everything".

13      168.   MF asked ML if he wanted alternative offers on the sale of his

14  songwriting royalties. He said he did and MF arranged a meeting though his son in

15  Lake Tahoe with Blackrock and Primary wave.  They flew into Reno on April 11, 2017,

16  drove to Lake Tahoe, but JPL went into a rage, and forbade them from coming into their

17  mansion, claiming she had an "exclusive NDA" with BMG – a lie – it was not exclusive.

18      169.   **March 29, 2017**:  Based on ML's disclosures to MF about the secret BMI to

19  ASCAP switch with $666,000 already paid secretly as advances, Plaintiff, Mike Tabb

20  sent an email to Sue Rosensteel at CPA Ashley's office and inquired about the drop in

21  royalty payments during the prior year; but without disclosing what ML had told MF

22  about the secret switch from BMI to ASCAP.  Rosensteel responded without disclosing

23  the ASCAP agreement or advances.  BUT JPL found out that ML had told MF, and *then*

24  *7 days later responded* on April 4, 2017 acknowledging for the first time the secret switch.

25  This all took place in the middle of the ML and MF divorce discussions about JPL's

26  "schemes", lying, and intercepting ML's communications. The Rosensteel first response

27  without revealing the switch and the subsequent JPL delayed response revealed to MF

28

the seriousness of the developing issues based on JPL's "scheming nature".

170.   **April 10 -11, 2017:  Lake Tahoe:**  On April 10-11, 2017, MF and ML engaged in lengthy and detailed discussions on numerous matters including facts and issues concerning JPL "lying about everything";  JPL arranging a sale of ML's songwriter royalties to BMG, the music publisher, as part of a "copyright deal" in which JPL would receive a "2.5 million administrative fee" insuring that the future copyright reversions would go to BMG;  but that ML was told it was illegal; and that JPL had already received $666,000 on the secret BMI switch; that ML did not know all of the illegal "deals" she may be involved in, or where all of the money was going;  but JPL was signing his name to documents, and had "cheated" the Plaintiffs' out of their royalties. ML said that JPL had a lawyer at Greenberg Traurig advising her how to claim 50% of everything ML owned including all of the songs recovered by the Plaintiffs.

171.   On April 10, 2017, MF asked ML if he wanted MF to prepare an email to Jay Cooper, the partner at Greenberg Traurig who was handling the "illegal" deal involving the "administrative fee" with BMG; and instructing Mr. Cooper to terminate all negotiations between JPL and BMG; and to propose to Mr. Cooper, the "terms" on which ML would sell his songwriter royalties and copyright reversions.

172.   The purpose of the proposed email was to put "all the cards on the table with Jackie," and "put the spotlight on the BMG illegal deal"; terminate the "secret" negotiations between JPL and BMG; and thereafter obtain the highest bid possible with Primary Wave and Blackrock, buyers who were flying in on April 11 to discuss a potential sale and "partnership."

173.   On the evening of April 10, 2017, MF advised ML that he would prepare the email to Jay Cooper the following morning for ML to send to Cooper and copy the proposed email to JPL.  ML agreed.

174.   The next morning, April 11, 2017, MF prepared and sent a draft email to ML about 6:15AM for him to send to Jay Cooper, insisting that it had to be copied to JPL

1   in order to confront all of the issues, find out the "truth" about all of her secretive

2   "deals," and bring "Gita Time" into reality.  See Email dated April 11, 2017 attached

3   hereto as **Exhibit 6**.  But ML was afraid to send it.

4         175.    ML stated:  "it will blow everything up.  She will blackmail me."  ML

5   said that we have to keep all of our conversations confidential, no emails or texts.  JPL is

6   monitoring phone calls and texts.  She may have a private detective.  She has a "lawyer

7   at Greenberg advising her how to pull off the entire thing."   In words to the effect:

8   "What she is doing now for alimony amounts to "blackmail."  She claims she can defeat

9   your fee agreements and "didn't have to pay you your share of the BMI/ASCAP deal."

10         176.    In a conversation that day on April 11, 2017 between MF and JPL, JPL

11   claimed that she knew nothing about the Primary Wave meeting and that ML had lied

12   to her and never told her about it.

13         177.    **April 12, 2017:  D-DAY**:  MF met with ML before and after the Primary

14   Wave/Blackrock meeting scheduled for that morning. MF made notes that day of the

15   prior discussions and discussions that day:  "ML trying to decide what to do with

16   "threats " from JPL and divorce. "She somehow gets all my texts so we cannot use that

17   to communicate. " JPL "carrying a gun." ML concerned for his safety and Ambha Lila,

18   his daughter.   JPL's relatives in Chicago connected to mobsters.  JPL has lied about her

19   background as a nurse since he met her, she "lies about everything." She has "some

20   scheme going with lawyers at Greenberg Traurig to get $2.5 million from BMG and they

21   eventually get copyright reversions but it is illegal to do it now." She is lying in the

22   construction case."  "She has signed my name to documents." If I don't go along with

23   her, my family will be ruined, and my career destroyed. "She is capable of anything."

24         178.    MF asked exactly what is she blackmailing you about?  ML said he would

25   discuss it later, but his testimony and documents JPL has are a problem; and there may

26   be something "worse."  ML said she is making him remortgage all their property to get

27   cash out.  ML said he doesn't trust Greenberg Traurig – ethnic slur about them – and the

28

"music industry they control with Branca and others."  JPL "is scheming with them, creating fees for them, and will end up with everything I own."

179.    MF said:  "As we know more than anybody, the music industry is corrupt, screwed you to help Brian. It took us years and a jury just to get your credits."  Those firms control it and manipulate it to make millions while the artists get screwed unless they are on the inside.  "Jackie apparently has gone over to the dark side for money."  ML:  She has always been about scheming for money.  She is "greedy and a liar but has me trapped." MF:  "Mike: we have fought this corruption for years, don't cave into anything on the dark side.  Don't get in bed with them.  They are morally corrupt.  They will sell their mothers for money.  You need to do the dharmic thing here.  If Jackie has sold out for money, that's her karma."   ML: "Yes. Its Gita time." MF:   This is the battle of Kurukshetra now in your life as Uta (the therapist) warned.  ML:  "I've known all along. Uta warned me it would come to this." MF:  "Jackie knows that you have discussed with Uta her schemes, lying, deception, and threats. Did you ever give Uta details on the blackmail?"  ML:   " I may have."

180.    JPL refused to allow Primary wave into their 20,000 sq. ft mansion; and the meeting was moved to CPA Ashley's office.  JPL attended by phone claiming to MF that ML had never told her about the meeting.

181.    **April 17, 2017**:  Primary Wave made a $10 million offer for the songwriting rights including a $6 million loan to a proposed partnership that would eventually administer the copyrights. BMG had only offered $5 – 6 million for the songwriter royalties.

182.    **April 30, 2017**:   In one text on April 30, 2017, after an ongoing discussion on the phone about JPL's schemes, threats and intentions as had just previously been discussed at his house in Incline Village, ML stated again: "Its Gita Time."

183.    **April, 2017 – July, 2017**:  ML's resolve to deal with JPL's "domestic

blackmail" and pursue a divorce weakened during May and June, 2017 as it became clear to MF that JPL was in fact "blackmailing" ML; and that she intended to claim a 50% community property interest in the 35 songs; and defraud the Plaintiffs.

184.   According to ML, his texts were being intercepted; and some he said were written by JPL which he acknowledged on phone calls, some from hotels because "JPL is getting my cell records." During this period as the situation deteriorated, ML's calls and texts became more guarded, some texts were obviously written by JPL, one of which ML confirmed on the phone.

185.   **May, 2017**:   In several calls in May, 2017, between MF and JPL, JPL stated that she "would never have allowed Mike Love to agree to the 30% of the gross recovery required by the fee agreements." JPL also stated that the "fee agreements should have stopped after 7 years."  JPL stated that Mike Love "misunderstood the $2.5 million BMG payment.  It is for administrative fees."  (Recognizing the $2.5 million as an illegal scheme, Chieffo later withdrew it.)

186.    In another call, JPL stated:  "Mike Love never signed the 30% agreement." In another phone call, ML said JPL is sending a text on his phone changing the contents of a phone call ML had with attorney, Carla DiMare in which ML told Carla that JPL had a lawyer who told her she could claim "community property rights on the 35 songs. On July 20, 2017, ML/JPL sent a text stating:

> **"Thanks for your VM this AM. I agree that we need to resolve everything. The use of the word divorce is not applicable but rather community property rights stemming from the fact that Jacquelyne and I have been together for 30 years. I think Cara (sp?) misunderstood or mischaracterized something I said in my conversation with her. I will get back in touch with you soon and appreciate your message."**

187.   **May-July, 2017:**   Having alerted his former partners throughout the entire period from March, 2017  to the present of the  communications between MF and ML and JPL,  particularly relating to JPL's schemes, fraud, breach of their fee contracts,

1   divorce issues, and intentions to breach the fee agreements in order to claim

2   "community property" in the songs,  in May, 2017 MF sent a copy via email of the July

3   27, 1992 fee agreement to his former partners explaining that he had only found a copy.

4   (Mr. Chieffo's frivolous allegations relating to the "scansnap metadata" when MF

5   scanned the copy and sent it to his former partners evidencing some impropriety relate

6   to this email.)

7        188.    Mr. Stillman sent a series of letters to Mr. Chieffo's partner, Jay Cooper

8   and to BMG reciting the Plaintiffs' contractual rights and lien *originating in 1994-95* on

9   the 35 Songs. One of the letters responded to Mr. Chieffo's ridiculous assertion that the

10  Plaintiffs were "driving a wedge" into ML's marriage.  In the context of MF's decades of

11  dealing with the Loves and ML's chronic complaints of JPL's "lying", "cheating,"

12  "forging", "threatening", "scheming", "blackmailing", etc., MF interpreted the letter as

13  more lies of JPL to Chieffo; but could not understand how Chieffo would buy into her

14  absurd accusations because he *knew* about JPL's history and background from his

15  former client, Alan Jardine; and he knew that he was part of the Branca Documents

16  cover-up.

17       189.    **July 26, 2017**: Mike Flynn sent his friend Mike Love an email, **Exhibit 7,**

18  confirming the Plaintiffs' 30% ownership interest in the songs, ML's stated divorce

19  intentions, JPL's intentions to cheat the Plaintiffs, and JPL's greed and deceit driving the

20  entire matter.

21       190.    **July 28, 2017**:  Mr. Chieffo cavalierly terminated the 25 year client/friend

22  relationship between Mike Flynn and Mike Love at the demand of Jaquelyne Piesen

23  Love.

24       191.    **July – September 15, 2017:**  MF repeatedly requested Mr. Chieffo to have

25  "just ask Mike Love" to "simply confirm the 30% fee agreement" that had been in place

26  for 23 years until the Loves began to fight over community property.  MF recited in the

27  barest detail in hopes of resolving the matter the years of conflict in their marriage

28

which erupted over her "schemes" to obtain 50% of ML's assets.  During this period, based on his 25 year friendship with ML, MF repeatedly offered ML, JPL and Chieffo "olive branches" to ward off the impending conflict manufactured by JPL.

192.    JPL's ruthlessness and schemes just worsened.

193.    **September 15, 2017:**  Disappointed and conflicted over having to sue his friend and client and knowing that JPL's "schemes" were the basis for the conflict, MF emailed a comprehensive letter to Mr. Chieffo attaching copies of the fee agreements he had found and scanned into his computer.

194.    **October – December, 2017**:  On or about April, 2014, Mr. Stillman had met JJ Little; and began working with him on several cases. Between the years approximately 2014 to 2016, Mr. Little gradually began making disclosures to Mr. Stillman on numerous matters relating to the *Love v Irving / Wilson* cases.  In October – December, 2017 recited herein before his death in January, 2018, Mr. Little made the following disclosures to Mr. Stillman:

(a)  In 1985, Attorney John Branca, representing the Beach Boys, conducted an investigation into the Somer conflict of interest in connection with the 1969 sale of the Sea of Tunes catalog to Almo Irving Music.

(b)  In 1985, Mr. Branca sent correspondence regarding the Somer conflict of interest in the 1969 sale to all of the Beach Boys, including Mike Love, Alan Jardine, Carl Wilson and Brian Wilson; and copies to all of their attorneys, managers or CPA's, including Bernstein, Kory, and Schwartz; and to BRI, and to the Beach Boys manager, Tom Hulett.

(c)  In December, 1986, Mr. Tierney entered into a confirmed in writing agreement with Mike Love and Robert Kory for Mr. Love to "cooperate" in the proposed case for Brian Wilson to sue Almo/Irving Music, and Abe Somer, and Somer's law firm, in exchange for 30% of the Wilson recovery, 50% of the regained copyrights, and restoration of the Mike love songwriting credits with a floor of $2 million.

**(d)** Between January, 1989 and late 1990, in the *Wilson v Irving* case, Mr. Little worked out a plan with all of the Beach Boys and their attorneys, managers, etc., to cooperate with the Beach Boys lawyers, including John Branca, to remove from their files all evidence of correspondence, documents and notes relating to the 1985 Branca investigation into the Somer conflict of interest. After the law suit was brought in August, 1989, Tierney and Little met again with Mike Love and Robert Kory in December, 1989; and confirmed their prior agreement, but also required that Kory and Mike Love provide JJ Little with access to all of their 1985 Branca files.  Mike Love and JPL both agreed. Mr. Little said that JPL retained copies of everything he removed from the Love archives involving Branca's 1985 investigation; and that he believes Mr. Kory retained copies of what he took from the Kory files regarding the Branca investigation.  Branca had copied all lawyers and all Beach Boys in his 1985 correspondence.

**(e)** Thereafter, between January 1989 and September, 1991, Mr. Little executed this plan with the full "cooperation" of all of the Beach Boys including Mike Love, Alan Jardine and Carl Wilson; and with their lawyers, Vince Chieffo, Robert Kory, and Ross Schwartz.  Before the Mike Love deposition in March, 1991, Mr. Little removed all Branca documents from the Mike Love files relating to the Somer conflict of interest with the cooperation of JPL; and also from Mr. Kory's files.  Mr. Little also removed Somer conflict of interest files from the files of John Branca, Eugene Landy, Jim Tierney, Vince Chieffo, Ross Schwartz, BRI, Alan Jardine, Carl Wilson, and Tom Hulett, all before they testified and responded to defense subpoenas.

195.  **February 16, 2018**:  Following the death of JJ Little on January 13, 2018, Vince Chieffo sent out his email voiding the 92 Agreement.  Upon information and belief, before his death, Mr. Little informed an unknown source connected with Melinda Wilson, that he had given the information to Mr. Stillman regarding the Branca investigation. Mr. Flynn had previously advised Love who advised JPL.

196. **March 1, 2018**:  Chieffo and JPL sent the email attempting to void the July 27, 1992 fee agreement.

197. **March 2018 – May, 2019**:   The Plaintiffs reviewed 25 years of history, reviewed the files they have left not in JPL's possession, researched the law, and decided how to proceed with arbitration against ML; and file the Nevada law suit, as a "placeholder" suit against JPL for interference with contract, BUT with the minimal disclosures in order to protect the career of Mike Love.

198.      The Plaintiffs hereby stipulate that Mike Love was in fact, and it has been adjudicated, that he was defrauded by Murry and Brian Wilson; and by the manner in which the music industry appears to do business based on the Branca issues. The Plaintiffs stipulate that the jury reached the correct verdict, (**Exhibit 1**), notwithstanding Mike Love's perjury, and JPL's concealment and suppression of documents and history of "lying about everything" to MF when he met with them in December, 1991; and to the Plaintiffs throughout the *Love v Wilson* case.  The Plaintiffs hereby stipulate that the "Section 1542 Waivers" in all of ML's settlement agreements with the Irving defendants, and with Brian Wilson, and with his attorneys, all preclude any "claw back," or reversal, or voiding of any of those settlement agreements.

199. **May 3, 2019**:   MF sent a tolling agreement to Vince Chieffo to toll all statutes of limitation while the Plaintiffs investigated the JJ Little allegations, which became admissible as "dying declarations" following his death on January 13, 2018, in order to exchange evidence on the matter, including JPL's possession of the "Branca documents."   Chieffo first said that he would review with his clients, but then never responded.

200. **May 8, 2019:**  With the two year statute of limitations looming, the Plaintiffs sued Jacquelyne Piesen Love in the Reno, Nevada Federal Court for, *inter alia*, interference with contract.  In order to protect Mike Love's career, the Plaintiffs filed a very narrow, factually limited, "placeholder" complaint, without disclosing the facts

1    and allegations contained in the Second Amended Complaint regarding the ML

2    perjury, JPL's and ML's frauds, and issues and facts involving the Branca documents, in

3    order to protect the career of Mike Love and seek arbitration.

4        201.   **July 26, 2019**:  The Plaintiffs filed their First Amended Complaint bringing

5    in Michael Love as a defendant, but again asserting only the narrowest of facts and

6    claims, as a placeholder complaint, in order to protect his career, hoping for resolution

7    with arbitration. With their Second Amended Complaint, Plaintiffs sought immediate

8    production of all of the "Branca documents" in the possession of ML and JPL, their

9    agents, or managers, under Fed R. Civ. Proc 26 (a)(1)(A) (ii).   Such production would

10   have potentially greatly expedited this action and save judicial resources.

11       202.   **May 13, 2019 - Present**:   The Plaintiffs filed for arbitration with a narrow,

12   factually limited application, again, in order to not prejudice Mike Love, but thereafter,

13   they were compelled to supplement with a Reply responding to JPL's frivolous "cut and

14   paste" forgery allegations. The arbitration Panel issued its "Award" on Feb. 2, 2021

15   following five days of testimony and over 100 exhibits in which Love essentially

16   admitted the authenticity of his signatures on the fee agreements while acknowledging

17   no memory of when, where and with whom he signed it.  Defendants are now

18   challenging the "Award" and have opposed Plaintiffs' RJN of the Award.  But

19   Defendants have procedurally violated the primary thrust of the California statute

20   requiring the filing of a "*complaint*" along with a Notice of Rejection."  Defendants'

21   violation implicates profound subject matter jurisdiction issues for this Court; it

22   implicates the rationale in the California statutory framework for the filing if a

23   "complaint" following fee arbitration; and arguably nullifies the legal effect of their

24   "Rejection," thereby potentially making the "finding" in the Award of the validity of the

25   92 Agreement, a final judgement under California law.  The Plaintiffs are now

26   compelled to fully explicate these issues and their claims following the Court's leave to

27   amend in this Fourth Amended Complaint.

28                        **FIRST CAUSE OF ACTION**

## FRAUD

### (Against defendants, Love,  JPL, and Love as Trustee of The Trust)

203.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 – 203 above.

204.     Plaintiffs' fraud allegations are based on the following statements, representations, and acts of the defendants charged in this Cause of Action:

(a) Between December, 1991 and continuing to the present, both of the individual Defendants have engaged in a pattern of fraud which has, without any intervening mitigation, *directly caused* the Plaintiffs to enter into fee agreements with Defendant, Love - fraud in the inducement; and then as part of that fraudulent inducement, Defendants have fraudulently interfered with and voided the agreements by, among other facts, *concealing the fully executed agreements*;  asserting that Love's signature has been "*cut and pasted*" or "*electronically affixed*" to the agreements; fraudulently manufacturing and fabricating facts and defenses, and making statements  in order to interfere with and void the agreements, while at the same time collecting royalties on the 35 songs without paying the Plaintiffs as they had for the previous 23 years;  selling 50% of the rights to the royalties to a third party, BMG ; and representing in writing to BMG, which purchased 50% of the songwriter royalties on or about October – November 2017 (based on Defendants' representations)  including the songwriting royalties to the 35 songs, (royalties for which Plaintiffs had been receiving 30% of for the past 23 years) that "*Mike Love intends to continue to honor his agreement to pay future contingency fees to the Former Attorneys  as he has for the last 22 years.*" Defendants, through Mr. Chieffo, wrote the foregoing  statement in an email dated August 21, 2017 after asserting in writing for the previous three months that the 92 Agreement was invalid as not fully executed when the Defendants were concealing the actual copy of it.  Fraudulently, two days later on August

23, 2017, Defendants, through Mr. Chieffo, wrote an email to Plaintiffs dishonoring the fee agreements, and asserting that Plaintiffs owed Defendants over $800,000 based on fraudulent 23 year old "made up" accounting and manufactured legal claims. Defendants have filed their "check marked" complaint in San Diego for the purported $800,000.   Thereafter, between August 23, 2017 and November 30, 2017, by lying to BMG in the August 21, 2017 email while deceiving Plaintiffs, Defendants collected by means of an additional, secondary,  fraudulent "scheme" of JPL at least $5 million, of which at least 30% of said amount, according to their August 21 email, belonged to the Plaintiffs, or at least $1.5 M in hard money,  (in fact approximately $1.8 M in "value")  which has never been paid to the Plaintiffs, notwithstanding Mr. Chieffo's August 21, 2017 email.

(b) The fraudulent, secondary  "scheme" that enabled Defendants to defraud the Plaintiffs of at least $1.5 M in 2017, as recited above,  involved the following: Between November 2016 and October, 2017, JPL exclusively negotiated, (mostly without Love's knowledge according to his April, 2017 admissions to Mr. Flynn), employing  a pattern of fraud, deceit, misrepresentation and outright lies, the sale of 50% of the songwriter royalties to BMG, including all of the 35 songs, comprising approximately 90% of the "value" in the sale.   The true value of 50% of the sale of the 35 songs to BMG represented at least $6 M. JPL's scheme, as disclosed to Mr. Flynn in April, 2017 by Love, involved her illegal "scheme" to receive $2,5 M on the sale acting as an "administrator" in order to insure the receipt by BMG of the copyrights to the songs when they reverted years in the future – an illegal scheme.  This scheme blew up when Love disclosed it to Mr. Flynn in April, 2017.  Thereafter, JPL concocted the scheme to sell 50% of the royalties to the 35 songs, plus a few others, for $3.8M to BMG while receiving the rest of the "value" in the form of JPL acting as an "administrator" to Mike Love's relatively worthless music publishing

Fourth Amended Complaint

company, Clairaudient Publishing.  During the arbitration this scheme was exposed.   JPL's email dated May 7, 2017 exposes this entire "scheme."  As a direct, causative result of this secondary scheme, Plaintiffs have been defrauded of approximately $1.5 to $1.8M.

(c) Defendants directly defrauded Plaintiffs by concealing the "switch"  from BMI to ASCAP on April 1, 2016 in which they received a $1M "advance" payable in three  $333,000 installments, none of which has been paid to the Plaintiffs either pursuant to their fee agreements, the 23 year history of payments, or their August 21, 2017 representations by Mr. Chieffo that " *Mike Love intends to continue to honor his agreement to pay future contingency fees to the Former Attorneys  as he has for the last 22 years.*"  This fraudulent concealment of the BMI switch is part of the same "pattern" of concealment starting in 1992 with the Branca Documents, which continues to the present; the concealment of the fee agreements, which continues to the present; the concealment of the sale to BMG incorporating the "secondary fraud recited above, which continues to the present; and each and every fraudulent act of the Defendants which have directly caused Plaintiffs to lose approximately $32 million.

(d) Between January, 1992 and continuing to the present, JPL and ML falsely represented to the Plaintiffs, repeatedly, and on numerous occasions, times and places, that they had no knowledge of the Somer conflict of interest involved in the 1969 sale of the copyrights to ML's 35 songs recovered by the Plaintiffs by Special Verdict on December 12, 1994, until MF disclosed it to them between January and June, 1992.  Pursuant to these false representations made to the Plaintiffs in early 1992, between January, 1993 and December 1, 1994, ML repeatedly lied under oath and committed perjury in his multiple depositions, in the evidentiary hearing, and before the jury, that he only acquired knowledge of the Somer conflict of interest in the 1969 sale when

Michael Flynn informed him of it, and discussed it with him, in the period between January and May, 1992.

(e) The aforesaid representations and statements, of both JPL and ML, and the sworn testimony of ML, made to the Plaintiffs claiming lack of knowledge of the Somer conflict of interest until informed by MF in early 1992, is and was false throughout the period from January, 1992 to the present.

(f) In fact, ML acquired knowledge of the Somer conflict throughout 1985 and 1986 from the Branca documents, or before, in multiple meetings with his attorney, Robert Kory, in meetings and discussions with James Tierney, John Mason and John Branca, and with other members of the Beach Boys and with officers and directors of BRI.  In fact, in 1985 – 86, ML and his attorney, and the other members of BRI and their attorneys all knew and recorded in writing facts relating to the Somer conflict of interest, which would have revealed their knowledge of the Somer conflict prior to 1985 – 86, thereby defeating any and all claims to recover the copyrights lost in the 1969 sale, even in 1985, under the applicable statutes of limitation.

(g) In fact, JPL acquired knowledge of the Somer conflict between at least January, 1990 and March 29, 1991, after the filing of the *Wilson v. Irving* case in August, 1989, and before ML's deposition on March 29, 1991, while living with ML, discussing it with him, meeting with Robert Kory and JJ Little, and discussing it with them.

(h) In fact, at least as of early 1990, JPL was in possession of the "Love Archives" containing the 1985 Branca documents revealing the Somer conflict of interest, reviewed them with ML, and discussed them with Robert Kory and JJ Little before ML's deposition on March 29, 1991.  They all agreed to conceal the Branca documents, suppress them, and not produce them to the defendants in the *Wilson v Irving* case.  JPL instructed ML to lie about his knowledge of the Somer conflict in his March 29, 1991 deposition, if asked.

Fourth Amended Complaint

(i)  ML and JPL have continuously from early 1992 to the present, misrepresented, falsely denied, concealed and suppressed their prior knowledge of the Somer conflict until MF informed them in their meeting in early 1992; and from early 1992 to the present, they have concealed their possession of the Branca Documents.

