**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| MICHAEL J. FLYNN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL E. LOVE, *et al.*,<br><br>Defendants. | Case No. 3:19-CV-00239-MMD-CLB<br><br>**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE**[1]<br><br>[ECF No. 287] |

In the nearly four years since this case was filed, it has been beset by numerous delays due to various discovery issues. These issues have primarily been the result of Michael J. Flynn and Philip Stillman's ("Plaintiffs") repeated refusals to comply with discovery requests and orders of the Court. In fact, the Court has been frequently left to wonder—wouldn't it be nice if Plaintiffs would simply comply with their discovery obligations? Certainly, we would not have waited so long for discovery to be completed. Unfortunately, the Court is left to wonder still, as Defendants have filed yet another discovery motion seeking relief from Plaintiffs' improper discovery conduct.

Specifically, Defendants Michael E. Love ("Love"), Jacquelyne Love, and Meleco, Inc.'s ("Defendants") move the Court for evidentiary sanctions against Plaintiffs and Intervenor Rebecca Flynn-Williams, as successor trustee of Laima Flynn Trust (the "Trust"). (ECF No. 287.) The Trust, together with Plaintiffs, opposed the motion, (ECF Nos. 288, 289, 290)[2], and Defendants replied (ECF No. 295). For the reasons discussed below, the Court recommends Defendants' motion for evidentiary sanctions be granted, in part.

---

[1]  This Report and Recommendation is made to the Hon. Miranda M. Du, United States District Court Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

[2]  ECF No. 289 consists of Flynn's declaration and various exhibits, in support of the opposition to Defendants' motion for evidentiary sanctions. ECF No. 290 consists of a sealed exhibit to the declaration.

## I. BACKGROUND

The instant discovery issue is the alleged spoliation of three agreements purportedly entered into by Love and the law partnership Flynn, Sheridan, & Tabb (the "Partnership") in the 1990s. The agreements are critical because they underlie Plaintiffs' claims in this case. Consequently, they are the instruments upon which Defendants might base their own defense. The first is the original contingency fee agreement when Love retained the Partnership, the second is an alleged amendment to that contingency fee agreement, and the third is another alleged amendment to the earlier agreements. To organize the relevant facts, the Court will address each of the three agreements in chronological order.

### A. 1992 Contingency Fee Agreement (the "'92 Agreement")

In the '92 Agreement, the Partnership agreed to represent Love in litigation to acquire co-authorship credit of 35 of the songs performed by the music group, The Beach Boys, of which Love was a member. (ECF No. 50 at 3 ¶ 7.) According to Flynn, Love retained the services of the Partnership pursuant to the '92 Agreement, allegedly signed by both Love and Flynn on July 27, 1992. (ECF No. 1 at 6-7.) On February 9, 1993, Flynn faxed a partially executed copy of the '92 Agreement with only Love's signature, dated July 27, 1992. (ECF No. 287-22.) District Judge Du noted this logical oddity in her ruling on a Motion for Partial Summary Judgment—"[h]ad a fully executed agreement in compliance with § [6147] been executed on July 27, 1992, a copy of that Agreement with both signatures would have been later faxed on February 9, 1993" when instead, only a partially executed copy was sent. (ECF No. 120 at 13.)

On September 11, 1995, almost a year after Love settled the litigation, Love's accountant Ashley Quinn Nelson, CPAs ("Ashley Quinn") sent a letter to the Partnership discussing various accounting issues and requesting a copy of the settlement agreement and the '92 Agreement. (ECF No. 287-23.) On October 27, 1995, another letter was sent to the Partnership from Ashley Quinn discussing accounting issues and yet again requesting a copy of the settlement agreement and the '92 Agreement. (ECF No. 287-

2

24.) On January 31, 1996, Flynn faxed a response to the October 1995 Ashley Quinn letter addressing various accounting issues but did not include the settlement agreement nor the '92 Agreement. (ECF No. 287-25.) On February 23, 1996, Ashley Quinn sent another letter to Flynn discussing various accounting issues but also further emphasized their need for the settlement agreement and '92 Agreement:

> We have also requested several times, copies of the settlement agreement between Love and Wilson and your fee agreement with Mike Love. These agreements are necessary for tax purposes and as authorization for us to release any funds to your firm. Please have these copies sent to us at your earliest convenience.

(ECF No. 287-26.)