(j)  Between early 1992 and the present, ML and JPL have also lied and misrepresented to the Plaintiffs, and ML has committed perjury, in connection with his knowledge of his "legal rights" based on the Somer conflict of interest to pursue his claims.   In fact, ML knew of his "legal rights" based on the Somer conflict in 1985 -86.  Throughout 1985 -86, ML and JPL were informed by Kory, Mason and Branca of ML's "legal rights" to pursue his claims to regain the copyrights to his songs. ML's sworn testimony in his March 29, 1991 deposition in *Wilson's* case as specifically recited in paragraph 49 hereof, was perjured on at least *seven* bases*:* (i) ML lied about having a "financial interest" in the *Wilson* case; (ii)  ML lied about having  "discussions" with BW's representatives about benefitting from the case;  (iii)  ML lied about "no one"  having even "suggested" or "indicated" he could benefit from the *Wilson* case; (iv) ML lied about not having any "legal rights" to benefit from the case as the reason he was lying about the above lies; (v) ML concealed his knowledge of who, in fact,  had informed him of his "legal rights" which included at least John Mason (another of BWs lawyers), John Branca and Robert Kory; (vi) ML concealed his knowledge that his attorney Robert Kory was then  on the phone during the deposition confirming their agreement for ML to "benefit" while JJ Little was instructing him to commit perjury; (vii)   ML lied and concealed , and JPL  concealed, along with JJ Little and Robert Kory the written December 22, 1986 agreement from Tierney.

(k) The foregoing pattern of lies and perjury were later concealed by JPL and ML from the Plaintiffs because it would have exposed the Branca documents and

Fourth Amended Complaint

ML's and JPL's lies to them about only discovering the conflict of interest when they met the Plaintiffs. The Plaintiffs had to endure summary judgment and 3 years of litigation with NO writing confirming the agreement to share in the BW case.  To this day, the defendants have never produced the December 22, 1986 Tierney letter, but like all lies of JPL, the plaintiffs have just recently learned that the letter exists; and it has been unwittingly exposed by ML's coauthor.

(l) The pattern of lies, concealment and fraud relating to the Branca documents, and Love's' accompanying falsehoods under oath continues to the present. It is part of the pattern of fraud which pattern is the direct cause of Plaintiffs' being *currently* cheated out of approximately $32 M.  Fraud begets fraud. But for the fraud involving Branca and his concealed 1985 investigation and the suppression of the documents, Plaintiffs would have been paid under their fee contracts.  This fraud is the direct cause of JPL blackmailing her husband and the failure to pay the Plaintiffs under the fee agreements.

(m)     From at least early 1992 to the present, ML and JPL have repeatedly and continuously, lied to, and misrepresented to the Plaintiffs; and  concealed, and suppressed, from the Plaintiffs;  and ML has committed perjury in his depositions, evidentiary hearing testimony, and trial testimony,  all in connection with ML's and JPL's  possession of a written confirmation given to ML and Kory on December 22, 1986 by James Tierney confirming their agreement for ML to receive 30% of the Wilson recovery, 50% of the copyrights and $2 million for past unpaid songwriter royalties.  ML and JPL always and repeatedly lied to the Plaintiffs that there was "nothing in writing."  In fact, in his March 29, 1991 deposition, ML committed perjury on the specific questions and answers on this specific issue of receiving a "financial benefit" from the *Wilson* case as specifically recited in paragraph 49 hereof.

Fourth Amended Complaint

(n) In September 1993, during the Irving Music and Somer settlement, JPL in ML's presence, gave the Plaintiffs what appeared to be a fully executed amended fee agreement signed by ML, which JPL is now claiming to be "forged."  (**Exhibit 3**).  The Plaintiffs did not know it was either forged or signed without authorization.  If it is in fact either "forged" and/or ML authorized JPL to execute his signature without informing Plaintiffs, this constituted a fraud on the Plaintiffs.

(o) In December, 1994, if JPL again forged ML's signature on **Exhibit 4**, and delivered the document in ML's presence thereby representing that ML had signed it; and agreed to the "recovery" at a valuation of $50 - $80 million, and a payment schedule at 30% of the annual songwriter royalties, this constituted a fraud on the defendants.

(p) For the past 25 years, the defendants represented; and the Plaintiffs believed and relied upon, the accounting statements of the defendants and the Ashley CPA firm, that Plaintiffs were in fact receiving 30% of the annual songwriter royalties paid to the defendants.   This was all a fraud.   ML has admitted in his book released in 2016 that before the "recovery" from the 1994 Special Verdict, he was receiving about $75,000 per year in songwriter royalties. After the recovery under the verdict, ML received over a million dollars a year. Defendants have thereby defrauded the Plaintiffs in an amount of approximately $2.5 million in monies owed under the contracts.

(q)  The "recovery" under the fee agreements included the discounted, "present value" of the lost copyrights.  In December 1994, that amount was at least $15 million.   ML was unable to pay the fees according to the agreements claiming lack of resources to pay them; but the parties agreed to have ML pay 30% of the annual songwriter royalties going forward, plus all income derived from the 35 songs until the copyrights reverted or ML received income on the reversions.  The reversions on the 35 songs began in February, 2018; and the

reversions will continue to revert until at least 2024.  The defendants have not only defaulted on their contractual 30% agreements, they have manufactured a fraud on the Plaintiffs claiming that 50% of all of the rights and income from the 35 songs including the reverting copyrights constitute a "community property" asset of JPL.   JPL first raised this claim in the Spring of 2017.  The Plaintiffs relied upon 23 years of defendants' representations, accounting statements, and statements of ML that the Plaintiffs effectively "owned" 30% of the copyrights to the songs, and/or 30% of any and all income derived from the copyright reversions.  JPL's "community property" scheme, now joined in by her husband, is a fraud on the Plaintiffs directly causing Plaintiffs to lose approximately $32 M as part of the "pattern" of fraud recited herein.

205.    The foregoing acts, conduct, concealments and misrepresentations on the dates specified, and under the circumstances specified, directly caused plaintiffs to (i) not claim their full fees of at least $12 million in December, 1994; (ii)  cease representation of Love in December 1994, and claim full payment of their fees; (iii) not take legal action to protect all of their rights at any of the dates specified, including December, 1994, and continuing to the present; (iv) lose approximately $2.6 million between July 2017 and the present from the love's failure to pay royalties during said period; (v)  lose control to the Loves of most of their files including all of their fee agreement and Branca files; (vi)  allow 23 years to transpire with loss of evidence, witnesses, memory, and documents; (vii)  such other damages to be determined in discovery and at trial.

206.    The *Love v. Wilson* case (which included claims against Rondor Music, the owner of the copyrights, and Mitchell, Silberberg & Knupp, Somer's law firm) was already a challenge in 1992.  Plaintiffs would not only be attempting to set aside a sale of the Sea of Tunes Catalog that occurred 23 years earlier, in 1969, based on a one year statute of limitations against Somer for his undisclosed conflict of interest, but Plaintiffs also had to surmount the fact that a similar case was litigated by Brian Wilson right

under Love's nose, and in which he cooperated and testified.  However, Plaintiffs

believed that Love *had* written the songs, *had* been taken advantage of, and Plaintiffs

believed that the equities – if not the legalities – clearly favored Love in front of a jury.

207.    Had Love not concealed the Branca Documents, for example, from

Plaintiffs, Plaintiffs never would have agreed to represent Love in the case without a

minimum of a standard one-third contingent fee, an evergreen retainer for the

enormous costs incurred, and an increase in the contingent fee to 40% at trial.  Plaintiffs

never would have made the sweetheart deal with Love that they did, and further,

would have insisted on payment at the close of the case or obtained a security interest

in the copyrights at that time.  Plaintiffs would *not* have even considered. The type of

arrangement that the made with Love at the time – a sweetheart deal that he is now

trying to set aside.

208.    The foregoing statements, falsehoods, lies, perjuries, misrepresentations,

acts and concealments of the defendants were all frauds on the Plaintiffs.  They were all

material inducements for the Plaintiffs to enter into fee agreements with the Plaintiffs;

and undertake 4 years of grueling litigation; and then remain in the dark for 25 years,

and not pursue their legal remedies.  They were all part of a concealed pattern of fraud

which deceived Plaintiffs into not taking action, confronting the Defendants, or seeking

legal remedies for a period of 25 years.  Concealed fraud lulling Plaintiffs into inaction

based on the close personal relationship between Love and Flynn for 25 years is a direct

and proximate cause of Plaintiffs' loss of approximately $32 million.  But for said fraud

and fraudulent concealment, Plaintiffs would not have undertaken the representation of

the defendant, Mike Love;  would not have entered into the fee agreements; would not

have agreed to his reliance upon JPL to produce all relevant documents involved in

Plaintiffs'  representation; would not have undertaken 4 years of massive litigation to

obtain the "recovery;" would not have agreed to accept 30% of the annual songwriter

royalties for the ensuing 23 years;  would have received significantly more than they

have been paid; would not have waited 25 years to pursue legal remedies; and would not even be involved in this lawsuit at great time, expense, and legal fees.

209.    The Plaintiffs, individually and collectively relied upon the foregoing false representations, statements, inducements, acts and frauds of the defendants.

210.    The transferee defendant, The Michael Love Family Trust, controlled and fraudulently manipulated by JPL, has received monies directly resulting from the frauds on the Plaintiffs. Throughout the past 25 years, JPL has diverted monies to this entity which were owed to the Plaintiffs.  The entity is dominated and controlled by JPL and constitutes her alter egos.

211.    As a direct and proximate result of the defendants' frauds, Plaintiffs have been damaged in an amount to be determined at trial but least $32 million.

212.    Because of the intentional, oppressive, fraudulent and malicious conduct of Defendants, Plaintiffs are also seeking punitive damages in an amount to be determined at trial but no less than $52.5 million.

### SECOND CAUSE OF ACTION

### BREACH OF CONTRACT

### (Against Michael E. Love)

213.    Plaintiffs repeat and reallege the allegations set forth in paragraph 1 – 212 above.

214.    The July 27, 1992 Fee Agreement, the 1993 amendment, and the 1994 Agreement on valuation – not a contingent fee agreement - were valid contracts which obligated ML to pay the Plaintiffs either a fee based on the "recovery" of the "present value" of the rights relating to the 35 Songs that ML received in the Wilson settlement, or to pay to the Plaintiffs 30% of all income ML received on account of the 35 Songs. Plaintiffs fully performed all of their obligations pursuant to the written contracts. In fact, ML and JPL represented that they had fully performed in accordance with the agreements at the 30% rate for approximately *23 years*.

Fourth Amended Complaint

215.   As of September 2017, ML is in breach of his obligations under these agreements.

216.   Plaintiffs have the right to enforce ML's contractual obligations.

217.   As a proximate and foreseeable result of ML's breach of the written agreements, Plaintiffs have suffered and continue to suffer damages in an amount of at least $15 million.

**THIRD CAUSE OF ACTION**

**<u>ACCOUNTING</u>**

(**Against defendants Love and JPL**)

218.   Plaintiffs repeat and reallege the allegations set forth in paragraph 1 – 217 above.

219.   Defendant was required to account to the Plaintiffs for all royalties and other income he received on account of the 35 Songs.  Between 1995 and 2017, ML and JPL *appeared* to provide such accountings on a regular basis. They did not. In this case, the royalties go back over the last 25 years, involving quarterly and semi-annual payments owed on each of the 35 Songs, as well as other sums obtained by Defendants through special arrangements with third parties.  Accordingly, the **accounts** are so complicated that an ordinary legal **action** demanding a fixed sum is impracticable.

220.   Facts learned by the Plaintiffs in 2017, in addition to statements made by ML in his autobiography, suggest that the accountings made by JPL were incomplete, inaccurate or fraudulent.  The switch from BMI to ASCAP was concealed by JPL for over a year until ML revealed it to MF in the context of the divorce discussions.  As of the next payment after May 9, 2017, ML and JPL have failed to make any payments or accounting to the Plaintiffs.

221.   Wherefore, Plaintiffs are entitled to a complete and accurate accounting of all payments Love has received on account of his interests in the 35 Songs, and to be paid in accordance with said accounting.

**FOURTH CAUSE OF ACTION**

<u>**QUANTUM MERUIT**</u>

**(Against LOVE)**

222.     Plaintiffs repeat and reallege the allegations set forth in paragraph 1 – 222 above.

223.     Alternatively, in the event that it is determined that neither of the Fee Agreements, nor the 1994 agreement are binding and valid contracts between the Plaintiffs and ML, the Plaintiffs performed legal services for ML in connection with the Wilson litigation with the understanding and expectation that they would be paid for such services. JPL also benefitted directly from the Plaintiffs' services.  Millions of dollars recovered by the Plaintiffs were received by her and spent on ML's properties that she schemed to put under their joint names; and in her "fashion business"; and indeed, she is claiming a 50% "community property" interest in all of the rights obtained by Plaintiff for ML in the 35 songs, including copyright reversion rights.

224.     When the September 1993 amendment occurred, JPL demanded that ML and the Plaintiffs accept the settlement proposal from the defendants in order to complete the remodeling of their Lake Tahoe mansion which she had placed in both their names, notwithstanding ML's stated desire to reject the money and pursue the copyrights.

225.     As a result of Plaintiffs' provision of such services, ML successfully litigated against Wilson and recovered the "bundle of all rights" in the 35 Songs which he would not have received but for the legal services provided by the Plaintiffs.

226.      Plaintiffs delivered services of the highest quality in extremely difficult litigation and produced results that few, if any, lawyers and law firms would be able to match. Further, Plaintiffs provided such services in a difficult environment, and were

hampered in their efforts by both ML and JPL who committed the frauds recited in the fraud count herein; and who breached their promises to fund the expenses for the litigation because payment of such expenses might have curtailed JPL's extravagant life style.

227.    JPL also deliberately and intentionally "schemed" – the words of ML – at all material times to control the litigation, control document production, control execution of agreements, and related matters, in order to place title and control over all of ML's assets which he collected for over 30 years before their marriage in both their names.

228.    JPL exercised her "schemes" to benefit herself from Plaintiffs' services at their expense.  Her current claim to 50% of the "community property" value of the 35 songs is a direct interference with Plaintiffs' "bundle of rights" in the songs.  If Defendants are successful in setting aside at least the '92 Agreement, the defendants and each of them owe plaintiffs in *quantum meruit* for the reasonable value of their services.

229.    Plaintiffs are entitled to be compensated for the fair value of the extraordinary services they provided from all of the defendants.

230.    ML has already admitted in his autobiography that the fair value of the services Plaintiffs provided were millions of dollars more than what he has paid them, which includes the royalty payments JPL made throughout the past 25 years.

## FIFTH CAUSE OF ACTION

## <u>INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS</u>

### (Against Jacquelyne Piesen Love)

231.    Plaintiffs repeat and reallege the allegations set forth in paragraph 1 – 230 above.

232.    Plaintiffs had valid and existing contracts with ML as recited in Exhibits 2, 3 and 4.

233.    At all times, JPL knew of the contracts entered into between Plaintiffs and ML and approved of them.  They were all reviewed by her before she allowed ML to sign them.  If either ML or JPL now claim that ML's signatures on either the September, 1993 or December, 1994 agreements have been forged, then either ML authorized it or allowed JPL to forge his signature because they were delivered in her presence. Moreover, JPL was aware of and directly involved in the Plaintiffs' rights to receive 30% of all income paid to ML on account of his interest in the 35 Songs for the past 23 years.

234.    Knowing of these rights, and without any justification, JPL intentionally and wrongfully took actions designed to disrupt and interfere with Plaintiffs' contractual rights, by among other things, entering into licensing agreements such as the BMI/ASCAP switch, and other business contracts relating to ML's rights to the 35 Songs; claiming a 50% "community property" interest in the 35 songs; "forging" ML's signature; breaching the agreements by controlling the 30% payments and failing to pay the contractual amounts; and/or delaying payments, all with the wrongful intention of not paying the Plaintiffs their share of income derived from the 35 Songs.

235.    JPL has deliberately instructed Ashley Quinn not to make payments of royalties to the Plaintiffs which were otherwise due to them in order to divert funds that were owed to the Plaintiffs to herself and the other defendants. JPL has been directly involved in matters to be determined in discovery operating to interfere with Plaintiffs' contractual rights with ML.

236.    As a direct and proximate result of JPL's intentional interference with Plaintiffs' ongoing contractual rights, Plaintiffs have been harmed and continue to be harmed by JPL's intentional interference with Plaintiffs' contractual rights.  As a result of wrongful actions she has taken and instructions she has given to persons who would have otherwise paid the Plaintiffs, Plaintiffs have not received their full share of income related to the 35 Songs to which they are entitled, and have suffered and continue to suffer damages in an amount to be determined, but well in excess of the jurisdictional

1  minimum of this Court.

## SIXTH CAUSE OF ACTION

## <u>UNJUST ENRICHMENT</u>

## <u>(against all Defendants)</u>

237.   Plaintiffs repeat and reallege the allegations set forth in paragraph 1 – 236 above.

238.   Defendants have been unjustly enriched by their failure to account to the Plaintiffs for all sums owed before June, 2017; and for their receipt in the future of all monies received on account of the 35 Songs recovered for them by the Plaintiffs covering future songwriting royalties and copyright reversions.  Morally and ethically, defendants should not keep or receive 30% of any and all monies they have received or receive in the future on the 35 Songs, which belongs to the Plaintiffs.

239.   All five elements of this Count have been established: (a) Defendants have been enriched by the Plaintiffs' work; (b) Plaintiffs have been impoverished by defendants' enrichment and failure to pay the Plaintiffs; (c) there is a direct  and indisputable connection between defendants receiving Plaintiffs 30% of the monies paid on the 35 Songs; (d) there is no lawful justification for the enrichment and the impoverishment; (e) unjust enrichment is intended to be an equitable doctrine, so if the defendants claim that Plaintiffs cannot benefit  from the defendants' frauds, perjury and crimes, it provides a remedy that may not be available at law.

240.   Plaintiffs have suffered damages under this Count in at least the amount of $15 million.

## <u>SEVENTH CAUSE OF ACTION</u>

## <u>DECLARATORY JUDGMENT</u>

## <u>(against Love and JPL)</u>

241.   Plaintiffs repeat and reallege paragraphs 1 through 240 as if fully recited in this count.

Fourth Amended Complaint

242.     An actual controversy now exists between the Plaintiffs and the defendants. Plaintiffs contend:

(a)     The July 27, 1992 is binding and enforceable against the defendants as a valid contingent fee agreement.

(b)     The September 1993 Amendment is a valid, binding and enforceable amendment to the '92 Agreement.

(c)     The December 19, 1994 agreement is not a contingent fee agreement and is valid, binding and enforceable as an agreement on the items recited therein, including valuation of the "recovery" under the fee agreements.

(d)  The "bundle of rights" in the 35 Songs recovered by the Plaintiffs for the defendant, Love, include all income derived directly or indirectly from the songs, including 30% of the songwriter royalties; any income from any other sources such as the "Wixen" settlement based on Love's co-authorship of the 35 Songs; the copyright reversions; and once any "ownership" rights have vested in any reverted copyrights, 30% of all such rights are vested in the Plaintiffs.

243.     Defendants contend:

(A)   That the fee agreements are void.

(B)    That the Plaintiffs have no rights to income or vested ownership rights in the 35 songs.

(C)   JPL has a 50% "community property" interest in the 35 songs superior to the rights of the Plaintiffs.

244.     Plaintiffs are entitled to a declaration of rights from this Court:

(A)     The 1992 fee agreement is valid, binding and enforceable;

(B)     The September 1993 Amendment to the '92 Agreement is is valid, binding and enforceable;

(C)     The December 19, 1994 agreement is vali, binding and enforceable

Fourth Amended Complaint

(D)     That Plaintiffs are entitled to receive 30% of all income, monies, or properties received by the defendants derived directly or indirectly from the 35 Songs.

(E)     That Plaintiffs have a 30% ownership interest in whatever percentage of interest the defendants have in any and all vested copyrights on the 35 Songs.

(F)     Any "community property" interest claimed by JPL is subordinate to any and all interests, rights, income, monies, or ownership in the 35 Songs or in vested copyrights in said songs.

### EIGHTH CAUSE OF ACTION

### (Fraudulent Transfers against Love and JPL)

245.     Plaintiffs repeat and reallege paragraphs 1 through 244 as if fully recited herein.

246.     Plaintiffs are and at all times relevant, creditors of Mike Love and JPL with claims against them.

247.     Defendant JPL and Mike Love made transfers of funds due to Plaintiffs to Defendants Meleco, Inc. and the Michael Love Family Trust and other Doe Defendants with an intent to hinder, delay or defraud their creditors, including Plaintiffs.

248.     Moreover, JPL and Mike Love made the transfers at a time that defendants JPL and Mike Love believed or reasonably should have believed that they would incur debts beyond his ability to pay as they came due without receiving a reasonably equivalent value on exchange for the transfer.

249.     Accordingly, Plaintiffs seek a judgment from this Court declaring said transfers void or in the alternative, for a judgment against Meleco and the Trust for all sums so transferred.

### NINTH CAUSE OF ACTION

### (Constructive Trust against All Defendants)

250.     Plaintiffs repeat and reallege paragraphs 1 through 249 as if fully recited herein.

Fourth Amended Complaint

251.    Since 1991, a confidential relationship has existed between Plaintiffs and Love and JPL, such that Plaintiffs reposed their trust and confidence in Love and JPL to treat them fairly and relied on them to accurately account for all money due under the fee agreements between Plaintiffs on the one hand and JPL and Love on the other.

252.    Love and upon information and belief, JPL, currently are retaining legal title to the copyright reversions and income derived from those copyright reversions and other contractual payments derived from the 35 Songs and specifically included in the fee agreements between the parties against Plaintiffs in the amount of at least 25% or 30% and allowing Love and JPL to abscond with the valuable rights earned by and belonging to Plaintiffs would be inequitable.

253.    The imposition of such a trust is essential to the effectuation of justice to prevent Defendants' unjust enrichment at Plaintiffs' expense.

254.    Accordingly, Plaintiffs request that this Court impose a constructive trust on all funds received by Love and or JPL from the 35 Songs from 2017 forward, as well as on Love's and JPL's share of all copyright reversions that have occurred and will occur in the future.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHERFORE, for the reasons set forth above the Plaintiffs request this court:

1.    Enter judgment in favor of the Plaintiffs and award them all damages to which they are entitled, including costs and reasonable attorney's fees;

2.    Declare the rights of the parties hereto as requested in the Sixth Cause of Action;

Fourth Amended Complaint

3.      Impose a constructive trust on the copyrights that have reverted, and will revert to Mike Love and JPL in the future, or the money received as a result of the copyright reversions that have already occurred;

4.      For treble damages, costs and a reasonable attorney's fee pursuant to Nev. Rev. Stats. § 41.580;

5.      Order an accounting be provided to the Plaintiffs regarding all royalties and other income Love has received on account of the 35 Songs and enter a declaration that the Plaintiffs shall receive 30% of said accounting;

6.      In the event the Court finds that there is no valid contract between the Plaintiffs and Love, enter judgment that the Plaintiffs shall be paid for the fair value of their services in an amount to be determined at trial but no less than $32 million more than Love has already paid them to date;

7.      Prejudgment and post-judgment interest pursuant to Cal. Code Civ. P. § 685.010 from December 19, 1994 through the present;

8.      Strike the Defendants' "Rejection" of the Fee Arbitration Award and enter judgment on the validity of the 92 Agreement pursuant to the Fee Arbitration Award; and conduct a damages hearing/trial pursuant to the Plaintiffs' San Diego Superior Court "Complaint" filed as an Exhibit in the Plaintiffs' Motion to Strike; and

9.      Enter such other relief as the Court finds to be fair and equitable.

Respectfully submitted,

/s/ *Michael J. Flynn*
Michael J. Flynn, Pro Se

/s/ *Philip H. Stillman*
Philip H. Stillman, Pro Se

DATED: April 14, 2021

**Exhibit 1**



FILED

DEC 12 1994

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL E. LOVE,<br><br>    Plaintiff,<br><br>    v.<br><br>BRIAN D. WILSON, an<br>individual, by and through<br>JEROME S. BILLET in his<br>representative capacity as<br>Conservator of the Person and<br>Estate of BRIAN WILSON,<br><br>    Defendant. | ) CASE NO.   CV 92 4594 WJR (SHx)<br>)<br>) SPECIAL VERDICT<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

We, the jury in the above entitled action, find the following Special Verdict on the questions submitted to us:

### SECTION I.   FRAUDULENT CONCEALMENT

Question No. 1:   Were Brian Wilson and Mike Love partners?

Answer "yes" or "no".

Answer: YES

Proceed to answer Question No. 2.

EXHIBIT 1

Question No. 2:  Were Mike Love and Brian Wilson in a fiduciary or confidential relationship?

Answer "yes" or "no".

Answer: YES

Proceed to answer Question No. 3.

Question No. 3:  Did Brian Wilson or his authorized agent(s) know of material facts and know that such facts were neither known nor readily accessible to Mike Love or his agent(s)?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 1, 2 or 3 "yes," then answer Question No. 4.  Otherwise go to section II.

Question No. 4:  Did Brian Wilson or his authorized agent(s) conceal or suppress a material fact which they had an obligation to disclose?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 4 "yes," then answer Question No. 5. If you answer Question No. 4 "no," then go to section II.

Question No. 5:  Did Brian Wilson or his authorized agent(s) intentionally conceal or suppress a material fact(s) with the intent to defraud Mike Love?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 5 "yes," then answer Question No. 6.  If you answer Question No. 5 "no," then go to section II.

Question No. 6:  Would Mike Love have acted in the way he acted if he had known of the concealed or suppressed fact(s)?

2

Answer "yes" or "no".

Answer: NO

If you answer Question No. 6 "no," then answer Question No. 7. If you answer Question No. 6 "yes," then go to section II.