The implication here is that Ashley Quinn did not have the '92 Agreement. On April 1, 1996, Michael Tabb of the Partnership faxed a response to Ashley Quinn including **only** the settlement agreement and not the '92 Agreement. (ECF No. 287-27.)

According to the record submitted by the parties, there is no communication directly relevant to the validity of '92 Agreement for several years until 2017. On May 8, 2017, Stillman sent a demand letter to Defendants after Plaintiffs became aware that Defendants were engaged in negotiations to sell their interest in the 35 songs, which were the subject of the underlying representation. (ECF No. 287-3 at 2.) Stillman attached the fully executed settlement agreement and the jury verdict form to the letter but did not attach the '92 Agreement. (*Id.* at 7-48.) On June 1, 2017, Love's attorney responded to Stillman's demand letter, expressed that Defendants disagreed Plaintiffs had an ownership interest, and noted the only documentation found was "a retainer agreement of July 27, 1992." (ECF No. 287-4.) The implication is that Love's attorney was referencing the '92 Agreement, however, it is unclear what signatures, if any, are on the referenced agreement.

On August 3, 2017, Flynn emailed Love's attorney, Vincent Chieffo ("Chieffo"), about his "VERY GRAVE concern, [they] need a mechanism … to preserve evidence." (ECF No. 287-28 (emphasis in original).) On August 23, 2017, Chieffo emailed Flynn to discuss the dispute. (ECF No. 287-5.) Chieffo addresses the '92 Agreement as follows:

3

> The copy of the [92 Agreement] that I reviewed was faxed from your office to [Ashley Quinn] on February 2, 1993. That copy has Mike Love's signature dated July 27, 1992, but it does not have a signature by you or anyone else at your firm at that time. The search of the Love's and Ashley [Quinn]'s files did not disclose a fully signed copy. It would appear that the partially signed copy does not satisfy applicable California rules and law necessary to create an enforceable contingency agreement.

(ECF No. 287-5 at 2.)

On August 28, 2017, Flynn replied to Chieffo in an email of particular importance to the present motion because of the statements Flynn made and the files Flynn attached. (ECF No. 287-6.) In the August 28, 2017 email, Flynn demands that Love's attorney instruct Ashley Quinn to preserve evidence, while also explicitly mentioning litigation, judges, and the judicial process. "PLEASE SPECIFICALLY INSTRUCT THE ASHLEY FIRM TO **PRESERVE** ALL COMPUTER DATA, AND **PAPER RECORDS** ON THIS MATTER BETWEEN JULY 27, 1992 AND DECEMBER 30, 1995." (*Id.*) (capitalization original, emphasis added). "…resolution of this matter and **hopefully avoid litigation**." (*Id.*) (emphasis added). "…any **judge dealing with this matter** ..." (*Id.*) (emphasis added). "Again, we can save a lot of **judicial resources** by doing this work now." (*Id.*) (emphasis added). The '92 Agreement was attached to Flynn's email as a PDF file, created sometime between early 2017 and May 2017[3]. (ECF No. 287-7.)

Flynn attached a PDF version of the '92 Agreement to his August 28, 2017 email. The PDF version was different than the faxed version from 1993, signed only by Love, because the PDF had both Love and Flynn's signatures, each dated July 27, 1992. (ECF No. 287-7.) In their reply, "Defendants [claim they] now had for the *first time* fully executed copies of the ['92 Agreement] … after not having them for decades." (ECF No. 295 at 2:16-17.) (emphasis original). In his opposition, Flynn admits that "the copies he found were simply copies. Flynn has not had the original documents in over a decade."

---

[3] Defendants allege the PDF creation date in their briefing, (ECF 287 at 8:8-9), but no basis for this allegation is offered. The Court is aware that electronic files often contain metadata specifying the date of creation, however, Defendants have not claimed this as the basis of their allegation. Flynn argues "he found a copy of the ['92 Agreement] in early 2017, [and] he scanned it to his computer…" (ECF No. 288 at 8:9-11); *See also id.* at n. 6.

4

(ECF No. 288 14-15.) The Court now turns to the next alleged agreement.