Question No. 7:  Did Brian Wilson's or his authorized agent(s)' concealment or suppression of the fact(s) cause Mike Love damage?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 7 "yes," then answer Question No. 8.  If you answer Question No. 7 "no," then go to section II.

Question No. 8:  Did Mike Love have knowledge of the essential facts giving rise to his claim for concealment or suppression of facts before July 31, 1989?

Answer "yes" or "no".

Answer: NO

Proceed to section II.

SECTION II.  **PROMISSORY FRAUD**

Question No. 9:  Did Brian Wilson or his authorized agent(s) make any of the following promises to Mike Love: (1) Wilson would pay Love 30% of the proceeds from Wilson's lawsuit; and/or (2) Wilson would pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs; and/or (3) Wilson would give Love credit and future royalties on the 35 songs; and/or (4) Wilson would pursue recovery of the copyrights to the songs; and/or (5) Wilson would keep Robert Kory informed of the status of the Wilson v. Irving litigation?

///

3

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | |
| 4. | Would pursue recovery of the copyrights for the songs. | YES | |
| 5. | Would keep Robert Kory informed of the status of the _Wilson v. Irving_ litigation. | YES | |

If you answer Question No. 9 "yes," as to any of the promises, then answer Question No. 10. Otherwise go to section III.

Question No. 10: At the time Brian Wilson or his authorized agent(s) made the promise(s), did Brian Wilson or his agent(s) intend for Brian Wilson to perform them?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | | NO |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | | NO |

4

|  |  | Yes | No |
|---|---|---|---|
| 3. | Give Love credit for future royalties on the 35 songs. | _____ | NO |
| 4. | Would pursue recovery of the copyrights for the songs. | YES | _____ |
| 5. | Would keep Robert Kory informed of the status of the Wilson v. Irving litigation. | _____ | NO |

If you answer Question No. 10 "no," as to any of the promises, then answer Question No. 11. Otherwise go to section III.

Question No. 11: Did Brian Wilson or his authorized agent(s) make the promise(s) for the purpose of inducing Mike Love to rely upon them and to act or refrain from acting in reliance upon them?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | _____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | _____ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | _____ |
| 4. | Would pursue recovery of the copyrights for the songs. | YES | _____ |

///

///

5

0006

|  | | Yes | No |
|---|---|---|---|
| 5. | Would keep Robert Kory informed of the status of the <u>Wilson v. Irving</u> litigation. | <u>YES</u> | _____ |

If you answer Question No. 11 "yes," as to any of the promises, then answer Question No. 12.  Otherwise go to section III.

Question No. 12:  Did Mike Love, at the time Mike Love acted, know of the intention of Brian Wilson or his authorized agent(s) not to perform the promise(s)?

Answer "yes" or "no".

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | _____ | <u>NO</u> |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | _____ | <u>NO</u> |
| 3. | Give Love credit for future royalties on the 35 songs. | _____ | <u>NO</u> |
| 4. | Would pursue recovery of the copyrights for the songs. | _____ | <u>NO</u> |
| 5. | Would keep Robert Kory informed of the status of the <u>Wilson v. Irving</u> litigation. | _____ | <u>NO</u> |

If you answer Question No. 12 "no," as to any of the promises, then answer Question No. 13.  Otherwise go to section III.

6

Question No. 13:  Did Mike Love act in reliance upon the me(s)?

Answer "yes" or "no".

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | _____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | _____ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | _____ |
| 4. | Would pursue recovery of the copyrights for the songs. | YES | _____ |
| 5. | Would keep Robert Kory informed of the status of the Wilson v. Irving litigation. | YES | _____ |

If you answer Question No. 13 "yes," as to any of the promises, then answer Question No. 14.   Otherwise go to section III.

Question No. 14:  Was Mike Love justified in relying upon the promise(s)?

Answer "yes" or "no".

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | _____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | _____ |

7

|  |  | Yes | No |
|--|--|-----|----|
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ____ |

|  |  | Yes | No |
|--|--|-----|----|
| 4. | Would pursue recovery of the copyrights for the songs. | YES | ____ |
| 5. | Would keep Robert Kory informed of the status of the Wilson v. Irving litigation. | YES | ____ |

If you answer Question No. 14 "yes," as to any of the promises, then answer Question No. 15. Otherwise go to section III.

Question No. 15: Was Mike Love damaged as a result of his reliance upon the promise(s)?

Answer "yes" or "no".

|  |  | Yes | No |
|--|--|-----|----|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ____ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ____ |
| 4. | Would pursue recovery of the copyrights for the songs. | YES | ____ |

///

///

8

|  | Yes | No |
|---|---|---|

5.   Would keep Robert Kory informed

of the status of the

Wilson v. Irving litigation.          YES

If you answer Question No. 15 "yes," as to any of the
promises, then answer Question No. 16.  Otherwise go to section
III.

Question No. 16:  Did Mike Love have knowledge of the
essential facts giving rise to his claim for promissory fraud
before July 31, 1989?

Answer "yes" or "no".

|  | Yes | No |
|---|---|---|
| 1. Pay Love 30% of the proceeds from Wilson's lawsuit. | | NO |
| 2. Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | | NO |
| 3. Give Love credit for future royalties on the 35 songs. | | NO |
| 4. Would pursue recovery of the copyrights for the songs. | | No |
| 5. Would keep Robert Kory informed of the status of the Wilson v. Irving litigation. | | NO |

Proceed to section III.

///

///

///

9

SECTION III.   FRAUD/INTENTIONAL MISREPRESENTATION

Question No. 17:   Did Brian Wilson or his authorized agent(s) make a representation as to a past or existing material fact?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 17 "yes," then answer Question No. 18.  If you answer Question No. 17 "no," and you answered Questions Nos. 8 and 16 "yes" then go to section V.   If you answer Question No. 17 "no," and you answered Question Nos. 8 or 16 "no," then go to section IV.

Question No. 18:   Was the representation false?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 18 "yes," then answer Question No. 19.  If you answer Question No. 18 "no," and you answered Questions No. 8 and 16 "yes," then go to section V.  If you answer Question No. 18 "no," and you answered Questions Nos. 8 or 16 "no," then go to section IV.

Question No. 19:   Did Brian Wilson or his authorized agent(s) know that the representation was false at the time it was made?

Answer "yes" or "no".

Answer: YES

Proceed to Question No. 20.

Question No. 20:   Did Brian Wilson or his authorized agent(s) make the representation(s) recklessly without knowing whether they were true or false?

10

0011

answer "yes" or "no".

Answer:  NO

If you answer Question Nos. 19 or 20 "yes," then answer

Question No. 21.  If you answer Question Nos. 19 and 20 "no," and

you answered Questions Nos. 8 and 16 "yes," then go to section V.

If you answer Question Nos. 19 and 20 "no," and you answered

Questions Nos. 8 or 16 "no," then go to section IV.

Question No. 21:  Did Brian Wilson or his authorized

agent(s) make the representation(s) with an intent to defraud

Mike Love?

Answer "yes" or "no".

Answer:  YES

If you answer Question No. 21 "yes," then answer Question

No. 22.  If you answer Question No. 21 "no," and you answered

Questions Nos. 8 and 16 "yes," then go to section V.  If you

answer Question No. 21 "no," and you answered Questions Nos. 8 or

16 "no," then go to section IV.

Question No. 22:  Did Mike Love know of the falsity of the

representation(s)?

Answer "yes" or "no".

Answer:  NO

If you answer Question No. 22 "no," then answer Question No.

23.  If you answer Question No. 22 "yes," and you answered

Questions Nos. 8 and 16 "yes," then go to section V.   If you

answer Question No. 22 "yes," and you answered Questions Nos. 8

or 16 "no," then go to section IV.

Question No. 23:  Did Mike Love justifiably act or fail to

act in reliance upon the truth of the representation(s)?

11

Answer "yes" or "no".

Answer: YES

If you answer Question No. 23 "yes," then answer Question No. 24. If you answer Question No. 23 "no," and you answered Questions Nos. 8 and 16 "yes," then go to section V. If you answer Question No. 23 "no," and you answered Questions Nos. 8 or 16 "no," then go to section IV.

Question No. 24: Was Mike Love damaged as a result of his justifiable reliance on Brian Wilson's misrepresentation(s)?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 24 "yes," then answer Question No. 25. If you answer Question No. 24 "no" and you answered Questions Nos. 8 and 16 "yes," then go to section V. If you answer Question No. 24 "no" and you answered Questions Nos. 8 or 16 "no," then go to section IV.

Question No. 25: Did Mike Love have knowledge of the essential facts giving rise to the fraud before July 31, 1989?

Answer "yes" or "no".

Answer: NO

If you answer Question No. 25 "yes," and you answered Questions Nos. 8 and 16 "yes," then go to Section V. Otherwise go to section IV.

SECTION IV. PUNITIVE DAMAGES

Question No. 26: Do you find by clear and convincing evidence (as opposed to a preponderance of the evidence) that Brian Wilson was guilty of oppression, fraud or malice as defined in his dealings with Mike Love?

12

Answer "yes" or "no".

Answer: NO

If you answer Question No. 26 "no," then answer Question No. 27. If you answer Question No. 26 "yes," then go to section V.

Question No. 27: Do you find by clear and convincing evidence (as opposed to a preponderance of the evidence) that Brian Wilson's authorized agent(s) were guilty of oppression, fraud or malice as defined in their dealings with Mike Love?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 27 "yes," then answer Question No. 28. If you answer Question No. 27 "no," then go to section V.

Question No. 28: Do you find by clear and convincing evidence (as opposed to a preponderance of the evidence) that Brian Wilson ratified the conduct of his authorized agent(s) that constituted the claimed oppression, fraud or malice?

Answer "yes" or "no".

Answer: NO

Go to section V.

## V. LANHAM ACT

Question No. 29: Did Mike Love co-author any of the following songs with Brian Wilson for which Mike Love did not get songwriting credit?

|  | | Yes | No |
|---|---|---|---|
| 1. | 409 | YES | ___ |
| 2. | All Summer Long | YES | ___ |
| 3. | Amusement Parks USA | YES | ___ |

13

|  | | Yes | No |
|---|---|---|---|
| 4. | Be True To Your School | YES | _____ |
| 5. | California Girls | YES | _____ |
| 6. | Catch A Wave | YES | _____ |
| 7. | Chug-A-Lug | YES | _____ |
| 8. | Custom Machine | YES | _____ |
| 9. | Dance, Dance, Dance | YES | _____ |
| 10. | Do You Remember | YES | _____ |
| 11. | Don't Back Down | YES | _____ |
| 12. | Don't Hurt My Little Sister | YES | _____ |
| 13. | Drive In | YES | _____ |
| 14. | Farmer's Daughter | YES | _____ |
| 15. | Finder's Keepers | YES | _____ |
| 16. | Good to My Baby | YES | _____ |
| 17. | Hawaii | YES | _____ |
| 18. | Help Me Rhonda | YES | _____ |
| 19. | I Get Around | YES | _____ |
| 20. | I Know There's An Answer | YES | _____ |
| 21. | In The Back Of My Mind | YES | _____ |
| 22. | Kiss Me Baby | YES | _____ |
| 23. | Let Him Run Wild | YES | _____ |
| 24. | Little Saint Nick | YES | _____ |
| 25. | Merry Christmas Baby | YES | _____ |
| 26. | Salt Lake City | YES | _____ |
| 27. | Santa's Beard | YES | _____ |
| 28. | She Knows Me Too Well | YES | _____ |
| 29. | The Girl From New York City | YES | _____ |
| 30. | The Man With All The Toys | YES | _____ |

14

|  | Yes | No |
|---|---|---|
| 31. The Noble Surfer | YES | ___ |
| 32. Wandy | YES | ___ |
| 33. When I Grow Up | YES | ___ |
| 34. Wouldn't It Be Nice | YES | ___ |
| 35. You're So Good To Me | YES | ___ |

If you answer Question No. 29 "yes" to any of the songs, then answer Question No. 30 as to those songs only.  Otherwise go to section VII.

Question No. 30:  Were the song(s) used in commerce during July 31, 1989 to the present?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 30 "yes," then answer Question No. 31.  If you answer Question No. 30 "no," then go to section VI.

Question No. 31:  Was commercial use made of the song(s) with a false designation of origin during July 31, 1989 to the present, with Brian Wilson's knowledge?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 31 "yes," then answer Question No. 32.  If you answer Question No. 31 "no," then go to section VI.

///

///

///

///

15

0016

Question No. 32:  Was Mike Love damaged as a result of the false designation of origin?

Answer "yes" or "no".

Answer: YES

Proceed to section VI.

SECTION VI.  <u>DECLARATORY RELIEF</u>

Question No. 33:  As to any of the songs you answered "yes" to in Question No. 29, is Mike Love entitled to a judicial declaration that he is the co-author of those songs?

Answer "yes" or "no".

Answer: YES

Proceed to section VII.

SECTION VII.  <u>ACCOUNTING</u>

Question No. 34:  Does Brian Wilson owe Mike Love an accounting of the profits derived from any of the songs which you answered "yes" to in response to Question No. 29, based upon their songwriting partnership?

Answer "yes" or "no".

Answer: YES

If you answer Question No. 34 "yes," then answer Question No. 35.  If you answer Question No. 34 "no" then go to section VIII.

Question No. 35:  Is Mike Love's claim for an accounting just and reasonable?

Answer "yes" or "no".

Answer: YES

Proceed to section VIII.

///

16

## SECTION VIII. BREACH OF CONTRACT

Question No. 36: Did Brian Wilson or his authorized agent(s) make an offer to Mike Love to enter into a contract whereby (1) Wilson would pay Love 30% of the proceeds from Wilson's lawsuit; and/or (2) Wilson would pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs; and/or (3) Wilson would give Love credit and future royalties on the 35 songs.?

Answer "yes" or "no".

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ___ |

If you answer Question No. 36 "yes," as to all of the terms, then answer Question No. 37. Otherwise go to section IX.

Question No. 37: Did Mike Love accept Brian Wilson's offer? Answer "yes" or "no".

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |

17

|  |  | Yes | No |
|---|---|---|---|
| 3. | Give Love credit for future royalties on the 35 songs. | YES | |

If you answer Question No. 37 "yes," as to all of terms then answer Question No. 38. Otherwise go to section IX.

Question No. 38: Was there consideration?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | |
| 3. | Give Love credit for future royalties on the 35 songs | YES | |

If you answer Question No. 38 "yes," as to any of the terms, then answer Question No. 39. Otherwise go to section IX.

Question No. 39: Did Mike Love and Brian Wilson enter into a contract?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | |
| 3. | Give Love credit for future royalties on the 35 songs | YES | |

18

If you answer Question No. 39 "yes," as to any of the terms, then answer Question No. 40.  Otherwise go to section IX.

Question No. 40:  Did Mike Love perform his part of the contract?

Answer "yes" or "no".

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs | YES | ___ |

If you answer Question No. 40 "yes," as to any of the terms, then answer Question No. 42.  Otherwise go to section IX.

*TYPO ?* [handwritten annotation: "41 ?" pointing to "42"]

Question No. 41:  Which contract(s), if any, did Brian Wilson breach?

|  |  | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs | YES | ___ |

Proceed to Question No. 42.

///

///

19

Question No. 42:  Did the breach occur before July 31, 1990?

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | ___ | NO |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | ___ | NO |
| 3. | Give Love credit for future royalties on the 35 songs | ___ | NO |

Go to section IX

## SECTION IX.  PROMISSORY ESTOPPEL

Question No. 43:  Did Brian Wilson  promise Mike Love that (1) Wilson would pay Love 30% of the proceeds from Wilson's lawsuit; and/or (2) Wilson would pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs; and/or (3) Wilson would give Love credit and future royalties on the 35 songs?

Answer "yes" or "no".

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | ___ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | ___ |
| 3. | Give Love credit for future royalties on the 35 songs. | YES | ___ |

///

///

20

0021

If you answer Question No. 43 "yes," as to any of the promises, then answer Question No. 44. Otherwise go to section X.

Question No. 44: Did Mike Love rely upon Brian Wilson's promise to his detriment?

Answer "yes" or "no".

|  | Yes | No |
|---|---|---|
| 1. Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | _____ |
| 2. Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | _____ |
| 3. Give Love credit for future royalties on the 35 songs. | YES | _____ |

If you answer Question No. 44 "yes," as to any of the promises, then answer Question No. 45. Otherwise go to section X.

Question No. 45: Should Brian Wilson have reasonably expected Mike Love to rely upon Brian Wilson's promise?

Answer "yes" or "no".

|  | Yes | No |
|---|---|---|
| 1. Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | _____ |
| 2. Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | _____ |
| 3. Give Love credit for future royalties on the 35 songs | YES | _____ |

21.

If you answer Question No. 45 "yes," as to any of the promises, then answer Question No. 46. Otherwise go to section X.

Question No. 46:  Which promise(s) should Brian Wilson have reasonably expected Mike Love to rely on?

|  | | Yes | No |
|---|---|---|---|
| 1. | Pay Love 30% of the proceeds from Wilson's lawsuit. | YES | _____ |
| 2. | Pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs. | YES | _____ |
| 3. | Give Love credit for future royalties on the 35 songs | YES | _____ |

Go to section X.

## SECTION X. UNJUST ENRICHMENT

Question No. 47:  Was Brian Wilson unjustly enriched as a result of the promise(s) that: (1) Wilson would pay Love 30% of the proceeds from Wilson's lawsuit; and/or (2) Wilson would pay retroactive songwriter royalties of a minimum of $2 million for the 35 songs; and/or (3) Wilson would give Love credit and future royalties on the 35 songs?

Answer "yes" or "no".

Answer: YES

Proceed to section XI.

## XI.  OTHER

Question No. 48:  Is Mike Love barred by the doctrine of unclean hands from asserting any of the following claims?

|                          | Yes | No  |
|--------------------------|-----|-----|
| Fraudulent Concealment   |     | NO  |
| Promissory Fraud         |     | NO  |
| Fraud                    |     | NO  |
| Lanham Act               |     | NO  |
| Declaratory Relief       |     | NO  |
| Accounting               |     | NO  |
| Breach of Contract       |     | NO  |
| Promissory Estoppel      |     | NO  |
| Unjust Enrichment        |     | NO  |

Proceed to Question No. 49.

Question No. 49:  Is Mike Love barred by the doctrine of laches from asserting any the following claims?

|                      | Yes | No  |
|----------------------|-----|-----|
| Lanham Act           |     | NO  |
| Declaratory Relief   |     | NO  |
| Accounting           |     | NO  |

Proceed to Question No. 50.

Question No. 50:  Is Mike Love barred by the statute of limitations from asserting any of the following claims?

|                          | Yes | No  |
|--------------------------|-----|-----|
| Fraudulent Concealment   |     | NO  |
| Promissory Fraud         |     | NO  |
| Fraud                    |     | NO  |
| Accounting               |     | NO  |
| Breach of Contract       |     | NO  |

Proceed to Question No. 51.

///

23

Question No. 51:  Is Mike Love estopped from asserting any of the following claims?

|  | Yes | No |
|---|---|---|
| Lanham Act | _____ | NO |
| Breach of Contract | _____ | NO |
| Promissory Estoppel | _____ | NO |

Proceed to Question No. 52.

Question No. 52:  Is Brian Wilson estopped or barred by the doctrine of unclean hands from asserting a Statue of Limitation defense to any of the following claims?

|  | Yes | No |
|---|---|---|
| Suppression of Fact | YES | _____ |
| Promissory Fraud | YES | _____ |
| Fraud | YES | _____ |
| Breach of Contract | YES | _____ |

Proceed to Question No. 53.

Question No. 53:  Is Brian Wilson estopped or barred by the doctrine of unclean hands from asserting an Unclean Hands defense to any of the following claims?

|  | Yes | No |
|---|---|---|
| Suppression of Fact | YES | _____ |
| Promissory Fraud | YES | _____ |
| Fraud | YES | _____ |
| Lanham Act | Yes | _____ |
| Declaratory Relief | YES | _____ |
| Accounting | Yes | _____ |
| Breach of Contract | YES | _____ |
| Promissory Estoppel | YES | _____ |

24

Proceed to Question No. 54.

Question No. 54: Is Brian Wilson estopped or barred by the doctrine of unclean hands from asserting any Laches defense to any of the following claims?

|                     | Yes   | No  |
|---------------------|-------|-----|
| Lanham Act          | YES   | ___ |
| Declaratory Relief  | YES   | ___ |
| Accounting          | YES   | ___ |

Proceed to Question No. 55.

Question No. 55: Is Brian Wilson estopped or barred by the doctrine of unclean hands from asserting an Estoppel defense to any of the following claims?

|                     | Yes   | No  |
|---------------------|-------|-----|
| Lanham Act          | YES   | ___ |
| Breach of Contract  | YES   | ___ |
| Promissory Estoppel | YES   | ___ |

Please sign and return this Special Verdict form to the Clerk.

DATED: DECEMBER 12, 1994

Jury Foreperson
CHARLES S. DAVIS

25

0026



1    Law Offices
     **FLYNN, SHERIDAN & TABB**
2        P.O. Box 1668
         6125 El Tordo
3    Rancho Santa Fe, California 92067
         (619) 756-5823
4
     PHILIP H. STILLMAN, Bar # 152061
5    Attorneys for Plaintiff MICHAEL E. LOVE

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11   MICHAEL E. LOVE,                    )   CASE NO. 92-4594 WJR (SHx)
                                          )
12                   Plaintiff,           )
                                          )   JUDGMENT PURSUANT TO TERMS
13                                        )   OF SETTLEMENT
                                          )
14            vs.                         )
                                          )
15   BRIAN D. WILSON, an individual,      )
     by and through Jerome S. Billet      )
16   in his representative capacity as    )
     Conservator of the Person and        )
17   Estate of Brian Wilson,              )
                                          )   Courtroom 10
18                   Defendants.          )   The Honorable William J. Rea
                                          )

19        IT IS HEREBY STIPULATED by and between plaintiff Michael E. Love and defendant Brian D.

20   Wilson, by and through Jerome S. Billet, Conservator of the Person and Estate of Brian Wilson

21   through their respective counsel, that a Judgment, in the amount of $5,000,000 (Five Million Dollars

22   and No Cents), based upon the Special Verdict returned by the jury and filed on December 12,

23   1994, shall be entered on December 29, 1994 upon the terms and conditions set forth in the

24   Settlement Agreement and Mutual Releases executed by the parties, and enforcement of Judgment

25   shall be upon the terms and conditions set forth in the Settlement Agreement and Mutual Releases.

26        IT IS FURTHER ORDERED, ADJUDGED AND DECREED that pursuant to the Special Verdict,

27   Michael E. Love is a co-author of the songs listed below and shall receive royalties from the songs

28   listed below pursuant to the following schedule:

0028

| SONG | MIKE LOVE'S SHARE | BRIAN WILSON'S SHARE | OTHER AUTHOR'S SHARE |
|---|---|---|---|
| 409 | 25% | 25% | 50% |
| All Summer Long | 50% | 50% | |
| Amusement Parks USA | 50% | 50% | |
| Be True To Your School | 50% | 50% | |
| California Girls | 50% | 50% | |
| Catch A Wave | 50% | 50% | |
| Chug A-Lug | 25% | 25% | 50% |
| Custom Machine | 50% | 50% | |
| Dance, Dance, Dance | 25% | 25% | 50% |
| Do You Remember | 50% | 50% | |
| Don't Back Down | 50% | 50% | |
| Don't Hurt My Little Sister | 50% | 50% | |
| Drive In | 50% | 50% | |
| Farmer's Daughter | 50% | 50% | |
| Finder's Keepers | 50% | 50% | |
| Good To My Baby | 50% | 50% | |
| Hawaii | 50% | 50% | |
| Help Me Rhonda | 50% | 50% | |
| I Get Around | 50% | 50% | |
| I Know There's An Answer | 37.5% | 37.5% | 25% |
| In The Back Of My Mind | 50% | 50% | |
| Kiss Me Baby | 50% | 50% | |
| Let Him Run Wild | 50% | 50% | |
| Little Saint Nick | 50% | 50% | |
| Merry Christmas, Baby | 50% | 50% | |
| Salt Lake City | 50% | 50% | |
| Santa's Beard | 50% | 50% | |
| She Knows Me Too Well | 50% | 50% | |
| Girl From New York City | 50% | 50% | |
| Man With All The Toys | 50% | 50% | |
| Noble Surfer | 50% | 50% | |
| Wendy | 50% | 50% | |
| When I Grow Up | 50% | 50% | |
| Wouldn't It Be Nice | 37.5% | 37.5% | 25% |
| You're So Good To Me | 50% | 50% | |

FINAL.ORD

0029

Accordingly, Judgment shall be entered on December 29, 1994 against Brian Wilson and in favor of Michael E. Love pursuant to the terms of settlement in the amount of $5,000,000 as set forth above, and Michael E. Love's rights as a co-author of the above listed songs are hereby declared.

Dated:          December 20, 1994                    J. MICHAEL CROWE
                                                     DOUGLAS L. DAY
                                                     CROWE & DAY


                                                     By:_____
                                                        Douglas L. Day
                                                        Attorneys for defendant Brian Wilson
                                                        by and through Jerome S. Billet,
                                                        Conservator of the Person and Estate
                                                        of Brian Wilson

Dated:          December 20, 1994                    MICHAEL J. FLYNN
                                                     PHILIP H. STILLMAN
                                                     FLYNN, SHERIDAN & TABB


                                                     By:_____
                                                        Michael J. Flynn
                                                        Attorneys for Michael E. Love

          IT IS SO ORDERED.