### B. 1993 Amendment to the Fee Agreement (the "'93 Amendment")

There is no indication in the record that Defendants knew of subsequent amendments to the '92 Agreement until 2017. Stillman's May 8, 2017 demand letter declares that Plaintiffs "have a thirty percent ownership interest in [Love's] share of the 35 songs…" pursuant to the '92 Agreement and subsequent amendments (ECF No. 287-3.) On June 1, 2017, Love's attorney, Jay Cooper, refuted this declaration, stating "I have reviewed the files and find no documentation indicating that ownership. The only documentation having been found is a retainer agreement of July 27, 1992 …" (ECF No. 287-4.) In Chieffo's August 23, 2017 email to Flynn, he states that Flynn has asserted "some alleged, but as of yet undocumented, amendments to [the '92 Agreement] …" (ECF No. 287-5 at 3.) The '93 Amendment is mentioned, seemingly for the first time in Flynn's August 28, 2017 email. (ECF No. 287-6 at 2.) An <u>unexecuted</u> and <u>undated</u> PDF version of the '93 Amendment was attached to the email. (ECF No. 287-8.) Defendants claim this PDF was created just two days prior. (ECF No. 287 at 8:10); *See also* n. 3.

On September 15, 2017, Flynn sent an email to Chieffo, and the body states only: "Please see attached. Our lawyer will be taking over from here." (ECF No. 287-10.) The email includes five attachments, one of which is named "September 1993 executed amendment.pdf." (*Id.*) The document is an executed version of what appears to be the same '93 Amendment that was sent in Flynn's August 28, 2017 email, containing signatures of both Love and Flynn. Incidentally, this version contains no dates. (ECF No. 287-11.) Defendants have concerns about the authenticity of Love's signature on this document, (ECF Nos. 287, 295), and those concerns are countered by Plaintiffs in their opposition. (ECF No. 288.) The Court will next discuss the last amendment.

### C. 1994 Amendment to the Fee Agreement (the "'94 Amendment")

Like the '93 Amendment, the '94 Amendment is not explicitly mentioned in provided communications between the parties until Flynn's August 28, 2017 email to Chieffo. (ECF No. 287-6.) In that email, Flynn mentioned the '94 Amendment in the body

of the message but did not attach any copies of it. (*Id.*) Flynn described discovering the '94 Amendment, which he refers to as a "memo:"

> I have located my original notes of a meeting that I had with Mike Love on or about December 19, 1994, apparently the day before execution of the Wilson settlement documents; and the execution of a "memo" by Mike Love on or about that date relating to multiple issues involving the Wilson settlement and our fee agreement.

(*Id.*)

A version of the document itself does not appear until a September 15, 2017 email from Flynn to Chieffo. (ECF No. 287-10.) The filename of the attached document is "Dec 19, 1994 Executed Memo.pdf." (*Id.*) The document appears to be a client memorandum from Flynn to Love, one week after receiving the successful jury verdict and one day before Love and Wilson entered into the settlement agreement. (ECF No. 287-12.) This document has one unknown signature, appearing to be Love's (while the authenticity is disputed, the parties agree the signature resembles Love's style). (ECF No. 287-12 at 5.)

### D.  Plaintiffs' Response to Requests for Production

After Plaintiffs filed this case and discovery commenced, Defendants served "Requests to Produce Tangible Things to Michael J. Flynn, Set One," on or about August 19, 2022. (ECF No. 287-14.) This request for production asked for the original copies that Flynn scanned to create the PDFs that were: (1) attached to the August 28, 2017 email; (2) attached to the September 15, 2017 email; (3) attached to the Fourth Amended Complaint; and (4) all versions and/or copies of the three agreements. (*Id.*) The request gave specific instructions for Plaintiffs to produce the items to Fisher Forensic Documentary Laboratory, Inc., located in San Ramon, CA. (*Id.*) Defendants claim their expert has not received any of the requested documents. (ECF No. 287.)

In their opposition, Plaintiffs maintain that "Flynn truthfully responded to [the request for production] by explaining his belief that the Loves have the original 1992 Agreement and that he cannot identify which copies of the 1992 Agreement he used to create the PDF in 2017 (five years ago)." (ECF No. 288 at 10:11-13.) The opposition continues, "Flynn never destroyed or altered any of the documents used to create the

2017 PDFs … [and] Flynn continued to use the copies of the relevant agreements to make more copies …" (*Id.* at 10:15-18.) Flynn admits to "sloppy record keeping" and states "it would be impossible for Flynn, five years later, to figure out which copies of the agreements he scanned to create the PDF documents in 2017." (*Id.* at 3, 10.)