Dated:          December ____, 1994

                                                     _____
                                                     UNITED STATES DISTRICT COURT JUDGE

- 3 -



## THE 35 SONGS

1.   409
2.   ALL SUMMER LONG
3.   AMUSEMENT PARKS USA
4.   BE TRUE TO YOUR SCHOOL
5.   CALIFORNIA GIRLS
6.   CATCH A WAVE
7.   CHUG-A-LUG
8.   CUSTOM MACHINE
9.   DANCE, DANCE, DANCE
10.  DO YOU REMEMBER
11.  DON'T BACK DOWN
12.  DON'T HURT MY LITTLE SISTER
13.  DRIVE IN
14.  FARMER'S DAUGHTER
15.  FINDER'S KEEPERS
16.  GOOD TO MY BABY
17.  HAWAII
18.  HELP ME RHONDA
19.  I GET AROUND
20.  I KNOW THERE'S AN ANSWER
21.  IN THE BACK OF MY MIND
22.  KISS ME BABY
23.  LET HIM RUN WILD
24.  LITTLE SAINT NICK
25.  MERRY CHRISTMAS BABY
26.  SALT LAKE CITY
27.  SANTA'S BEARD
28.  SHE KNOWS ME TOO WELL
29.  THE GIRL FROM NEW YORK CITY
30.  THE MAN WITH ALL THE TOYS
31.  THE NOBLE SURFER
32.  WENDY
33.  WHEN I GROW UP
34.  WOULDN'T IT BE NICE
35.  YOU'RE SO GOOD TO ME

## EXHIBIT 3

## ACKNOWLEDGEMENT AND RECEIPT

I, *Michael J. Flynn*, hereby acknowledge receipt of check no. 001433, in the amount of $1,500,000 (One Million Five Hundred Thousand Dollars and No Cents), payable to Michael E. Love and his attorneys, Flynn, Sheridan & Tabb, for partial satisfaction of the Judgment per Settlement Agreement in Michael E. Love v. Brian D. Wilson, et al., Case No. 92-4594 WJR (SHx).

Dated: December *21*, 1994

Judgement Pursuant to Terms of S.     Int. CV 92 6594 WJR (SHx)

| SONG | MIKE LOVE'S SHARE | BRIAN WILSON'S SHARE | OTHER AUTHOR'S SHARE |
|------|-------------------|---------------------|----------------------|
| 409 | 25% | 25% | 50% |
| All Summer Long | 50% | 50% | |
| Amusement Parks USA | 50% | 50% | |
| Be True To Your School | 50% | 50% | |
| California Girls | 50% | 50% | |
| Catch A Wave | 50% | 50% | |
| Chug A-Lug | 25% | 25% | 50% |
| Custom Machine | 50% | 50% | |
| Dance, Dance, Dance | 25% | 25% | 50% |
| Do You Remember | 50% | 50% | |
| Don't Back Down | 50% | 50% | |
| Don't Hurt My Little Sister | 50% | 50% | |
| Drive In | 50% | 50% | |
| Farmer's Daughter | 50% | 50% | |
| Finder's Keepers | 50% | 50% | |
| Good To My Baby | 50% | 50% | |
| Hawaii | 50% | 50% | |
| Help Me Rhonda | 50% | 50% | |
| I Get Around | 50% | 50% | |
| I know There's An Answer | 37.5% | 37.5% | 25% |
| In The Back Of My Mind | 50% | 50% | |
| Kiss Me Baby | 50% | 50% | |
| Let Him Run Wild | 50% | 30% | |
| Little Saint Nick | 50% | 50% | |
| Merry Christmas, Baby | 50% | 50% | |
| Salt Lake City | 50% | 50% | |
| Santa's Beard | 50% | 50% | |
| She Knows Me Too Well | 50% | 50% | |
| Girl From New York City | 50% | 50% | |
| Man With All The Toys | 50% | 50% | |
| Noble Surfer | 50% | 50% | |
| Wendy | 50% | 50% | |
| When I Grow Up | 50% | 50% | |
| Wouldn't It Be Nice | 37.5% | 37.5% | 25% |
| You're So Good To Me | 50% | 50% | |

- 2 -

FINAL 090

Judgment Pursuant to Terms of Settlement, CV 92 4354 WJR (SHx)

Accordingly, Judgment shall be entered on December 29, 1994 against Brian Wilson and in favor of Michael E. Love pursuant to the terms of settlement in the amount of $5,000,000 as set forth above, and Michael E. Love's rights as a co-author of the above listed songs are hereby declared.

Dated:    December 20, 1994

J. MICHAEL CROWE
DOUGLAS L. DAY
CROWE & DAY

By: _____
Douglas L. Day
Attorneys for defendant Brian Wilson
by and through Jerome S. Billet,
Conservator of the Person and Estate
of Brian Wilson

Dated:    December 20, 1994

MICHAEL J. FLYNN
PHILIP H. STILLMAN
FLYNN, SHERIDAN & TABB

By: _____
Michael J. Flynn
Attorneys for Michael E. Love

IT IS SO ORDERED.

Dated:    December 29, 1994

_____
UNITED STATES DISTRICT COURT JUDGE

- 3 -

FINAL.WRD

3 of 3

.. TOTAL PAGE.04 ..

0035

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This Settlement Agreement and Release ("Agreement") is made by and between Michael E. Love ("Love") and Brian D. Wilson, by and through his specially appointed guardian ad litem Judge Peter Smith ("Wilson") and subject to and upon approval by the Superior Court of California, Los Angeles County, Judge David Rothman presiding, Santa Monica Branch ("Court Approval") with reference to the following facts:

### 1.0 RECITALS

1.1 Certain civil litigation has been filed in the United States District Court, Central District of California Michael E. Love v. Brian D. Wilson, et al., Case No. 92- 4594 WJR (SHx) and companion case filed in the Los Angeles Superior Court entitled Michael E. Love v. Brian D. Wilson, et al., Case No. BC 065322 which has been stayed pending resolution of the Federal Action (collectively "the Action").

1.2 Between October 4, 1994 and December 1, 1994, the jury trial of this Action went forward before the Honorable William J. Rea United States District Court Judge. On December 12, 1994, the jury returned a Special Verdict in favor of Michael E. Love against Brian D. Wilson on all claims only on the issue of liability ("Verdict"), a copy of which is attached hereto as Exhibit "1."

1.3 Subject to the terms and conditions of this Agreement, the parties wish to enter into a complete settlement with each other with respect to any and all claims, demands, and or causes of

1

0036

**Exhibit 2**

## FEE AGREEMENT

CLIENT:          Michael E. Love

ATTORNEYS:       Michael J. Flynn, Philip Stillman,
                 Flynn, Sheridan & Tabb and others designated by
                 Michael J. Flynn

RE:              Potential Claims against Brian Wilson, Irving
                 Music, Abraham Somers and Others

───────────────────────

        This Agreement is made with reference to your claims
against Brian Wilson, A&M Records, Irving Music and others,
Mitchell, Silberberg & Knupp, Abe Somers, and others arising
from your co-authorship of Beach Boys songs and the sale of the
"Sea of Tunes" catalog to Irving Music Co; and also arising out
of the conduct, representations, writings and statements of
Brian Wilson.

        You hereby retain FLYNN, SHERIDAN & TABB (the
"Attorneys") to represent you in all claims for damages arising
from the event above identified and for no other purpose.   All
matters not covered by this Agreement attended to by the
within-named Attorneys at your request shall be the subject of
a separate contract.

        The Attorneys shall do all things necessary to
protect your interests, including the filing of suit.   No
settlement shall be made without your express consent.   No
costs or expenses, for investigation or otherwise, shall be
incurred unless reasonably necessary to protect your interests.

You agree to provide a $25,000 retainer to the Firm against which will be charged for the costs for legal services rendered and out-of-pocket disbursements on your behalf. You agree to deposit additional funds into the account to maintain the retainer balance at $25,000 when the account value decreases to below $7,000 at the end of any billing cycle.

Monthly billings will be submitted to you for the out-of-pocket disbursements. The amount of the monthly billing will be deducted first from any retainer on deposit.

All items of cost or expense remaining unpaid at the time of any recovery herein shall be deducted from your share of such recovery. No costs or expenses, for investigation or otherwise, shall be incurred unless reasonably necessary to protect your interests. Further, no costs or expenses of an unusually large amount will be incurred without your prior approval. As used herein, "costs and expenses" includes without limitation, copying charges, long distance telephone charges, telecopier charges, overnight delivery expenses, and filing fees required by the relevant Courts.

Attorneys' fee shall be paid according to the following schedule:

1.  FIRST 3 MILLION OF RECOVERY:
    (a)  Prior to filing of case(s)    -    15%
    (b)  Prior to Trial                -    25%
    (c)  Within 20 days of trial       -    30%
    (d)  On Appeal                     -    35%

- 2 -

0039

2. **SECOND 3 MILLION OF RECOVERY:**

    (a)  Prior to filing of case(s)  —  10%
    (b)  Prior to Trial  —  25%
    (c)  Within 20 days of Trial  —  28%
    (d)  On Appeal  —  30%

3. **OVER 6 MILLION OF RECOVERY:**

    (a)  Prior to filing of case(s)  —  5%
    (b)  Prior to Trial  —  20%
    (c)  Within 20 days of Trial  —  25%
    (d)  On Appeal  —  28%

If there is no recovery, Client will owe Attorneys nothing for their services herein.

For the purposes of this agreement, "recovery" shall include: (a) the gross amount paid by each responsible party at the resolution or conclusion of the litigation with each responsible party; and (b) the present value of the amount of payments expected to be received from each responsible party in the future in excess of the present value of amounts currently expected to be paid. (It being the intention of the foregoing clause to include within the definition of "recovery" the present value of any increased future royalties or license fees to be paid to Client as a result of the Attorneys' representation of Client and pursuance of the Client's claim). The present value of future payments shall be agreed upon by the Attorneys and Client at the conclusion of the lawsuit and if they are unable to agree shall be submitted to binding arbitration in accordance with the rules of the State Bar Fee

- 3 -

Arbitration program set out in Section 6200-6206 of the California Business and Profession Code.

If there is any dispute over the fees charged for our services, then you and the Attorneys agree to submit the controversy to binding arbitration in accordance with the Rules of the State Bar Fee Arbitration program set out in Section 6200-6206 of the California Business and Professions Code.

The Attorneys make no representations or warranties concerning the successful prosecution of this action or the favorable outcome of any legal action that may be filed, and do not guarantee that they will obtain compensation or reimbursement to you of any of your costs, expenses, or other damages resulting from matters out of which their claim arises. All statements of the Attorneys on these matters are STATEMENTS OF OPINION ONLY. You agree that any discussion of the merits of your claim, the likelihood of success on the merits are OPINION ONLY, and do not constitute a guarantee of the outcome, or a promise of a particular result. You further agree that your retention of the Attorneys was not based on any such representation.

Finally, while we will exercise our best judgment in providing legal services you requested, we will consult with you about our actions. In the event that disagreements arise in these areas which cannot be resolved amicably, we reserve the right to withdraw without being in breach of this agreement.

- 4 -

It is understood that the fees agreed upon herein are
not set by law, but are the result of negotiations between the
parties.  By executing this Agreement, you acknowledge receipt
of an executed copy hereof.


_July 27'92_
DATED

MICHAEL E. LOVE


_7/27/92_
DATED

MICHAEL J. FLYNN, ESQ.
FLYNN, SHERIDAN & TABB


- 5 -

0042

**Exhibit 3**

Mike:

Before we sign the Rondor settlement and give up claims on the copyrights to the 79 songs, we need to memorialize some key issues and our agreed upon changes to the fee agreement. All of these matters are being reviewed by your new transactional counsel.  We recommend that you secure their approval before execution. Our comprehensive meeting with you and Jackie dealt with these issues in depth including changes to our fee agreement, but we need to record several key issues before we execute the latest proposed document. I know you and Jackie need the money, but both of us are giving up rights in this settlement, These may impact what we can ultimately collect for you – hence our fees.

As discussed, the proposed Rondor settlement documents are complex, and substantially impact the main object of the law suit – secure "all right, title and interest" to the 79 songs, credits, royalties and rights, past, present and future.

The proposed settlement documents also potentially impact your rights against third parties, such as Tierney and GDC and Kory – a key witness we need to keep at least neutral. For example, although we have exempted out specific parties, like Kory, GDC, Branca, Tierney etc  allowing claims against them for past damages like unpaid royalties, all other potential defendants are out. This substantially impacts the fee agreement as discussed, as well as your ultimate collection of money damages.  We may be able to get your share of the songs back from Brian, and perhaps money from others, but there may be other claims against third parties we are both losing which could range into the millions of dollars.  There is much discovery to be done in Brian's case.

The most critical issues are as follows:

1.  Paragraphs 2.4 and 5.1 release and warrant that you are giving up all rights to the 79 songs and have never attempted to assign or encumber them, including the copyrights. Excluded under par. 4.1 are Kory, Branca, Tierney, GDC etc.  We need to show this to Kory.  I know you are still on speaking terms with him as am I, and I understand that there are serious issues between he and Jackie over his warnings to you about her, which you have not fully shared with me, BUT he is a critical witness on multiple issues in his and your dealings with Tierney.  Of course, the most obvious, and our biggest hurdle is the statute of limitations.  If he knew about these claims based on Somer's conflict, this case is in serious trouble.  His extensive testimony in his MSK depo held the line about yours and his ignorance about Somer's conflicts while Brian's case was proceeding, but he will need to be a trial witness and any vacillation could kill us?? I will discuss with him.

2.  Our fees and risks, as well as yours, are substantially impacted by the current status of the case, these settlement provisions, and your indemnification and granting of a security interest to the defendants. Basically, we have inherited and are left with the negligence of Kory and the total opposition of Tierney in our efforts against Brian. As discussed, we are ok with the 25% under the existing agreement, but we now know the agreed upon 30% going forward against all potential defendants poses more risk for us and is below market rates. Additionally, Jackies' inability to maintain the $25K retainer as agreed

0044

upon necessitates our new agreement. As needed we will also pay the expenses going forward in Brian's case. The amounts of damages originally contemplated in the $50M range for the loss of the copyrights, effectively "stolen" by Somer and Murry, with this settlement are potentially lost. It is unlikely Brian has those resources or you would want to destroy him, as discussed. His settlement with Rondor also effectively negated your opportunity to recover them. This also impacts us and our fees. As you know the time commitment of myself and my entire firm has been so extensive, our potentially hourly recovery is diminishing by the minute. We are ok with the 30% but as agreed it covers everything. The original agreement covers "gross recovery" of all "gross amounts" we recover for you including the "present value" of all future royalties, rights etc as well as all future songwriter royalties. In effect, IF we recover the 79 songs we will become joint owners if you are unable to pay present value; and when and if you sell them or any rights thereto, we will be entitled to 30% of any amount you receive. At this point it is difficult to discern how big this toal "pie" may be but, as agreed 30% belongs to us.

3. Next, the security agreement the defendants are imposing, potentially impacts our priority rights under our statutory attorney's lien, as well substantially impacts you. You are giving them a security interest in the songs, monies you receive from third parties, like BMI, Capitol, BRI etc, including future contracts and monies and on any contracts related to them. One of your contracts is with us as now amended. As long as you don't breach the settlement agreement we are both secure. MSK claims it needs this security because they are concerned a third party, like an unknown partner, ex-wives etc could come out of the woodwork and make a claim. We are now both at risk now and in the future.

4. This new fee agreement terminates all the scaled percentages and the capped amounts in the original agreement and fixes a flat percentage of 30% on all claims against all related parties contemplated by the agreement and / or discovered as we proceed and not excluded under the Rondor settlement provisions. In sum, we now own 30% of whatever you own in the songs, the rights, the royalties etc.

Please sign below:

Michael E. Love

Michael J. Flynn for FST

**Exhibit 4**

0046

## MEMO RE: WILSON ISSUES / DISCUSSIONS / FEES / FUTURE

From:  MJF – Doctor / Slave of Vertical Legal Work

To:  MEL – Doctor of Horizontal Recreation

Date:  December 19, 1994

Subject:   WE WON!  Wilson Settlement.  Great Celebration!

NOTES OF OUR DISCUSSIONS:  WE NEED TO SIGN.

1. First.  We have discussed this now ad nauseam – copyrights /publishing.
   When we took the case and embarked on this journey 3 years ago, the goal
   was to recover songwriting credit and the copyrights for your songs, plus
   money damages for the past frauds, royalties lost, copyright income lost, etc.
   These are very complex damages calculations in the context of decades of
   records covering past money damages from both the lost songwriter
   royalties AND the copyright income earned by AI from the date of the
   copyright recording on the songs to the present.   Additionally, the
   discounted projections for future songwriting royalties and future,
   discounted projections for copyright income is potentially over $100M.  The
   past songwriter losses appear to be at least $20M, but we can only calculate
   past lost copyright income from past songwriter income percentages. This is
   complex.  As you know and have discussed, we retained Robert Hall, a
   leading economist ($$$$$) to make these calculations.  He is prepared to
   testify that the projected future, discounted value of both the royalty stream
   and the copyrights is over $50M, and depending on many variables, possibly
   as much as $100M.  We don't yet have his report but he has substantial
   underlying documents to prepare it. You are forfeiting that money in this
   settlement except for what you can collect from Tierney, and the other
   discussed defendants, which raises deep pocket issues.
2. The complexity in this calculation increases by both the now 25 – 30 year
   time lag and document availability; and, more importantly, the legal fallout
   from the Rondor settlement.  We discussed this at length before that
   settlement.   Although we sued Ronder and MSK to get the copyrights back,

we gave that up for $1.6M as we discussed at the time. Also discussed were the claims v Brian, and others - most importantly, the deepest pocket – Gibson, Dunn and Crutcher. That is why we exempted them in the Rondor settlement. The real monetary value of the copyrights now lost, past and present, can potentially ONLY be recovered from Gibson, which involves Kory issues. His testimony in the pre trial hearings and in trial was stellar on the most critical issues. We have discussed this problem almost daily for three years. But he and GDC were grossly negligent for not interpleading you into the Wilson v Rondor case in order to protect your copyrights. That is where they were lost – hence we settled with Rondor because your copyrights were effectively lost in that case. Complex divisibility issues in the context of litigation? But if we did proceed against BW in this case to final judgment, then sued GDC and got more money – the copyrights are still gone - and if Kory flipped on us – he is bound by his sworn testimony - there are numerous, complex issues relating to Wilson filing motions to overturn the judgement, Kory issues with your new wife(?). Significantly, undoing the Rondor settlement involves the security agreements we gave Rondor! Then Rondor could go after you and our contracts on our fees. Bottom line – in this Wilson settlement, you get songwriting credit and a small fraction of the past royalties due while giving up copyright damages past and future in the tens of millions – likely over $50M plus punitives for the fraud claims in the verdict.

3. As discussed, fraud is not dischargeable in bankruptcy. Their threats to file are severely undercut by the multiple fraud claims in the verdict. But BW's incompetency – which we have prevailed on so far – may become a factor in bankruptcy, notwithstanding legal doctrines emanating from this case making the incompetency issues likely in our favor. The future on this issue is also complex and uncertain. Then you have BW's resources issue. You have repeatedly said you do not want to wipe him out or take his future royalty income. I agree it is draconian.

4. Our fees. As discussed over the weekend, obviously the settlement monies cannot pay 30% of the "present value" under our agreements of what we have recovered for you – future songwriter royalties and other rights involving the songs, known and unknown at this point. This also is a complex issue. The cash portion of both the Rondor (25%), and this settlement are simple – 30% as agreed in the September, 93 amended fee agreement with no capped percentages. Going forward against Tierney,

Branca and GDC is also simple – 30% of what we collect from Tierney for your $2,250,000 portion with no capped percentages; ; 30% of what we collect for you over that amount, but we can only charge BW 15% for his portion.

5. The "present value" provision of our fee agreement, as discussed, is more complex, but I think it is covered by our amended fee agreement. I understand you spoke to George Ashley and he has suggested, and you have asked us to take 30% of the royalty stream until, if ever, you sell your royalties and all other rights to the 35 songs we recovered. We have agreed based on the agreement we already reached in the amended fee agreement that whatever you own, we own 30% of it. Since we are now looking into the future, which is contemplated in our original fee agreement, with the "gross recovery" and "gross amounts" and present value" provisions but subject in that agreement to scaled percentages and caps, which are now out, neither one of us has a crystal ball. Robert Hall fixes "present value" for future rights at over $50M, which you obviously cannot pay. We agree that the simplest way to handle it is that you pay us from the royalty stream for these songs and whatever rights you own in the songs, past, present and future, 30% of those bundle of rights and monies belong to us.

6. Next, but not an insignificant problem - the proposed settlement agreement we are signing, presumably tomorrow, has some troublesome provisions we have discussed at length. One provides that Jerome Billet, the GAL, our antagonist throughout this case, who backed Tierney, hired Crowe and Day, testified against us, and refused to settle at the outset, while offering us $500,000, has joint decision making authority with us over the case, and if he deems the case "totally unmeritorious", he can terminate it. Obviously, this impacts the $2,750K owed to you on the $5M judgment and the 30% owed to me from you on your money; and the 15% owed to me from Wilson. In sum, Billet could pull the rug out from the balance of these settlement funds we seek to collect from Tierney. As you know, we agreed to the 15% for Wilson to increase Brian's and Billet's motivation to stay in the case. Billet being who he is liked that deal.....BUT, Tierney and Billet have a long history and when we first started going after Tierney with demonstrative evidence, Billet continued to back him until we finally got Tierney DQ'ed. Suppose, Tierney makes a back door deal with Tierney? There is a provision that the probate judge has the final authority on this

which should keep Billet honest, and the money incentivizes Brian, so I think we are ok, but this issue is significant.

7. The last discussable problem among many, but needed to memorialize in this memo is "confidentiality." There is a confidentiality provision in the settlement. We fought with them at length over the language in this provision. You have been vilified as one of the worst human beings on the planet by BW's media driven machine for bringing this case. The media, as you know, ranges from abject hatred and disgust directed at both of us for suing a legally adjudicated "Genius" incompetent, to just plain greedy bottom feeders. The jury verdict says it all and is a public document, but I don't think the BW media is going to let up and our hands will be tied in what we can say. You are in the public spotlight and you have to consider your career as the lead singer of the Beach Boys in terms of your ability to publicly respond to the facts and details of this case. I guess we will have to deal with it on a case by case basis. If you are ok with it, so am I. We need to get some finality to this 3 year war. It has almost killed me to get justice for you!

The last problem we have privately discussed are your brothers, Jackie, several Beach Boys band members, some of whom have cooperated with us to a degree on this case, and your request to keep many matters we have discussed privately between us. Essentially, we have been doing that discretely for three years knowing that there are major leaks within our camp. I understand that there are several individuals, one very close to you, whom you do not trust and do not want any "leakage" whatsoever – what you have described as "the Kory problem." I agree. Those issues are just between us, but I don't want someone coming forward in the future and claiming I had some duty of disclosure to them. In such a case, it will be your problem.



**Exhibit 5**

1



1

2



2

Case 3:19-cv-00289-MMD-CLB   Document 50   Filed 07/03/20   Page 125 of 181

3

ADMISSIONS:   Mike Love Autobiography

"We were all excited about the impending purchase— not just Brian but Dennis, Carl, and Al as well. This was our music, our legacy, and we didn't want Murry to have anything to do with it. Our business manager, Nick Grillo, was involved in the negotiations. Letters were written. Meetings were held. Updates were given. But months passed, and nothing got finalized. I assumed this was just the way the business works.

I was wrong. On August 20, 1969, Grillo told us that the Sea of Tunes had indeed been sold— but not to the Beach Boys. It had been sold to Almo/ Irving, the music-publishing arm of A& M Records. A& M agreed to pay $ 700,000 for the entire catalog, and the payment was going to Uncle Murry. In cash."

(Love, Mike; Hirsch, James S.. Good Vibrations: My Life as a Beach Boy (p. 224). Penguin Publishing Group. Kindle Edition.)

"When I reached his house, I stormed into his room and asked what happened with our songs. "My dad fucked us," he said. "Yeah, no shit." "Brian appeared angry, but he didn't do anything to try to stop his father. I had no sway with Murry, but I did call Chuck Kaye, the head of Almo/ Irving, and cursed him out for being party to such a betrayal. I also told him that Murry was responsible for driving both Brian and Dennis to drugs, and now he had screwed all three of his sons as well as his nephew. "This is the most chickenshit thing he could have done," I said.

(Love, Mike; Hirsch, James S.. Good Vibrations: My Life as a Beach Boy (p. 225). Penguin Publishing Group. Kindle Edition.)

"Yeah," Kaye agreed, "we all know Murry is an asshole, and he is hard to deal with. But this is what he wants to do. He sold it to us, and there's nothing you can do." "Actually, there was something. For the deal to go through, the agreement had to be signed by Brian, Dennis, Carl, Al, and me. No signatures, no sale. The Beach Boys, however, had a lawyer, Abe Somer, who told us that it was a done deal and that everything was in order— Murry controlled the catalog and could do with it what he wanted. We had no recourse.

"I complained bitterly. I told Somer that many of my songs had not been credited, so what could I do if they were now owned by a third party?

3

4

"Somer worked for a big Los Angeles law firm Mitchell, Silberberg & Knupp, and I had no reason to question his judgment. He said I was all confused. He told me that I had to sign the agreement to ensure that I kept my name on the songs that I had already been credited for. If I didn't sign it, I could lose credit for those as well.

"Those were my options: If I signed the agreement, I would never receive credit for "California Girls," "Help Me, Rhonda," "I Get Around," "Surfin' USA," and many other songs that I cowrote. But if I refused to sign the agreement, I might lose credit for "Good Vibrations," "Surfin' Safari," and "The Warmth of the Sun," among others.

"That's one helluva choice. What could I do? I had to sign the agreement to retain what I had. Everyone else signed too, and with that, we lost all that we had created.

"I couldn't get any answers, from Somer or anyone else, on how Murry had stolen our songs, sold them, and walked away with $700,000. We were all in the dark. As Al later said, "It was done quite in a cloak-and-dagger kind of way, really. Very mystifying." I don't know if Murry ever shared any of that money with his sons, but I never saw a penny. I suspect that Murry needed a few more dollars for himself."

(Love, Mike, Hirsch, James S.. Good Vibrations: My Life as a Beach Boy (pp. 225-226). Penguin Publishing Group. Kindle Edition.)