II. **LEGAL STANDARD**

Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending, or reasonably foreseeable litigation. *United States v. Kitsap Physicians Sys.*, 314 F.3d 995, 1001 (9th Cir. 2002) (citing *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (a party engages in spoliation "as a matter of law only if they had 'some notice that the evidence was potentially relevant' to the litigation before they were destroyed," altered, or lost); 7 Moore's Federal Practice - Civil § 37.120 (2023). A party has a duty to preserve evidence it knows or should know is relevant to a claim or defense of any party, or that may lead to the discovery of relevant evidence. *Id.*; *see also In re: Napster*, 462 F.Supp.2d 1060, 1067 (N.D. Cal. 2006) (duty to preserve begins when a party should have known that the evidence may be relevant to future litigation). The party seeking spoliation sanctions has the burden of establishing the elements by a preponderance of the evidence. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).

"There are two sources of authority under which a district court may sanction a party who has despoiled evidence." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). First, sanctions under Rule 37 against a party failing to obey an order to provide or permit discovery. Second, "the inherent power of federal courts to levy sanctions in response to abusive litigation practices." *Id.*

Courts also have the authority to sanction litigants for spoliating evidence as part of their inherent power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *In re Napster*, 462 F. Supp. 2d at 1066 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). "A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction

or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d at 1329.

### III. DISCUSSION

While the Ninth Circuit has not described a precise standard for determination of spoliation sanctions, the majority of courts in the circuit have adopted the following test: "(1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989-90 (N.D. Cal. 2012); see also *Hernandez v. Vanveen*, 2016 WL 1248702 (D. Nev. 2016). The party seeking spoliation sanctions has the burden of establishing all three elements. *Id.*

#### A. Control Over Documents and Obligation to Preserve

First, the Court addresses whether Plaintiffs had control of the evidence and had an obligation to preserve it in anticipation of litigation. The duty to preserve is triggered "not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation." *Morford v. Wal-Mart Stores, Inc.,* 2011 WL 635220 at *3 (D. Nev. 2011); see *Zublake v. UBS Warburg LLC,* 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

Here, Defendants have met their burden to show that Plaintiffs had a duty to preserve the documents used to scan the four PDFs because they provided evidence that Flynn subjectively anticipated litigation. Flynn repeatedly demanded throughout the summer of 2017 that Defendants needed to "PRESERVE ALL COMPUTER DATA, AND PAPER RECORDS." (ECF No. 287-6.) Simultaneously, Flynn mentioned potential litigation, judges, and the judicial system in his communications. (*Id.*) While the standard is objective on whether litigation was reasonably foreseeable at the time, Flynn's comments show a clear subjective intent for potential litigation that would be more than enough to conclude that he should have known <u>he</u> had a duty to preserve relevant evidence. Flynn argues it is unreasonable that he should have foreseen Defendants

1  would later want to have a forensic document expert look at versions of the agreements
2  he sent to Defendants. (ECF No. 288.) The Court disagrees—discovery is not a one-way
3  street. A dispute about versions of the agreements existed since at least June 1, 2017,
4  when Defendants' attorney replied to Stillman's May 2017 demand letter, noting that after
5  reviewing the files the only documentation found was "a retainer agreement of July 27,
6  1992." (ECF No. 287-4.) Therefore, Plaintiffs should have reasonably anticipated litigation
7  and should have known versions of the agreements would be relevant before the PDFs
8  were sent.

### B. Culpability in Loss of the Documents

Turning to the second prong, in the Ninth Circuit negligence is a sufficient state of mind to warrant even a mandatory adverse inference instruction. *Glover*, 6 F.3d at 1329 (simple notice of potential relevance to litigation is sufficient to impose sanctions for spoliation). A party spoliates evidence with a culpable state of mind when it willfully, recklessly, or negligently destroys, alters, or loses potentially relevant evidence. *See e.g.*, *Badger v. Wal-Mart Stores, Inc.*, 2013 WL 3297084, at *8 (D. Nev. 2013).

Ordinary negligence is the failure to identify, locate, and preserve evidence when a reasonably prudent person acting under like circumstances would have done so. *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 519 (S.D. W. Va. 2014). Proving gross negligence requires a similar showing, but to a greater degree. *Herman v. City of New York*, 334 F.R.D. 377, 384 (E.D.N.Y. 2020) (gross negligence "may exist where a party failed to take widely recognized steps to preserve materials relevant to a claim"); *Best Payphones, Inc. v. City of New York*, 2016 U.S. Dist. LEXIS 25655, at 17 (E.D.N.Y. 2016) (gross negligence is "a failure to exercise even that care which a careless person would use").