"It was, of course, one of the dumbest decisions in music history. The Beach Boys didn't die, and the catalog was a cash machine for decades to come, generating more than a hundred million dollars in publishing royalties, none of which Murry or the Beach Boys ever saw."

(Love, Mike; Hirsch, James S.. Good Vibrations: My Life as a Beach Boy (p. 227). Penguin Publishing Group. Kindle Edition.)


"The sale of the catalog, for me, had a long ripple effect. For years, I'd been expecting a lump sum of money for the lost royalties on my songs, and, once the writing credits were fixed, I assumed I'd be receiving a new flow of income. Now all that money owed would stay with Brian and those future songwriting royalties would also go to Brian. The rest of us would have to make do, and without any new hit records, that meant even greater reliance on touring. It was lose-lose for me and the touring band. Instead of being recognized and promoted as the co-lyricist of our most popular songs (three No. 1s and ten originals that charted in the Top 10), I was simply

4

the perennial front man, and any effort on my part to set the record straight was seen as my vanity run amuck."

(Love, Mike; Hirsch, James S.. Good Vibrations: My Life as a Beach Boy (p. 228). Penguin Publishing Group. Kindle Edition.)


"Reaching my limits forced me to consider what I was doing with my life. At the time, I was fighting for custody of Hayleigh and Christian, and I knew I had to be stronger, and smarter, for them. I had a lot at stake professionally as well. I was angry that our music had been stolen from us and that I had lost a huge part of my own legacy. I realized that the only way I could claim ownership of the songs that I had written, the only way I could stay connected to them, was to be a road dog: to rejoin the guys, get back onstage, and take our music to all four corners of the country and beyond.

"That would be my nourishment, and my revenge."


(Love, Mike; Hirsch, James S.. Good Vibrations: My Life as a Beach Boy (p. 230). Penguin Publishing Group. Kindle Edition. )


"The walls were closing in, as Landy's principal— maybe only— source of income was now Brian, not as a patient but as a business partner. It was all the more reason for Landy to lead the charge against Irving Music. That suit, filed in September of 1989, sought $ 50 million in lost publishing royalties and $ 50 million in punitive damages, while the catalog itself, if reclaimed, was thought to be worth much more. Landy was to receive 15 percent of all proceeds."

(Love, Mike; Hirsch, James S.. Good Vibrations: My Life as a Beach Boy (pp. 343-344). Penguin Publishing Group. Kindle Edition.)


"In December of 1989, my attorney and I met with Brian and his lawyers as well as Landy to review my involvement in the case. I told them that I had drawn up a list of songs that I had cowritten but not been credited on, including "California Girls" as well as "I Get Around," "Help Me, Rhonda," "Catch a Wave," and "Be True to Your School"— several dozen in all, which was only a partial list of the songs that I had written with Brian. I told them that I wanted credit for my songs.

"Landy jumped off the sofa, yelled that I had no talent, and asked, "How dare you make this claim now?"

"Landy understood that if I were given credit, the songwriter royalties that had been flowing to Brian as the sole author would now be divided with me, which would mean less money for Brian and less for his business partner, Eugene Landy. But I didn't budge from my demand, and we secured the promises from Brian's lawyers: if they prevailed, I would receive credit on those songs while also collecting 30 percent of the lawsuit's proceeds, or a minimum of $ 2 million.

"It was a strange time, in so many ways, as I was involved in two simultaneous legal proceedings with Brian— one allied with him and Landy in their claims against Irving Music, and one trying to drive them apart."

(Love, Mike; Hirsch, James S.. Good Vibrations: My Life as a Beach Boy (p. 344). Penguin Publishing Group. Kindle Edition. )


Chapter 23 "Universal Truth"

"If the legal proceedings against Landy had a satisfactory end, those against Irving Music did not. I was utterly blindsided.

"In October of 1991, my lawyer told me that Brian had decided to settle with Irving Music, and the proposed settlement was $ 10 million for all claims— a fraction of what Brian's lawyers thought they could win. In a phone call, my attorney told me that I would not receive any of those proceeds, nor would I receive credit on any of the songs that I wrote. The case would soon be over, and there wasn't anything I could do about it.

"After hanging up, I paced back and forth across the house, not so much in rage but in disbelief, asking myself over and over again, What the fuck just happened? I had been deposed for two full days for this lawsuit, and I had helped them get $ 10 million, and now, no money, no song credits, nothing. This was the third time I had been screwed. First when Murry didn't give me credit. Then when Murry sold the catalog. And now this time.

"We needed to get away, and in December, Jacquelyne and I took our son, Brian, now three, to the Maharishi Ayurveda Health Center in Lancaster, Massachusetts. We went for panchakarma, or "five actions," in which herbal products, oil massages, and other treatments are used to purify the body. The center was run by Deepak Chopra.

"Just as Jacquelyne spoke to him in her time of need, I sat down with Deepak and told him what happened with the lawsuit. Deepak told me I had to meet a lawyer who had represented him and was at the center right now. His name was Mike Flynn, and he might be able to help.

"Mike joined Jacquelyne and me for dinner. He was lean, with straight dark hair and sharp angular features. Even at a health spa, he didn't seem like the relaxing type, and the more I told him about what happened, the more interested he became. He preferred cases that involved "huge injustices" — right versus wrong, underdog versus top dog, good versus evil. "When I'm looking into the eyes of the jury," he later said, "I want to be wearing the white hat."

"Mike Flynn had spent eight years fighting the Church of Scientology and had helped put three of its leaders in prison. He liked high-profile cases as well, representing Joan Kennedy and, later, Monica Lewinsky, though he turned down Michael Jackson.

"Our spiritual faith created a common bond— Mike Flynn had practiced TM since 1974— but it was his legal faith that separated him from all others. Dating back to the 1960s, every lawyer I had spoken to about my music-related legal problems had told me the same thing: yes, I'd been cheated, but there was nothing I could do.

"Lost causes, combined with huge injustices, were the very causes that Mike Flynn embraced. His willingness to help me was a revelation, but we still needed to do our astrological vetting. Jacquelyne asked Mike over dinner what his birth date was and what time he was born. He excused himself to call his mother and returned with the information. Then Jacquelyne left the table and returned with our astrologer's planetary assessment of Mike: "In the twelfth House of Justice, he has an exalted Jupiter."

"That was good enough for Jacquelyne. "Hire him," she said. Mike Flynn, who had offices in San Diego County, began his work, and it included filing a suit against HarperCollins for defamation in Brian's memoir. The book itself cast Gene Landy as Brian's savior (Landy also collected a third of the $ 250,000 advance), while depicting me and the other members of the band as shameless malefactors who exploited Brian. Over the years, I've told many people, including reporters, that Wouldn't It Be Nice is "my favorite book that I've never read," because HarperCollins settled the suit for a good deal of money. But that flippant remark deflected my true feelings. I read as much of Brian's book as I could stomach and was stung by the false attacks against me, some of which were recycled from the 1970s. Describing me as "smarmy," "creepy," and "flashing an evil grin," the memoir falsely claimed that I "hated everything" about Pet Sounds, alleged that I had cost Brother Records "millions of dollars in lost royalties" in bad business decisions, and blamed me for Brian's descent into "booze, drugs, and

Case 3:19-cv-00289-MMD-CLB   Document 121   Filed 04/04/21   Page 130 of 181
Case 3:19-cv-00289-MMD-CLB   Document 121   Filed 04/03/20   Page 130 of 181

8

food." Writing songs with cousin Mike, Brian wrote, "had nearly killed me several times over."

"What was most irritating was Brian's disparagement of me and virtually everyone in the Beach Boys as musical incompetents. "The proper thing," Brian wrote, "would've been to remind Mike that if not for me, he'd still be pumping gas, Al that he'd be a medical supply salesman, and Carl that he'd be running errands for me."

"HarperCollins also settled defamation lawsuits from Carl and Brother Records.

"In his depositions, Brian said he had only skimmed the manuscript and couldn't account for the falsehoods. "I don't recall nothing," he said. We assumed that Landy wrote the actual lies, but as far as I'm concerned, that doesn't exonerate Brian. It's his book, and if you buy it online or find it at a used bookstore, it doesn't come with a cover sticker that reads: "Warning: False and Defamatory Statements Included."

"The most despicable section was the attack on the person who loved Brian the most— his mother. According to the book, Brian often saw his mom "pour a drink in the afternoon and continue sipping through the evening," a bystander to Murry's abuse. She once "looked on as [my dad] tied me to a tree as punishment," and after Murry caught Brian masturbating in his bedroom, Murry demanded that Audree deny their son dinner for two nights.

"My mom complied," Brian wrote. Aunt Audree sued HarperCollins, but the judge threw out that case. I don't know if Brian ever apologized to his mom.

"My suit against HarperCollins allowed Mike Flynn to gain access to the transcripts of Brian's interviews with his collaborator, Todd Gold. Those interviews affirmed— according to Brian— that I had been the inspiration of the group and that I had written many of the songs that were now in dispute.

"All of that was a cornerstone for Mike's investigation into what happened in Brian's case against Irving Music. Brian's $10 million settlement had been finalized in May of 1992, which Brian split with his lawyers (who received 40 percent). Around that time, Mike called me at our house in Incline Village and asked to come up. He had some important information.

"I knew that over the past three decades, plenty of things had happened to the Beach Boys that I either didn't understand or had neglected, but when Mike sat down with us in our living room, he came with piles of documentary evidence that he and his law firm had collected and analyzed, documents that I had never seen before, some dating all the way back to the inception of the group. He had copyright applications for songs, minutes from Brother Records board meetings, incorporation papers from Beach

0059

Boy– related companies, and letters. I then received a history lesson in deception, greed, and misplaced loyalty.

"For one thing, Brian's lawyers misled me from the beginning about the grounds on which they were going to overturn the sale of the catalog. It wasn't only that Brian was mentally incompetent. It was also that our lawyer at the time of the sale, Abe Somer, was representing both sides of the transaction. He was the Beach Boys' attorney, but he was also the lawyer for Irving Music and its subsidiary, A& M Records. In addition, Somer was on the board of directors for both Irving Music and A& M Records, and he assisted Irving in the transaction. He never disclosed his dual representation to me or, as far as I knew, to anyone in the Beach Boys. It was a clear conflict of interest, and it was used in Brian's case against Irving Music to try to overturn the catalog's sale."

"That was a shot to the gut. The guy we had entrusted to protect our songs was a snake, and as Mike Flynn explained it, the lies continued to this day. Brian's current lawyers had to know that if I was aware of the Somer conflict, I would have wanted to join the case against Irving Music. But if I joined Brian's case, we would have to split the proceeds and take money out of their pockets and Landy's. These lawyers concealed the Somer conflict from me, even though some of them knew it as early as 1986. Mike explained that because Brian and I had been music and business partners since the inception of the band, Brian and his lawyers had a fiduciary obligation to share that information with me. Instead, they concealed it, and I testified in their case, in exchange for promises of money and credit— promises, of course, that were never kept.

"That was sleazy, but I wasn't surprised. I knew about Landy, and I'd been dealing with corrupt lawyers for decades. But Mike Flynn said I hadn't heard the worst of it. He grabbed another folder and said that the actual sale of the catalog in 1969 was the product of an elaborate scam to defraud me and was the culmination of years of deception.

"I was listening.

" It started with the Sea of Tunes. When it was formed in 1961, it was a sole proprietorship, and Uncle Murry and Brian each had a 50 percent stake, though Brian gave his half away the following year. Throughout the 1960s, Brian told me that he controlled the Sea of Tunes, which reassured me that I needn't worry about my song credits. But according to a 1965 letter from Brian, Uncle Murry controlled the catalog.

"The actual scam began in 1967, when Abe Somer began representing the Beach Boys. Mike told me that Somer had engaged in these kinds of deals in the past, so he

0060

Case 3:19-cv-00233-MMD-CLB   Document 121   Filed 04/03/20   Page 132 of 181

**10**

knew what he was doing, and once he and my uncle formed an alliance, he could move the pieces into place.

"Their goal was to sell the catalog and pocket the cash, but when Somer investigated the actual songs, he encountered a major problem. When you write a song, you're supposed to assign the copyright to a publisher, through a copyright registration and a songwriter's agreement, and the publisher distributes songwriter royalties from record sales and other publishing fees. For the Beach Boys, Uncle Murry and Brian tried to assign the copyrights to the Sea of Tunes, but when Somer searched for those assignments, he discovered a mess. The wrong songwriter forms had been used, while other forms were incomplete, dated incorrectly, or appeared to have been forged (which was later confirmed). Others were simply missing. Under the laws at the time, if a copyright was not assigned, then it remained with the songwriter, and any alleged copyright holder— in this case, Murry— lost it.

"No one would buy the publishing rights to our songs unless they could also buy the copyrights, but in terms of copyrights, the Sea of Tunes was an empty vessel.

"Fixing the problem required even more chicanery. It involved the incorporation of Brother Records and the Sea of Tunes catalog, which masked the defects in the assignments and limited the liability for the buyer. Even those secret moves weren't enough to ensure the acquisition. I still owned the copyright to all my songs, and I could assert those rights regardless of who owned the catalog. To get the copyrights assigned to the catalog, Somer could have come to me with a stack of songwriter agreements and asked me to sign them, but I might have asked questions or smelled something rotten. So Somer had to trick me.

"After Murry found a buyer for the catalog, Somer drafted the letter that all the Beach Boys were told to sign. Dated August 20, 1969, and addressed to Irving Music, it said that the songs "authored by [the Beach Boys] have been assigned to Sea of Tunes in accordance with normal practice in the publishing business . . . [and] we acknowledge that we have executed songwriters' agreements whereby all of our rights in and to the foregoing musical compositions have been assigned to Sea of Tunes."

"I had no idea what the hell that meant. So I asked my lawyer— Abe Somer! He told me there was nothing I could do. He didn't tell me that he had secretly planned this transaction for two years and that he represented Irving Music. It was premeditated, cunning, and diabolical. And in signing the letter, I gave away my songs.

"What Mike Flynn told me deepened my contempt for Uncle Murry. I knew he wanted to keep the Beach Boys a family band, but I didn't realize that in his eyes, I was never part of the family. When I later told my dad what happened, he said he wasn't

**10**

Case 3:19-cv-00289-MMD-CLB   Document 131   Filed 04/03/20   Page 133 of 181

**11**

surprised. "I knew he was a crook," he said. "He was always a crook. But he didn't have it out for you. He had it out for me." I'm sure he was right. Jealous of my dad, Murry wasn't going to let the entitled son of his rich brother-in-law receive the credit, the due, that he deserved. My uncle wanted the glory for his sons, and through his duplicity he got it.

"Mike told me there was another part of the story. Recall, he said, that Brian had signed the letter of August 20, 1969, that paved the way for the catalog's sale. But I needed to read another document, which said that on December 28, 1967, Somer incorporated the catalog into the Sea of Tunes Publishing Company. Mike then pulled out another file and showed me the minutes of a board meeting, apparently the only one ever held by the Sea of Tunes Publishing Company, and the meeting resolved that "the liquidation and the distribution of [the company's] assets be commenced as soon as practicable."

"It was a resolution to sell the catalog.

"Mike told me to look at the signatures.

"It was signed by the company's sole shareholder and director, Murry Wilson, and by the directors, Audree Wilson and Brian Wilson.

"Mike told me to look at the date. "It was July 21, 1969, a full month before we signed the letter to Irving Music. Brian had told me that his father had fucked us when the catalog was sold, but Brian had signed the document to commence the sale a full month before it actually happened. He knew his father was trying to sell the catalog, and he approved it.

"Mike also said that in Brian's own suit against Irving Music, his lawyers argued that Brian and Murry each had a 50 percent stake in Sea of Tunes even before its incorporation in 1967, and Brian was now bound by that. In other words, if Brian were a full partner with his father, then all the fraud and deceit surrounding the catalog must also be attributable to Brian. He could not escape responsibility.

"Brian is just as culpable as Murry," Mike said.

"I put my head down in my hands.

"Mike Flynn said that he needed to pursue Brian in order to subpoena additional documents and to depose Brian and his lawyers, but he thought he knew the outlines of his case— that Brian lied to me from the very beginning about the Sea of Tunes; that he bore responsibility for blocking credit on my songs; that he worked with his father in the fraudulent sale of the catalog; and that he and his lawyers have been concealing information from me for years.

11

"My lawyer was telling me that my cousin was my adversary. "I rubbed my eyes, looked up, and took a deep breath: "Okay," I said. "Go for it."

"I didn't want to sue Brian, but I knew a resolution was long overdue. I assumed that, in the 1960s, Brian had not credited me on our songs because he wanted to avoid fighting his father. But Murry died in 1973, and even though Irving Music owned the catalog, Brian faced no legal or industry barrier from simply adding my name as a lyricist. But he never did that. Even when I was in bankruptcy proceedings, Brian kept cashing the royalty checks, year after year.

"Actually, I thought the suit would be settled quickly. Brian had just wrapped up a three-year legal battle against Irving Music, and the two-year effort to establish a conservatorship had recently been made final. The last thing he wanted was a courtroom bloodletting that reopened old family wounds. Brian also knew the truth.

"On August 27, 1992, one month after my suit against Brian was filed, the Beach Boys were playing in New Jersey, and Jacquelyne and I were staying at the Rihga Royal Hotel in New York. She was in the room when Brian called and said he needed to speak with me. Jacquelyne told him I was doing an interview with the Associated Press. Brian called back several more times before I had time to reach him. He quickly got to the point.

"You were right to sue me," he said. "I owe you money. I want to pay you."

"I told him that I was sure the lawyers could reach a settlement and that I was less interested in the money than in getting credit on our songs, mainly "California Girls."

"He said he knew that. He also told me that he had been working on a new arrangement of "Proud Mary," and he wanted to do it with the group.

"I told him I couldn't wait to hear it, and we said good-bye. If Brian agreed that I was right to sue him, what was there to argue about? Or so I thought. The settlement talks, however, quickly broke down between Mike Flynn and Brian's conservator, Jerome Billet, who was appointed by a judge. Billet's job was to protect Brian's assets, and I guess Billet thought he could do a better job of that by going to trial.

"What a blunder. I knew that regardless of the outcome, Brian was going to pay a price by exposing himself to a history that he had tried to bury and forget. During a deposition on November 3, 1993, while acknowledging that he owed me money, the lawyers were aghast at what they saw: Brian was hurting himself. His lawyer, Jim Tierney, said, "I want the record to reflect that Brian is digging his fingernails into his arm, and the sores are opening up and bleeding." Tierney urged him to cease."

**12**

" I knew the lawsuit was also going to be one of the most stressful experiences of my life, but I had found new ways of coping.

"One day in the early 1980s, I was driving from my house in Santa Barbara to Los Angeles, a drive I often made, but now I pulled off in Calabasas, inland from Malibu, and saw in the rolling hills a Hindu temple. I didn't know anything about it but decided to check it out. Entering the front door, I took off my shoes, walked through the main temple, and soon found my way into the inner sanctum. There the priest was doing an aarti, or a blessing, with a lighted camphor, which emitted a sharp but pleasing aroma. I stood silently as the priest chanted invocations, and then out of the blue, he turned to me.

"Your life is going to get better," he said.  "Excuse me?"

"Your life is going to get better very soon."

"Are you sure?"

"Yes."

"I can't recall how it got better at the time, but I do know that the exchange marked the beginning of my friendship with Narasimha Bhattar, a sturdy, darkhaired Brahmin priest whose job was to interpret the cosmos. He explained how the relationship among the planets can influence your daily life and how your birth chart can predict your relationship with others or foretell the success of a new job or even a marriage. His philosophy, his way of looking at things, appealed to my desire for esoteric knowledge. It was an alternative but orderly framework to understand a chaotic world.

"On my second visit, Narasimha told me that I should come with him to India to visit the Hindu temples, each one with a presiding deity whose forefather had been a priest there five hundred years ago. I joined him on several pilgrimages to the southern part of that country, to visit these architectural splendors, some of which had been there a thousand years ago. Vedic rituals seemed to recognize the need for physical as well as spiritual engagement; and for someone like me who was easily distracted, these rituals intrigued me because they were active, experiential, and tactile. The supplicants did not have to sit back and await their fate. They could tilt the odds in their favor.

"I wanted to do just that for the trial. Our chances of prevailing were not high, given that so much time had passed — more than thirty years — since the initial wrongs were committed. I knew the facts were on my side, but I wanted cosmic insurance.

"So with Narasimha joining us, Jacquelyne and I took little Brian, now four and a half, to India. I had been traveling to India for several decades, but this was the first time I could integrate that part of my spiritual life with my family life. We rode the elephants together and explored the sights but were there mainly to visit the temples, and I took great pride that I could share this ancient knowledge with my young son. Vedic priests performed different yagnas, or fire sacrifices, in which offerings are made to different deities to achieve results in various parts of your life, including health, career, finances, and personal relationships. Then there are sacrifices for Ganesha, who is the remover of obstacles and whose image — the head of an elephant — is one of the most recognized in the Hindu pantheon.

"I needed some legal obstacles removed. Inside one of the temples, I stood next to a small fire, and with hundreds of priests chanting, I threw into the blaze almonds, chili peppers, and food grains. The goal is not to harm any of your adversaries but to evolve them to a more enlightened state, and it seemed fitting that the temple was equipped with its own choral effects. I loved the sound of the crackling flames, the chants, the invocations, the chorus of drums, bells, and gongs. These were harmonies of the spirit.

"On another occasion, back in the states, Mike Flynn and I visited the temple in Calabasas when he was taking depositions and had hit some roadblock. We asked Narasimha to chant the thousand names of Ganesha, the linking of the names expressing the belief in the glory of the deity. Narasimha did all the work. Mike and I just sat back and listened until the sounds washed over us. When we got back to our car and drove down the highway, it felt like we were floating.

"The pretrial skirmishing dragged on for many months, in part because Brian's lawyers delayed or blocked access to documents. In February of 1994, Judge William J. Rea reopened discovery when Mike Flynn convinced him that documents had been suppressed. The judge also removed Brian's two lawyers, J. J. Little and Jim Tierney, for conflicts of interest, as their misconduct, acting on Brian's behalf, was part of the case. I didn't have the money to cover Mike's expenses, which included hiring a forensics expert to comb through Brian's computer, and Mike would ultimately spend about $ 200,000 of his own cash just to keep the case going.

"If I rushed into my other marriages, I compensated by taking a long time with Jacquelyne. To be honest, there almost wasn't a marriage. Not long after Brian was born, Jacquelyne and I separated, for no good reason except my own fears and insecurities about being a father again and making a commitment to a family. That was my pattern. But this time was different. We had some friends — Terry Melcher in

particular— who made sure Jacquelyne and I continued to communicate, and they prodded me to open up in a way that I've never done before.

"Jacquelyne and I were back together soon enough, as a couple and a family, on a path I had not taken before. Jacquelyne insisted that it was either all or nothing— either we stay together as a family, including every tour and road trip, or we split up. Tours aren't easy for adults, let along small children, but Jacquelyne said she would handle the logistics. Off we went, and little Brian had a truly unique childhood. By the time he was three, he had exhausted his passport and had to get a new one. In India, he wanted to wear the same kind of dhoti that I wore. Once on a bus in Germany, our tour manager handed him the public address mic and asked, "Brian, what city are we in now?"

"Dusseldorf!" he cried.

"Before he was in kindergarten, he had seen more parts of America than most people see in their lives. When we performed at festivals or amusement parks, I took him on rides in between concerts. When he was old enough for school, we hired a tutor and homeschooled him. Before going onstage, I'd put him on my shoulders, and he'd yell, "Let's knock out this show!" Then he'd come onstage with us, but he wasn't a prop. He attacked the tambourine viciously, like his dad, and he could sing! He put his heart into it, and when he was five or six, Carl gave him the last falsetto part on "Fun, Fun, Fun."

"It was the first time I'd done the things you're supposed to do as a dad. I regret how much I missed with my other children but savored every moment this time around.

"For Jacquelyne and me, those years traveling together went a long way toward building trust and reassuring both of us that this relationship was going to work. Hell, our courtship— seven years— had lasted longer than several of my marriages combined, but we finally knew the time was right to get married.

"Jacquelyne had a bridal shower, and Aunt Audree attended and gave her a risqué nightgown. But she told Jacquelyne she couldn't come to the wedding because of the litigation with Brian.

"I don't think it would be the right thing to do," she told her, "but I know you'll be a beautiful bride, and you have my blessing."

"A few days before the wedding, Audree called Jacquelyne. "Guess what," she said.

"We're coming."

**15**

"My aunt was always a class act, and I believe she was also instrumental in getting another guest to attend— Brian.

"The wedding itself, on April 24, 1994, was at a lakeside mansion in Tahoe. Carl sang "God Only Knows," and my sister Marjorie and her husband, Joe, sang "When I Fall in Love" and "Ave Maria." Mike Flynn was my best man. He had recently deposed Brian for seventeen days, two hours a day, during which time Brian had admitted— to the dismay of his lawyers— that I had contributed lyrics to thirtyfive contested songs. (We initially identified seventy-nine, but that number was too unwieldy.) Professional ethics prevented Mike Flynn from speaking to Brian at the wedding, but in his lengthy and very funny toast, he integrated lyrics from all thirtyfive songs. Brian sat and listened to it in good humor and later told Carl how much he liked it. "

"The trial finally began on October 4, 1994, in United States District Court in Los Angeles, and what occurred over the next two months was the most comprehensive history of the Beach Boys ever assembled, in several thousand pages of testimony (including pretrial depositions) and documents (hearings, rulings, motions, contracts, exhibits, letters, interview transcripts, medical reports, boardroom minutes, and more). The jurors heard from Brian and me as well as Al, Bruce, David Marks, Marilyn, and various promoters, record company executives, lawyers, managers, and medical experts. Carl refused to appear in court, but he was deposed at length, and his testimony was read to the jurors.