Here, Plaintiffs received a sizeable stream of income for decades from Defendants, based on these agreements. The Court finds it astonishing that Plaintiffs lacked the insight to place such important documents in safekeeping, demonstrating a reckless disregard of "care which [even] a careless person would use." *Id.* While Plaintiffs do claim

that "[i]t is likely that the signed originals of all three documents, including the September fee agreement are in the possession of the Loves in the files [Flynn] returned to them or in their own files," Defendants have denied this. (ECF No. 287-13 at 4 ¶ 5.) A reasonably prudent person acting under like circumstances would have preserved the documents on which a perpetual stream of royalty income depended. Therefore, at a minimum, ordinary negligence has been established—but the degree of recklessness suggests gross negligence.

Plaintiffs were not just objective, ordinary people; they were acting as attorneys with a "widely recognized" duty to take steps necessary to protect their client's interests. Plaintiffs were licensed and practicing in California at the relevant times herein, and California law and ethics rules governed their conduct. "Business and Professions Code § 6068(e) obligates the attorney 'at every peril to himself or herself to preserve the secrets' of his or her client. Business and Professions Code § 6149 states that the protection of § 6068(e) covers the written fee agreement with the client." Cal. Bar Ass'n Standing Comm. on Prof'l Responsibility, Formal Op. 2001-157, at 4-5 (2001); Cal. Bus. & Prof. §§ 6068, 6149. "Thus, the duty stated in § 6068(e) applies to the storage, handling, and ultimate disposition of the files and papers of former clients." *Id*. "A lawyer's violation of a rule may be evidence of breach of a lawyer's fiduciary or other substantive legal duty in a non-disciplinary context." Cal. R. Prof'l Conduct, rule 1.0, comment 1 (2023). *See Mirabito v. Liccardo,* 4 Cal. App. 4th 41, 44 (1992); *Fletcher v. Davis,* 90 P.3d 1216, 1222 (Cal. 2004) (enforcement of attorney's lien); *Chambers v. Kay*, 56 P.3d 645, 657 (Cal. 2002) (enforcement of fee sharing agreement).

Here, Plaintiffs admit that they engaged in "sloppy record keeping" and that "[e]xecuted copies of the agreements are likely in several potential locations with different individuals or law firms." (ECF Nos. 288 at 3:22-23, 287-13 at 4 ¶ 4.) Despite having over two decades to remedy the "storage, handling, and ultimate disposition of the files and papers of [Love]," Plaintiffs admit "there is no inventory system for itemizing or locating files, let alone their contents," as required. Cal. Bar Ass'n, *supra* at 4-5; (ECF No. 287-13

at 5 ¶ 2.) Therefore, Plaintiffs had a duty to preserve the agreements and were grossly negligent in the handling and loss of these relevant documents.

### C. Relevancy to Claims and Defenses

Finally, the Court turns to the third prong, whether the documents are relevant to Defendants' claims or defenses. In Nevada, the Rules of Professional Conduct permit a contingency fee to only be signed by the client. Nev. R. Prof. Cond. 1.5(c) ("A contingent fee agreement shall be in writing, signed by the client…"). However, these agreements were all signed in California, when the parties were residents of California, and Plaintiffs were licensed to practice law in California. Therefore, California law and the California Rules of Professional Conduct apply.

California "Business and Professions Code § 6147 requires attorneys who represent clients on a contingent fee basis to obtain signed written fee agreements from their clients." *Huskinson & Brown v. Wolf*, 84 P.3d 379, 383 (Cal. 2004). "[Section 6147] provide[s] that a failure to comply with [its] requirements renders an agreement voidable at the client's option…" *Id*. The relevant requirements of § 6147 are that both attorney and client shall each have a copy of the contract signed by both parties. In its July 1992 form, § 6147(a) stated: "An attorney who contracts to represent a plaintiff on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the plaintiff…" Bus. & Prof. Code § 6147 (Stats. 1986, ch. 475, § 6). Any contract making material changes to an existing contingency fee agreement must comply with § 6147, the statute requiring disclosures and signatures on contingency fee agreements. *Stroud v. Tunzi*, 72 Cal. Rptr. 3d 756, 761 (Cal. Ct. App. 2008).