"I was on the stand for all or parts of six days. I knew that, when provoked, I could lose my temper, so I consulted a Vedic astrologer, and she told me I could cultivate "sweet speech" by eating "white candies." On the days that I testified, I either drank vanilla milk shakes or ate divinity fudge. It worked, for the most part, though I may have been too irreverent— when I first took the stand, Mike Flynn asked what my occupation was, and I said, "Hard-core unemployable." (I then noted I played in a rock and roll band.)

" Much of my testimony focused on the thirty-five songs. Every Beach Boy, including Brian, acknowledged my contributions, but Brian's lawyers tried to minimize them. Another issue was whether Brian and I were actually "partners." Legally, if we were true business partners, then Brian or his representatives had certain fiduciary obligations to me. But if we weren't partners, then no such obligations existed.

"This was no mere legal point. It cut to the heart of the Beach Boys. Were we really a group in which all members contributed, or was this Brian's band, with the rest of us just along for the ride? If the latter was true, I had no case.

"All I could do was describe how I worked with Brian to create our music, and the jurors would decide.

"When Mike Flynn asked me about "Surfin' USA," I said that Brian borrowed the melody from Chuck Berry's "Sweet Little Sixteen."

"Brian did the arrangement," I explained, "and I took all the disparate words and assembled them in a coherent way so that they would rhyme and you could sing them. There were different surfing spots that were recommended by different neighbors, and I just took the words, wrote them all down, and put them into something that you could sing that rhymed . . . There is part of the song that says, 'Haggerty's and Swami's,' but I ran it together like [singing] 'At Haggerty's-andSwami's-Pacific-Palisades, San-Onofre-and-Sunset, Redondo-Beach-L.A.' It is like running the lines together in syncopation with the track. So I had to do that because I was singing the lead, and it is an up-tempo song and you just can't go like 'At Haggerty's and Swami's' while the track is pumping. So I remember very clearly tailoring the melody and tailoring the lyrics to fit the track."

"The song," I added, "is credited to Chuck Berry, which is all well and good, but Chuck didn't surf."

"Did you get any credit?"

"No." Then Mike flipped on a CD player and—" If everybody had an ocean . . ." — the jurors listened to the song.

"Hour after hour, I walked the jurors through the process of how I came up with the words for "California Girls" and "I Get Around" and "Be True to Your School" and all the rest, and then I'd sing a few lines and then sometimes Mike Flynn would play the tune, all of which, I believe, left little doubt that I was either the author or coauthor of these songs.

"When Al Jardine took the stand, Mike Flynn asked him what happened when he gave Brian "Sloop John B." "I arranged it in a fashion that I thought Brian would appreciate [and] that we could possibly have as a Beach Boy song," Al said. "I wrote it out for him and played it for him."

"Al testified that to his surprise, Brian completed the song on his own, and it became a hit in America and around the world.

"Did you get credit?" Mike Flynn asked.

"No, I didn't," Al said. "No."

**17**

Case 3:19-cv-00233-MMD-CLB  Document 131  Filed 04/04/21  Page 140 of 181
Case 3:19-cv-00233-MMD-CLB  Document 131  Filed 04/03/20  Page 125 of 148

18

"Brian, in his testimony, denied that Al helped him, but Al had no reason to perjure himself: he wasn't a plaintiff in the case, he had nothing to gain financially, and the song itself wasn't even being contested. But a pattern of behavior was established.

"Beyond disparaging me, the defense centered on showcasing Brian as mentally incompetent from the late 1960s to the current day. It was a dark spectacle. One psychiatrist said that Brian had the mentality of a six-year-old. Another said he had an "organic personality disorder." His conservator said he would not allow Brian to drive because he might hear a voice tell him to turn left when he wasn't supposed to turn left. His current psychiatrist said Brian suffered a "mini-breakdown" as a result of the trial, compromising his ability to testify.

"On the stand, Brian told jurors that he took lithium, Zoloft, Klonopin, clozapine, and Benadryl, four times a day, "to keep my head on an even keel."

"His bloodstream was a flowing pharmacopoeia— Mike Flynn accused the defense of ramping up his meds to debilitate him for the trial— but the strategy was to generate sympathy for Brian while using his mental health issues to exculpate him.

"I attended every day of the proceeding, and Jacquelyne most of the days, and we sat a row behind Mike Flynn and his co-counsel, Philip Stillman. Jacquelyne had to buy me several new suits, as I rarely dressed up, and one night at dinner, our son said, "I want to go to the place where you wear the suits." My general feeling is that the less exposure you have to our legal system, the better, but if little Brian really wanted to join us, I didn't see a problem.

"Our son inherited the Loves' blond hair (curly) and blue eyes, and he was in a phase where he wanted to wear the same thing I was wearing. So when I wore a gray suit to the courthouse, Jacquelyne bought him a gray suit, and the three of us journeyed to court one morning.

"Cousin Brian was on the stand that day.

" We settled in behind our lawyers and watched one of Brian's attorneys, Douglas Day, ask about "California Girls."

"Brian acknowledged that I wrote it, though he couldn't remember which parts specifically, and blamed his father for not giving me credit. He was asked about other songs—" Wouldn't It Be Nice," "Be True to Your School," "Catch a Wave," "When I Grow Up (To Be a Man)" — and he said he thought we both wrote some parts of them; others, only he; others, he wasn't sure. And there was "Dance, Dance, Dance" (" Mike and Carl wrote it") and "In the Back of My Mind" (" I don't know").

18

"Little Brian fell asleep between Jacquelyne and me as the testimony droned on, and then the lawyer asked about "I Get Around."

"Do you recall when that song was written?" Day asked.

"Sometime in 1964," Brian said.

"And do you recall who wrote the music for the song 'I Get Around'?"  "I did, with the exception of a possible— possibility that Mike wrote the intro, the 'round 'round.' If you get an instrument, I would be able to demonstrate it."

"Let me ask you, Mr. Wilson, with regard to the writing process, can you explain how you wrote the song 'I Get Around'?"

"No, I can't."

"Can you explain it in words?" "No, I can't.

" Day asked for a keyboard, which was at the ready, so Brian could demonstrate. The instrument was wheeled out, and when Brian sat down at it, he perked up noticeably.

"The dispute," he said, "is over who wrote the introduction patter, the vocal patter, like a riff. And I personally can't remember if I had written that, and it had come up previous times that Mr. Love had said that he had written some of the introduction to 'I Get Around.' So explaining what an introduction is versus what a song is, I explain this in these terms."

"Brian then pounded the keys and broke out in song: "' Round 'round get around, I get around!" The chords and his voice were loud and bracing and startled the courtroom.

"Brian explained that the song started with one note, and then he played and sang it again: "' Round 'round I get around!"

"With that, little Brian woke up, looked around, and blurted, "That's my daddy's song!"

"The jurors looked at this moppet in a gray suit. The courtroom fell silent.

" It was an unusually bitter trial, a war within a family and a band, with lawyers thundering at one another at every turn.

"At one point, Judge Rea, who'd been on the bench for twenty-six years, said he had never had a trial in which the attorneys voiced— or yelled— so many objections. And now, out of nowhere, the voice of a child pierced the ramblings of his medicated

namesake. I suddenly got emotional and started to well up. I headed for the exit, and Jacquelyne, lifting Brian, followed me to the door.

"Brian Wilson, continuing with his testimony, said, "It does sort of sound like a Mike Love– type of riff."

" In addition to all the testimony, the paper trail told a clear story of deception and complicity. Thanks to the forensic analysis of Brian's computer, Mike Flynn had supplemented the documents from the 1960s with Brian's diary entries from the late 1980s, and they contradicted the depiction of a mental incompetent. Rather, they showed that Brian was intimately involved in his case against Irving Music, following the direction of his counsel and seeking to maximize his financial gain. Noting the guidance that he had received from his lawyers, Brian wrote:

" 'These kinds of questions were leading to the fact that if I was caught    saying that I remember when I was told about Sea of Tunes, the statute of limitation would have started instantly. Anyway J.J. assured me that we couldn't get shafted if I answered the questions that J.J. and Jim had been teaching me . . . **. We are not talking about two million dollars. We are talking about forty million dollars.' "** (bold, underline supplied by MJF)

"In other examples, Brian's own words undermined his credibility. When he was on the stand, Mike Flynn read for him an interview he did with Todd Gold, his collaborator on his memoir, regarding "California Girls." Brian said that he and I wrote the song but I never received credit.

" ' GOLD: Why? Whose fault was that?

BRIAN: That was my fault.

GOLD: Why didn't you give him credit?

BRIAN: Because I forgot that he wrote it with me.

GOLD: Did you ever regret forgetting to give him credit?

BRIAN: Very much so, yes.  Gold asked why he hadn't given me credit since then.

BRIAN: I don't know. I keep fucking up. I keep forgetting to do it.' "

"He kept forgetting? If "California Girls" had been an obscure song, that might have been believable. But Brian himself described it as the Beach Boys' "anthem." Every time he heard it, played it, sang it, or saw the record itself, he was reminded that this was fraud on vinyl.

"There were songwriter agreements in which my name had been forged, and there were hidden letters and financial arrangements among the lawyers. There was a lot of talk about suppression of evidence and promissory fraud and breaches of contract, but ultimately, after twenty-four days of testimony, the jurors had to decide if Brian Wilson victimized me or was himself a victim of his own frailties.

"In his closing argument, Brian's attorney, Michael Crowe, asked jurors for sympathy. Brian, he said, suffers from a "long-term mental disability . . . So unlike you and hopefully me, who every day can wake up and perhaps with some difficulty go to work and conduct our lives, Brian Wilson can't do that. Brian Wilson can't do that today, he couldn't do it yesterday, and sadly enough, he won't be able to do it tomorrow."

"Crowe also seemed intent on erasing me from Beach Boy history entirely, as he not only rejected my claim for songwriting credit but said I didn't deserve my name on my existing songs: "If you look at the songwriting credit Mike Love received on the songs that he has received credit on, it is mostly 50 percent. We would submit to you that almost all of that was at recording sessions where he didn't deserve credit."

"Crowe suggested that Brian was the real artist; I, a mere handyman: "The artist who creates the music, who is the inventor, gets the credit. You may adjust the frame, but the Picasso doesn't change."

"Mike Flynn, in his closing argument, was equally unsparing toward Brian: "The guy who wrote the songs" — me — " helps his cousin for thirty years, supports him during that whole period of time while at least a good percentage of that money that Mr. Love is earning both from touring revenues and songwriter royalties . . . a good portion of that money is being used for drugs by Brian Wilson while Mr. Love is out working. And then they get his cooperation in Wilson vs. A& M, and then they turn around after they get the cooperation and use it against him . . . I submit to you, ladies and gentlemen, when you think of what has happened here, it is simply outrageous."

"After a lengthy summary of the misrepresentations and betrayals, Mike Flynn concluded: "It has been a long two months . . . The guy who did all the work and wrote the songs hasn't got anything . . . So after you deliberate and consider all these items, all this evidence, all this testimony, I am going to ask you to return a verdict for this man because he deserves it. He wrote the songs."

"To reach a verdict, Brian's lawyers requested that jurors fill out a twenty-fivepage questionnaire— a typical request from a defendant. The more that jurors have to consider, or the more deeply they plunge into every piece of evidence, the greater the possibility that doubt will creep in. (Plaintiffs prefer three-line verdicts.) To Mike

Case 3:19-cv-00289-MMD-CLB   Document 121   Filed 04/04/21   Page 144 of 181

22

Flynn's dismay, I told him to accept those instructions. I wanted jurors to consider all aspects of this case. I wanted a long verdict as a document on the history of the Beach Boys.

"The jurors began their deliberations on December 2. Though we all knew what was at stake, I didn't feel nervous. I very much believe in karma, which is a doctrine of universal truth. It basically states that notwithstanding the machinations of man — and regardless of the good or evil in the world — if you follow your conscience, the universe will support the truth. Mike Flynn and I talked about this at length. He knows a lot more about the legal system than I do, so he was worried about how the jurors were reacting to various arguments and rulings. At the same time, I was taking hits in the press for my attempted "money grab." But I remained confident that if you follow what is true, the universe will support it. I was at peace.

"After ten days of deliberation, the jury returned with its "special verdict," and Judge Rea, who at seventy-four was himself showing the stress of a long trial, looked right at Mike and me with a worn smile. Page by page, he read the verdict. The jurors ruled that I deserved credit on all thirty-five songs; that Brian and I were partners; that Brian or his agents concealed material facts with the intent to defraud me; that they engaged in promissory fraud regarding songwriting credits and royalties; and on and on it went.

"It was a clean-sweep victory. I hugged Jacquelyne and Mike, but there was no celebration, no cheering. I was vindicated but subdued. I was thinking about what came next. When I left the courthouse and faced the television cameras, I said that I hoped this case would allow Brian and me to put the past behind us so that we could write music again.

"The case wasn't over yet. The trial established Brian's liability, but a second trial would determine damages. The enduring popularity of the songs, which included seven Top 10 hits, left Brian badly exposed. To determine lost royalties or compensatory damages, Mike Flynn analyzed the past financial records of Capitol Records and Irving Music and estimated I had lost between $ 18 million and $ 22 million. To determine the value of the actual copyright, Mike was going to have experts testify that it was worth between $ 40 million and $ 100 million. And because Brian was guilty on multiple counts of fraud, Mike was going to ask for punitive damages, which — if awarded — would have been ten times the compensatory damages.

"Brian was facing potential damages of between $ 58 million and $ 342 million — almost certainly the largest case of fraud in music history. Brian's lawyers and friends understood his exposure, and some of them called Mike Flynn, reminding him of Brian's financial commitments to his children and to Marilyn and the costs of his own

Case 3:19-cv-00288-MMD-CLB Document 121 Filed 07/04/21 Page 145 of 181
Case 3:19-cv-00288-MMD-CLB Document 50 Filed 07/03/20 Page 136 of 148

23

medical care. They asked him to convince me to settle, but Mike didn't need to. I had no interest in crushing my cousin, and it wasn't about the money anyway. It was about getting credit for my songs. Brian had settled his suit with Irving Music for $ 10 million, so I proposed that he give me $ 5 million and we move on.

"Brian agreed.

"By accepting a fraction of what I could have collected, I cost Mike Flynn millions of dollars in contingency fees, every penny of which he earned. But he never pushed me to get more money, nor did he ever waver in a case that became a three-year crusade. With all due respect to Bobby Hatfield and Bill Medley, Mike Flynn is the ultimate Righteous Brother.

" Frankly, I had no idea how much money I was being ripped off each year. Before the trial, I was receiving about $ 75,000 a year in songwriter royalties. After the trial, the amount jumped to over $ 1 million a year. Even that doesn't reflect what I'm owed. I never received credit for "Surfin' USA," the most popular surfing number in history, as it was never part of Sea of Tunes. It was published instead by Arc Music, Chuck Berry's publisher. This apparently stemmed from Chuck's lawsuit against Brian and Capitol, which resulted in Chuck receiving the songwriting credit. I don't know how much money "Surfin' USA" has generated in songwriter royalties over the past fifty-three years, but if I'm going to lose out on millions, it might as well be to Chuck."

"The trial set the record straight, but it didn't affect Brian's reputation. By now, the myth was too strong, the legend too great. Brian was the tormented genius who suffered to deliver us his music— the forever victim, as his lawyer said, or as Brian himself suggested in his beautiful ballad "Till I Die":

I'm a cork on the ocean/ Floating on the raging sea . . . I'm on rock in a landslide/ Rolling over the mountainside . . . I'm a leaf on a windy day/ Pretty soon I'll be blown away . . .

"To Brian's fans, he was beyond accountability. According to the Houston Press, "Wilson suffered the indignity of paying $ 5 million to Beach Boys singer Mike Love, who sued for co-authorship of 35 songs previously credited solely to Wilson." Yes, the indignity. Peter Ames Carlin, in Catch a Wave: The Rise, Fall & Redemption of the Beach Boys' Brian Wilson, wrote: "Mike had taken particular interest in his cousin's lawsuit against A& M's publishing company. And when Brian took home a $ 10 million settlement in 1992, Mike got in on the celebration by filing a $ 3 million lawsuit claiming that he had been uncredited for work on [thirty-five] of the songs in question. And if some of Mike's claims were legit . . . others were less convincing." He never mentioned the outcome.

23

**24**

"What the trial did not address was Brian's motives in joining with his father to sell the Sea of Tunes in 1969. At that point, the publishing rights were his, so why sell them— and in the process, sell out the Beach Boys? There are possible explanations. I'll never believe that Brian was "mentally incompetent," but it's possible that the drugs and alcohol, combined with mental illness, made him susceptible to his father's demands or prevented him from fully understanding what he was doing.

"It's possible that his father agreed to give him part of the $ 700,000. Asked in a deposition if he received any of that money." "Brian said he didn't recall."

"It's also possible that Brian agreed with his father and with the consensus in the industry— that the Beach Boys were through. All signs pointed to it in 1969. In March, we had sued Capitol Records for over $ 2 million in unpaid royalties and production fees. The suit ended our relationship with Capitol, with the label deleting our catalog and refusing to ship past albums to music stores. You couldn't even find Friends, which had been released in June of 1968. This was temporary but squeezed us further financially. In the studio, meanwhile, Brian struggled to finish songs. He began "This Whole World" and "All I Want to Do," but Carl completed them. Brian's gloom was evident in the lyrics to a song he wrote in 1969 — " Till I Die."

"Brian stunned all of us on May 27 of that year when he called an impromptu press conference— Brian hated press conferences, yet he would do this one by himself. He told reporters that the Beach Boys were nearly broke. "If we don't watch it and do something drastic in a few months, we won't have a penny in the bank," he said.

"Our finances weren't that bad, and we were just about to launch a successful European tour (though Brian, back home, would have been unaware of its success). Brian told reporters that he was placing his hopes on a new single, "Break Away," that he had written with his dad. How fitting, I suppose, that a collaboration between Uncle Murry and Brian would rescue the Beach Boys from our imminent demise. But it didn't happen.

"Released on June 16, "Break Away" only charted at No. 63, making it our worst-performing single since our debut recording.

"On July 21, Murry and Brian signed the papers to commence the liquidation of the Sea of Tunes Corporation.

"And on August 20, the catalog was gone.

"Now it's probably worth more than $ 100 million. I've never asked Brian why he did what he did. Some doors are better left shut.

**24**

25

"The experience confirmed everything I knew about the music industry. Recall David Anderle, the "mayor of hip" who presented himself to the writer David Leaf as the defender of artistic integrity during the Smile era. Serving as Leaf's "chief guide," Anderle skewered the Beach Boys for our supposed resistance to Brian's creativity and spent years blaming me for Brian's collapse. The author Steven Gaines later reported that it was Anderle who hired Abe Somer as the Beach Boys' lawyer. I don't know what Anderle knew about Somer, but I do know that in 1970, Anderle formed a production company whose main job was sending artists to Irving Music's A& M Records. The label was probably a nice fit for Anderle, as he went to high school with its founders, Herb Alpert and Jerry Moss. In 1973, with Abe Somer still on its board, A& M Records hired Anderle to be its director of talent development.

"So in summary . . . the Beach Boy lawyer who engineered the fraudulent sale of our catalog was introduced to us by a man who ended up working at the very company that bought the catalog— a scam that enriched that company mightily and, indirectly, all of its employees, including David Anderle, who, everyone agreed, had a smashing twenty-six-year career at A& M Records. "What a town"

25

Case 3:19-cv-00289-MMD-CLB   Document 120   Filed 04/03/20   Page 138 of 143

26

CHAPTER 22

A SPECIAL PLACE IN HELL

Around others, we called our son "Baby Brian" or "Little Brian," hopeful that he would acquire the best personal traits of his famous second cousin and believing that Brian Wilson would once again be part of all of our lives. I even had reason to believe that the injustices committed long ago against both of us, by my uncle Murry, would be reversed. Tom Hulett, our manager, would have drinks with Landy as a way to keep the door open with my cousin, and in 1986, Landy told Tom that Brian was going to sue Irving Music, the parent of A& M Records, whose Almo/ Irving publishing arm bought the Sea of Tunes catalog in 1969 for $ 700,000. According to Landy, Brian was going to try to win back his publishing rights, and he, Landy, was driving the case. One of Brian's representatives called me to discuss the suit, and on December 5, 1986, my lawyer, Robert Kory, and I met with Brian's attorneys, John Mason and Jim Tierney. They said they believed they could reverse the 1969 sale. Even though it had occurred seventeen years earlier, they said mental incompetency could overturn the statute of limitations, and they were going to argue that Brian was mentally incompetent at the time. My testimony, Tierney said, would be critical in explaining the early days of the Beach Boys and how Murry interacted with Brian. He asked me some questions about Sea of Tunes, and I told him I really didn't know anything about it, beyond what Brian had told me, which was that he controlled it while his father administered the songs. I told them I was still unhappy about the many songs that I had coauthored but had never been given credit on nor compensated— I had been cheated, and no one had been held accountable. Tierney said if they won the suit, they would get the songs back so that we could correct the copyright issues. He also told me that they would give me a third of whatever they won in the case. We talked as well about my writing with Brian again, without any interference from Landy. All of that sounded good to me, incredibly good, as I had given up hope that I would ever regain the copyright of my songs. I assumed that even if I had a valid legal claim, the statute of limitations had expired. That occurred to me when David Lee Roth's cover of "California Girls" had become a sensation. Even if I told people that I had written the lyrics, who'd believe me? I reached the point that whenever someone asked me what I did for the Beach

26

27

Boys, I just said I was the lead singer and didn't mention that I was a lyricist. On December 22, 1986, just a few weeks after we had met with Brian's lawyers, they sent me a letter confirming what we had discussed, including that I would receive a third of any proceeds from their suit. That was fine, but what I most wanted was to set the record straight on my songs and to once again work with Brian. The problem was Landy, who was never going to cede control of the person who was making him rich (Brian was paying him about $ 300,000 a year) and famous (Landy was profiled on TV and in magazines as the man who saved Brian Wilson). Landy was negotiating with Warner Brothers about a movie on the Brian Wilson/Gene Landy story. The relationship was naked exploitation, and creepy. Landy and Brian once went to a costume party together— Landy dressed as a doctor, Brian as a skeleton. Landy created a company called Brains and Genius, for "Brian and Gene," a partnership that allowed Landy to pursue his songwriting ambitions while Brian was attempting his comeback as a solo artist. Even after our board meeting in August of 1988, when Landy vowed to reconnect Brian to the group, the "firewall" remained. Landy's pledge was a ruse to get us to write a letter in his defense against the California authorities. We never wrote the letter, and Brian's public behavior continued to unsettle. In 1989, at the end of an interview with Howard Stern, Brian said that appearing on the show was "like taking two amphetamines!" While the California AG's office investigated Landy, my brother Stan was not waiting around. He saw a television news report about a lawyer named Tom Monson who had just won a large judgment against a psychiatrist. Stan wrote Monson a letter explaining Landy's control of Brian and asked Monson if he could help him remove Brian from Landy's grip. Monson recommended filing a petition for conservatorship, which, if successful, meant that a court-appointed lawyer, or conservator, would be responsible for Brian's financial affairs and medical decisions. I contributed money to get the ball rolling, and Stan garnered the necessary support from Brian's children, Wendy and Carnie; from Brian's mom; from Carl; and from Marilyn, who in a deposition accused Landy flat-out of "brainwashing" Brian. Aunt Audree said the same thing. As Stan was laying the groundwork, the AG's investigation of Landy finally yielded results. In 1989, Landy signed a settlement with state authorities over charges of professional misconduct, including having sex with a female patient. Landy was forced to surrender his license to practice in California, and he agreed not to petition for

27

Case 3:19-cv-00289-MMD-CLB Document 121 Filed 04/03/20 Page 150 of 181

reinstatement for two years. The walls were closing in, as Landy's principal— maybe only— source of income was now Brian, not as a patient but as a business partner. It was all the more reason for Landy to lead the charge against Irving Music. That suit, filed in September of 1989, sought $ 50 million in lost publishing royalties and $ 50 million in punitive damages, while the catalog itself, if reclaimed, was thought to be worth much more. Landy was to receive 15 percent of all proceeds. In December of 1989, my attorney and I met with Brian and his lawyers as well as Landy to review my involvement in the case. I told them that I had drawn up a list of songs that I had cowritten but not been credited on, including "California Girls" as well as "I Get Around," "Help Me, Rhonda," "Catch a Wave," and "Be True to Your School"— several dozen in all, which was only a partial list of the songs that I had written with Brian. I told them that I wanted credit for my songs. Landy jumped off the sofa, yelled that I had no talent, and asked, "How dare you make this claim now?" Landy understood that if I were given credit, the songwriter royalties that had been flowing to Brian as the sole author would now be divided with me, which would mean less money for Brian and less for his business partner, Eugene Landy. But I didn't budge from my demand, and we secured the promises from Brian's lawyers: if they prevailed, I would receive credit on those songs while also collecting 30 percent of the lawsuit's proceeds, or a minimum of $ 2 million. It was a strange time, in so many ways, as I was involved in two simultaneous legal proceedings with Brian— one allied with him and Landy in their claims against Irving Music, and one trying to drive them apart.