Here, Defendants argue the original agreements may violate § 6147 and are thus voidable because Plaintiffs may not have contemporaneously signed the originals. Considering Ashley Quinn's repeated demands for Plaintiffs to provide a fully executed copy of the '92 Agreement, and Plaintiffs' continued dismissal of every opportunity to so provide, Defendants' suspicion is warranted. The appearance of a fully executed copy in

2017 is especially suspect, given the record shows the only agreement in existence for the prior 24 years was the partially executed copy faxed by Flynn in 1993.

The suspect origins of the PDFs extend to the two amendments ('93 Amendment and '94 Amendment), because their first appearance is in Flynn's August and September 2017 emails. The first '93 Amendment PDF sent by Flynn in August 2017 was undated and unsigned. However, in his September 2017 email, Flynn attached a second PDF version of the '93 Amendment, this time with two signatures, yet still undated. A PDF version of the '94 Amendment was also attached to Flynn's September 2017 email, but with only one signature. The Court finds Defendants' suspicion of these three PDF versions of the two amendments warranted, because amendments were not even mentioned until 2017, when both unsigned and signed versions appeared.

All versions of the agreement in Plaintiffs' possession in 2017 are relevant because there is at least a possibility the originals did not comply with statutory requirements, which might render them voidable by Defendants. Therefore, the documents are relevant, as their authenticity might establish the basis for Defendants' claims and defenses.

### D. Adverse Inference Sanctions are Appropriate

Sanctions for spoliation include dismissal of claims, exclusion of evidence, and adverse jury instructions against the party responsible for the destruction, alteration, or loss. *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368-70 (9th Cir. 1992). A court can instruct the jury that it may draw an adverse inference against the party responsible for destroying the evidence. *Glover*, 6 F.3d at 1329. The Ninth Circuit has held that a trial court's "adverse inference sanction should be carefully fashioned to deny the wrongdoer the fruits of its misconduct yet not interfere with that party's right to produce other relevant evidence." *In re: Oracle Corp. Securities Litigation*, 627 F.3d 376, 386 (9th Cir. 2010). "[A]n adverse inference instruction" lies on a spectrum "ranging in degrees of harshness. The degree of harshness should be dictated by the nature of the spoliating party's conduct—the more egregious the conduct, the more harsh the sanction." *Apple Inc. v. Samsung,* 881 F. Supp. 2d at 1150. "[T]he least harsh instruction

permits a jury to presume that the lost evidence is both relevant and favorable to the innocent party." *Id.*

Here, although Defendants have met each of the elements in showing that sanctions are warranted, the severe sanctions of deeming the agreements non-compliant or preclusion of any evidence as to their enforceability, are too extreme in this instance. Plaintiffs do not appear to have <u>intentionally</u> destroyed the documents, rather they were grossly negligent in managing their files.

However, this gross mismanagement has caused Defendants to suffer prejudice. Without the original agreements or the versions Plaintiffs used to scan the PDFs, Defendants are left without the opportunity to have their forensic document expert examine the several versions to determine their authenticity. Whether the documents complied with California's laws on contingency fee agreements is dispositive for Defendants. As discussed above, Defendants have reason to question the authenticity of the documents. Given the arguments in Defendants' motion, a jury could draw the same inference.

Balancing the need to deter future spoliation, to place the risk of an erroneous judgment on Plaintiffs, and to restore Defendants to the same position they would have been in, absent the wrongful loss of evidence, the Court recommends the least harsh adverse jury instruction. There is not enough evidence to show that Plaintiffs acted willfully to trigger a mandatory presumption and Plaintiffs should be able to enter rebuttal evidence to the jury. This sanction prevents Plaintiffs from benefitting from their own spoliation without restricting their right to produce relevant evidence.

### IV. CONCLUSION

Accordingly, the Court recommends Defendants' motion for sanctions, (ECF No. 287), be granted, in part, consistent with the above.

The parties are advised:

1. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and

Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## V. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that Defendants' motion for sanctions, (ECF No. 287), be **GRANTED, in part**, such that the Court recommends that:

- the District Court instruct the jury to presume that the lost evidence is both relevant and favorable to the Defendants, and
- the District Court allow the jury to consider the Plaintiffs' rebuttal evidence and then decide whether to draw an adverse inference against the spoliating party.

**DATED**: April 25, 2023

_____
UNITED STATES MAGISTRATE JUDGE