In May of 1990, as Wilson v. Irving began making its way through the courts, Tom Monson filed the petition requesting the conservatorship, and the filing prompted one of the most bizarre press conferences that anyone had ever seen. (The Beach Boys were touring and did not attend.) At the Los Angeles Press Club, Stan was at the lectern, explaining why Brian needed to separate from his "former psychologist," when he looked up and stopped short. In strode his cousin. "Why, we can ask Brian," Stan said in amazement. "He's here. I haven't seen him in five years, and he just walked through the door." I'll say this much for Landy— he was clever. When he got word of Stan's press conference, which was held on a Monday, he sent Brian up to San Carlos, California, that weekend, and there he joined the Beach Boys, unannounced, onstage. He hadn't performed with us, I

Case 3:19-cv-00289-MMD-CLB   Document 121   Filed 04/03/20   Page 156 of 181

believe, in three years, and we didn't know why he appeared. Immediately after the concert, Landy sent Brian back to Los Angeles, moving him like a pawn on a chessboard, and had Brian show up at Stan's press conference. Wearing a tan sports coat and a black button-up shirt, Brian looked to be in good shape. Stan gave him the microphone, and Brian read from a piece of paper: "I have heard of the charges made by Stan Love, and I think they are outrageous, which means they are out of the ballpark . . . I feel great." Brian's lawyer also disputed the claim that Landy had kept him estranged from the Beach Boys. Why, Brian had just performed with the group that weekend! But Brian clearly wasn't great. He slurred some of the words, appeared medicated, and was surrounded by bodyguards. Monson had had a difficult time serving him with his summons, so he ran out to his car, grabbed it, and pressed it against Brian's chest on his way out. News reports struggled to make sense of a story of one cousin trying to save another cousin against the wishes of that cousin. The coverage, however, was seen by a former employee of Landy's, and she gave us our first real glimpse into what was actually happening behind closed doors. We knew we were right in our efforts to free Brian, but it was far worse than any of us imagined. — Kay Gilmer, a twenty-seven-year-old music publicist, interviewed with Landy in March of 1990. She applied for the job because she loved Brian's music— so much that she was not deterred by Landy's offensive questions. "Do you have a boyfriend?" "Do you have a girlfriend?" "Do you have both?" "Do you give head?" When Landy asked her what she thought about psychiatry, Kay said, "I think it's for people who are too lazy or too scared to dig down deep and work hard to find solutions for their own problems." "My," Landy said, "you're a feisty one, aren't you? Can you start tomorrow?" She worked at Landy's studio on Pico Boulevard, and the office assistant, Caroline Henning, took her into her confidence and explained how the office worked. Brian was not to receive any phone calls or mail from his family, and he specifically was not to accept any calls from Gary Usher, one of Brian's early lyricists. Gary was dying of cancer, and all he wanted to do was say good-bye to Brian, but Landy didn't like him and would not allow it. Extreme measures were also taken to isolate Brian from loved ones: Brian's daughters had formed a singing group, and their first album was out, but any story about them in any of the trade magazines had to be ripped out before Brian could see it. Even more alarming, to Kay, was how heavily medicated Brian was. Unable to prescribe meds

himself, Landy called Dr. Solon Samuels, an eighty-twoyear-old psychiatrist who ordered whatever Landy requested, and a pharmacy in Beverly Hills made the delivery. One of Landy's aides, known as the "surf Nazi," followed Brian around with a bag of pill bottles, and whenever Brian twitched or lashed out, the aide gave Brian pills to calm him. At times he swallowed eight or nine, of all different colors. Once, after Brian punched a hole in the wall, the aides sat him down, put an IV in his arm, and told him he was receiving a vitamin B12 drip. They would do it again, telling Brian that it was "time for your B12 drip." Kay didn't know what was in the solution, but she did recognize the name of one of the drugs dropped off by the pharmacy— amyl nitrates, or "poppers," used to enhance a man's sexual experience. Landy received boxes of them. Another time, Kay went into Landy's office and saw twenty-five different bottles of drugs prescribed to Brian over a three-month period. Landy frequently told Brian that Carl, Bruce, Al, and I were all "money grubbers" who were jealous of him and were trying to keep him down, and that only he, Landy, had his best interests at heart. This echoed what Brian had heard in the 1960s from his father as well as from some of the hipsters who told Brian that the Beach Boys were dragging him down. Landy seemed to enjoy humiliating Brian: when he had to sign a document, Landy made him get on his hands and knees. Landy or one of his surrogates kept Brian under constant watch, including in his social life. According to Kay, Caroline told her that Landy set up Brian with Melinda Ledbetter, and they double-dated with Landy and his girlfriend. Other accounts have Brian meeting Melinda randomly in a car dealership and dating under the supervision of Landy's aides. What was most disturbing was that Landy did not discard long-expired drugs but kept many half-filled bottles on the top floor of the office building. Some dated back to the 1970s, with the names of his famous patients still attached— Alice Cooper or Rod Steiger. Though Kay had been there a short time, it was no secret that Brian was depressed and lonely. He once said to her, "You know, Kay, do you ever think about looking out into the ocean and swimming and swimming." Landy's actions made no sense: why keep these expired drugs within arm's reach of a despondent, isolated man? She told Landy, "This stuff is dangerous. Shouldn't you dispose of it?" "No," Landy said. "You keep it exactly where it is." Stranger still were bottles of liquid adrenaline, with syringes, that were kept in a studio desk. When Kay asked about them, Landy said, "Don't you touch that." "Brian can get

30

0081

it." "It's none of your business." The final straw came when Kay was sent to Landy's house to pick up an envelope. She looked inside and saw a revised will and testament for Brian, drafted by John Mason, which left 80 percent of Brian's assets to Landy and his girlfriend, the rest to Carl and to Brian's daughters. The document had not been signed. Was this scenario, Kay thought, really possible? Convince Brian to change his will, and then leave out toxic drugs so that Brian might decide, what the fuck, it's time to end it all? The sequence had an altogether perverse logic: Kay heard Landy talk about how much money they were going to collect in the Irving Music lawsuit. Landy had saved Brian's life when that life generated steady income, but now that Brian stood to collect millions of dollars, that same life, with a revised will, might be worth more dead than alive. I had long thought Landy to be a greedy bastard and a megalomaniac, but Kay came to a different conclusion: he was pure evil. She believed that if she stayed any longer, she'd be complicit in Landy's designs against Brian, but before she left, she searched the office Rolodex and found Gary Usher's number. She called him to explain why his messages had not been returned. Gary warned her: "If Landy knows that you're calling me, he'd kill you. He'd literally kill you." Two months later, on May 25, 1990, Gary died of cancer at his home in Los Angeles. Kay left her job after three weeks but took with her some of the expired drug bottles as well as names, phone numbers, and bank account information, all of which she turned over to the California Board of Medical Quality Assurance. When a representative of the agency asked her what she thought of Dr. Landy, Kay said, "If I was assured that he would burn in hell, it would be too good for him." Kay also shared her information with Tom Monson, who used it as part of the conservatorship proceedings. Four months after she stopped working for Landy, Kay began getting late night calls. She recognized the voice as someone who worked with Landy. "We know where you are," he said. "You've been a bad girl." Kay moved to Colorado and never heard from Landy or his enforcers again. Brian's memoir was published in 1991, and to promote it, he and Landy were interviewed in October on Primetime Live. Most of Diane Sawyer's questions, however, centered on Landy's misconduct. Compared to just three years ago, Brian looked miserable, his eyes unable to make contact with Sawyer, his face contorted, his answers jumbled. Landy was defiant, but his reign was almost over. As Landy's cash machine, Brian was sputtering. His solo career had not taken off,

his lawsuit had yet to produce anything, and Brian, inconveniently, was still alive, so his new will (now signed) did not yield benefits to anyone. Carl and his own lawyer had taken over the conservatorship efforts, after Stan ran low on money. Carl's style was to avoid confrontation at all cost, particularly in family matters (he was known by some as the "ostrich"), but he recognized Brian's dire condition. His lawyer filed a new petition in 1991, which included Carl's name, as well as Stan's and mine. With Brian's entire family unified, and with the evidence against Landy mounting, Brian's lawyer knew he could never win a trial. In December of 1991, a settlement was reached between Carl's lawyer and Brian's lawyer that formally severed Landy's ties to Brian while allowing a Superior Court judge to appoint a conservator. It would still take months for that transition to occur. Landy, however, had minimal contact with Brian thereafter, but the psychotropic drugs may have caused Brian greater neurological damage than the illegal drugs. Brian struggled for the next several years with shakiness, slurred speech, and mini-seizures. Dr. Eugene Landy had achieved the near impossible: he saved Brian's life but left him in worse shape than when he found him.

Love, Mike; Hirsch, James S.. Good Vibrations: My Life as a Beach Boy (pp. 342-350). Penguin Publishing Group. Kindle Edition.

**Exhibit 6**

0084

# Gmail
by Google

Michael Flynn <mike@mjfesq.com>

---

## Instructions to Jay Cooper
1 message

---

**Michael Flynn** <mike@mjfesq.com>                                    Tue, Apr 11, 2017 at 6:15 AM
To: Mike Love <mlove315@yahoo.com>
Cc: "Christopher J. Conant" <cconant@hatchlawyers.com>, "mjf@invidiad.com" <mjf@invidiad.com>

Mike:    I recommend you authorize me to send the following email to Jay Cooper copied to Jackie this morning at 8 AM.

Hi Jay:

Mike and I have discussed at length the current situation involving BRI, particularly in the context of Mike's claims against it in connection with the touring license, Brian Wilson's incompetency, and breach of fiduciary duties by members of the Board of Directors of BRI. We have prepared a complaint against BRI and are prepared to file.

We have also discussed the Manatt Phelps & Philips  representation of BMG in its acquisition of Primary Wave's publishing assets. Please see the following link:

http://www.billboard.com/biz/articles/news/publishing/5680027/bmg-rights-management-to-acquire-bulk-of-primary-waves

We have also discussed as attorney and client the BMG discussions with Mike to purchase his songwriter and copyright reversion rights and other aspects of those discussions.

Mike would now like to take the following steps:

1.  Please inform whoever you are in contact with in connection with the BMG discussions that Mike is terminating all further discussions and negotiations as of 9 AM this morning.

2.  Mike hereby offers to sell his songwriter royalties for $12 million, payable within 30 days from today's date.  Mike hereby offers to sell the reversionary copyright rights to his songs for $25 Million payable within 30 days from today's date.  This offer will remain open until 4 PM today and is not subject to further negotiation or discussion.

If you have any questions, please feel free to call me on my cell:  858 775 7624.

Mike Flynn

---

0085

**Exhibit 7**



**Gmail**
by Google

Michael Flynn <mike@mjfesq.com>

---

## (no subject)

3 messages

---

**Michael Flynn** <mike@mjfesq.com>                                         Wed, Jul 26, 2017 at 9:06 AM
To: "Love, Mike" <mijameleco@sbcglobal.net>

Dear Mike:

I never thought I would be writing this but here it is - our 25 year relationship of client and friend, honestly elucidated by you in your book, ended by what you have described as Jackie's greed and deceit.  Truly, money is the root of all evil.

I am also compelled to send you this email because of Vince Chieffo's letter I received last night. Apparently, you have not disclosed to him the details and extent of our conversations regarding your stated  intention to me to divorce Jackie, and all of the detailed reasons your gave me, including her more recent deceptions against us in the ASCAP and BMG deals.  Additionally, Vince's 5 pages of mostly self - serving nonsense attempting to explain away our agreement - whatever you own in the 35 songs, we own 30% of - I can only construe as your intent not to honor this simple, fundamental agreement.    Please confirm this yourself as I asked you to do on June 29 - no response - or have Chieffo do it in plain language.

Your  last text - I don't know if you or Jackie wrote it, (you did previously tell me she was intercepting everything, texts, emails, phone calls etc), did explicitly say that divorce was no longer "applicable" but "community property" is in connection with our contracts.  From our previous discussions I can only conclude that Jackie has concocted this claim for the first time in 25 years either to cheat us or make you pay for what you described as her "entitlement after 30 years of marriage"?

1. I must take Jackie's statements to me concerning our 22 years of contractual payments on our original contracts,  as partially recited in Phil Stillman's letter, as her intention to breach our agreements and thereby terminate our relationship.  Your statements and disclosures to me in April and May regarding ASCAP and BMG before you left for Europe certainly confirm her intent, but also confirm your stated intent to prevent her from cheating us.

2. In the event of litigation which appears to be part of her plan to cheat us out of all or a portion of our fees, I will prepare a memo of all the things you have said to me over the years and specifically in April and May about her "tendency to lie about everything," and all of the related matters regarding ASCAP, BMG, Primary Wave and Blackrock, and our agreements.  These facts are relevant to the current dispute and our claims for interference with both contractual and business relationships.  Vince Chieffo's letter denies our right to participate in the BMG negotiations and agreements involving our 30% interest in the 35 songs we recovered for you against impossible odds.  Your frequent, almost routine statements over the years about the inherent corruption in the LA music industry, which we fought against to recover your rights in the songs, seems hollow now that Jackie has joined forces with them to cheat us.

Please confirm your receipt of this email, and confirm your intention to terminate our attorney client relationship.  If I do not receive a response from you (I do understand as you have said that Jackie intercepts and responds to your emails in your name) I will conclude that you have terminated the relationship and proceed accordingly.

Mike

Sent from my iPad

---

**Exhibit 8**

PLD-C-001

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Greenberg Traurig, LLP<br>Vincent H. Chieffo (SBN 49069)  ChieffoV@gtlaw.com<br>1840 Century Park East, Suite 1900<br>Los Angeles, CA 90067-2121<br>TELEPHONE NO: 310-586-7700      FAX NO. *(Optional):* 310-586-7800<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* Plaintiff Michael Love | **FOR COURT USE ONLY**<br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**03/03/2021** at 04:03:57 PM<br>Clerk of the Superior Court<br>By Taylor Crandall, Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS: 330 W. Broadway, Room 225
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Hall of Justice

PLAINTIFF: Michael Love

DEFENDANT: Michael Flynn and Philip Stillman

☐ DOES 1 TO _____

|  |  | **CONTRACT** |
|---|---|---|
| ☒ **COMPLAINT** | ☐ | **AMENDED COMPLAINT** *(Number):* |
| ☐ **CROSS-COMPLAINT** | ☐ | **AMENDED CROSS-COMPLAINT** *(Number):* |

**Jurisdiction** *(check all that apply):*
☐ **ACTION IS A LIMITED CIVIL CASE**
   Amount demanded  ☐ does not exceed $10,000
                    ☐ exceeds $10,000 but does not exceed $25,000
☒ **ACTION IS AN UNLIMITED CIVIL CASE** (exceeds $25,000)
☐ **ACTION IS RECLASSIFIED** by this amended complaint or cross-complaint
   ☐ from limited to unlimited
   ☐ from unlimited to limited

CASE NUMBER:
37-2021-00009347-CU-CO-CTL

1. **Plaintiff*** *(name or names):* Michael Love

   alleges causes of action against **defendant*** *(name or names):* Michael Flynn and Philip Stillman

2. This pleading, including attachments and exhibits, consists of the following number of pages: 60
3. a. Each plaintiff named above is a competent adult
      ☐ **except** plaintiff *(name):*
         (1) ☐ a corporation qualified to do business in California
         (2) ☐ an unincorporated entity *(describe):*
         (3) ☐ other *(specify):*

   b. ☐ Plaintiff *(name):*
      a. ☐ has complied with the fictitious business name laws and is doing business under the fictitious name *(specify):*

      b. ☐ has complied with all licensing requirements as a licensed *(specify):*
   c. ☐ Information about additional plaintiffs who are not competent adults is shown in Attachment 3c.
4. a. Each defendant named above is a natural person
      ☐ **except** defendant *(name):*                    ☐ **except** defendant *(name):*
         (1) ☐ a business organization, form unknown      (1) ☐ a business organization, form unknown
         (2) ☐ a corporation                              (2) ☐ a corporation
         (3) ☐ an unincorporated entity *(describe):*      (3) ☐ an unincorporated entity *(describe):*

         (4) ☐ a public entity *(describe):*               (4) ☐ a public entity *(describe):*

         (5) ☐ other *(specify):*                          (5) ☐ other *(specify):*

\* If this form is used as a cross-complaint, plaintiff means cross-complainant and defendant means cross-defendant.

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>PLD-C-001 [Rev. January 1, 2007] | **COMPLAINT—Contract** | Page 1 of 2<br>Code of Civil Procedure, § 425.12<br>American LegalNet, Inc.<br>www.FormsWorkflow.com |

PLD-C-001

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Love vs. Flynn, et al. | |

4. *(Continued)*

    b. The true names of defendants sued as Does are unknown to plaintiff.

        (1) ☐ Doe defendants *(specify Doe numbers):* _____ were the agents or employees of the named defendants and acted within the scope of that agency or employment.

        (2) ☐ Doe defendants *(specify Doe numbers):* _____ are persons whose capacities are unknown to plaintiff.

    c. ☐ Information about additional defendants who are not natural persons is contained in Attachment 4c.

    d. ☐ Defendants who are joined under Code of Civil Procedure section 382 are *(names):*

5. ☐ Plaintiff is required to comply with a claims statute, **and**

    a. ☐ has complied with applicable claims statutes, *or*

    b. ☐ is excused from complying because *(specify):*

6. ☐ This action is subject to ☐ Civil Code section 1812.10 ☐ Civil Code section 2984.4.

7. This court is the proper court because

    a. ☒ a defendant entered into the contract here.

    b. ☒ a defendant lived here when the contract was entered into.

    c. ☒ a defendant lives here now.

    d. ☒ the contract was to be performed here.

    e. ☐ a defendant is a corporation or unincorporated association and its principal place of business is here.

    f. ☐ real property that is the subject of this action is located here.

    g. ☒ other *(specify):* A non-binding MFAA fee arbitration was conducted in the Ciity of San Diego and Plaintiff rejects the award and requests trial de novo.

8. The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached):*

    ☒ Breach of Contract

    ☐ Common Counts

    ☒ Other *(specify):* Declaratory Relief

9. ☒ Other allegations: Plaintiff has attached and is concurrently filing his Rejection of Award and Request for Trial After Attorney-Client Fee Arbitration (Form ADR-104)

10. **Plaintiff prays** for judgment for costs of suit; for such relief as is fair, just, and equitable; and for

    a. ☒ damages of: $ 815,000.00

    b. ☐ interest on the damages

        (1) ☒ according to proof

        (2) ☐ at the rate of *(specify):*        percent per year from *(date):*

    c. ☐ attorney's fees

        (1) ☐ of: $

        (2) ☒ according to proof.

    d. ☒ other *(specify):* A declaration of the Parties' rights pursuant to the contingency fee agreements attached as Exhibit A.

11. ☒ The paragraphs of this pleading alleged on information and belief are as follows *(specify paragraph numbers):*

Date: March 3, 2021

Vincent H. Chieffo
_____
(TYPE OR PRINT NAME)

▸ _____
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

*(If you wish to verify this pleading, affix a verification.)*

PLD-C-001 [Rev. January 1, 2007]
**COMPLAINT—Contract**
Page 2 of 2

American LegalNet, Inc.
www.Forms*Workflow*.com

PLD-C-001(1)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Love v. Flynn and Stillman | |

___FIRST___          **CAUSE OF ACTION—Breach of Contract**
_(number)_

ATTACHMENT TO          ☒ Complaint          ☐ Cross - Complaint

_(Use a separate cause of action form for each cause of action.)_

BC-1.  Plaintiff _(name):_ Michael Love

alleges that on or about _(date):_ July 1992, September 1993, and December 1994, the "Contingency Fee Agreements"

a    ☒ written          ☐ oral          ☐ other _(specify):_

agreement was made between _(name parties to agreement):_ Love and the Firm of Flynn, Sheridan, & Tabb

☒    A copy of the agreement is attached as Exhibit A, or

☐    The essential terms of the agreement     ☐ are stated in Attachment BC- 1     ☐ are as follows _(specify):_

BC-2.  On or about _(dates):_ March 2, 2018
defendant breached the agreement by     ☐    the acts specified in Attachment BC-2     ☒   the following acts
_(specify):_ Plaintiff exercised his rights to void the Contingency Fee Agreements on or before March 2, 2018 pursuant
to Bus. & Prof. Code Section 6147, thus limiting Defendants to only a "reasonable fee." From 1993 - May 2017 had
been paying Defendants contingency fees far in excess of a "reasonable fee." and Plaintiff demanded that Defendants
refund the excess fees paid for the legal services rendered by  Defendants. Defendants refused to refund any of the
excess fees claiming to be owed additional contingency fees on specific future revenues of Plaintiff and aserted to
Plaintiff and third parties that Defendants "co-owned" certain of Plaintiff's assets which could not be sold unless they
expressly agreed.greed.and

BC-3.  Plaintiff has performed all obligations to defendant except those obligations plaintiff was prevented or
excused from performing.

BC-4.  Plaintiff suffered damages legally (proximately) caused by defendant's breach of the agreement
☐    as stated in Attachment BC-4     ☒    as follows _(specify):_ not less than $815,000.

BC-5.  ☒      Plaintiff is entitled to attorney fees by an agreement or a statute
☐    of $
☒    according to proof.
BC-6.  ☐    Other:

Page  3

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
PLD-C-001(1) [Rev. January 1, 2007]          **CAUSE OF ACTION— Breach of Contract**          Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com

| SHORT TITLE:<br>Love v. Flynn and Stillman | CASE NUMBER: |
|---|---|

**SECOND**      **CAUSE OF ACTION – Declaratory Relief**
(number)

ATTACHMENT TO:   Complaint

*(Use a separate cause of action form for each cause of action.)*

DR-1.  Plaintiff *(name):*  Michael Love

> Incorporates by the reference as set forth in full hereat all of his allegations in the First Cause Of Action For Breach of Contract.

DR-2.  An actual controversy now exists between Plaintiff and Defendants Flynn and Stillman regarding their respective rights and duties pursuant to the Contingency Fee Agreements attached as Exhibit A to Plaintiff's First Cause Of Action For Breach of Contract.

DR 3.  Plaintiff contends:

> (a)  That each of the Contingency fee Agreements have been properly voided pursuant to Bus. & Prof. Code Section 6147;

> (b)  That Plaintiff has paid contingency fees through May 2017 at least $815,000 in excess of a "reasonable fee" for the legal services rendered to him by Defendants pursuant to the Contingency Fee agreements;

> (c)  That pursuant to the Contingency Fee Agreements, Plaintiff never conveyed to Defendants any co-ownership interest in any of Plaintiff's assets whether intellectual property of income streams based upon the exploitation of intellectual property; and,

> (d)  That Plaintiff owes no future contingency fees to Defendants.

DR-4.  Defendants contend:

> (a)  That the Contingency Fee Agreements are not voidable and have not been voided by Plaintiff

> (b)  That Defendants have a vested and continuing right of 30% ownership of a specific income stream received by Plaintiff from the exploitation of specific intellectual property;

> (c)  That Defendants currently have a vested 30% ownership of certain of Plaintiff's intellectual property and that in the future they will obtain vested 30% interests in certain of Plaintiffs other intellectual property; and,

> (d)  That Plaintiff owes to Defendants past unpaid contingency fees and will owe future contingency fees to Defendants.

DR-5.  Plaintiff and Defendants are entitled to a declaration by this Court of their respective rights and duties under the Contingency Fee Agreements.

Page  4

Page 1 of 1

**Exhibit 9**

1                SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  FOR THE COUNTY OF LOS ANGELES

3                        -  -  -

4

5    BRIAN DOUGLAS WILSON,      )

6    AN INDIVIDUAL,          )

7               PLAINTIFF,  )    VOLUME 1

8      VS.                )    NO. C 737 675

9    IRVING MUSIC, INC., A     )

10   CALIFORNIA CORPORATION,    )

11   ET AL.,              )

12             DEFENDANTS. )

13   - - - - - - - - - - )

14

15

16

17       DEPOSITION OF ALAN JARDINE TAKEN ON BEHALF

18    OF THE DEFENDANTS AT 1999 AVENUE OF THE STARS,

19    SIXTH FLOOR, LOS ANGELES, CALIFORNIA, COMMENCING

20    AT 10:20 A.M., TUESDAY, APRIL 23, 1991, BEFORE

21    BONITA A. TOTH, CSR NO. 2143, PURSUANT TO NOTICE.

22

23

24

25

1    APPEARANCES:

2

3        FOR PLAINTIFF:

4            LAW OFFICES OF JAMES P. TIERNEY

5            BY:  JAMES J. LITTLE, ESQ.

6            100 WILSHIRE BOULEVARD

7            20TH FLOOR

8            SANTA MONICA, CALIFORNIA  90401

9

10       FOR DEFENDANTS RONDOR MUSIC INTERNATIONAL, INC.

11       AND RELATED CORPORATE ENTITIES:

12           O'MELVENY & MYERS

13           BY:  ALAN RADER, ESQ.

14           1999 AVENUE OF THE STARS

15           7TH FLOOR

16           LOS ANGELES, CALIFORNIA 90067

17

18       FOR DEFENDANTS MITCHELL, SILBERBERG & KNUPP,

19       A CALIFORNIA PARTNERSHIP; ABRAHAM SOMER;

20       AND CERTAIN OTHER MSK PARTNERS:

21           KEESAL, YOUNG & LOGAN

22           BY:  JOHN LOFTUS, ESQ.

23           CATALINA LANDING

24           310 GOLDEN SHORE

25           LONG BEACH, CALIFORNIA  90801-1730

3

```
1     APPEARANCES (CONTINUED):

2

3         FOR DEFENDANTS MESSRS. AXELRAD, STEINBERG,

4         MC HALE AND HUNT:

5             MANATT, PHELPS, ROTHENBERG & PHILLIPS

6             BY:  TIMOTHY M. THORNTON, ESQ.

7             11355 WEST OLYMPIC BOULEVARD

8             LOS ANGELES, CALIFORNIA   90064

9

10        FOR THE WITNESS:

11            GIPSON, HOFFMAN & PANCIONE

12            BY: VINCENT H. CHIEFFO, ESQ.

13            1901 AVENUE OF THE STARS

14            SUITE 1100

15            LOS ANGELES, CALIFORNIA   90067

16

17

18

19

20

21

22

23

24

25
```

4

1        Q.    APPROXIMATELY HOW MANY TIMES?

2        A.    FOUR TIMES.

3        Q.    WHAT, IF YOU CAN RECALL, WERE THE SITUATIONS IN

4    WHICH YOU HAD YOUR DEPOSITION TAKEN?

5        A.    EQUINE RELATED.

6        Q.    WHAT DOES THAT MEAN?

7        A.    HORSES.

8        Q.    I GUESS I KNEW THAT.  BUT WHAT WAS THE ISSUE IN

9    THOSE CASES?  THESE ARE ALL LITIGATION ABOUT DISPUTES --

10       A.    CONTRACT DISPUTES.

11       Q.    I TAKE IT NONE OF THESE HAD ANYTHING TO DO WITH

12   THE BEACH BOYS?

13       A.    NO.

14       Q.    HAVE YOU EVER HAD YOUR DEPOSITION TAKEN IN ANY

15   CASE OTHER THAN THOSE EQUINE DISPUTES?

16       A.    NO.

17       Q.    APPROXIMATELY HOW LONG AGO WAS IT THAT YOU HAD

18   THESE DEPOSITIONS TAKEN?

19       A.    WITHIN THIS LAST YEAR OR TWO.

20       Q.    I ASSUME BEFORE TODAY, BEFORE YOU CAME IN HERE

21   TODAY, MR. CHIEFFO EXPLAINED TO YOU THE BASIC PROCEDURE WE

22   FOLLOW AT THE DEPOSITIONS?

23       A.    YES.

24       Q.    AND MR. CHIEFFO IS YOUR COUNSEL TODAY; IS THAT

25   RIGHT?

8

1       A.   YES.

2            MR. CHIEFFO:  LET ME INTERRUPT.  I WILL BE HERE

3   CERTAINLY ALL MORNING.  I MAY OR MAY NOT BE HERE THIS

4   AFTERNOON.

5            ALSO, MR. JARDINE HAS A FLIGHT OUT TOMORROW AT

6   3:00 WITH THE BAND.  THEY HAVE AN ENGAGEMENT, AND THEY ARE

7   ON THEIR WAY TO TEXAS.

8            SO JUST AS A MATTER OF SCHEDULING, WE WILL DO AS

9   MUCH AS WE CAN, BUT THAT'S A BUSINESS DATE, AND WE HAVE TO

10  LIVE WITH IT.

11  BY MR. RADER:

12      Q.   JUST TO PURSUE THAT FOR A MOMENT SO I UNDERSTAND,

13  YOU HAVE A FLIGHT AT 3:00.  THAT MEANS YOU NEED TO LEAVE

14  HERE BY LUNCHTIME?

15      A.   YES.

16           MR. RADER:  VINCE, YOU SAY YOU HAVE TO LEAVE THIS

17  AFTERNOON.  WHEN DO YOU HAVE TO LEAVE?  DOES THAT MEAN WE

18  CAN'T GO FOR --

19           MR. CHIEFFO:  NO.  I'M SORRY IF YOU

20  MISUNDERSTOOD.  I MAY NOT BE IN ATTENDANCE WITH MR. JARDINE,

21  BUT MR. JARDINE, WITHOUT ME, WOULD GO FORWARD THIS

22  AFTERNOON.  THAT IS ALL I WAS CLARIFYING.

23           MR. RADER:  I UNDERSTAND.  OKAY.

24      Q.   JUST LET ME EXPLAIN TO YOU THE PROCEDURE WE ARE

25  GOING TO FOLLOW TODAY.

9

1      Q.    HAVE YOU HAD A CHANCE TO READ BOTH OF THEM?

2      A.    UH-HUH.

3      Q.    HAVE YOU EVER SEEN EITHER OF THESE LETTERS

4  BEFORE?

5      A.    I SAW A COPY OF THESE THIS MORNING.

6      Q.    WHO SHOWED THEM TO YOU THIS MORNING?

7        MR. CHIEFFO:  I DID.

8        THE WITNESS:  VINCE CHIEFFO.

9  BY MR. RADER:

10      Q.    WHEN YOU SAW THEM THIS MORNING, DID THEY RING A

11  BELL AS DOCUMENTS YOU HAD SEEN PRIOR TO THIS MORNING?

12      A.    I'VE NEVER SEEN THESE BEFORE THAT TIME.

13      Q.    ARE THERE ANY OTHER DOCUMENTS THAT YOU HAVE

14  REVIEWED IN PREPARATION FOR THIS DEPOSITION OTHER THAN

15  THESE TWO?

16        MR. CHIEFFO:  I HAVE A SET OF DOCUMENTS.  THESE

17  ARE ALL THE ONES THAT HE HAS LOOKED AT.  THEY WERE PROVIDED

18  TO ME BY MR. LITTLE.

19        MR. LITTLE:  OFF THE RECORD FOR A MOMENT?

20        MR. RADER:  YES.

21        (A DISCUSSION WAS HELD OFF THE RECORD.)

22  BY MR. RADER:

23      Q.    MR. JARDINE, HAS BRIAN WILSON EVER TOLD YOU THAT

24  HE HAD AGREED TO GIVE TO HIS FATHER HIS INTEREST IN THE SEA

25  OF TUNES PUBLISHING COMPANY?

26

1     Q.    DID HE SAY WHAT HE THOUGHT WAS WRONG WITH HIM?

2     A.    NO.  IS IT POSSIBLE YOU COULD DO YOUR DOCUMENT

3 PRESENTATIONS WHILE VINCE IS STILL HERE?  DO YOU HAVE OTHER

4 DOCUMENTS THAT YOU WANT TO PRESENT?

5     Q.    SURE.

6     A.    IF YOU WOULDN'T MIND.

7     Q.    THAT'S FINE.

8     A.    I APPRECIATE IT.

9     Q.    MR. JARDINE, LET ME SHOW YOU A COPY OF A LETTER

10 WE HAVE MARKED PREVIOUSLY AS 503, ON THE LETTERHEAD OF

11 ZIFFREN, BRITTENHAM, WHICH IS DATED JUNE 11, 1875.

12     I KNOW THE BEACH BOYS HAVE BEEN PERFORMING A LONG

13 TIME, BUT I DON'T THINK IT GOES BACK THAT FAR.  THE SECOND

14 PAGE, I BELIEVE, IS DATED 1985.

       YOU WILL SEE THIS LETTER IS ADDRESSED TO YOU,

16 AMONG OTHERS.  I'D LIKE YOU TO REVIEW IT AND TELL ME IF YOU

17 REMEMBER HAVING RECEIVED THIS LETTER.

18    A.    (EXAMINES DOCUMENT.)  OKAY.

19    Q.    DO YOU REMEMBER THIS LETTER?

20    A.    VAGUELY, YES.

21    Q.    THE FIRST SENTENCE OF THE LETTER MAKES REFERENCE

22 TO ALAN JARDINE'S SUGGESTION, AND THEN IT GOES ON TO TALK

23 ABOUT DISCUSSIONS WITH ALMO/IRVING MUSIC.

24     DO YOU REMEMBER A SUGGESTION YOU MADE ABOUT A

25 BUSINESS DEAL IN CONNECTION WITH ALMO/IRVING MUSIC?

**148**

1          A.     SOMETHING TO DO WITH OUR -- HAVING OTHER

2     PEOPLE RECORD OUR SONGS.  AND IT WAS JOHN'S SUGGESTION

3     THAT WE --

4               MR. LITTLE:  WELL, LET ME JUST -- IF YOU ARE

5     GETTING INTO DISCUSSIONS THAT YOU HAD WITH MR. BRANCA

6     SPECIFICALLY, THAT WOULD PROBABLY BE AN ATTORNEY-CLIENT

7     PRIVILEGED COMMUNICATION.

8               THE WITNESS:  THAT IS A GOOD POINT.

9               MR. LITTLE:  I CAN'T INSTRUCT YOU NOT TO ANSWER,

10    BUT I WOULD JUST CAUTION YOU NOT TO DISCLOSE SPECIFIC ADVICE

11    GIVEN OR A SPECIFIC CONVERSATION YOU HAD.

12              THE WITNESS:  OKAY, YES.

13              MR. CHIEFFO:  I THINK THE QUESTION WAS ONLY, DO

14    YOU RECALL WHAT YOUR SUGGESTION WAS?

15              THE WITNESS:  I SEE.

16              MR. CHIEFFO:  SO IF YOU RECALL WHAT THE

17    SUGGESTION WAS, THAT'S OKAY.

18              THE WITNESS:  WELL, IN THE EVENT THAT OTHER

19    PEOPLE RECORD OR WE CAUSE FOR SOMEONE ELSE TO RECORD OUR

20    SONG, THROUGH OUR INFLUENCES IN THE BUSINESS AND IN THE

21    INDUSTRY WHEN WE WERE TRAVELING AROUND, YOU KNOW, IF WE

22    COULD GET ELTON JOHN TO DO "CALIFORNIA GIRLS" OR SOMETHING,

23    THAT WE CAUSE IT TO HAPPEN, AND WE NOTIFY, I GUESS, THEM

24    THAT IT HAPPENED, THAT THEY WOULD AGREE TO SHARE THE

25    COPYRIGHTS.

149

1    BY MR. RADER:

2         Q.    WERE THERE NEGOTIATIONS THAT TOOK PLACE IN THE

3    MID 1980'S BETWEEN REPRESENTATIVES OF THE BEACH BOYS AND

4    ALMO/IRVING ABOUT THAT SUGGESTION?

5         A.    I HONESTLY CAN'T SAY.   THIS WAS A SUGGESTION BOX

6    THING, AND I DON'T KNOW IF IT WAS FOLLOWED UP ON.

7         Q.    LET ME SHOW YOU ANOTHER DOCUMENT TO MAYBE HELP

8    REFRESH YOUR RECOLLECTION.

9              THIS IS EXHIBIT 504, PREVIOUSLY MARKED, A LETTER

10   DATED DECEMBER 1ST, 1986, FROM KAREN LANGFORD AT ZIFFREN,

11   BRITTENHAM & BRANCA.   AND I BELIEVE YOU ARE LISTED AS ONE OF

12   THE CC'S.

13        A.    I SEE THAT.

14        Q.    COULD YOU TAKE A LOOK AT THAT AND TELL ME IF YOU

15   CAN RECALL HAVING RECEIVED THIS?

16        A.    NO, I DON'T RECALL RECEIVING THIS.   A LOT OF

17   TIMES WE ARE ON TOUR AND WE DON'T GET HALF OF OUR MAIL UNTIL

18   SIX MONTHS LATER WHEN WE GET BACK, AND IT IS ALREADY FILED,

19   YOU KNOW.   BUT I CAN SEE SOME THINGS WORK OUT.

20        Q.    DOES LOOKING AT THAT REFRESH YOUR RECOLLECTION

21   ABOUT ANYTHING YOU HEARD ABOUT WORKING OUT SOMETHING WITH

22   ALMO/IRVING?

23        A.    NO.   IT WAS IMPLEMENTED, IT APPEARS, BUT...

24   I SHOULD HAVE DONE SOMETHING ABOUT IT, I GUESS.

25        Q.    MR. JARDINE, LET ME ASK YOU NOW TO TAKE A LOOK AT

1    WHAT HAS BEEN PREVIOUSLY MARKED AS EXHIBIT 505, A LETTER ON

2    THE LETTERHEAD OF MASON, SLOANE & GILBERT DATED DECEMBER

3    4TH, 1986.

4        A.    SURE.

5        Q.    YOU WILL SEE THE FIRST LINE MAKES REFERENCE TO

6    THE DECEMBER 1ST LETTER WE JUST LOOKED AT.

7              IF YOU COULD, LOOK OVER THIS LETTER AND TELL ME

8    IF YOU'VE EVER SEEN THIS ONE BEFORE.

9        A.    I DO NOT REMEMBER READING THIS LETTER, NO.

10       Q.    LOOKING AT THE SECOND PARAGRAPH OF THIS LETTER,

11   IT STATES IN THE SECOND SENTENCE -- OR I SHOULD SAY

12   MR. MASON STATES IN THE SECOND SENTENCE:

13             "THE CIRCUMSTANCES SURROUNDING THE SO-CALLED

14              ACQUISITION OF SEA OF TUNES BY MURRY WILSON

15              AND THE SALE OF THAT CATALOG TO IRVING/ALMO

16              ARE EXTREMELY SUSPECT FROM BRIAN'S AND

17              POSSIBLY MIKE'S POINT OF VIEW."

18             DO YOU SEE THAT?

19       A.    YES.

20       Q.    DO YOU REMEMBER HEARING IN DECEMBER OF 1986 OR

21   THEREABOUTS THAT JOHN MASON HAD EXPRESSED THAT VIEW?

22             MR. LITTLE:  OBJECTION.  THAT QUESTION IS

23   MISLEADING AS PHRASED.

24             ARE YOU ASKING HIM WHAT THIS LETTER SAYS OR HIS

25   INDEPENDENT RECOLLECTION OR WHAT?

1    BY MR. RADER:

2         Q.    DO YOU HAVE ANY RECOLLECTION APART FROM THE

3    LETTER OF MR. MASON EXPRESSING THAT OPINION?

4         A.    NO, I DON'T.

5         Q.    HAVE YOU EVER HEARD, SUBSEQUENT TO DECEMBER OF

6    1986, THAT MR. MASON EXPRESSED THAT OPINION?

7         A.    NO.  I DON'T HAVE ANY RELATIONSHIP TO JOHN --

8    WITH JOHN, I SHOULD SAY.

9         Q.    DOES THAT MEAN THAT YOU DID NOT HEAR AT A BRI

10   MEETING THAT MR. MASON HAD EXPRESSED THESE VIEWS?

11        A.    NOT THAT I RECALL.

12        Q.    MR. JARDINE, ONE OF THE CC'S ON THIS LETTER IS

13   EDWARD BERNSTEIN.  AM I CORRECT THAT EDWARD BERNSTEIN WAS

14   YOUR LAWYER BEFORE MR. CHIEFFO?

15        A.    YES, HE WAS.

16             MR. RADER:  OFF THE RECORD FOR A MINUTE.

17             (A DISCUSSION WAS HELD OFF THE RECORD.)

18             (MR. CHIEFFO LEFT THE PROCEEDINGS AT

19             THIS POINT.)

20             (RECESS.)

21                  EXAMINATION

22   BY MR. THORNTON:

23        Q.    MR. JARDINE, MY NAME IS TIM THORNTON, AND I

24   REPRESENT FOUR RETIRED ATTORNEYS.  I REFER TO THEM AS THE

25   SENIOR CITIZENS OF THIS LAWSUIT.  THEY ARE ALL FORMER

*[handwritten note in right margin: VC Leaves Knowing Bernstein gave him the Brane Files!]*

152

1          Q.    DID ANYONE OTHER THAN THE BEACH BOYS ATTEND ANY

2    OF THOSE MEETINGS?

3          A.    STEVE LOVE.

4                MR. LITTLE:   SAME OBJECTIONS.

5    BY MR. LOFTUS:

6          Q.    DID THE POSSIBILITY OF DUPLICITY BY ABE SOMER IN

7    CONNECTION WITH THE SALE OF SEA OF TUNES COME UP IN ANY OF

8    THOSE BOARD MEETINGS?

9                MR. LITTLE:   OBJECTION.   I WOULD INSTRUCT THE

10   WITNESS -- LET ME INFORM THE WITNESS THAT TO THE EXTENT HE

11   HAD SPECIFIC DISCUSSIONS AT A BRI BOARD MEETING, THEY MAY BE

12   ATTORNEY-CLIENT PRIVILEGED, DEPENDING ON WHO WAS AT A

13   PARTICULAR BOARD MEETING AND WHAT WAS THE PURPOSE OF THE

14   MEETING.

15               AND YOU WERE A DIRECTOR OF BRI, SO THERE IS A

16   CORPORATE PRIVILEGE THAT WOULD ATTACH TO SOME OF YOUR

17   CONVERSATIONS.

18               AND I THINK YOU NEED TO BREAK IT DOWN YEAR BY

19   YEAR AND MEETING BY MEETING, IF THIS WITNESS CAN REMEMBER

20   IT, IN ORDER TO ADDRESS MY OBJECTION.

21   BY MR. LOFTUS:

22         Q.    LET ME JUST ASK YOU GENERALLY, MR. JARDINE,

23   SEPARATE AND APART FROM BOARD MEETINGS, IN ANY SITUATION

24   OUTSIDE THE PRESENCE OF ATTORNEYS, DID THE POSSIBILITY OF

25   DUPLICITY BY ABE SOMER IN CONNECTION WITH THE SEA OF TUNES

1    TRANSACTION COME UP IN ANY DISCUSSIONS AMONG THE BEACH BOYS

2    IN THE 1970'S?

3        A.    NOT THAT I RECALL.

4        Q.    BUT IS THAT SOMETHING THAT YOU SENSED IN THE

5    1970'S, WAS THAT SOMEHOW THERE HAD BEEN SOME DUPLICITY BY

6    ABE SOMER IN CONNECTION WITH THE TRANSACTION?

7        A.    I CAN'T REALLY PUT A LABEL -- A TIME THING ON IT,

8    A TIME FRAME ON IT, BECAUSE IT'S BEEN SO -- IT COULD HAVE

9    BEEN AN INCIDENT THAT HAPPENED MUCH LATER ON THAT SOMEBODY

10   FOUND OUT ABOUT SOMETHING.   IT WASN'T -- IT WASN'T DURING

11   THE '70'S.

12        SOMEONE MIGHT HAVE FOUND OUT SOMETHING.   I DON'T

13   REMEMBER EXACTLY WHAT CRYSTALIZED THAT IN MY MIND.   BUT YOU

14   MIGHT ASK THE OTHER GUYS.   MAYBE THEY CAN HELP YOU.

15        Q.    AND WE ARE DOING THAT.   BUT TO THE EXTENT WE HAVE

16   THE BENEFIT OF YOUR TESTIMONY HERE, WE WOULD JUST LIKE TO

17   ASK YOU ABOUT IT.

18        DO YOU EVER RECALL DISCUSSING ABE SOMER'S ROLE IN

19   CONNECTION WITH THE SALE WITH CARL AT ANY TIME?

20        A.    NO, I DO NOT.

21        Q.    DO YOU RECALL THAT A TRUST WAS FORMED FOR BRIAN

22   WILSON IN OR ABOUT 1982?

23        A.    YES.   I DON'T KNOW WHAT YEAR, BUT I KNOW CARL WAS

24   INVOLVED IN A TRUST.

25        Q.    DID YOU PARTICIPATE AT ALL IN THE DECISION TO

1    FORCE HIM TO SAY AN ANSWER THAT HE HAS REPEATEDLY

2    REPUDIATED.  IT IS UNFAIR.  IT IS CALCULATED TO MISLEAD.

3           THE WITNESS:  IT IS PROBABLY UNFAIR FOR ME TO

4    COMMENT ON -- ALSO IN FAIRNESS TO MR. SOMER, FOR ME TO

5    COMMENT ON THIS ANYMORE.

6    BY MR. LOFTUS:

7       Q.    I APPRECIATE YOUR CONCERNS, BUT I AM JUST TRYING

8    TO FOLLOW UP.  THIS IS OBVIOUSLY A VERY IMPORTANT LAWSUIT TO

9    MY CLIENT.

10          AND MR. LITTLE CAN MAKE HIS OBJECTIONS, BUT I AM

11   NOT TRYING TO HARASS YOU.  I AM JUST TRYING TO GET OUT YOUR

12   BEST RECOLLECTION.

13          MR. LITTLE:  HE HAS GIVEN YOU THAT THREE TIMES.

14   THREE SEPARATE TIMES, HE SAID THE SAME THING.

15          THE WITNESS:  I CAN'T GIVE YOU A TIME FRAME.

16   BY MR. LOFTUS:

17      Q.    FAIR ENOUGH.  BUT LET ME JUST ASK YOU:  I BELIEVE

18   YOU TESTIFIED EARLIER THAT YOU HEARD ABE REPRESENTED ALMO

19   AND MURRY WILSON; IS THAT RIGHT?

20      A.    YES.

21      Q.    AND WHEN YOU REFERRED TO THE TWO CAMPS, IS THAT

22   WHAT YOU MEANT?  IN THE ONE CAMP, ALMO/IRVING; AND IN THE

23   OTHER, MURRY WILSON?

24          MR. LITTLE:  OBJECTION.  THAT MISSTATES HIS

25   TESTIMONY.  HE SAID THE WARNER BROS. DEAL.

1    THEN I JUST WANT TO FOLLOW UP ON THAT.

2            MR. LITTLE:  YOU WANT HIM TO SAY IT AGAIN?

3            THE WITNESS:  I AM NOT GOING TO.  I CAN'T.  IT IS

4    JUST SILLY BECAUSE THERE IS NO VALIDITY TO IT, AND I TAKE IT

5    BACK.

6    BY MR. LOFTUS:

7        Q.   I AM REALLY NOT TRYING TO COMPLICATE THIS.  BUT I

8    DON'T THINK IT IS SPECULATION.

9            CORRECT ME IF I'M WRONG, BUT I BELIEVE YOU SAID

10   YOU HAD HEARD THAT ABE SOMER REPRESENTED ALMO AND MURRY

11   WILSON IN THE SEA OF TUNES TRANSACTION.

12           MR. LITTLE:  HE HAS ALSO SAID HE DOESN'T KNOW

13   WHEN HE HEARD IT.  HE COULD HAVE HEARD IT IN CONNECTION WITH

14   THIS LAWSUIT.  HE TOLD YOU THAT 1300 TIMES.

15           MR. LOFTUS:  J.J., YOU ARE NOW PROLONGING THIS,

16   BECAUSE I DON'T EVEN HAVE A QUESTION OUT.

17           MR. LITTLE:  YOU ARE TRYING TO FORCE THIS WITNESS

18   TO TELL YOU WHEN HE HEARD SOMETHING.

19           MR. RADER:  MAYBE --

20           MR. LITTLE:  HE DOESN'T KNOW WHEN HE HEARD IT.

21   HE TOLD YOU HE DOESN'T KNOW WHEN HE HEARD IT A HUNDRED

22   TIMES.  HE DOESN'T KNOW IF HE HEARD IT IN CONNECTION WITH

23   THE LAWSUIT.

24           AND YOU ARE TRYING TO FORCE THE ISSUE, AND I

25   THINK IT IS UNFAIR.  AND HE HAS TOLD YOU IT WOULD BE

1    SPECULATION FOR HIM TO SAY ANYTHING ELSE, AND YOU ARE TRYING

2    TO FORCE THE ISSUE.

3    BY MR. LOFTUS:

4        Q.    MR. JARDINE, I AM GOING TO ASK THE QUESTION

5    AGAIN, AND I AM NOT SURE WHAT MR. LITTLE WILL DO.

6              I BELIEVE YOU TESTIFIED -- LET ME ASK YOU THE

7    STRAIGHT QUESTION.

8              DID YOU IN FACT HEAR THAT MR. SOMER REPRESENTED

9    ALMO AND MURRY WILSON IN CONNECTION WITH THE SEA OF TUNES

10   TRANSACTION?

11       A.    NO.

12       Q.    OKAY.  YOU NEVER HEARD THAT?

13       A.    NO.

14       Q.    OKAY.  MR. JARDINE, IT HAS BEEN A LONG DAY, AND I

15   DON'T WANT TO PUT YOU IN A BAD SPOT WITH THE RECORD HERE.

16   AND I MAY HAVE WORN OUT YOUR PATIENCE FOR THE DAY.

17       A.    I AM NOT BEING CONTRARY WITH YOU.  I JUST DON'T

18   KNOW.  I CAN'T HONESTLY SAY I HEARD SOMEBODY TELL ME THAT

19   BECAUSE I DON'T KNOW WHO IT IS.  I DON'T KNOW WHO IT WOULD

20   BE.  AND --

21       Q.    THAT'S FINE.  THAT IS FINE IF YOU DON'T RECALL

22   WHO TOLD YOU THAT OR WHEN, BUT --

23       A.    I DON'T RECALL WHEN.

24       Q.    BUT I DON'T WANT TO PUT THIS RECORD IN A BAD SPOT

25   WHEN YOU ARE SAYING "YES" ONE MINUTE AND "NO" IN ANOTHER.  I

```
 1    WANT TO GIVE YOU THE BEST OPPORTUNITY TO DEAL WITH IT.
 2              MR. LITTLE:  HE COULD HAVE READ IT IN THE
 3    NEWSPAPER.
 4              MR. RADER:  MAKE AN OBJECTION.  DON'T MAKE A
 5    SPEECH.  YOU HAVE SAID THAT TO US A HUNDRED TIMES.  IT IS
 6    NOT RIGHT.
 7              MR. LITTLE:  BUT I THINK THIS IS VERY UNFAIR.  I
 8    AM GOING TO LODGE MY OBJECTION.  THE RECORD SPEAKS FOR
 9    ITSELF.  I THINK THIS IS UNFAIR.  I THINK IT IS CALCULATED
10    TO MISLEAD THIS WITNESS ON A CRUCIAL ISSUE WHICH HE HAS
11    REPEATEDLY GIVEN YOU --
12              MR. LOFTUS:  I'D LIKE TO TAKE THE LIBERTY OF
13    CUTTING YOU OFF RIGHT NOW AND CALLING THE DEPOSITION FOR
14    THE DAY.
15        Q.    IT IS NOW 5:00 O'CLOCK, MR. JARDINE.  I WANT YOU
16    TO KNOW THAT I CONSIDER THIS VERY IMPORTANT TO THE DEFENSE
17    OF THIS CASE.  I KNOW IT IS VERY TEDIOUS FOR YOU.
18        A.    THAT'S ALL RIGHT.
19        Q.    I THINK IT HAS BEEN A LONG DAY.  I THINK YOU HAVE
20    PUT IN A HEROIC EFFORT TODAY, AND THINK WE OUGHT TO CALL IT
21    FOR THE DAY.
22        A.    OKAY.  BUT I STAND ON MY ANSWER.
23        Q.    THE BAD NEWS IS WE ARE GOING TO COME BACK TO IT
24    TOMORROW, BUT THINK IF WE ALL SLEEP ON IT --
25        A.    WELL, I LEARNED SOMETHING TODAY, AND IT IS NOT TO
```